**No. 2014-1228**

========================================================

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

————————

OPTIMUM SERVICES, INC.,

Appellant-Petitioner,

v.

JOHN MCHUGH, SECRETARY OF THE ARMY,

Appellee-Respondent.

————————

Appeal from the Armed Services Board of Contract
Appeals in No. 57575
Administrative Judge Peter D. Ting

————————

APPELLANT-PETITIONER'S CORRECTED INITIAL BRIEF

————————

KARL F. DIX, JR.
SMITH, CURRIE & HANCOCK LLP
2700 Marquis One Tower
245 Peachtree Center Avenue NE
Atlanta, GA 30303-1227
(404) 582-8038
(404) 668-0671 –fax
email: kfdix@smithcurrie.com

RICHARD W. GOEKEN
SMITH, CURRIE & HANCOCK LLP
1025 Connecticut Avenue, N.W.
Suite 600
Washington, D.C. 20036
(202) 452-2140; (202) 775-8217 – fax
email: rwgoeken@smithcurrie.com

Counsel for Appellant-Petitioner

Dated:  April 18, 2014

Form 9

FORM 9.  Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Optimum Services, Inc.          v. U.S. Army Corps of Engineers

No. 14-1228

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Petitioner                  certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:
Optimum Services, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:
Not applicable.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:
None

4. ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:
Daniel J. Puckett of Smith, Currie & Hancock LLP

January 15, 2014
Date

Signature of counsel

Karl Dix, Jr.
Printed name of counsel

Please Note: All questions must be answered
cc: _____

# TABLE OF CONTENTS

**PAGE**

Table of Authorities ...........................................................................v

Statement of Related Cases.............................................................. vii

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUES............................................................1

STATEMENT OF THE CASE................................................................1

    A.    Overview Of The Facts .........................................................1

    B.    Procedural History.................................................................5

STATEMENT OF FACTS ......................................................................7

    A.    The "Aquatic Ecosystem Restoration Project" Contract .....................7

    B.    The Contract Indicated The Subsurface Conditions Of The Island And Provided Instruction For Designing The Timber Piles To Secure The Weirs ................................................10

        i.    Indication Of Subsurface Conditions........................................10

        ii.    Required Use Of Round Timber Pilings To Secure The Weirs ................................................................11

    C.    The Three Components of The Weir System......................................14

    D.    OSI Notifies The Corps Of A Differing Site Condition .....................17

    E.    Delay In The Corps' Completion Of Its Investigation Of The DSC ................................................................18

i

i.     Corps' Request For Proposal To Remove The Muck Field Identified With The Steel Rod ..........................................20

ii.     The Corps' Ongoing Investigation Into The Extent Of The DSC ...............................................................21

iii.     OSI Notifies The Corps That Its Delay In Investigating The DSC Has Breached The Contract ................22

iv.     The Corps Drafts Modification 4 For Removal Of The Muck Field And Admits That The DSC *Will* Impact The Design Of The Timber Piles ..........................23

v.     The Corps Finally Requests That OSI Provide A Proposal To Investigate The Extent Of Impact Of The DSC On The Timber Pile Designs ....................................24

vi.     As Anticipated, The New Core Borings Resulted In Changes To The Timber Pile Design.........................................26

        a.     First Re-Submittal Of The Timber Pile Design..............26

        b.     Second Re-Submittal Of The Timber Pile Design .........27

        c.     Third Pile Re-Submittal Of The Timber Pile Design And Subsequent Overhaul Of The Pile Design ..........................................................................29

F.     OSI Requests And The Corps Denies An Equitable Adjustment For The Impact Of The DSC On The Timber Pile Design And Installation Of The Weirs ..................................................31

SUMMARY OF THE ARGUMENT ......................................................33

ARGUMENT ............................................................................35

I.     Standard Of Review..........................................................35

II. The Board Erred As A Matter Of Law By Ruling That The Corps Had No Liability For The Delay Caused By Its Investigation Of The DSC From September 23, 2009 To December 4, 2009 .........................................36

    A. The Corps' Initial Investigation Of The DSC At The Site Of The Weir Pilings.........................................................................................36

    B. The Corps' Investigation Continued At Least Until December 4, 2009 While The Results Of Its Subsurface Investigation Were Applied To The Timber Pile Design...................................................39

    C. The Board Erred By Concluding That Execution Of Mod. 4 "Implicitly" Authorized OSI To Resume Installation Of The Weirs.....................................................................................................40

III. The Board Also Erred By Finding That The Redesign Of The Timber Pilings Was Not The Result Of The DSC ....................................................45

    A. Contrary To The Board's Ruling, Subsurface Conditions At The Site Of The Weir Piles Differed Materially From Those Indicated In The Contract...................................................................46

        i. The Contract Indicated That Commonly Available Round, Timber Piles Of Less Than 60' Would Be Used .........47

        ii. Both Parties Anticipated That The DSC Would Impact The Timber Pile Design...........................................................50

        iii. As Anticipated, After Discovery Of The DSC, Fundamental Changes To The Timber Pile Design Were Required ................................................................................51

    B. The Board's Finding That A DSC Did Not Exist, Was Based Based Solely On The Testimony Of An Expert, And Is Contrary To The Substantial Evidence ...............................................54

CONCLUSION ........................................................................................................60

iii

Addendum

Certificate of Service

Certificate of Compliance

# TABLE OF AUTHORITIES

**CASES**                                                             **PAGE**

*Brewer v. United States*
    *Postal Serv.*, 647 F.3d 1093 (Ct. Cl. 1981), *cert. denied*,
    454 U.S. 1144 (1982).........................................................................46

*E.L. Hamm & Assocs. v. England*,
    379 F.3d 1334 (Fed. Cir. 2004) .....................................................45

*Foster Constr. C.A. & Williams Bros. v. United States*,
    435 F.2d 873 (Ct. Cl. 1970)............................................................34

*G B & E Elec. Contractors*,
    ASBCA No. 34026, 87-3 BCA § 20,119 (1987).....................36, 39

*H.B. Mac, Inc. v. United States*,
    153 F.3d 1338 (Fed. Cir. 1998) ...............................................34, 47

*Ingalls Shipbuilding, Inc. v. O'Keefe*,
    986 F.2d 489 (Fed. Cir. 1993) .......................................................46

*J.C. Equip. Corp. v. England*,
    360 F.3d 1311 (Fed. Cir. 2004) .....................................................59

*Max Drill, Inc. v. United States*,
    427 F.2d 1233 (Ct. Cl. 1970) (*en banc*) (*per curiam*)............50-51, 54, 59-60

*McCormick Constr. Co. v. United States*,
    18 Ct. Cl. 259 (1989), *aff'd*, 907 F.2d 159 (Fed. Cir. 1990) ............48, 52, 55

*McHugh v. DLT Solutions, Inc.*,
    618 F.3d 1375 (Fed. Cir. 2010), quoting *Lockheed Martin IR Imaging
    Sys., Inc. v. West*, 108 F.3d 319 (Fed. Cir. 1997) ..........................35

*Northrup Grumman Information Technology v. United States*,
    535 F.3d 1339 (Fed. Cir. 2008) ....................................................48

*P.J. Dick Inc. v. Principi*,
    324 F.3d 1364 (Fed. Cir. 2003) ....................................................35

*P.J. Maffei Bldg. Wrecking Corp. v. United States*,
    732 F.2d 913 (Fed. Cir. 1984) .............................................34, 47

*Tom Shaw, Inc.*,
    DOTCAB No. 2109, 90-2 BCA ¶ 22,861 (1990)..........................48

## STATUTES AND REGULATIONS

28 U.S.C. § 1295(a)(10) (2011) ............................................................1

41 U.S.C. § 7107(b)(1) (2011)............................................................35

41 U.S.C. § 7107(b)(2)(C) (2011) .......................................................45

Fed. Cir. R. 47.5 ............................................................................ vii

## MISCELLANEOUS

http://www.publications.usace.army.mil/Portals/76/Publications/EngineerManuals/
EM_1110-2-2906.pdf (last visited April 18, 2014)................................12

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Fed. Cir. R. 47.5, there is no other appeal in or from this same proceeding that was previously before this or any other appellate court.  Counsel is not aware of any case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(10) (2011).  The

judgment and opinion appealed from are final.

## STATEMENT OF THE ISSUES

1. Whether the Board erred as a matter of law in denying, in its entirety, Appellant's claim under the Differing Site Condition clause where the agency's protracted investigation into the extent of the differing site condition delayed the work.

2. Whether the Board erred in ruling that no differing site condition existed by relying exclusively on the testimony of the government's expert witness, to the exclusion of the contemporaneous statements and conduct of the parties demonstrating the existence of a differing site condition.

## STATEMENT OF THE CASE

### A.    Overview Of The Facts

This dispute arose out of a contract awarded by the Army Corps of

Engineers ("Corps") to Optimum Services, Inc. ("OSI") on June 19, 2009, which

called for rebuilding of a dredged spoil disposal area on Lost Creek Island

("Island") in the intercoastal waterway of Florida.  The wet spoils were to be

"dredged," *i.e.*, pumped directly from the floor of the Rose Bay into the rebuilt

disposal area to drain, such that:  sediment would settle out and remain on the

Island, while water would pool in front of weirs and then be allowed to return to

1

the intercoastal waterway at a controlled rate by passing over the weirs.[1]  The

Island had the purpose in the 1970s.

OSI was to design and install the weirs which, pursuant to the contract, were

to be anchored in place with commonly available, round timber piles.  The contract

required the contractor to design the timber piles based on subsurface conditions

disclosed in core borings data provided by the Corps in the contract and in

accordance with a Corps' Pile Design Manual also identified for use by the

contract.

On September 23, 2009, while clearing dense vegetation so that installation

of the weirs could begin, OSI encountered for the first time an area where its

equipment sank into the soil.  The area was located in front of, *i.e.*, to the south of

where the old weirs had been, and encroached into the area where the piles for the

new weirs were to be driven.  The parties surmised that this was the area where

sediment ("muck") had settled out from the wet, dredged spoils when the Island

had been used previously for draining dredged spoils decades earlier.  OSI reported

the area as a Differing Site Condition ("DSC") to the Corps that same day.

---

[1]A "weir" is a structure that initially blocks the flow of water in front of
itself, causing the water to pool, and then allowing the water to be released at a
steady rate over its top.  A photo of the weirs in this case is found at Appendix
("A") at 989.  (One of the weirs is being installed in the vertical position while the
other weir is lying sideways on the ground awaiting installation.)

Under the DSC clause of the contract, the Corps had a duty to promptly investigate the DSC and advise OSI how to proceed.  Add26.[2]  In this case, however, the Corps' investigation proceeded slowly, and only belatedly did the Corps even authorize additional core borings to ascertain the full extent of the muck where the weirs were to be installed.  Such borings were plainly necessary, however, because the nearest core boring provided by the Corps in the contract documents was at least 75' to 100' away from where the weirs were to be installed and had not disclosed the existence of the muck.  In internal emails the Corps acknowledged that the newly discovered muck "will have a significant impact on the design of the piles [to anchor the weirs]" (A685) but also raised a serious concern because the Corps had "minimal funds available for any changes" (A632) to the contract.

The new borings, belatedly authorized by the Corps to investigate subsurface conditions at the site of weir pilings, were not completed and a report of their findings not issued until November 11, 2009, *i.e.*, more than six weeks after the OSI had advised the Corps of the DSC.  The report showed that the subsurface

---

[2]Citations to the Addendum attached to this brief are abbreviated "Add."

3

conditions at the site of the weir pilings were less able to provide support for the pilings than the contract borings had indicated.

Before the DSC had been discovered, the Corps had approved OSI's original design for the weirs, which called for weirs to be anchored by the use of two 50' long, round timber piles per weir embedded to a depth of 25'. Based on the results of the new core borings, however, OSI's pile engineer redesigned the weir piles and called for four timber piles per weir, embedded to a depth of 28'. Despite the considerable increase in support afforded by the four-pile design, the Corps rejected the new design on the putative basis that it did not provide enough support for the piles to anchor the weirs. Thereafter, in December of 2009, OSI's pile engineer prepared and submitted two additional timber pile designs – the second of which called for timber piles over 100' in length – but neither design was approved by the Corps. Single piles in excess of 90' would have had to have been ordered months in advance and the contract prohibited splicing together of two or more piles to obtain a desired length.

Faced with these facts, OSI raised the possibility with the Corps of alternatives to timber piles of commonly available lengths to anchor the weirs as had been indicated by the contract. The Corps eventually acknowledged its willingness to consider the use of steel helical piles to anchor the weirs. Although

4

this design was not permissible under the original terms of the contract, the Corps eventually approved the use of helical steel piles to anchor the weirs on January 27, 2009, more than four months after the DSC had been discovered and reported to the Corps.

### B.     Procedural History

OSI submitted a request for equitable adjustment on December 15, 2009 seeking $1,012,184.95 in estimated increased costs and the addition of 83 days to the contract due to delays caused by the DSC as of that date. A744-766. OSI noted that the delays were ongoing, and had become so protracted that even the limited work that it could perform on the Island during the delay (albeit much less efficiently than anticipated) was now complete and OSI had, therefore, gone on standby. At that time, OSI's second submittal for the redesign of the timber piles was pending with the Corps. *Id*. OSI remained on standby for over a month.

David R. Tolle, the Corps' Administrative Contracting Officer ("ACO"), responded to OSI's request for equitable adjustment under the DSC clause by letter dated December 22, 2009. He acknowledged that the Corps was responsible for "any modifications relating to the physical construction of the weir structures (such as changes to the lengths or diameters of the piles) required due to the DSC." A769. ACO Tolle further explained that the extent to which the DSC had

5

impacted the pile design could not be determined *yet,* because the Corps had not approved any of the pile designs submitted by OSI. *Id.* Although the new core borings had been completed and a report of their findings available since November 11, 2009, ACO Tolle did not claim that the new borings established that no DSC existed at the site of weir pilings.

After the Corps (1) had indicated its willingness to accept something other than timber piles required by the contract, (2) the use of the steel helical piles had been approved by the Corps, and (3) the steel piles had been installed, OSI filed an updated and certified request for equitable adjustment on May 10, 2010, seeking an equitable adjustment in the amount of $2,297,066.45, as well as an additional five months of contract time due to the delays caused by the DSC. A777-847. The Corps denied this claim in its entirety in a letter titled "notice of intent to issue Contracting Officer's final decision." A873-878. The putative basis for the Corps' denial was that the new core borings had confirmed that the DSC did not extend into the weir area and, therefore, no additional changes to the Contract were required or compensable. A877. The Contracting Officer's ("CO") letter did not address why, after the new core borings were performed, the Corps had rejected three timber pile design submittals, each of which increased the number and/or length and/or the depth of embedment of the timber piles, nor did the letter address

6

why the Corps approved a change from round timber piles to helical steel piles,
something that was not contemplated by the original contract.

Thereafter, OSI provided additional supporting information to the CO and
met with the Corps in an effort to resolve the dispute; however, these efforts were
not successful as the Corps adopted the position that OSI already had been
compensated for the DSC by being paid to remove a portion of the muck and, since
no DSC existed where the weirs were to be constructed, OSI was not due any
additional payment or time beyond the small payment it had received for
conducting the new borings. A883-892. Accordingly, on November 29, 2010,
OSI requested that the CO issue a final decision on OSI's claim (A881-882), which
the CO issued on March 4, 2011 and which, once again, denied OSI's request for
an equitable adjustment in its entirety.

OSI timely appealed the CO's final decision to the Armed Services Board of
Contract Appeals ("Board") and now timely appeals to this Court from the Board's
September 10, 2013 decision denying OSI the relief it requested.

## STATEMENT OF FACTS

### A. The "Aquatic Ecosystem Restoration Project" Contract

On March 10, 2009, the Corps solicited bids for the "Aquatic Ecosystem
Restoration Project" Contract ("Contract"). A341-553. The purpose of the

7

Contract was to restore natural tidal processes and deteriorated oyster habitat by removing accumulated silt and sediment within Rose Bay, which is located adjacent to the intercoastal waterway in Florida. *See* A341; *see also* Add2. The Contract called for dredging of up to 152,000 cubic yards of sediment from the floor of Rose Bay to the Island. *Id.* The sediment was to be pumped directly into a dredged spoil disposal area at the Island, where the sediment would be retained while water was allowed to drain back into the intercoastal waterway. *Id.*; Add3. The Island had been used for a similar purpose during the 1970s. *See* A626.[3]

The Contract consisted of a base item for reconstruction of the dredged spoil containment area on the Island, as well as three option items for the dredging work. Add2. Work under the base item included:

1. Reconstruction of the old dredged spoil containment area by rebuilding a pear-shaped embankment within which the dredged spoils would be placed to drain and dry;

2. The removal of two existing weirs; and

3. The installation of the two new weirs.

---

[3] An aerial photograph showing the condition of the Island and the outline of the abandoned containment area before work began is found at A972.

8

*Id.*[4]

Simply put, each weir is a partially submerged, half-barrel structure, which functions as a means to moderate the release of water back into the intercoastal waterway as it drains from the sediment in the containment area. *See* A989. As water drains from the dredged sediment, it collects in front of the weirs and, while pooled there, remaining spoils and suspended materials settle-out and is retained on the Island. Add2; *see also id.* At the same time, water relatively free of sediment at the top of the pool is allowed to flow over the weir and return to the intercoastal waterway via a 36" pipe at the bottom of each weir. *Id.*; *see also* Add3. The height of the weir facing the pooled water is adjustable over a range of 17' by inserting boards called "flashboard risers" across the open mouth of the weir. *See* A939; Add2-3. By adjusting the height of the weir, by inserting or removing flashboard risers, the flow of water is controlled such that only the clear water near the top of the pool is released back into the intercoastal waterway. *See* Add2-3. Because the partially submerged weirs are subject to buoyant and, therefore, subject to uplift pressure from the water in the containment area, the Contract specified that the contractor was to anchor the weirs with **timber** piles.

---

[4]The embankment that encloses the dredged spoil disposal area is also referred to by various descriptions including "dike," "levee," or "berm." Add2.

A474-501, A906-910. The new weirs were to be installed near to where the old weirs had been located, *i.e.*, at the narrow, northern end of the pear-shaped embankment. *See* A971.

As noted, in addition to the base work on the Island, the Contract contained three option items for the dredging of sediment for disposal on the Island. A341. As a practical matter, however, the dredging work could not begin until the spoil containment area was rebuilt on the Island. A916 (Tr. 1/101:9-14). Additionally, the embankment around the dredged spoils containment area had to be built to a height even with the newly installed weirs. *See* A777. As such, installation of the weirs was on the critical path for completion of the containment area on the Island and the subsequent dredging work, a fact that was well known and acknowledged by the Corps. A945 (Tr. 2/178:10-12) ("The weir submittals and the weirs were on the critical path, along with the dike construction . . .").

**B.** **The Contract Indicated The Subsurface Conditions Of The Island And Provided Instruction For Designing The Timber Piles To Secure The Weirs**

**i.** **Indication Of Subsurface Conditions**

The Contract solicitation contained a "Geotechnical Data Report" (A229-336) prepared by the Corps, which assessed the subsurface conditions on the Island via 20 core borings, *i.e.*, CB-LCI103-1 through CB-LCI103-20. A238. Based on

10

the results of these borings, the Corps advised contractors that "[c]onsistently

throughout the site, the spoil material is comprised of light brown clean medium

dense fine quartz sand with minor amounts of shell and trace silt." A230. The

Contract stated that the borings were "representative of subsurface conditions at

their respective locations and [the conditions revealed by the] vertical reaches . . ."

(A239) and the Contract did not require OSI to perform any subsurface

investigations of its own. *See* A342. For purposes of designing the timber piles,

the Contract referred the contractor to boring CB-LCI103-10 ("CB-10") which was

the boring most proximate to where the piles for the weirs were to be driven even

though it was located at least 75' to 100' from the new weir structure and outside

of the embankment. Add3. The log for CB-10, consistent with the conclusion of

the Corps' Geotechnical Report of the site as a whole, identified fine-grained,

natural sand from an elevation of -5.0' to -38.0' with only trace amounts of silt.

A279-282.

> ii.    **Required Use Of Round Timber Pilings To Secure The Weirs**

The uplift pressure on the partially submerged weirs was to be counteracted

by attaching the weirs to round timber pilings. *See* A64; A475-482. The

contractor was to determine the number of timber piles to be used, their design and

the depth to which the piles were to be driven by taking the subsurface core boring

data provided by the Corps and applying it via the methodology "outlined in EM

1110-2-2906, Design of Pile Foundations" ("Corps' Pile Design Manual").[5]  A685.

Thus, although the contractor was to "design" the weir piles, the Corps required the

use of timber piles, the design of which was to be based on subsurface data

provided by the Corps, and the depth to which the piles were to be driven was to be

calculated by using the Corps' Pile Design Manual.  A475-482.

     In this latter regard, the Corps' Pile Design Manual emphasized the

importance of subsurface borings on pile design:

> subsurface explorations are the first consideration from site selection
> through design. These investigations should be planned to gain full

---

[5]EM 1110-2-2906 refers to the Corps' Manual for the "Design of Pile Foundations" dated January 15, 1991.  Add27-212.  The Pile Design Manual is also publicly available at http://www.publications.usace.army.mil/Portals/76/Publications/EngineerManuals/EM_1110-2-2906.pdf (last visited April 18, 2014).  The Corps' Pile Design Manual recognizes that the availability of piles of appropriate lengths for a project is an important consideration because:

> Piles must be available in the lengths required, or they must be spliced
> or cut off.  Project scheduling may make lead time an important
> consideration, since some piles may require up to 6 months between
> order and delivery.

Add42.  The Contract prohibited the contractor from splicing piles together to achieve the desired length.  *See* A480.

and accurate *information beneath* and immediately adjacent to the structure. *The investigation program should cover the area of the foundation and, as a very minimum, extend 20 feet below the tip of the longest pile anticipated.*

Add45 (emphasis added).[6]

The Corps' boring at CB-10 extended to a depth of 51.5'. A281-282.

Thus, based on its Pile Design Manual, the Corps indicated that the tip of a pile

driven into subsurface conditions like those at CB-10 would be embedded to no

more than approximately 31.5' (*i.e.*, 51.5' minus 20'). *See* Add45. Given that the

height of the weir was 21.5' (A65), the total length of a timber pile to anchor the

weir indicated by the Contract provided to prospective bidders was 52'. This was a

length commonly stocked by pile suppliers. Add13.

On June 19, 2009, the Corps awarded the Contract, with all three dredging

options, to OSI (Add2) and issued the Notice To Proceed on August 5, 2009,

thereby establishing the contract completion date 324 calendar days later, *i.e.*, June

25, 2010. A554-555; A555(a); A555(c); A914-914(a) (Tr. 1/88-20-25; 89:1-8).

Aerial photographs taken during August and early September of 2009 show the

---

[6]Even the Corps' expert acknowledged the importance of core borings extending below the anticipated tip of the pile, because "we need to understand if there's any bad conditions below the pile." A966 (Tr. 3/70:14-15).

considerable progress OSI made in preparing the Island for installation of the weirs. A972-973.

### C. The Three Components Of The Weir System

The Contract identified three discrete components of the weir system: (1) the half-barrel weirs, (2) the elevated wooden walkway to access the weirs, and (3) the timber pilings to anchor the weirs. A907 (Tr. 1/72:18-19). Pursuant to the approved August 21, 2009 construction schedule (A914-914(a) (Tr. 1/88-20-25; 89:1-8)), OSI was to begin installation of the weirs on September 19th, and installation was to be completed on October 6th. A915 (Tr. 1/90:6-7). The approved construction schedule was "tight;" accordingly, at the pre-construction meeting, the Corps instructed OSI to provide submittals as soon as they were ready for review. A909-910 (Tr. 1/74:24-24; 75:1-2).

On August 28, 2009, OSI provided its submittal for the weirs and the elevated walkway by which the weirs could be accessed. A556-571. On September 9, 2009, OSI submitted the drawings for the weir pilings, which included calculations for both the number of piles and their lengths. *See* A572-601. Thus, as of September 9, 2009, the Corps had the requisite drawings for the three components of the weir (weir, elevated walkway and weir piles). *Id.*; *see also* A917-918 (Tr. 1/119:14-22); Add6 at ¶ 16. Because the installation of the

14

weirs was critical to the timely completion of other work, including the ability of

OSI to efficiently access other areas at the site, the weir submittals were among the

first OSI made to the Corps.  A909-910 (Tr. 1/74:24-25; 75:1-7).  Although OSI

requested at that time, and repeatedly thereafter, that the Corps expedite its review

of these crucial submittals, A903-909; A911-912, none of the submittals was

returned to OSI on an expedited basis, or even within the maximum 30-day review

period provided for by the Contract; but, as the Board found, the reviewed hard

copies of the submittals were not returned until November 25, 2009, *i.e.*, 89 days

after the first weir submittal was made.  Add6.

Based on the subsurface conditions revealed by the Corps' borings

(specifically including CB-10), the Corps' Pile Design Manual and the Corps'

requirement that wooden piles be used, OSI's submittal called for the weirs to be

anchored by two 50' long, 12" diameter, timber piles per weir, driven a minimum

of 25' into the sand zone.  *See* A594; A879.[7] The submittal advised the Corps that

OSI's pile engineers:

> have accordingly utilized soil information from the closest soil boring
> and have determined pile lengths from formulas given for timber pile
> design in [the Corps' Pile Design Manual.  We] have not made any

---

[7]OSI subcontracted the design and construction of the weir and piling.  *See* Add5.

15

independent evaluation of the pile capacity, and we are relying totally
on the information furnished to us as being correct and indicative of
the foundation conditions at the location of the structure.

A580-581.

On September 18, 2009, the Corps returned the Pile Design submittal to OSI

via the Corps' electronic Quality Control System ("QCS"). A574. The Corps'

remarks stated that:

-This transmittal had been coded "C."
-See comments on attached.
-Does not appear that the piles are adequate in wind loading.
-The pile does appear to [be] adequate for uplift.

*Id.* A submittal coded "C" means "Approved, except as noted on drawings"

(A372); however, no drawings containing the Corps' comments were attached to

the Corps' electronic approval. A574. As ACO Tolle testified, a shortcoming of

the Corps' QCS electronic system was that documents larger than 8½ x 11, such as

OSI's timber pile design drawings, could not be returned electronically to the

contractor after review and, therefore, the Corps had "to physically give the

drawings back to the contractor, with the marked up comments included on there."

A941 (Tr. 2/138:1-3).

Based on the Corps' return of the timber pile submittal via QCS on

September 18, 2009, OSI understood that its design had been approved, albeit with

16

exceptions that were yet to be provided by the Corps. Thereafter, OSI *repeatedly* requested that the Corps return the hard copy of the pile drawings with its comments, including asking the Corps to bring those drawings to weekly progress meetings, a November partnering meeting, and/or deliver the hard copies via Federal Express.[8] The Corps, however, did none of these things, and OSI only received hard copies of the weir pile drawings on November 25, 2009, 77 days after they had been submitted. A912 (Tr. 1/86:9); Add6.

### D. OSI Notifies The Corps Of A Differing Site Condition

On September 23, 2009, two weeks after OSI provided its submittal for the timber piles to the Corps, work on the Island was halted by the discovery of an area where the ground yielded under the weight of OSI's vehicles. A627-629; *see also* A632-641. The area contained wet organic material (*i.e.*, "muck") and was located adjacent to where the new weirs were to be installed. *Id.*; A919-921. As required by the Differing Site Conditions Clause ("DSC") (APR 1984) of the Contract,

---

[8]*See*, *e.g.*, A646-648 (Corps' recognition of repeated requests by OSI for the review and approval of the weir submittals); A672 ("design plans for the Flashboard Riser Submittal is currently over 45 days in review by the USACE. We are currently looking to expedite materials and upon confirmation of delivery we'll need to discuss delays caused by the extended review process"); A903 (Tr. 1/68:9-11) ("I kept asking [the Corps] for the backup material so I can have my engineer address [the Corps' comments]. But I was never given that. It was being held from me").

A159, OSI immediately reported this discovery to the Corps and requested further direction about how to proceed (A624) and reminded the Corps that *OSI would need to be working in the area within a week or the construction schedule would be impacted*. A630-631.

The next day, ACO Tolle was advised, via internal Corps email, that the DSC reported by OSI "appears to coincide with the location of the old weir structures and this material quite possibly may be fine grained material that settled out in front of the weirs back whenever the site used to be active (1970's?)." A626. The new weirs were to be located between the site of the old weirs and the area where the muck was found. A920 (Tr. 1/122:1-11); A971.

**E.     Delay In The Corps' Completion Of Its Investigation Of The DSC**

The DSC clause of the Contract provides that "The Contracting Officer shall investigate the site conditions promptly after receiving the notice [of a DSC]." A159. On September 25, 2009, the Corps conducted a preliminary investigation at the site, which focused on:

> an area of fine grained dredge sediments discovered at the approximate location of the old weir structure. It is assumed that *the material found is a result of fine grained sediments that settled out from the weir structure when the dike was originally used*. Though no plans or As-Builts exist for the original dike, the dilapidated weir was found in this vicinity.

18

A649 (emphasis added).

The Corps' investigation consisted primarily of ACO Tolle using a 5' steel pole in an effort to assess the basic contours of the field.  A649-650; *see also* A942-944.  The ACO identified an area roughly 100'x50' and at least 5' deep (the steel pole could go no further) containing muck, near the area where the weir pilings were to be driven.  *See* A971.  Ms. Owens, the Corps' soils scientist who also attended the site visit, concluded in a memorandum that, despite the ACO's use of the metal rod, "the exact extent of the subsurface muck cannot be determined without additional investigation (i.e., test pits)."  A650.

Later that same day, ACO Tolle sent an email of "high importance" to members of the Corps' team addressing the DSC forwarding pictures of the muck environment during the site visit and stating that "[T]he muck is located . . . near the location of the new weirs. . . .  We will need to develop a Scope of Work for addressing this issue . . . As most of you are aware, we only have minimal funds available for any changes, so we need to keep the solution simple and timely (as possible – without jeopardizing the dike integrity)."  A632.

Three days after the site visit, ACO Tolle sent a letter to OSI forwarding a copy of the DSC clause and explaining that OSI was "to not work in the area identified (between Sta. 2+85 and Sta. 3+85) until such time as you are provided

additional direction" and that the Corps' "Geotechnical personnel are continuing their investigation of this situation." A642. The area between the two stations included the site where the weir piles were to be installed. A920 (Tr. 1/122:1-11); A971.

### i. Corps' Request For Proposal To Remove The Muck Field Identified With The Steel Rod

Thirteen days after OSI reported the DSC, the Corps requested that OSI submit a proposal to address the muck field. A653-654. The Corps' request, however, provided no information about the status of the Corps' ongoing investigation into the full extent of the DSC and, as of that time, the Corps had neither undertaken nor authorized any additional subsurface investigations into the extent of the muck where the weirs were to be installed as its own soils scientist had recommended. A649-652. Moreover, the Corps continued to retain the hard copies of the pile drawings containing the Corps' comments so that no progress could be made on them by the OSI engineer. A903 (Tr. 1/68:9-11). On October 12th, OSI responded to the Corps' request with a proposal to remove the portion of the muck field found through the use of the steel rod. A656-657.

### ii. The Corps' Ongoing Investigation Into The Extent Of The DSC

On October 13, 2009, *i.e.*, 20 days *after* OSI reported the DSC and more

than 30 days *after* OSI provided the last of its submittals for the weirs, Ms. Owens,

the Corps' soils scientist, sent an email internally to, among others, Corps Project

Engineer, John Wilson, and ACO Tolle again asking:

> if there is a suspicion that the muck is located where the piles are to be
> installed, we may have to ask the contractor to re-calculate the FS [*i.e.*
> "Factor of Safety" consideration in pile design] based on the new
> material. Any chance of getting of [sic] test pit completed in the
> vicinity of the piles?

A668. Later that day, Mr. Wilson emailed OSI regarding OSI's weir submittals

that had been pending for more than a month, and stated:

> The District [Headquarters of the Corps in Jacksonville] has expressed
> some concerns regarding your submittal design data which was based
> on nearby core boring information [*i.e.*, CB-10 provided in the
> contract documents]. Espec
> ially in light of the muck DSC nearby *suggesting that data used in the*
> *design analysis may not accurately represent the soil conditions at*
> *and around the proposed location for pile driving. There have been*
> *some discussions concerning the value of excavating test pits in order*
> *to confirm the soil type used by your designer in his analysis.*

A669 (emphasis added).

The email, however, neither authorized OSI to dig test pits nor did it indicate

whether the Corps planned to investigate its concerns. OSI responded to the

Corps' email that same day and explained the weir design submittals had been made "based on the project's borings and prior to the discovery of the [DSC]" and that unless additional test pits or borings were made, it would be difficult to ascertain the extent of the change, if any, to the weir piles. A655.[9] OSI also indicated its willingness to assist with the Corps' subsurface investigation but, because it was engaged in the critical path of its construction schedule, could only do so on an overtime basis as authorized by the ACO. *Id.*

### iii. OSI Notifies The Corps That Its Delay In Investigating The DSC Has Breached The Contract

On October 19, 2009, OSI notified the Corps that it was in breach of contract and that, although OSI was slightly ahead of schedule with respect to the construction of the embankment, the ongoing delays in resolving the DCS would push OSI past the anticipated contract completion date and, in the absence of clear direction from the Corps for dealing with the DSC by October 21, 2009, OSI would be forced to demobilize. A670-671.

---

[9]This was a conclusion that the Corps' soils scientist had reached based on the site visit weeks earlier. A649-650.

22

### iv. The Corps Drafts Modification 4 For Removal Of The Muck Field And Admits That The DSC *Will* Impact The Design Of The Piles

On October 21, 2009, the Corps issued Modification 00004 ("Mod. 4") in response to OSI's proposal for dealing with the 100'x50' muck field. A679-683. By its terms, Mod. 4 allowed for just three additional days of contract time to remove the muck field at a total cost to the Corps of $13,100.22. *Id.* Although the Corps had yet to conduct or authorize an investigation into the extent of muck at the nearby site of the pilings, Mod. 4 included the following "Closing Statement"

> the Contractor hereby releases the Government from any and all liability under this contract for further equitable adjustments attributable to such facts or circumstances giving rise to [Mod. 4].

A683. Due to the Corps' insertion of this language, and with the investigation of the DSC at the pilings yet to be authorized, that same day OSI informed the Corps that it would not execute Mod. 4 "until review of the design drawing submittals are received, an RFP [to investigate the extent of the DSC] is received, or further clarification is given to the design of the [weirs]." A678. OSI also requested a partnering meeting with the Corps at the earliest possible time. *Id*.

In internal email communications responding to OSI's notice of breach, ACO Tolle acknowledged the next day that the new weir structures were to be installed "*in the same area where the muck was encountered [which was] also the*

23

*location of the old weir structures*" and further conceded that the subsurface data provided by the Corps in the Contract documents for use by OSI in designing the piles, "does not indicate the presence of muck and *this muck will have a significant impact on the design of the piles*." A685 (emphasis added).

> **v.** **The Corps Finally Requests That OSI Provide A Proposal To Investigate The Extent Of The Muck Impact Of The DSC On The Pile Designs**

On October 26, 2009, more than a month after OSI had reported the muck area and only after having been notified by OSI that its ongoing failure to investigate the extent of the DSC was a breach of contract, the Corps requested that OSI submit a proposal for

> a geotechnical investigation of the location where the weirs will be constructed . . . to evaluate the effect of the deposit of [the muck] on the weir design and the design of the associated pilings.

A686. The Corps indicated that it intended to prepare a new modification for the redesign of the pile lengths resulting from the geotechnical investigation. A687. The Corps' request did not attempt to estimate or provide additional time for the delay to OSI construction schedule already caused by the investigation of the DSC or that would arise from the geotechnical investigation and necessary redesign efforts. *Id.*

OSI hired Universal Engineering Sciences ("UES") to perform the geotechnical investigation (A689), which took place on October 29, 2009, and consisted of three core borings ("B"):  B-1 was taken at the location of the proposed weir pilings; B-2 was taken 30' to the northeast of CB-1 and between the two 36" outfall pipes; while B-3 was taken 80' northeast of the weir structures and also between the outfall pipes.  *See* A689-692; A971.  UES submitted a report of the conditions at the sites of the three borings on November 11, 2009, and found that although conditions at new core B-3 were roughly consistent with conditions at CB-10, conditions at new core borings B-1 and B-2 were not.  A689-690.

After the new borings had already been completed and before any redesign of the weir pilings had been made, the parties executed Modification 5 ("Mod. 5"), pursuant to which the Corps agreed to pay OSI a total of $12,320.06 to conduct the borings as part of the Corps' investigation into the extent of the DSC.  A693-694.  By its terms, Mod. 5 deferred consideration of additional time or money "for any changes in the physical construction of the project such as additional lengths of pilings or increased diameters of pilings."  *Id.*

25

### vi. As Anticipated, The New Core Borings Resulted In Changes To The Pile Design

#### a. First Re-Submittal Of The Timber Pile Design

OSI's pile engineer, CBC, applied the results of the new core borings to the contract requirements that: (1) round timber piles be used; and (2) the piles be designed pursuant to the Corps' Pile Design Manual. The result of this analysis was that the "skin friction" value dropped from 226 pounds per square foot ("psf") as had been the case using soil characteristics provided by the Corps in CB-10 (A593; A879); to just 172 psf, based on the subsurface conditions revealed at the site of the piles by new boring B-1. A879-880.[10] Based on the new core borings of the subsurface conditions at the site of the new weir pilings, CBC revised its pile design from just two timber piles of 50' in length with 25' feet of embedment (A590; A594), to *four* timber piles of a minimum 50' in length with 28' of embedment. A879; *see also* A932-936. Given the greatly enhanced uplift capacity of four more deeply embedded piles as compared to two piles that had been

---

[10]"Skin friction" describes the inherent ability of soil to resist uplift pressure, *i.e.*, as even the Corps' expert had to acknowledge where, as is the case here, friction piles are used: "What's resisting that pile movement . . . is the friction of the soil around the pile." A948 (Tr. 3/39:17-19). Thus, based on the site-specific core borings, the soil was less able to resist uplift than had been the assumption based on CB-10, which was some 75' to 100' away from where the piles were to be driven.

26

approved by the Corps in the original piling submittal, OSI anticipated no
problems with this approach.  A969-970.

The revised timber pile design was submitted to the Corps on or about
November 20, 2009.  A733.  Although the Corps had approved the original
calculation of the uplift capacity and resulting design utilizing just two timber piles
per weir (A574), following the new core borings at the site of the piles, the Corps
*rejected* OSI's redesign doubling the number of piles and increasing their length.
A733.  The reason given by the Corps for its rejection of the redesign was that the
"[u]plift capacities will likely be *much less than* those currently calculated" (A697
(emphasis added)), *i.e.*, the additional measures that OSI took to combat uplift
were not sufficient in light of the new core borings.[11]

### b.    Second Re-Submittal Of The Timber Pile Design

Upon the Corps' rejection of the first redesign of the piles, OSI's engineer
re-calculated the uplift capacities, and prepared a second pile re-design dated
December 3, 2009, which called for four timber piles, and this time each of  the
piles was to be a minimum of 58' long and embedded 36'.  *See* A741-743; A879-

---

[11]Although the Corps' comments on the original design drawings indicated
that the wind loading analysis did not appear to be adequate, after the new core
borings were made, the Corps did not appear to question any of the redesigned
piles with respect to wind loading.  *See* A938.

880.  As a practical matter, a minimum pile length of 58' meant that OSI would likely have had to obtain somewhat longer piles.[12]  Piles greater than 60' in length had to be custom ordered, while seventy-foot piles required 3-4 weeks to obtain, and piles of greater than 90' had to be ordered three to four months in advance. A899; A742.  Due to the increasing length of piles in the redesigned submittals, the Corps' internal emails reveal that, even before the second redesign submittal was made, the agency recognized a need to consider engineering alternatives to the use of timber piles, not provided for by the Contract, to address the fact that the uplift capacity of the soil at the site of the pilings was less than anticipated by the Contract documents.  A734 ("The Contractor is reporting that the Engineer has specified 60-foot long piles for the weirs to counteract the uplift forces.  The 60-foot long piles have a very long lead time.  Would you be open to adding weight (i. e. concrete) to the weirs to resist uplift?").

The second pile redesign submittal was provided to the Corps on December 11, 2009.  A740.  While this submittal was pending, by letter dated December 15, 2009, OSI advised the Corps that it was seeking an equitable adjustment in an

---

[12]A contractor uses piles that exceed the minimum length to provide itself with some leeway, because the piles can be trimmed to the precise height necessary after installation and, in this case, because the Contract precluded splicing together of piles.  A475.

amount in excess of $1 million for the impact of the Corps' investigation of the

DSC on its Contract of the work, and that OSI had reached a point where further

work under the contract could only be performed upon installation of the weir

structure. A744-766. For this reason, OSI went on standby until January 27, 2010.

On December 21, 2009, the Corps also rejected this submittal based on its

conclusion that the calculations pertaining to uplift capacity remained inadequate

to address subsurface conditions at the location where the weirs were to be

installed. A740.

### c. Third Pile Re-Submittal Of The Timber Pile Design Subsequent Overhaul Of The Pile Design

Based on the comments provided by the Corps, OSI's engineer recalculated

the uplift capacity for a third time, which resulted in a design calling for four

timber piles, over 100' in length. Add13. The Corps never responded to this

submittal. *Id.*[13]

Given that both parties understood that piles of this length would require

months to obtain (A734; A899 (Tr. 1/50:1-12)), the parties engaged in a

"brainstorming" session to try to identify an alternative engineering solution that

---

[13]As OSI's timber pile engineer explained, due to the DSC, the timber piles were redesigned three times. A879-880.

would avoid the delay associated with timber piles of the length now deemed necessary to address uplift at the site of the piles. Add14.[14] During the brainstorming session, the parties discussed several pile designs not contemplated by the Contract. *Id.* The Corps eventually indicated its willingness to consider the use of a helical steel pile design, instead of the timber piles called for by the Contract. *Id.* Helical piles consist of steel augers that are twisted into the ground until the desired amount of resistance (or torque) against uplift is reached. A897-898. Concrete footers are then poured on top of the helical piles to join the steel piles to timber piles that are placed in the cement and extend up from ground level to a height at which the new weirs would be attached. Add14. OSI engaged MBV Engineering, Inc. ("MBV") to design the helical piles. A901 (Tr. 1/59:11-14).

On or about January 15, 2010, OSI submitted the drawings for the helical steel piles to the Corps (*see* A775) and, on or about January 26, 2010, the Corps approved the submittal. *See* A771.

---

[14]The Board found that the brainstorming session addressing the use of helical steel piles had occurred in late-November or early-December 2009. Add14. The evidence is, however, that the session took place in mid- to late-December 2009, after the parties recognized that piles greater than 90' would be necessary to meet the Contract's requirement to use timber piles. A913-914.

**F. OSI Requests And The Corps Denies An Equitable Adjustment For The Impact Of The DSC On The Timber Pile Design And Installation Of The Weirs**

Due to (1) the Corps' delay in telling OSI how it should proceed in light of the DSC, (2) the Corps' delay in returning the original timber pile submittal, and (3) because Mod. 5 expressly had not addressed the issue of time or money resulting from the new core borings, OSI submitted a formal request for equitable adjustment on December 15, 2009, in the total amount of $1,012,184.95 for increased costs and the addition of 83 days to the contract due to delays as of that date. A744-746. OSI noted that the delay was ongoing, and had become so protracted that even that work that it could perform, albeit much less efficiently than anticipated, on the Island while awaiting the results of the Corps' investigation was now complete and OSI had gone on standby. At that time, OSI's second submittal for the redesign of the timber piles was pending with Corps. *Id.*

ACO Tolle responded to OSI's request by letter dated December 22, 2009, which acknowledged that the Corps was responsible for "any modifications relating to the physical construction of the weir structure (such as changes to the lengths or diameters of the piles) required due to the DSC." A769. ACO Tolle further explained that the extent to which the DSC had impacted the pile design could not be determined *yet,* because the Corps had not approved any of the pile

31

designs submitted by OSI.  *Id.*  Although the new core borings had been completed

and a report of their results had been available since November 11, 2009, ACO

Tolle did not assert that those borings confirmed that no DSC existed at the site of

weir pilings.

 After the Corps indicated its willingness to accept something other than

round timber piles required by the Contract and the design to allow the use of the

steel helical piles, on May 10, 2010, OSI filed a certified claim under the Contract

Disputes Act seeking an equitable adjustment in the amount of $2,297,066.45, as

well as an extension of the Contract for an additional five months.  A777-782.  The

Corps denied this claim in its entirety in a letter titled "Notice of Intent to Issue the

Contracting Officer's Final Decision."  A873-878.  The putative basis for the

Corps' denial was that the geotechnical investigation had

> confirmed that the DSC did not extend to the weir area.  Accordingly,
> no additional changes to the contract were required.

A877.  The CO's letter did not address why, after the new core borings were

performed, the Corps rejected three timber pile designs submittals, each of which

increased the number and/or length and/or the depth of embedment of the timber

piles, nor did the letter address why the Corps approved a change from round

32

timber piles to helical steel piles, something that was not contemplated by the original contract.

Thereafter, OSI provided additional responsive information to the CO and met with the Corps in an effort to resolve the dispute; however, this effort was not successful as the Corps adopted the position that OSI "already had been compensated for the DSC by [Mod. 4] and since no DSC existed where the new weirs were to be constructed the contractor was not due any additional payment or time beyond [Mod. 5] covering the investigation of the DSC and required revaluation/redesign."  A889.  Accordingly, on November 29, 2010, OSI requested that the CO issue a final decision on OSI's claim (A881-882), which the CO issued on March 4, 2011 and which, once again, denied OSI's request for an equitable adjustment in its entirety.  OSI timely appealed the final decision to the Board and now appeals the Board's September 10, 2013 decision to this Court.

## SUMMARY OF THE ARGUMENT

The instant appeal turns on the correct interpretation of Federal Acquisition Regulation 52.236-2 "Differing Site Conditions" (Apr. 1984) in the Contract.  A copy of the DSC from the Contract is found at Add26.  The DSC clause was developed for use in government construction contracts to prevent contractors from including (and the government from paying) costs in every bid to provide for the

possibility that unknown subsurface conditions might arise and disrupt construction. *E.g.*, *Foster Constr. C.A. & Williams Bros. Co. v. United States*, 435 F.2d 873, 887 (Ct. Cl. 1970). By its terms, the DSC clause defers treatment of such latent conditions until the need to do so actually arise within the context of a specific construction site. *Id.* DSCs arising under subparagraph (a)(1) of the clause, such as the DSC at issue in this case, are known as "Type 1" DSCs. *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1343 (Fed. Cir. 1998). As noted, the interpretation of the DSC clause, like any contractual provision, is a matter of law to be undertaken by this Court *de novo*. *Id.* at 1345, *citing P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913 (Fed. Cir. 1984).

In rejecting in its entirety OSI's claim for an equitable adjustment for a Type 1 DSC, the Board opined that OSI "failed to prove the existence of a DSC at the location where the new weir structures were built." Add20. The Board's opinion is manifestly incorrect because:

1.    It misinterprets the plain meaning of the DSC clause, which specifies that a contractor is to receive an equitable adjustment where the government's *investigation* of a DSC delays the work. Here, there can be no dispute that a DSC was discovered at the job site on September 23, 2009 and that the Corps'

34

protracted investigation into the extent of that DSC delayed key work under the

Contract until at least December 4, 2009; and

(2)     The Board's ruling that no DSC existed at the site of weir pilings is

not supported by substantial evidence and is, in fact, contrary to the evidence.

Due to these fundamental errors, this Court should reverse the Board's decision on

liability, enter a finding on liability in favor of OSI, and remand this matter to the

Board with instructions to conduct further proceedings on quantum.

**ARGUMENT**

**I.     Standard Of Review**

The Contract Disputes Act at 41 U.S.C. § 7107(b)(1) (2011) provides that

"the decision of the agency board on a question of law is not final or conclusive."

Contract interpretation under the Act is a question of law with no deference owing

to the interpretation adopted by either the agency or the Board.  *McHugh v. DLT*

*Solutions, Inc.*, 618 F.3d 1375, 1379 (Fed. Cir. 2010), quoting *Lockheed Martin IR*

*Imaging Sys., Inc. v. West*, 108 F.3d 319, 322 (Fed. Cir. 1997).

A Board's factual determination will be reversed if it is not supported by

substantial evidence.  *P.J. Dick Inc. v. Principi*, 324 F.3d 1364, 1370 (Fed. Cir.

2003).

35

## II. The Board Erred As A Matter Of Law By Ruling That The Corps Had No Liability For The Delay Caused By Its Investigation Of The DSC From September 23, 2009 To December 4, 2009

### A. The Corps' Initial Investigation Of The DSC At The Site Of The Weir Pilings

As noted, a Type 1 DSC exists when subsurface or latent physical conditions at the site differ materially from those indicated in the contract. Add20. There is no dispute that OSI discovered just such previously unknown conditions while clearing dense vegetation on the Island on September 23, 2009, when its vehicles began sinking into a muck field adjacent to where the weirs were to be installed. A624. As required by the DSC clause, OSI both avoided disturbing those conditions and promptly reported the DSC to the Corps that same day. A624. OSI also advised the Corps that it would need to be working in the area in a week or the approved construction schedule would be impacted. A630. Once OSI provided ACO Tolle with timely notice of the DSC, the onus shifted to the Corps under the DSC clause to ascertain both the extent of the problem and to advise OSI how it wanted the situation to be addressed. *E.g.*, *G B & E Elec. Contractors*, ASBCA No. 34026, 87-3 BCA ¶ 20,119 (1987). As discussed below, due to the Corps' ongoing investigation, OSI was delayed in installing the weirs for months.

36

Upon being notified of the DSC, the Corps commenced its investigation with a site visit by ACO Tolle and a Corp's soils scientist on September 25, 2009. A649-652. This initial "investigation" consisted primarily of ACO Tolle using a 5' steel pole in an effort to probe the basic contours of the muck field. A649; A942-944 (Tr. 2/150-152). In doing so, he identified a muck field roughly 100'x50' and at least 5' deep adjacent to the location where the weir piles were to be driven. *See* A943 (Tr. 2/151:13-19). The investigation was necessary because the subsurface data provided by the Corps in the Contract documents did not disclose the muck field and CB-10, the boring that was nearest the site where the weirs were to be installed, which was at least 75' to 100' away from the location where the piles were to be driven. Add3. Based on the site visit, the Corps, including its soils scientist, readily concluded that the investigation into the extent of the DSC could not be completed until additional subsurface investigations either by borings or test pits were conducted. A650.

On September 28, 2009, the Corps notified OSI that it was continuing its investigation into the full extent of the DSC and directed OSI "to not work" in an area between Sta. 2+85 and Sta. 3+85 until such time as the Corps provided

additional direction. A642-643. This area included the site where the weirs were to be installed. A920 (Tr. 1/122:1-11); A922-929; A971.[15]

Nearly two weeks after OSI reported the DSC, the Corps requested a proposal from OSI to excavate the muck field (A653-654), and in internal emails continued to recognize the need to perform additional subsurface investigations to determine the full extent of the muck where the weir pilings were to be driven. A649-650; A655. After further delay and OSI's notice that the Corps was in breach of contract for its delay in addressing the DSC and providing guidance, the Corps finally indicated on October 21, 2009, that it was willing to conduct additional core borings that included a boring at the location where the weir piles were to be driven. A653-654.[16] The subsurface conditions revealed by those

---

[15]The site diagram at A971 that was marked-up by witnesses at the hearing must be reviewed carefully. That is, the blue cross-hatched area labeled 100'x50' was drawn by ACO Tolle at the hearing and *is not to scale*; indeed, using the scale on the drawing itself shows the blue cross-hatched area is actually only about 75'x28'. An OSI employee testified that the muck field encroached into the location of the weir pilings, identified the muck field with a dotted black line on the site diagram, and labeled the location of the "Piles within Range of Mod P4," *i.e.*, within the muck field. A920 (Tr. 1/122:1-11); A922-929; A971. Aerial photographs of the site taken over several months (A972-988) show a large grey discolored area of the muck field that impinges on the site where the weirs were installed. *Compare* A975 *with* A985.

[16]The Corps paid OSI a total of $12,320.06 under Mod. 5 to undertake part of its investigation of the DSC by performing the new core borings. A694. Mod. 5

38

borings were set forth in a report dated November 11, 2009. A689-692. Thus, the

delay of OSI's work from September 23, 2009 to November 11, 2009 was directly

attributable to the Corps' extensive and protracted delay in completing its

obligation under the DSC clause to promptly investigate the full extent of the DSC

at the site. As such, the entire period of this delay is compensable.

**B.     The Corps' Investigation Continued Until At Least December 4, 2009 While The Results Of Its Subsurface Investigation Were Applied To The Timber Pile Design**

Pursuant to the DSC clause, an investigation of a DSC is not complete until

its impact on the work, if any, is determined and the contractor is advised as to

how it is to proceed. *See G B & E Elec. Contractors*, 87-3 BCA at 101,874. In the

present case, the Corps' investigation of the DSC was not complete with the

issuance of the new core boring report on November 11, 2009 (Add11); rather, the

Corps' investigation could only end upon the application of those results to a

determination of the effect of the DSC on the work, in this case installation of the

weirs. Indeed, ACO Tolle acknowledged as much when he denied OSI's

December 16, 2009 request for an equitable adjustment for the delay caused by the

ongoing investigation because until an "acceptable submittal [based on the new

---

deferred any consideration of additional time or money for changes to the work
resulting from the new borings. *Id.*

39

core borings] is received, *a determination regarding any impacts from the DSC cannot be completed*." A769 (emphasis added). At a minimum, therefore, a reasonable amount of time involved in preparing a submittal assessing the impacts of the results of the new core borings on the weir pile designs and obtaining the Corps' comments on that submittal is also a fully compensable part of the Corps' investigation. Here, that occurred on December 4, 2009, *at the earliest*.[17]

### C. The Board Erred By Concluding That Execution Of Mod. 4 "Implicitly" Authorized OSI To Resume Installation Of The Weirs

While the Corps was conducting its investigation, OSI was prevented from working on the installation of the weirs, because: (1) The DSC clause required OSI not to disturb the DSC; (2) The Corps had directed OSI to "not work" at the site of the DSC while its investigation into the extent of the DSC was ongoing and never rescinded that direction during its investigation; and (3) Even if the Corps had somehow lifted its direction to not work in the area under investigation, OSI

---

[17]At a minimum, the delay due to the Corps' investigation under the DSC clause lasted from September 23, 2009 to December 4, 2009, when the Corps rejected OSI's first pile redesign submittal. OSI maintains that the investigation continued until the Corps eventually agreed to use something other than the contractually required timber piles and finally approved the steel helical pile design on January 27, 2010. However, because the Board misapplied the plain language of the DSC when it denied OSI's claim in its entirety, despite the obvious delay caused by the Corps' investigation of the DSC, the precise dates of the delay should be determined by the Board on remand.

could not proceed because the Corps did not return the original, approved weir

submittals to OSI until November 25, 2009. A912 (Tr. 1/86:8-19); Add6. Thus, at

a minimum, and as the Board recognized, a reassessment of the original weir pile

design was going to have to be made due to the discovery of the DSC and weir

installation could not proceed until such time as either a new pile design was

approved or the Corps authorized OSI to proceed under the original, approved

submittal. Add11.

Even though the Corps' ongoing investigation of the DSC prevented OSI

from installing the weirs, the Board incorrectly concluded that the execution on

November 6, 2009 of Mod. 4 for the removal of a small area of muck identified

during the site visit, "*in effect* lifted the stop work order even though the Corps did

not formally lift the stop work order by separate letter." Add12 (emphasis added).

The Board's conclusion in this regard is incorrect for several reasons.

First, no formal "stop work" order was issued by the Corps in response to

OSI's notice of its discovery of the DSC. Rather, as OSI was required to do under

the DSC clause (Add26), *it* had already stopped work due to the discovery of the

DSC to avoid disturbing the conditions. A624.

In response to this notice, ACO Tolle, as he was required to do under the

DSC clause, began the Corps' investigation of the DSC, and instructed OSI (who

41

had already stopped work under the DSC clause) to "not work in the area identified (between Sta. 2+85 and Sta. 3+85) *until such time as you are provided additional direction*." A642 (emphasis added).[18] ACO Tolle's letter further stated that "[o]ur Geotechnical personnel are continuing their investigation of this situation" (*id.*) so that the Corps could provide direction about how to proceed. At this time, ACO Tolle recognized in internal Corps' emails that "this muck *will* have a significant impact on the design of the piles (A685 (emphasis added)) and that "we only have minimal funds for any changes." A632.

As noted, that investigation eventually included the Corps' belated decision to conduct a subsurface assessment at the location of the weirs (A653-654) to ascertain the extent of the impact of the DSC on the pile designs. *See* A679-683. For this reason and as the DSC clause requires, until such time as the Corps completed its investigation and was able to provide additional direction for the resumption of work where the weirs were to be installed, OSI simply could not have resumed this work. A642.

Secondly, Mod. 4 only addressed the removal of the muck field during the site visit (A681-683) and, even before Mod. 4 was executed, the Corps had

---

[18]The area between Sta. 2+85 and Sta. 3+85 includes the location where the weirs were to be installed. A922-929.

requested another proposal from OSI for "a geotechnical investigation of the location where the weirs will be constructed . . . to evaluate the effect of the deposit of [the muck] on the weir design and the design of the associated pilings." A686-688. This was not just prudent, but necessary because the new weir structures were to be installed between the old weir structures and the muck area that had accumulated in front of the old weirs. A920 (Tr. 1/122:1-11). As noted, the report of conditions revealed by the new borings was not completed until November 11, 2009, some eight days *after* Mod. 4 was executed. *See* A681; A689-690. Thus, contrary to the Board's ruling, the execution of Mod. 4 could not have authorized (either implicitly or explicitly) OSI to proceed with installation of the weirs because the Corps' investigation was ongoing and it had yet to provide any direction to OSI on how to proceed. A944.

Thirdly, even if the execution of Mod. 4 on November 6 had somehow completed the Corps' investigation into the extent of the DSC, the Corps, by its own admission and as the Board found, had yet to return to OSI the hard copies of the approved drawings for the weir structure submittals – something that the Corps would not do so until November 25, 2009. Without the Corps' comments on these

43

drawings, it was not possible for OSI to have proceeded with installation of the weirs.[19]

For these reasons alone, the Board clearly erred in its legal conclusion that by executing Mod. 4 on November 6, 2009, the Corps also simultaneously and *sub silencio* authorized OSI to resume all aspects of the contract work, including installation of the weirs. *See* Add12. Accordingly, even if this Court were to accept the Board's (quite incorrect) conclusion that the Corps' investigation demonstrated that no DSC existed at the site where the weirs were to be installed, the fact remains that *some* period of delay was directly attributable to the Corps' protracted investigation of its legitimate concerns about the full extent of the DSC and, as a result, the work was delayed and costs increased in an amount yet to be determined.[20]

As the Board recognized at the hearing (but subsequently lost sight of), OSI was damaged by the delay caused by the Corps' investigation:

---

[19]By the time the Corps finally returned the hard copies of the original submittal for the weir pilings on November 25, 2009, OSI had already prepared and provided Corps with a submittal for the redesigned timber piles based on the new core borings. Add6.

[20]The DSC clause provides that an equitable adjustment is appropriate, regardless of whether the work is changed as a result of the conditions under investigation. Add26.

44

PLAINTIFF'S COUNSEL:  So are you satisfied that there is damage?

THE BOARD:  Yes . . . .

PLAINTIFF'S COUNSEL:  That's fine, I just know that I have a responsibility to present a threshold issue to show that there was some damage.

THE BOARD:  *Yes, I'm persuaded that there's some damage.*

A930-931 (emphasis added).

Thus, the Board misinterpreted the DSC clause and erred as matter of law by finding that the Corps was not responsible for *any* delay while it conducted its investigation of the DSC clause at the site and while the results of that investigation were applied to the pile design.  As such, this Court should reverse the Board's denial of OSI's request for an equitable adjustment of this basis.

## III.    The Board Also Erred By Finding That The Redesign Of The Timber Pilings Was Not The Result Of The DSC

The CDA requires this Court to set aside a Board's findings of fact "not supported by substantial evidence."  41 U.S.C. § 7107(b)(2)(C) (2011).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *E.L. Hamm & Assocs. v. England*, 379 F.3d 1334, 1338 (Fed. Cir. 2004) (reversing ASBCA's factual determination that the contractor was not misled by defective specification);

45

*Brewer v. United States Postal Serv.*, 647 F.2d 1093, 1096 (Ct. Cl. 1981), *cert. denied*, 454 U.S. 1144 (1982) (reversing ASBCA's factual determination that company vice-president was "not in charge" for purposes of executing a certification).  The inquiry for this Court is "whether 'on the record as a whole' substantial evidence supports the ASBCA's findings."  *Ingalls Shipbuilding, Inc. v. O'Keefe*, 986 F.2d 486, 488-89 (Fed. Cir. 1993).  Here, the Board concluded that the Corps' decision to change from the contractually required use of round timber piles to steel helical piles to anchor the weirs was not the result of the DSC.  Add19-20.  The Board's conclusion, however, is not supported by substantial evidence and is directly contrary to the highly probative evidence of the contemporaneous actions of the parties that plainly establish that a DSC in fact existed and resulted in a complete redesign of the piles.

A.  **Contrary To The Board's Ruling, Subsurface Conditions At The Site Of The Weir Piles Differed Materially From Those Indicated In The Contract**

Pursuant to the DSC clause, OSI is entitled to an equitable adjustment if the subsurface conditions at the site of the weirs pilings differed materially from those in the Contract.  Add26.  The record as a whole demonstrates that (1) the subsurface conditions indicated by the Corps in the Contract differed materially

46

from what OSI encountered at the site where the weirs were to be installed; and (2) as a result, the work was changed from round timber piles to steel helical piles.

### i. The Contract Indicated That Commonly Available, Round Timber Piles Of Less Than 60' Would Be Used

A contractor is not eligible for an equitable adjustment for a Type 1 differing site condition unless the contract "indicated" what conditions the contractor could expect to encounter. *H.B. Mac, Inc.*, 153 F.3d at 1345, *citing P.J. Maffei*, 732 F.2d at 916. Whether a contract contains "indications" of a particular site condition under the DSC clause is a matter of contract interpretation and, thus, presents a question of law, which this Court decides *de novo*. *Id.* A proper technique of contract interpretation is for this Court to place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract documents. *H.B. Mac*, 153 F.3d at 1345, *citing P.J. Maffei*, 732 F.2d at 917.

As an initial matter, the Board found that the Contract Section 31 62 20 "ROUND TIMBER PILES" was absolutely plain in requiring the contractor to use round timber piles to anchor the weirs (Add4) and, as such, presumably the Corps had a reasonable belief that its required use of timber piles would be adequate for this purpose based on the subsurface conditions at the site as indicated in the

47

Contract, *i.e.*, CB-10.  Additionally, the Board quoted the Contract's requirement that OSI use the Corps' subsurface data and, by applying that data to the Corps' own Pile Driving Manual, arrive at design for the round timber piles.  Add4.[21]  The Board also found that:  "Contract borings are the most significant indicator of subsurface conditions."  Add20.

In this regard, the Contract indicated that the Corps had bored CB-10 to a depth of 51.5'.  A279.  Accordingly, based on the Corps' own Pile Design Manual, which requires that site investigation borings such as CB-10 be made to a depth that are, *at a minimum*, 20' below the anticipated depth of the tip of the pile (Add45 at ¶ 3-1), the Contract indicated that the maximum depth of the tip of the pilings anchoring the weirs was 31.5', *i.e.*, 51.5' minus 20' .  As such, and given

---

[21]Because the Contract specifically references the Corps' own Pile Design Manual by publication number and requires the contractor to utilize it in performing the Contract, the Pile Design Manual is part of the Contract. *McCormick Constr. Co. v. United States*, 18 Ct. Cl. 259, 263 (1989), *aff'd*, 907 F.2d 159 (Fed. Cir. 1990) (Table) ("'Contract documents' can be interpreted with considerable breadth to include not only bidding documents (Invitations for Bids, drawings, specifications and other documents physically furnished to the bidders) but documents and materials mentioned in the bidding documents as well" (citation omitted); *see Northrop Grumman Information Technology v. United States*, 535 F.3d 1339, 1344-45 (Fed. Cir. 2008) (collecting cases); *accord Tom Shaw, Inc.*, DOTCAB No. 2109, 90-2 BCA ¶ 22,861 (1990) (contract's reference to Naval Technical Manual by title and publication number incorporated the manual into the contract by reference).  A copy of the Pile Design Manual is provided at Add27 to Add212.

that the height of the weirs was 21.5' (A65), the *maximum* length of the pile

indicated by the Contract was 52' and, as such, bidders reasonably believed that

they could use piles of a length commonly stocked by timber pile suppliers.  *See*

Add13 ("Timber piles up to 60 feet in length are stocked items.  The lead time for

ordering 90-foot long piles was up to four months").  Yet, the Board committed

legal error in applying the DSC clause by restricting its consideration of the

Contract indications to the core borings, while ignoring this highly relevant and

probative evidence as to the length of timber piles indicated to bidders by the

Contract documents.

Moreover, prior to the discovery of the DSC, both parties understood that

the subsurface conditions at the site of the weir pilings were such that round timber

piles of commonly available length could be used to anchor the weirs, because:

- The Contract indicated that the time for completing the work on
  the Island (of which the weir installation was among the first
  things to be done) was just 146 days, something that could not
  be accomplished if six-month lead time to special order 100'
  timber piles was necessary.[22]

---

[22]The 146 days for work on the Island is derived from the fact that the total
duration of the Contract was 324 days, of which 178 days were allocated to
dredging operations to be performed after work on the Island was complete.  A68;
A555(c).

49

- The approved construction schedule allocated a total time from receipt of the Notice to Proceed on August 8, 2009 to completion of the installation of the weirs on November 5, of less than three months. A555(a); A555(c); A914-914(a) (Tr. 1/88:20-25; 89:1-8). Plainly, neither party would have agreed to this schedule if they anticipated that six months lead time was necessary to obtain timber piles.

- OSI's original submittal for the weir piles (which was made before discovery of the DSC) called for use of just two 50' timber piles per weir embedded to a depth of 25'. A573. The Corps approved this submittal with respect to uplift pressure of the weirs. A574.[23]

Although OSI certainly does not contend that it retained *no* discretion in the design of timber piles, in light of these facts, it was reasonable in relying on the Contract's indications that round timber piles of less than 60' would be adequate to anchor the weirs and, as such, that no lead time for special orders of timber piles of unusual length would be required.

ii.    **Both Parties Anticipated That The DSC Would Impact The Timber Pile Design**

It is well-established in this Circuit that "[t]he interpretation of a contract by the parties to it before the contract becomes the subject of controversy is deemed by the courts to be of great, if not controlling weight." *Max Drill, Inc. v. United*

---

[23]Although the Corps indicated some reservation as to wind loading in its comments on the original submittal (A574), this issue does not appear to have been the basis of concern to the Corps in any subsequent weir pile submittal made by OSI.

50

*States,* 427 F.2d 1233, 1240 (Ct. Cl. 1970) (*en banc*) (*per curiam*) (citation omitted). Upon discovery of the DSC, but before the instant dispute had arisen, both parties acknowledge that the DSC *would* result in a change of the pile design. As ACO Tolle unequivocally stated to his Corps colleagues who were working on the DSC issue: the original contract borings do "not indicate the presence of muck and *this muck will have a significant impact on the design of the piles.*" A685 (emphasis added). *See also* A655 ("the Muck DSC nearby suggest[s] that data used in the design analysis may not accurately represent the soil conditions at and around the proposed location for pile driving"). OSI certainly shared the Corps' view that the DSC would impact the pile design. A655. In this regard, the record is devoid of any indication after the DSC was reported that the Corps would approve *any* design using commonly available timber piles as it had indicated would be adequate in the Contract and as it had approved in OSI's original pile design submittal. Plainly, once the DSC was discovered, both parties understood that a reassessment of the timber pile design was going to be necessary.

### iii. As Anticipated, After Discovery Of The DSC, Fundamental Changes To The Timber Pile Design Were Required

Evidence establishing a "material difference" within the meaning of the DSC

51

commonly illustrates that a larger amount of work than initially contemplated or that an alternative method of workmanship must be implemented in order to complete the contract.

*McCormick Constr.*, 18 Ct. Cl. at 263 (citation omitted.)

As the Board acknowledged, if a DSC existed the weir piles would have to be redesigned but if no DSC were found the "original pile design . . . should suffice." Add11. After the new core borings were completed, OSI's pile design engineer presented new design calculations showing that the capacity of the soil itself to resist uplift was much less than had been assumed based on the original contract boring CB-10. A879-880.[24] Due to the new core boring data about the subsurface conditions, OSI's pile engineer doubled the number (from 2 to 4) and the increased length (from 50' to 58') and the embedment (from 25' to 28') of the weir piles. *Id*.

Despite these significant changes to combat uplift based on the worse than anticipated conditions at the weir site, the Corps *still* rejected the redesigned weir piles because "[u]plift capacities will likely *be much less than* those currently calculated." A697 (emphasis added). In other words, the Corps' view was that the subsurface conditions revealed by the new borings were so different from those

---

[24]Specifically, the skin friction calculation, *i.e.*, a determination of the subsurface soil to resist uplift changed from 226 psf (A593) to just 172 psf. A879-880.

52

indicated in the contract that *even greater* measures to combat uplift than OSI has proposed were necessary.  For this reason, after the DSC was discovered, the Corps never suggested that it was prepared to accept the original timber pile design that OSI had submitted and the Corps approved in September.  Of course, had no DSC existed at the site where the weir pilings were to be driven, no redesign of the original approved designs was necessary and in any event the four-pile design should certainly have been more than adequate.  Yet, the Corps would go on to reject two additional timber pile designs.  Add13.

Only after it became clear that the Corps would not approve the use of commonly available timber piles of 60' or less and, instead, acceptable pile lengths were going to exceed 100,' did the parties conduct "brainstorming" sessions to discuss means of re-engineering the weir piles to meet the increased uplift pressure.  A899 (Tr. 1/50:19-20).  Eventually the Corps agreed to consider, and then approved, on January 27, 2009, the use of helical steel piles, something not permitted by the Contract.  A771-772.  Thus, the Board's conclusion that no DSC existed belies the obvious:  If there were no DCS at the site:  (1) Why did the previously approved number, length and embedment of the piles all increase after the core boring data at the weir installation site became available?; and (2) Why

did the parties abandon the use of round timber piles of commonly available length

pursuant to the original Contract in favor of steel helical piles?

### B. The Board's Finding That A DSC Did Not Exist, Was Based Solely On The Testimony Of An Expert And Is Contrary To The Substantial Evidence

The Board's ruling that no DSC existed was based *exclusively* on its

determination that the Corps' expert had not been "effectively challenged" by OSI.

Add20.  This ruling, however, is incorrect because the expert's testimony

demonstrates that conditions at the location of the weir were different from those

indicated in the Contract and, in any event, the expert's testimony does not

overcome the parties' pre-dispute interpretation that a DSC did exist.  *See*, *e.g.*,

*Max Drill*, 427 F.2d at 1240 ("The interpretation of a contract by the parties to it

before the contract becomes the subject of controversy is deemed by the courts to

be of great, if not controlling weight").

At the hearing, Dr. Nicholas Hudyma was qualified as an expert for the

Corps, albeit only in the field of "geotechnical engineering" (A947); he readily

conceded that he was not a pile designer.  A960.  Thus, although Dr. Hudyma was

able to assess whether or not subsurface conditions were comparable to one

another from a geological perspective, he was not qualified to offer an expert

opinion on the key inquiry in this case:  whether differences between conditions at

54

the two locations were "material," *i.e.*, impacted the way the work was carried out. *See McCormick Constr.*, 18 Ct. Cl. at 263 ("material difference" under DSC clause demonstrated by larger amount of work than originally contemplated or implementation of an alternative method of workmanship).

Moreover, the Corps hired Dr. Hudyma to provide testimony long after this dispute arose and construction work on the Island had been completed. A865; A964 (Tr. 3/66:10-24). For this reason, his testimony was not based on any examination of subsurface conditions at the site (A965), but was based on the characterizations of the subsurface conditions provided to him by others, *i.e.*, the original contract core borings report in the Contract and the new core borings report. A961 (Tr. 3/57:6-25); A964 (Tr. 3/66:10-24). Thus, unlike the parties to the dispute, Dr. Hudyma did not actually observe any subsurface conditions at the site or even the core borings themselves. *Id.* Indeed, Dr. Hudyma was not even aware that the large muck field had been located at the site. A964 (Tr. 3/66:18-24).

Moreover, and despite its obvious limitations, much of Dr. Hudyma's testimony actually *supports* OSI's position that the conditions at new core boring B-1 differed materially from conditions indicated in CB-10 of the Contract. In this regard, Dr. Hudyma testified that the subsurface conditions at B-1, which were

closest to weir pilings, were the most relevant for assessing the conditions where the weir piles were to be driven. *See* A967(a) (Tr. 3/92:7-8) ("[t]he ideal situation is to have a boring at a pile location"). He further testified that the conditions at the site of the weirs as disclosed by B-1 were not as good for resisting uplift as those found at CB-10. *See* A962-963 (largest layer of organic material, *i.e.*, muck was found pooling around the B-1, while there was only a trace of "organics" at CB-10); *see also* A967 (Tr. 3/85:15-23) (organic material has lower blow counts and, as such, would not provide any resistance to pile movement); A948-958 (there was a lower number of blow counts experienced in B-1 at a depth of 15' compared to blow counts at the same depths for CB-10). The Board's opinion ignores this testimony, all of which demonstrates that the subsurface conditions at B-1, where the weir pilings actually were to be driven, were different *and worse* for pile support than those indicated by the Contract in CB-10. Notably, Dr. Hudyma declined to offer any opinion, because he was not qualified to do so, as to whether these differences caused the dramatic changes in design from timber piles to steel piles. A959-960.

Instead of addressing any of these highly relevant aspects of Dr. Hudyma's testimony, the Board instead cited Dr. Hudyma for the propositions that:

- Boring B-3 showed "almost identical" material to that found in CB-10;

- Boring B-3 showed more favorable blow counts for pile design purposes than CB-10; and

- Boring B-1 "can be considered nearly identical" to CB-10 "except for one anomalous blow count in [CB-10]."

Add20; A866; A868.

Again, in the statements relied on by the Board, Dr. Hudyma studiously avoided saying whether subsurface conditions discovered at B-1 "differ materially" (*i.e.*, impacted the work) from those found at CB-10, which is the relevant inquiry under the DSC clause. Instead, the expert testified that the two borings were "nearly identical" or "almost identical." This testimony acknowledges, however, that the borings are not the same and says nothing about whether the acknowledged differences are material. Moreover, Dr. Hudyma's testimony largely focused on B-3 and, although the Board cited that testimony in support of its decision, B-3 is *even less proximate* to the site where the weir piles were to be driven than was CB-10. *See* A971. As such, its probative value is nil with respect to the relevant inquiry under the DSC clause in this case: whether subsurface conditions at the weir site are materially different from conditions indicated in the Contract.

57

The Board's reliance on Dr. Hudyma's statements with respect to B-1 is also misplaced because Dr. Hudyma's report discloses that core boring B-1 contains several feet of "soft organic silt" (A867), *i.e.*, material that, by the expert's own admission, would not provide resistance to pile movement (A948 (Tr. 3/39:13-23)). Yet, the expert's report shows *absolutely no* such soft grey silt at CB-10, and a mere trace of other silts. A865-871. Despite this difference, Dr. Hudyma broadly opined that boring B-1 and CB-10 were consistent with one another because both have "sandy materials below the soft silt layer." A868. Although Dr. Hudyma's testimony may have identified some similarities between the two borings, these similarities do not establish whether the subsurface conditions at the site of the weir pilings differ *materially* from those indicated in the Contract *for purposes of pile design*.

Finally, even if Dr. Hudyma's testimony could, somehow, support an inference that no DSC existed, it was contrary to the substantial evidence of the parties own first-hand, contemporaneous observations and pre-dispute interpretation that a DSC did exist under the DSC clause. In sum, that evidence includes that:

- The Contract indicated that round timber piles of commonly available length would be used to anchor the weirs;

58

- The Corps approved OSI's original pile design for two timber piles of commonly available length;

- Upon the discovery of the DSC, both parties understood that the discovery *would* impact the pile design;

- After completion of the new core borings, OSI's engineer determined that a significant increase in both the number and length of the timber piles was appropriate to combat uplift due to the existence of worse subsurface conditions than had been indicated in the Contract;

- The Corps rejected the new pile design, claiming that even the greatly increased number, length and embedment of the timber piles proposed by OSI would not adequately combat uplift at the site of the weirs; and

- The Contract's requirement that timber piles be used was abandoned in favor of helical steel piles to anchor the weirs.

The Board's reliance on snippets of largely irrelevant expert testimony offered in support of the Corps' litigating position instead of the considerable evidence of the parties' own firsthand observations and actions in response to the DSC is contrary to substantial evidence in the record as a whole. *See*, *e.g.*, *J.C. Equip. Corp. v. England*, 360 F.3d 1311, 1315 (Fed. Cir. 2004) ("we know of no authority . . . that requires the trier of fact to credit expert testimony over conflicting non-expert testimony"). Indeed, as noted above, this pre-dispute evidence of the parties' own interpretation that a DSC did exist at the site of the weir piles within the meaning of the DSC clause is entitled to great, if not controlling, weight. *See Max Drill*,

59

427 F.2d at 1240.  Because the Board's decision is not supported by substantial evidence, it should be reversed.

**CONCLUSION**

In light of the foregoing, Optimum Services, Inc. respectfully requests that this Court reverse the Board's ruling on liability, enter an order in favor of Optimum on liability, remand the matter to the Board for further proceedings on quantum, and grant such other and further relief as this Court deems just.

Respectfully submitted,

s/Karl F. Dix, Jr.
SMITH, CURRIE & HANCOCK LLP
2700 Marquis One Tower
245 Peachtree Center Avenue NE
Atlanta, GA 30303-1227
(404) 582-8038
(404) 668-0671 –fax
email: kfdix@smithcurrie.com

Counsel for Appellant-Petitioner

Of Counsel:

Richard W. Goeken
SMITH, CURRIE & HANCOCK LLP
1025 Connecticut Avenue, N.W.
Suite 600
Washington, D.C. 20036
(202) 452-2140; (202) 775-8217 – fax
email: rwgoeken@smithcurrie.com


Dated:  April 18, 2014

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| Optimum Services, Inc. | ) | ASBCA No. 57575 |
| | ) | |
| Under Contract No. W912EP-09-C-0033 | ) | |

APPEARANCES FOR THE APPELLANT: Karl Dix, Jr., Esq.
J. Daniel Puckett, Esq.
  Smith, Currie & Hancock LLP
  Atlanta, GA

APPEARANCES FOR THE GOVERNMENT: Thomas H. Gourlay, Jr., Esq.
  Engineer Chief Trial Attorney
Sharon W. Conklin, Esq.
  Engineer Trial Attorney
  U.S. Army Engineer District, Jacksonville

## OPINION BY ADMINISTRATIVE JUDGE TING

Optimum Services, Inc. (OSI) claimed $2.3 million as equitable adjustment contending that completion of a disposal area on Lost Creek Island, Florida, was delayed as a result of (1) encountering a differing site condition at the location where a weir riser system and associated structures were built, (2) the Corps of Engineers' (Corps) late return of its submittals, and (3) defective specifications in requiring extra-long timber piles that were long lead-time special-ordered items.[1] The Corps' contracting officer (CO) denied the claim and OSI appealed. We deny the appeal.

## FINDINGS OF FACT

1. On 19 June 2009, the Corps' Jacksonville Regional Contracting Center in Jacksonville, Florida, awarded Contract No. W912EP-09-C-0033 to OSI. The contract was in the amount of $4,073,158.96. (R4, tab 4) The project involved the "Aquatic Ecosystem Restoration" at Rose Bay, Volusia County, Florida (WB[2], tab 25 at 761). Rose Bay is located in east-central Volusia County, Florida, immediately south of the city of Port Orange and is intersected by U.S. Highway 1. Lost Creek Island, the site of the

---

[1] OSI first raised the defective specifications issue in counsel's opening statement (tr. 1/10).

[2] At the hearing, both parties used witness books containing selected documents from the Rule 4 files. OSI's witness books are referred to in this decision as "WB," and the Corps' as "RW."

project's disposal area, is located adjacent to the Intracoastal Waterway approximately two miles east-southeast of Rose Bay. (WB, tab 1 at 395)

2. The contract required the restoration of inter-tidal and sub-tidal benthic substrate and hydrologic processes within Rose Bay by removing up to 152,000 cubic yards of unconsolidated sediment from the Bay. The contract was divided into a base and three option items: The base item included reconstruction of an existing upland disposal area on Lost Creek Island by constructing a new dike and gravel drainage; removing two existing weirs; and constructing two new weir structures. The three option items covered the dredging work of 104,000, 21,000, and 27,000 cubic yards respectively. The dredged material was to be placed in the upland disposal area on Lost Creek Island to be constructed about two miles from the dredging area. (WB, tab 1 at 395) Lost Creek Island is not accessible by land (tr. 1/56). Access required a trip of half an hour by boat (tr. 1/55). Materials must be brought to a staging area then onto a barge; they would also have to be off-loaded onto the island, and either stockpiled or put in place (tr. 1/56).

3. The contract required OSI to begin work within 30 calendar days and to complete the work within 324 calendar days after receiving notice to proceed (NTP) (R4, tab 4). The 324-day contract performance period included (1) 30 calendar days for mobilization, (2) 116 calendar days for the base item, (3) 130 calendar days for Option A, (4) 20 calendar days for Option B, and (5) 28 calendar days for Option C (see FAR Clause 52.211-10, COMMENCEMENT, PROSECUTION, AND COMPLETION OF WORK, WB, tab 1 at 155). The contract was awarded with all options (R4, tab 4). Among the standard FAR clauses incorporated by reference were: FAR 52.236-2, DIFFERING SITE CONDITIONS and FAR 52.242-14, SUSPENSION OF WORK[3] (WB, tab 1 at 144).

4. The disposal area to be constructed consisted of a berm (also referred to as an embankment or a dike) enclosing the disposal area and was to be constructed from materials on the site together with gravel to be imported by barge. Once constructed, the disposal area would provide a containment area in which the wet dredged materials could be deposited. The water from the material would then drain out of the disposal area through the drain pipes in the weir into the Intracoastal Waterway. (Compl. and answer ¶ 14)

5. The contract required OSI to design the weir structures with 36-inch diameter outfall pipes. The weirs were intended to allow water to drain out of the disposal area through the pipes. The weirs were to be constructed using a flashboard riser system, which would permit the weirs to operate from water surfaces ranging from an elevation of 9.5 feet to an elevation of 25.5 feet. Permitting the disposal area to drain was critical

---

[3]   The contract FAR clauses did not specify which versions of the clauses were applicable. We assume the April 1984 version of the clauses current at the time the solicitation was issued were incorporated.

to facilitating consolidation and drying of the dredged material. The weir system was to be anchored by timber piles. It was critical to the design that the weir system be properly anchored to maintain its structural integrity and the elevations of the pipes and the risers. (Compl. and answer ¶ 16)

6. By way of analogy, the weir is like a bucket placed in water. Water flows over the flashboards and discharges through the outfall pipes into the Intracoastal Waterway. In order for the weir system to stay in place, uplift from the water around it must be addressed. The weir system or structures must therefore be anchored with suitable timber piles or other anchoring devices. (Tr. 1/52-53) The weir structures are accessed through a walkway. The walkway is anchored by separate piles. The walkway, not being a bucket submerged in water, does not experience uplift from water. (Tr. 1/53)

*The Contract's Boring Information*

7. The contract specifications include a "Geotechnical Data Report" at Section 00 31 32 (WB, tab 1 at 283-390). Paragraph 1.2.2.2 indicates the soil borings taken on Lost Creek Island: CB-LCI03-01 through CB-LCI03-12 along the proposed dike alignment and CB-LCI03-13 through CB-LCI03-20 located at the central spoil mound (*id.* at 284). This report described the soil characteristics encountered:

> Consistently throughout the site, the spoil material is comprised of light brown clean medium dense fine quartz sands with minor amounts of shell and trace silt.... [N]ative material is present below the fill. The material is predominantly medium dense gray quartz silty sand to slightly silty sand, with minor organic and shell content.... Below the fine layer and in the other borings, medium dense clean fine quartz sand with minor shell and trace silt is present. This clean sand layer goes to elevation -38.0 ft. NGVD29 as found in boring CB-LCI03-10.

(*Id.*)

8. Of all the contract borings, the one that is important for purposes of this appeal is CB-LCI03-10. This boring was located approximately 75-100 feet from the planned new weir structures on the toe or exterior side of the dike between Sta. 2+00 and Sta. 2+50 (tr. 1/208, 2/115; WB, tab 60 at 2269). The drilling log for boring CB-LCI03-10 is included in the contract specifications. Blow counts (N values), an important factor in determining pile length, are shown in the drilling log for CB-LCI03-10 (WB, tab 1 at 333-36).

*The Contract's Timber Pile Design Criteria*

9.  The specifications contemplated the use of round timber piles to support the weir structures. It also specified the method of static analysis and the design requirements for the contractor to design the appropriate piles. Section 31 62 20, "ROUND TIMBER PILES," provides at Paragraph 3.1.2:

> The Contractor may choose a design of either 2 or 4 piles per weir. The tip elevations for the piles shall be determined using a static analysis method based on the subsurface data provided in the appendix. The method that the Contractor shall use for the static analysis is that outlined in EM 1110-2-2906, Design of Pile Foundations, or the SPT97 complete program. The design requirements of EM 1110-2-2906 shall apply for both design methods. For example, no load tests shall be performed. Therefore, the required factor of safety against uplift shall be 3.0 as per paragraph 4-2.c of this EM whether the design method of the EM or SPT97 is used to determine the tip elevation....

(WB, tab 1 at 532)

*The Contract's Submittal Requirements*

10.  Section 01 33 00 of the specifications pertains to "SUBMITTAL PROCEDURES." It provides, at Paragraph 1.10, Scheduling, that "Submittals covering component items forming a system or items that are interrelated shall be scheduled to be coordinated and submitted concurrently." The same paragraph requires the contractor to "[s]chedule submittals with sufficient time to obtain a Government response prior to delivery of applicable equipment and materials, and commencement of applicable work." For submittals requiring government QA review, the paragraph provides the government has 30 calendar days from the date of receipt to review, code, and return comments, and the contractor has 10 calendar days after return to resubmit disapproved submittals (coded "E") or approved submittals requiring resubmission (coded "C").[4] (WB, tab 1 at 425)

11.  A complete submittal for the new weir system would include the walkway, the weir, the pilings associated with the weir, and the weir risers, under several different sections of the specifications (tr. 1/72). As the Corps explained at the hearing, submittals could be reviewed more efficiently and quickly if everything pertaining to a system was

---

[4] Codes A through G and X are defined under Paragraph 1.11.1, Section 01 33 00 (WB, tab 1 at 426).

submitted together. If submittals were submitted piecemeal, the reviewer would not be able to find conflicts between designs, or how various components of a design would work together. (Tr. 3/186) Because of compatibility issues, a submittal approved earlier could be disapproved subsequently. Reviewing components of a system piecemeal could actually take longer because the reviewer would have to go back and see how components fit with the rest of the system. (Tr. 2/143-44) That said, piecemeal submission and review do have some benefits in that obviously wrong design components could be caught early and sent back to the contractor for correction (tr. 3/186). Initially, the Corps "started reviewing just some of the components of the weir system" (tr. 2/142). The Corps explained "At the time we were trying to…partner with [OSI], and as things came in, look at it to expedite the overall review process" (*id.*).

12. OSI subcontracted the construction of the weir structures and the walkway to Derrico Construction Co. of Melbourne, Florida (Derrico) (tr. 1/41). Through Contech Construction Products, Inc. (Contech) (*see* WB, tab 49 at 2201), a timber pile supplier, Derrico/Contech hired CBC Engineers & Associates, Ltd. of Centerville, Ohio (CBC) (*see* WB, tab 49), to design the timber piles for the weir structures (tr. 1/45).

*OSI's Schedule*

13. OSI submitted a "Bar Chart" schedule to the Corps on 21 August 2009 (R4, tab 251). The schedule showed OSI planned to construct the "Embankment/Dike" between 17 September to 13 November 2009, to install the "Weir and Outfall [discharge pipes]" between 19 September to 6 October 2009, and complete the disposal area by completing seeding between 20 and 28 November 2009 (*id.*). Thus, OSI planned to complete installation of the weir structures before completing the elliptical dike containment area. Fabrication of the weir system would take up to two weeks and installation would take about five days (tr. 1/91). While OSI "built the fabrication time and procurement time in the schedule," it did not incorporate submittal review time (30 calendar days) into its schedule (tr. 1/117-18).

14. OSI acknowledged receipt of the NTP on 5 August 2009 (R4, tab 2 at 2), thus establishing 25 June 2010 as the contract completion date. OSI mobilized in early September 2009 (WB, tab 8 at 3413; tr. 1/99).

15. OSI submitted its timber pile design (Static Pile Capacity Analysis) by Transmittal No. 31 62 20-1 on 9 September 2009 (WB, tab 12 at 2018). CBC's calculations were based on CB-LCI03-10 and the static analysis method outlined in EM 1110-2-2906 (R4, tab 244 at 2330). As reflected in CBC's calculations, its design called for two 12" timber piles of 50' in length "driven a minimum of 25 feet" into sand (R4, tab 244 at 2330; WB, tab 12 at 2018, 2040). The Corps coded the submittal "C" meaning "Approved, except as noted on drawings (Resubmit)" (*see* WB, tab 1 at 426, § 01 33 00, ¶ 1.11.1). Among the Corps' 18 September 2009 comments were (a) "Does not appear

that the piles are adequate in wind loading"; (b) "The pile does appear to [be] adequate for uplift"; (c) "No mention of piles for walkway"; and (d) "Resubmittal required" (WB, tab 12 at 2020).

16. The Corps' 18 September 2009 response to OSI's Static Pile Capacity Analysis submittal (timber pile design) was sent through the Corps' Quality Control System (QCS), a computer program that allowed the parties to share information (WB, tab 92 at 1; tr. 1/81). There was a limitation to the use of QCS, however; the Corps' comments made directly on the submittal drawings could not be sent back electronically (tr. 3/126). In the case of OSI's Static Pile Capacity Analysis, through "misrouting" (tr. 3/135) in the Corps' offices and events relating to Modification P00005 described later, the complete hard copy of the submittal was not returned to OSI until 25 November 2009, 77 days after submission. (WB, tab 92 at 1) OSI's submittal on the flashboard, weir riser and walkway design (Transmittal 33 40 01-3) was submitted on 28 August 2009. The submittal was coded "E" (Disapproved (See Attached and Resubmit)) and the Corps' comments were not visible on QCS. The complete hard copy of the submittal was not returned to OSI until 25 November 2009, 89 days after submission. (WB, tab 92 at 3)

17. On 22 September 2009, OSI representatives met with John H. Wilson (Wilson), the Corps' quality assurance specialist, and requested that the Corps group Transmittal 31 62 20-1 with several other submittals and review all of them together (WB, tab 67 at 903). The CO found "Optimum did not provide a complete submittal package for the weir system design until September 23, 2009" (WB, tab 6 at 21).

*Discovery of Unsuitable Material*

18. In the meantime, by email attachment to the Corps on 23 September 2009, OSI's project manager, Matthew W. Conneen (Conneen), sent pictures of an area at the site said to be between Station 2+00 and Station 4+00 showing "substantial yielding under our equipment at the existing embankment elevation" (WB, tab 21 at 757). The email went on to say:

> This area is located approximately under the center line of the proposed levee spanning the proposed Weir Riser System. Upon further investigation with our QC this isolated area is at an unknown depth and consists of a mixture of peat and clay/marl material. Boring Designation CB-LCI03-10 doesn't identify this material nor do any other surrounding borings. We feel that it is a differing site conditions and would like to be advised on how to proceed.
>
> We have located away from this area until a USACE representative is able to verify this condition.

6

(WB, tab 21 at 757-58) OSI's 24 September 2009 email notified the Corps that it "will need to be working in this area no later than within a week, after which [we] will be impacted" (WB, tab 23 at 2119).

19. Conneen testified that the "muck" found was described to be dark gray in color, different from the light sandy color materials typical on Lost Creek Island and not consistent with what was shown in contract boring CB-LCI03-10 (WB, tab 20, photographs; tr. 1/127). As reflected in its 24 September 2009 internal email, the Corps' initial assessment was that the area coincided with the location of the old weir structures and the materials could be "fine grained material that settled out" in front of the old weirs when the site was active, and the extent of the material should be limited and could be easily dealt with (WB, tab 22).

20. According to OSI, the Corps was "very quick in responding" to the differing site condition (DSC) notice (tr. 1/130-31). David R. Tolle, the Corps' Administrative Contracting Officer (ACO) and Area Engineer, and a Corps geotechnical representative visited the site on 25 September 2009 (tr. 2/107-08; RW, tab 6). While OSI had reported a potential DSC area between Sta. 2+00 and Sta. 4+00, roughly 200 feet long, Tolle, using a five foot probing rod determined that the maximum limits of the DSC area to be between Sta. 2+86 and Sta. 3+86, an area of approximately "50 feet by 100 feet" (tr. 2/88-89). He also determined that the DSC or "muck area" did not extend to the area where the timber piles for the new weir structures would be constructed (tr. 2/90).

21. After the site investigation, Tolle's 25 September 2009 email advised his colleagues that "the muck is located within the footprint of the dike foundation on the Northeast side of the disposal area, near the location of the new weirs." His email stated that the Corps would need to develop a scope of work to address the issue so that the impacts to the contractor's dike construction could be minimized. (WB, tab 24) Because the upland disposal site was designed to contain dredged materials from Rose Bay, the Corps' 2 October 2009 trip report on the 25 September 2009 investigation concluded that "[t]hick layers of unsuitable, fine grained material within the embankment footprint are not acceptable," and recommended that "[t]he contractor shall remove the material to EL-1 in accordance with Note 5 on sheet CN 714" (RW, tab 6).

22. So that the location of the DSC (muck) encountered could be clearly shown for purposes of the record, Conneen drew a sketch at the hearing on Contract Drawing No. ST 715. His sketch shows the 50' by 100' muck area (marked in blue cross-hatch) did not intrude into the area where the new weir structures and their supporting timber piles were to be built. His sketch also shows the location of contract boring CB-LCI03-10 to the north (green dot) and the new borings (B-1, B-2 and B-3) (blue dots) OSI's subcontractor would later drill. (WB, tab 3 at 3; tr. 1/140)

23. By letter dated 28 September 2009, ACO Tolle advised OSI that the Corps' initial investigation revealed the presence of a potential DSC and the Corps was continuing its investigation. The letter directed OSI to stop work in a limited area:

> In order to ensure the conditions at the area in question are not disturbed, you are instructed to not work in the area identified (between Sta. 2+85 and Sta. 3+85[5]) until such time as you are provided additional direction. However, you may continue to work in all other areas of Lost Creek Island.

(WB, tab 25 at 761)

24. ACO Tolle's 8 October 2009 letter asked OSI for a proposal to address the DSC described as "peat and clay/marl" located "between Station 2+86 and Station 3+86" approximately 50 feet wide. The scope of work of the requested proposal included (1) removal of the unsuitable material (peat and clay/marl) to Elevation -1 NGVD; and (2) placement of a bridging lift over the area where the unsuitable material was removed until the fill elevation matched that of the surrounding area. (WB, tab 28) In response to the Corps' request for proposal (RFP), OSI by letter of 12 October 2009 submitted a proposal of $14,291.69 plus a time extension of three calendar days for the work (WB, tab 29 at 768).

25. In a 13 October 2009 email to OSI, Wilson expressed concern whether OSI's "submittal design data" based on contract boring CB-LCI03-10 "accurately represent the soil conditions at and around the proposed location for pile driving" in light of the muck discovered nearby, and whether test pits should be excavated to confirm the soil type used in the design. The email asked OSI for "Any information…that could shed additional light…in addressing our concerns about the design data used in your submittal and expediting our review." (WB, tab 31)

26. OSI's 13 October 2009 email reply stated that it would forward the Corps' inquiry to the designer/builder and that delivery of material would be held "until further direction is provided." The email also mentioned that while OSI would assist with any test pits needed, it would only be available on overtime "provided direction is given by the Contracting Officer or authorized representative." (WB, tab 34) Conneen testified that since the "area of muck was outside the piles," he had no "big concern," but when he forwarded the Corps' 13 October 2009 email to CBC, CBC did have a concern (tr. 1/161).

---

5    Elsewhere the record describes the area as between Sta. 2+86 and Sta. 3+86. The minor differences have no significance.

8

27. To remediate the DSC problem (muck), the parties negotiated an increase of $13,110.22 to the contract price plus an extension of three calendar days to the contract completion date (WB, tab 39 at 791). Michael A. Presley (Presley), the Corps' Contracting Officer Representative (COR), who negotiated Modification P00004 with Conneen (tr. 2/175), testified that before negotiating the modification, the Corps believed the DSC area was contained. He testified he would not otherwise have negotiated a modification if he knew he had to issue another RFP to address other potential DSC areas. (Tr. 3/154-55)

28. By letter dated 21 October 2009, ACO Tolle forwarded Modification P00004 to OSI with instruction to sign and return the copies to the Corps' area office. Paragraph A of the modification set out the "SCOPE OF WORK":

> 1. In an area approximately 50 feet wide and 100 feet long between Station 2+86 and Station 3+86, remove the unsuitable material (peat and clay/marl) to Elevation -1 NGVD....

> 2. The Contractor shall place a bridging lift over the area where the unsuitable material was removed.... From this elevation, construction of the dike (in accordance with the provisions of Section 35 41 00, DIKE CONSTRUCTION, shall continue until the fill elevation matches the elevation of the surrounding area (subsequent to clearing and grubbing operations).

(WB, tab 39 at 790-91)

The modification included the Corps' standard "CLOSING STATEMENT" or release clause at Paragraph D:

> In consideration of the modification, agreed to herein as complete equitable adjustment for the Change Request NM004 proposal for adjustment, the Contractor hereby releases the Government from any and all liability under this contract for further equitable adjustments attributable to such facts or circumstances giving rise to Change NM004 for adjustment.

(WB, tab 39 at 792)

29. Because Modification P00004 included the release language, OSI became concerned that signing it might affect any future claims it might have outside of the DSC

(muck) area addressed. It decided not to execute Modification P00004 "until a subsequent request for proposal [relating to geotechnical investigation of the area where piles were to be driven] was submitted to us." (Tr. 1/155)

     30. Conneen's 21 October 2009 email advised ACO Tolle that OSI was unwilling to sign Modification P00004 in view of its release language "until review of the design drawing submittals are received, an RFP is received, or further clarification is given to the design of the flashboard riser system and walkway." His email explained that since CBC's design was "based on geotechnical information provided in the contract documents," OSI was "requesting an RFP on the additional geotechnical investigation needed to satisfy the concerns of our design engineer for flashboard rise[r] system and walkway." (WB, tab 40) Conneen acknowledged at the hearing that he essentially told the Corps that OSI was not going to do any more design work until there was a geotechnical investigation of the area where the weir structures and the walkway were to be built (tr. 1/203). Where the weir structures were to be constructed took up "may be five percent" of the total elliptical embankment/dike area. Except for "a large valley in that one specific area," OSI was able to perform 95% of its embankment/dike work. (Tr. 1/104-05)

*The Corps' Three-Phase Approach in Addressing Further Potential Differing Site Conditions*

     31. When OSI refused to sign Modification P00004 over its concern that the release language might preclude it from recovery if the DSC extended beyond Sta. 2+86 and Sta. 3+86, ACO Tolle came up with a three-phase strategy to move the project forward: Phase 1, already implemented, was to use Modification P00004 to remediate the 50' by 100' DSC; Phase 2 was to have OSI conduct a geotechnical investigation to determine if the DSC muck area covered by Modification P00004 extended to the area where the new weir structures were to be built, and to redesign the piling if necessary; Phase 3 would implement any physical aspects of redesign if a DSC was found (tr. 2/185). ACO testified that since "everything in the original differing site condition had been addressed by P4," he did not consider OSI's 21 October 2009 email to be "a continuation of the differing site condition that had been identified by Optimum on September 23rd" (tr. 2/112).

     32. OSI actually began a geotechnical investigation on its own that would later be covered by Modification P00005 (the Corps' Phase 2) before that modification was signed, and even before Modification P00004 was signed. OSI selected Universal Engineering Sciences (UES) on or about 26 October 2009 to determine the subsurface conditions where the new weir structures and the timber piles were to be built. (WB, tab 59 at 811-12) As the design engineer, CBC chose the locations of the borings (tr. 1/216, 219). UES drilled three borings: B-1 at 54' to the west of the centerline of the

weir structures; B-2 at 24' to the west of the weir structures; and B-3 at 80' from the weir structures (*see* Sketch at WB, tab 3; tr. 3/21).

33. UES performed the borings on or about 29 October 2009 (tr. 1/217-18), before Modifications P00004 and P00005 were signed. By letter dated 11 November 2009, UES forwarded to OSI the results of its field exploration and its recommended soil design parameters for use in timber piling design for the proposed weir structures. UES visually classified the samples in accordance with the Unified Soil Classification System (USCS), finding:

> The soils encountered at the borings generally consisted of fine sand (SP) (fill) within the upper 2.0 to 4.0 feet, underlain by soft organic silt (OH) to depths varying between 4.0 and 7.0 feet. Below the organic soil zone, loose to medium dense fine sand (SP), fine sand with silt (SP-SM), and shell with sand was then encountered to depths varying between approximately 21.0 and 35 feet (Boring termination depth at B-3 location). Loose clayey fine sand (SC) and silty fine sand (SM) was encountered to depths of 26.0 and 31.0 feet below grade at Boring B-1 and B-2 locations, respectively. Loose sand with shell was then encountered to the boring termination depths....

(R4, tab 231 at 2264-65) UES' report provided its recommended soil design parameters for use in the timber pile design on Sheet No. A-2 attached (*id.*).

34. While OSI's own geotechnical investigation was proceeding, as Phase 2 of his three-phase approach, ACO Tolle's 26 October 2009 letter asked OSI to respond to a Corps' RFP to "evaluate the effect of the deposit of peat and clay/marl on the weir design and the design of the associated pilings." The RFP specified that "[t]he Contractor shall obtain sufficient geotechnical information needed for the design of the piling system for the proposed weir structure," and "shall include Standard Penetration Test borings SPT boring(s) in accordance to ASTM D 1586-84 (Standard Test Method for SPT and Split-Barrel Sampling of Soils)." The Corps' RFP went on to say that "[t]he Government intends to include all costs, to include redesign of the pile lengths, associated with the geotechnical investigation with the costs of removing the unsuitable material from the dike foot print." (WB, tab 44) We find at the time the Corps issued this RFP, neither party knew whether the location where the new weir structures were to be built contained unsuitable material. Thus, if unsuitable material or DSC was found, supporting piles would have to be redesigned accordingly. If, however, soil conditions were found to be consistent with contract boring CB-LCI03-10, CBC's original pile design (submitted 9 September 2009), if designed in accordance with EM 1110-2-2906, should suffice.

11

35. Mr. Richard Evans (Evans), OSI's Vice President, signed Modification P00004 on 3 November 2009, and ACO Tolle signed the modification on 6 November 2009 (R4, tab 8 at 746). Up until 6 November 2009, OSI could work everywhere else on Lost Creek Island (tr. 3/108). Modification P00004 authorized OSI to resume work between Sta. 2+86 and Sta. 3+86 covered by the Corps' 28 September 2009 stop work order. We find that execution of Modification P00004 in effect lifted the stop work order even though the Corps did not formally lift the stop work order by separate letter. OSI removed the muck and backfilled the area as specified by Modification P00004 in three days, starting 5 November 2009 (tr. 2/15, 3/107-08, 166).

36. OSI's Evans and ACO Tolle signed Modification P00005 respectively on 17 and 18 November 2009, increasing the contract price by $12,320.06. The "SCOPE OF WORK" of this modification was set out in Paragraph A:

> The Contractor shall conduct a geotechnical investigation of the location where the weirs will be constructed. The purpose of the investigation shall be to evaluate the effect of the deposit of peat and clay/marle [sic] on the weir design and the design of the associated pilings.

Paragraph D, "CLOSING STATEMENT," included these three paragraphs:

> Please note that this modification does not include the costs for any changes in the physical construction of the project such as additional lengths of pilings or increased diameters of piling.

> This modification includes the geotechnical investigation for the weir structure and the re-evaluation and/or redesign of the pilings for [the] weir structure and the walkway.

> In consideration of the modification, agreed to herein as complete equitable adjustment for the Change Request NM005 proposal for adjustment, the Contractor hereby releases the Government from any and all liability under this contract for further equitable adjustments attributable to such facts or circumstances giving rise to Change Request NM005 for adjustment.

(R4, tab 8 at 749-50)

37. At the hearing, Presley explained the reason he included the cost of "reevaluation and/or redesign of the pilings for weir structure and the walkway" as a part of Modification P00005 or Phase 2: He testified that based on his discussion with OSI, the cost of having the design engineer evaluate the effect of the geotechnical investigation "was very close in cost to redesigning" (tr. 3/171-72). The Corps therefore decided to pay for a redesign it might or might not need. If there was no DSC at the location where the new weir structures were to be built, then OSI could simply "go ahead with their initial design" (tr. 3/172). If, on the other hand, a DSC was found, with the redesigned pilings in hand, it "would allow us to finish phase two without another mod [for re-design], and then a fourth mod for the changes" (id.).

38. Based on UES' 11 November 2009 report, CBC redesigned the timber riser support piles. On 20 November 2009, OSI forwarded to the Corps a new Static Pile Capacity Analysis submittal (timber pile design). CBC's calculations showed it designed four 78-foot (28' embedment plus 50') piles at the weir riser. (WB, tab 49 at 2200, 2213) OSI's pile design submittal was not approved by the Corps. The Corps' review found "[t]he uplift capacity (skin friction) calculations…incorrect" for five reasons, and commented "Uplift capacities will likely be much less than those currently calculated." (Id. at 2199) The Corps assigned an "E" code to the redesigned support piles and so advised OSI by email on 23 November 2009 (id. at 2197). Under ¶ 1.11.1, § 01 33 00, SUMBITTAL PROCEDURES, code "E" means "Disapproved (See Attached and Resubmit)" (WB, tab 1 at 426).

39. CBC obtained the "net" skin friction values on all three borings from UES on 2 December 2009. Using these values, CBC redesigned the timber piles on 3 December 2009 calling for 94-foot (58' + 36' embedment) piles. (App. supp. R4, tab 244 at 2330-31). This design (Transmittal No. 31 62 20-1.3) was coded "E" or disapproved, by the Corps on 21 December 2009 (R4, tab 27 at 830). Based on the Corps' comments to use the contract safety factor of 3.0 (finding 9) on the net friction values, CBC redesigned the timber piles yet again on or about 23 December 2009, this time calling for pile length of over 100 feet (app. supp. R4, tab 244 at 2331). The record does not show the parties acted on this latest design. Thus, since its original pile design submitted on 9 September 2009 (finding 15), CBC redesigned the timber piles three more times, from 50 feet to 78 feet to 94 feet, and finally, to over 100 feet in length.

*Use of Helical Anchors*

40. Timber piles up to 60 feet in length are stocked items (tr. 1/49). Timber piles over 60-feet typically have to be custom ordered. The lead-time for ordering 90-foot long piles was three to four months. (Tr. 1/50) Faced with this reality, the parties explored other options so that the project would not be unnecessarily delayed.

13

41. Various methods can be used to overcome uplift. Piles can be weighted down with the use of a "block of concrete" tied to a structure with rebars or a cable system. A saddle filled with concrete can be used to weigh down the structure. Concrete, however, was "a bulky item to get delivered." Helical anchors are not piles; they are a part of a "composite system" that can be tied into timber piles with U bolts. Helical anchors are stocked items that could be installed with a Bobcat. (Tr. 1/54-56)

42. At a brainstorming session in late November or early December 2009, the Corps proposed the use of concrete dead weights to counter the uplift which had been successfully used on other projects. OSI suggested the use of helical anchors which were "lighter and cheaper and easier to move to the island." (Tr. 3/179)

43. Meanwhile, CBC, having redesigned the timber piles three times, was unwilling to discard its calculations and come up with a "complete new design starting from scratch" (tr. 1/184), and was "looking for more money" (tr. 1/51). Once the Corps indicated that it was willing to accept the use of helical anchors, OSI went to another designer, MBV Engineering, Inc. (MBV), which had experience with helical anchors (tr. 1/51, 183). OSI asked MBV to design the weir structure support using UES' borings and helical anchors (tr. 1/180-81). OSI submitted the helical anchor submittals on 14 January 2010. They were reviewed and approved on 26 January 2010. (WB, tab 62 at 2273; tr. 3/130-31) By January 2010, OSI's flashboard riser submittals had been approved (tr. 1/186). The helical anchors were delivered to the job site by the end of February 2010 (tr. 1/187). Due to its piecemeal submission and repeated inability to have its timber pile design (Static Pile Capacity Analysis) submittals approved, we find OSI was, in whole or in part, responsible for the weir system submittal delays.

44. As shown in MBV's Drawing S-1, the weir riser structure was held in place by four timber piles which were embedded in deep concrete footers. The concrete footers, in turn, were tied to helical anchors. Under this design, the timber piles were kept completely above ground, the concrete footers and the helical anchors were kept below ground. (WB, tab 4; tr. 1/57)

*COE's Expert Report and CBC's Engineering Report*

45. In August 2010, the Corps engaged the services of Dr. Nicholas W. Hudyma (Hudyma) to look into whether the soil conditions shown in UES's borings (B-1, B-2 and B-3) varied from that shown in boring CB-LCI03-10 presented in the contract's Geotechnical Data Report (R4, tab 33). Dr. Hudyma, a professor at the University of North Florida, was accepted by the Board as an expert in geotechnical engineering (tr. 3/13, 17). He visited Lost Creek Island on 18 August 2010 (tr. 3/19), and prepared a report on his findings (R4, tab 33).

46. Soil characteristics are one of the factors used in determining the appropriate piles to use (tr. 3/54). In comparing the three UES's borings with the Corps' boring CB-LCI03-10, Dr. Hudyma found "consistency in materials with depth":

> The sandy materials encountered below the soft silt layer have several different classifications. The USACE boring classifies the materials as poorly graded sand with localized zones of shell. UES boring B-3 shows two zones of SP materials; the upper zone without shells and the lower zone with shells. In terms of materials, the two borings are almost identical.

> The other two UES borings, B-1 and B-2, further subdivide the sandy materials beneath the soft silt layer. B-1 consists of zones, in order of depth, of SP, shell with sand, SC, and SP. B-2 consists of zones, in order of depth, of SP, SM-SP, SM, and SP. It is imperative to note that all the materials identified in the UES borings below the silt layer are sandy materials. The original boring (CB-LCI03-10) also consists of sandy materials below the silt layer.

(R4, tab 33 at 951) Dr. Hudyma testified that he did not find in UES' borings any classification of muck prevalent between Sta. 2+86 and Sta. 3+86 (tr. 3/66).

47. Dr. Hudyma also looked into blow counts. Blow counts are used to determine soil properties for geotechnical design (tr. 3/32). Blow counts would impact uplift analysis because soil shear strength parameters are based on blow counts (tr. 3/74). In terms of pile design, a high blow count is better than a low blow count for uplift analysis (tr. 3/100). In terms of blow counts, Dr. Hudyma's report found:

> Based on blow counts from the four borings in the vicinity of the timber piles, the UES boring B-3 shows the most desirable blow count profile with depth. The sandy materials below the soft organic silt are all medium dense. The other three borings, CB-LCI03-10, B-2, and B-1, show a less desirable blow count profile with depth. However the blow count profiles for these three boring are nearly identical with the exception of one anomalous blow count in boring CB-LCI03-10 (N=26 at an elevation of -24 feet).

(R4, tab 33 at 952)

15

48. According to ACO Tolle, pile length is determined by a number of factors including "geotechnical wind loading, dead loading, friction factors, uplift," safety factor and others (tr. 2/126). To have its piles approved, OSI's Static Pile Capacity Analysis submittal must demonstrate that its designer's calculations adequately took into consideration the various analysis criteria outlined in EM 1110-2-2906 (*see* finding 9).

49. Dr. Hudyma's report has not been rebutted. OSI did not call a witness from UES or a soils expert to explain how UES' material classification on borings B-1, B-2 and B-3 differed materially from that shown in the contract boring CB-LCI03-10. We find that the muck found between Sta. 2+86 to Sta. 3+86 did not extend into the area where the new weir structures were to be built. Nor did OSI call its pile designer from CBC to explain its redesign starting with 50' piles and finally ending with 100' piles. We are not told whether and to what extent UES' borings made a difference. Finally, OSI has not challenged the Corps' reviews and comments on the Static Pile Capacity Analysis calculations provided with its submittals.

50. There is in the record an engineering report dated 18 October 2010 submitted by CBC. The purpose of this report was to "provide circumstances chronologically relating to the differing site conditions which resulted in four (4) separate designs for the [weir] structures." (R4, tab 244 at 2330) While the report stated that CBC used UES' borings and EM 1110-2-2906 to come up with the 78-foot timber pile design, used "net" skin friction to come up with the 94-foot pile design, and finally used a safety factor of 3.0 to come up with over 100-foot pile design, the report did not explain how the soil characteristics shown in UES' borings differed from those shown in CB-LCI03-10 (*id.*). While CBC's multiple redesigns resulted from the Corps' reviews, the report did not challenge the validity of the Corps' review as exceeding the design parameters called for by EM 1110-2-2906. OSI did not call the CBC designer as a witness to explain what specifically drove the need for the repeated redesign.

### *Summary of Progress*

51. Aerial photographs of Lost Creek Island shows the progress of work between September 2009 and May 2010. The aerial photograph shows that by 18 September 2009, OSI had cleared the site and was proceeding with the "embankment stage" of the work (WB, tab 7 at 3419-20; tr. 1/106). The aerial photograph of 21 October 2009 (when OSI announced that it was halting its design work until the area where the weir structures were to be built was investigated for DSC) shows OSI was still embanking, and the elevation at the north end where the weir structures were to be constructed was completed to Elevation 0 (WB, tab 7 at 3421; tr. 1/107). The aerial photograph of 19 November 2009 (just after OSI submitted its 78-foot pile design based on UES's borings) shows OSI was still in the process of embanking, and was installing filter material (WB, tab 7 at 3423; tr. 1/108). The aerial photograph of 21 December 2009 shows the embankment being close to completion, "except for the area" where the weir structures were to be

constructed (WB, tab 7 at 3426; tr. 1/108). The aerial photograph of 20 April 2010 shows the pilings and the weir structures were installed, the walkway was being installed, and the crane was being disassembled (WB, tab 7 at 3430; tr. 1/110). Around 19-20 February 2010, OSI began to seed the area (WB, tab 7 at 3428; tr. 1/109).

52. Thus, when measured against OSI's planned bar chart schedule, it completed the weir and outfall installation on or about 20 April 2010 as opposed to 6 October 2009, the embankment/dike construction sometime prior to 20 May 2010 (WB, tab 7 at 3431) as opposed to 13 November 2009, and seeding around 20 February 2010 as opposed to 28 November 2009. According to OSI, the project was completed in about 480 days as opposed to the 324-day contract performance period, or about five months (480 days – 324 days) late (tr. 1/93).

*Claim and CO Decision*

53. By letter dated 10 May 2010, OSI submitted to ACO Tolle an equitable adjustment proposal for $2,297,066.45 plus a five-month time extension. The proposal was not certified as a claim but sought a meeting with the CO and the Deputy District Engineer to try to negotiate a settlement on two issues relating to "[1] the Differing Site Conditions and [2] Delays in approval of submittals by the government." (WB, tab 66 at 832, 837) OSI's proposal assigned responsibility for the delays encountered in completing the upland disposal area to the Corps. OSI appeared to contend not only did it encounter a DSC between Sta. 2+86 and Sta. 3+86, but in the area where the weir structure was built, and this, in turn, caused delay in redesigning the proper piling for the weir structures:

> Clearly the delay was precipitated by the Differing Site Condition which required Geotechnical review by the owner, designing an approach for resolution, pricing of the change, accomplishing corrective work (Muck removal) in stages, accomplishing new testing, development of a new design, and the approval process of the new design which was changed as a result of the Differing Site Condition.

> ....

> Little did anyone know at this time that the material encountered was going to require wood pilings 99' long! This would also require a complete new design including the totally unanticipated use of helical anchors and additional time for resolution of the design and approval of the system and design.

17

(*Id.* at 834) OSI did acknowledge that "[o]nce we were all in the middle of a redesign…the government probably was reasonable in not returning the submittals with the appropriate comments as they did not expect them to be used." (*Id.* at 834-36)

54. CO Griselle Gonzalez (CO Gonzalez) rejected OSI's 10 May 2010 equitable adjustment proposal and issued her notice of intent to issue a CO decision (WB, tab 78). By letter dated 29 November 2010, OSI requested that the CO issue a decision and provided its claim certification (WB, tab 83).

55. CO Gonzalez issued her decision by letter dated 4 March 2011 (WB, tab 6). The decision summarized OSI's claim as follows:

> Optimum claims it was required to stop work from September 28, 2009 until January 29, 2010 in the area where the weirs were to be constructed while a workable design was being developed to address the DSC identified on September 23, 2009. According to Optimum, it experienced methodology changes due to the DSC and untimely submittal reviews by the Government.

(*Id.* at 13) In denying the claim, the CO addressed three issues: (1) Differing Site Conditions; (2) Submittal Review and Approval; and (3) Concurrent Delay (*id.* at 19-21). On the DSC issue, the CO took the position there were actually two potential DSCs under which OSI "gave two separate notices, the Government initiated two separate investigations, and two different results were found" (*id.* at 19). On the DSC that OSI provided notice on 23 September 2009, the CO acknowledged the muck "was not a natural feature, but rather was due to the deposit and settling of fine sediments from previous dredging operations" (*id.* at 19). As to this DSC, the CO concluded that "Contract Modification P00004…was executed to fully compensate Optimum for the additional cost and delay associated with DSC No. 1" (*id.* at 20). The CO considered OSI to have given a second notice of DSC when it told the Corps it was stopping work on the weir structure design until the Corps conducted an additional investigation to determine if the DSC extended to the weir area. Given that no DSC was found, the CO concluded that Modification P00005 "fully addressed the costs for the geotechnical investigation and any reevaluation or redesign required for the weir structure" (*id.* at 20). On the submittal review issue, the CO concluded that when OSI decided to stop designing unless it was shown that there was no DSC in the area where the weirs were to be built, it was reasonable for the Corps to wait until OSI provided a revised submittal package or was notified that there would be no change to the existing submittal (*id.* at 21). On concurrent delay, the CO contended even if the Corps delayed returning the submittal drawings, OSI was unable to produce an approvable design for the weir system

18

(1) prior to notifying the Corps it was stopping design work and (2) after it was found no DSC existed (*id.*).

56. OSI appealed the CO's decision by notice dated 28 March 2011. The Board docketed the appeal as ASBCA No. 57575.

## DECISION

### *Has OSI Proved the Existence of a Differing Site Condition at the New Weir Location?*

OSI contends that it encountered a Type I DSC, and that the DSC extended into the weir area (app. br. at 29). As proof of the DSC, OSI contends that based upon the contract boring CB-LCI03-10, it originally designed two 55-foot timber piles[6] for each weir, and as a result of additional borings by UES, CBC, its designer, ultimately had to redesign four 100-foot plus timber piles for each weir (*id.* at 31). The Corps' brief acknowledges that OSI did encounter a DSC referred to as "muck" located in a small 50-foot by 100-foot area, but contends that the DSC did not extend into the area where the weir structures were to be built (gov't br. at 30). The Corps tells us that the only qualified expert, Dr. Hudyma, opined that the soil characteristics shown in contract boring CB-LCI03-10 did not differ materially from those shown by UES' borings, and Dr. Hudyma did not observe muck in the UES' borings (finding 46).

Because the parties bilaterally dealt with the muck DSC in the contained 50-foot by 100-foot area between Sta. 2+86 and Sta. 3+86 through Modification P00004, we agree with the Corps that whether a DSC existed in the area where the weir structures were to be built was a separate and unrelated DSC issue. A Type I DSC consists of "subsurface or latent physical conditions at the site which differ materially from those indicated in [the] contract." FAR 52.236-2. To establish entitlement to an equitable adjustment due to a Type I DSC, a contractor must prove, by a preponderance of the evidence, that:

> [T]he conditions indicated in the contract differ materially
> from those actually encountered during performance; the
> conditions actually encountered were reasonably
> unforeseeable based on all information available to the
> contractor at the time of bidding; the contractor reasonably
> relied upon its interpretation of the contract and
> contract-related documents; and the contractor was damaged

---

[6] Although OSI says that CBC initially designed 55-foot piles, CBC's calculation indicates that it designed 50-foot piles: "TOTAL LENGTH OF PILE = 25' + 25' = 50' LENGTHS" (WB, tab 12 at 2040).

as a result of the material variation between expected and
encountered conditions.

*Comtrol, Inc. v. United States*, 294 F.3d 1357, 1362 (Fed. Cir. 2002) (citing *H.B. Mac,
Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998)).

To recover under a Type I DSC claim, the contractor bears the burden of proof
showing that conditions actually encountered differed materially from those "indicated"
in the contract. *Foster Constr. C.A. & Williams Bros. Co. v. United States*, 435 F.2d 873,
881 (Ct. Cl. 1970). A contractor cannot be eligible for an equitable adjustment for Type I
changed conditions unless the contract indicated what those conditions would supposedly
be. *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed. Cir.
1984); *S.T.G. Construction Co. v. United States*, 157 Ct. Cl. 409, 414 (1962). Contract
borings are the most significant indicator of subsurface conditions. *Nova Group, Inc.*,
ASBCA No. 55408, 10-2 BCA ¶ 34,533 at 170,322.

In comparing the three UES borings with contract boring CB-LCI03-10,
Dr. Hudyma found "consistency in materials with depth." He found that CB-LCI03-10
showed poorly graded sand with localized zones of sand below the soft silt layer. He
found UES' boring B-3 showed "almost identical" material, with sandy materials (SP)
with an upper zone without shells and with a lower zone with shells. In B-1 and B-2, he
found sandy materials below the soft silt layer. (Finding 46)

Blow counts are used to determine soil properties for geotechnical design. Blow
counts would impact uplift analysis because soil shear strength parameters are based on
blow counts. (Finding 47) In comparing the UES blow counts with the blow counts
shown in CB-LCI03-10, Dr. Hudyma found UES borings B-1 and B-2, closest to the new
weir location, and CB-LCI03-10 were "nearly identical with the exception of one
anomalous blow count in boring CB-LCI03-10." UES B-3 showed more favorable blow
counts for pile design purpose than CB-LCI03-10. (Finding 47)

Dr. Hudyma's findings have not been effectively challenged. OSI did not call a
witness from UES or a soils expert to explain how UES' material classification on
borings B-1, B-2, and B-3 differed materially from that shown in CB-LCI03-10
(finding 49). Significantly, Dr. Hudyma did not find in UES' borings any muck
prevalent between Sta. 2+86 and Sta. 3+86 (finding 46).

We conclude that OSI has failed to prove the existence of a DSC at the location
where the new weir structures were built.

20

*Has OSI Proved Delay Caused by the Corps' Submittal Review?*

OSI contends next that the Corps failed to timely review and return submittals (app. br. at 32). OSI tells us that its Static Pile Capacity Analysis (timber pile design) was submitted on 9 September 2009 and a complete hard copy with comments made on the drawings was not returned until 25 November 2009, 77 days later (*id.* at 33). OSI contends that it submitted its flashboard riser system submittals – another component of the weir system – on 28 August 2009 and a complete hard copy with comments made on the drawings was not returned until 25 November 2009, 89 days later (*id.* at 34).

The contract required submittals covering component items forming a system or items that were interrelated be submitted concurrently (finding 10). This requirement was to enable the Corps to find potential conflicts between designs, and to see how various components of a design would work together. Reviewing components of a system piecemeal could actually take longer because the reviewer would have to go back and see how components fit with the rest of the system. (Finding 11) The contract gave the Corps 30 calendar days from the date of receipt to review, code, and return comments, and the contractor had 10 calendar days to resubmit any returned submittals requiring resubmission (finding 10). The 30-day review period presupposed complete submission of interrelated components (finding 10). To the extent the Corps chose to review piecemeal submittals as an accommodation to OSI this accommodation did not impose on the Corps a 30-day review obligation as if OSI submitted all components of an interrelated system completely and concurrently (finding 11).

OSI's argument that it was delayed did not take into account its own actions that caused the Corps to put its review of OSI's submittals on hold. In this case, OSI did not submit the weir system components, including the timber pile design and the weir riser system concurrently in a coordinated fashion as required by the contract (findings 10, 15-17). But, even assuming, *arguendo*, that OSI submitted complete submittals for the entire new weir system on 9 September 2009, the Corps would have 30 calendar days or until 9 October 2009 to review, code and return comments to OSI. With OSI's submittal coded "C" by the Corps on 18 September 2009 (finding 15), requiring resubmission in 10 calendar days, the Corps' final approval could not be obtained until at least 19 October 2009. By then, on 23 September 2009, over three weeks earlier, muck was discovered between Sta. 2+00 and Sta. 4+00. The Corps investigated and agreed that OSI encountered a DSC in a 50-foot by 100-foot area between Sta. 2+86 and Sta. 3+86, and OSI's designer, CBC, however, expressed concern on or about 13 October 2009 that the muck might extend to the area where the new weir structures were to be built (finding 26). OSI then notified the Corps on 21 October 2009 that it was not going to do any more design work until there was a geotechnical investigation of the area where the weir structures and the walkway were to be built (finding 30).

21

OSI has acknowledged that "[o]nce we were all in the middle of a redesign…the government probably was reasonable in not returning the submittals…as they did not expect them to be used" (finding 53). In light of the foregoing, we conclude that the Corps acted reasonably in not returning OSI's submittals until such time when (1) a DSC was found in the weir area to be investigated and OSI submitted a redesign or, (2) a DSC was not found and the Corps could resume its review of the submittals already provided.

As it turned out, without sufficient justification that a DSC existed at the location where the weir structures were to be built, and based on UES' borings, CBC went ahead to redesign the timber piles (before Modification P00005 was signed). OSI transmitted a new Static Pile Capacity Analysis (or new pile design) submittal on 20 November 2009 (finding 38). In doing so, OSI reset the Corps' 30-day review clock to 20 December 2009. Between 20 November 2009 and 23 December 2009, CBC redesigned the piles two more times (findings 38, 39), and the parties began to explore using other anchoring devices to avoid the lead time necessary to procure non-stocked extra-long timber piles (findings 40-43). These developments rendered continued review of OSI's original 9 September 2009 Static Pile Capacity Analysis (pile design) a useless endeavor or, as the Corps put it, a "moot" point (gov't br. at 36).

Even though the contract specified timber piles, the specifications assigned to OSI the task of designing the appropriate timber piles to support the new weir structures. We conclude that the specifications are of the performance variety. *Penguin Industries, Inc. v. United States*, 530 F.2d 934, 937 (Ct. Cl. 1976) (holding specifications to be performance type where a contract left to contractor the duty of using its own judgment and experience in determining how to manufacture certain aspects of cartridge). Here, Section 31 62 20, ¶ 3.1.2 of the specifications does not specify the size or length of the timber piles to use. OSI was told that it could choose a design of either 2 or 4 piles per weir. Based on the use of static analysis method outlined in EM 1110-2-2906, the timber pile specifications let OSI's designer determine the tip elevations, and hence the length, of the piles. OSI and its designer, were expected to design the appropriate piles that would resist uplift, consider wind load, and include a proper safety factor. (Finding 9)

In designing the timber piles, OSI's designer was unable to get it right. CBC's first design calling for two 50-foot piles per weir was approved with the qualification that it must be resubmitted for final approval due to inadequate wind loading (finding 15). CBC's first redesign calling for four 78-foot piles per weir was disapproved for incorrect uplift calculations (finding 38). Its second redesign calling for four 94-foot piles per weir was not approved for failing to use the right safety factor (finding 39). Its third redesign calling for four 100-foot plus piles per weir was abandoned in favor of using timber piles in combination with helical anchors (finding 44). OSI's pile designer, CBC, did not testify. Nor did CBC challenge the Corps' comments on various submittals as erroneous but accepted the comments and made the necessary corrections.

22

Despite the Corps' failure to return the marked-up submittal drawings and its "misrouting," we conclude that the delays in having the disposal area completed were driven primarily by (1) OSI's piecemeal submissions of its weir system submittals; (2) OSI's unwarranted decision to suspend its design efforts pending a geotechnical investigation of the area where the new weir structures were to be built, (3) CBC, OSI's designer's decisions to redesign the timber piles without sufficient justification that a DSC existed at the location where the new weir structures were to be built; and (4) CBC, OSI's designer's repeated inability to properly design acceptable timber piles.

### *Jurisdiction Over OSI's Defective Specification Argument*

OSI argues that the specifications were defective in that (1) they required the use of timber piles, and (2) they required the use of 100-foot plus timber piles whose four-month lead time to obtain would consume the entire four months (116 days) OSI had to complete the base item of the contract (app. br. 28-29). The Corps urges us not to consider this argument because OSI did not raise the issue of defective specifications in its certified claim, and "[n]one of the serial letters or other correspondence in the record discusses defective specifications" (gov't br. at 28).

The CDA requires all claims by a contractor be submitted to the CO for decision. 41 U.S.C. § 7103(a)(1). We lack jurisdiction over claims raised for the first time on appeal, in a complaint or otherwise. *Versar, Inc.*, ASBCA No. 56857, 10-1 BCA ¶ 34,437 at 169,957. Whether a claim before the Board is new or essentially the same as that presented to the CO depends upon whether the claims derived from common or related operative facts. The requirement that the appeal brought before us be based on the same claims previously presented to and denied by the CO "does not require ridged [sic] adherence to the exact language or structure of the original administrative CDA claim" if the claim "arise[s] from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery." *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003); *see also The Public Warehousing Co.*, ASBCA No. 56022, 11-2 BCA ¶ 34,788 at 171,228.

Here, OSI's claim and the CO's decision were based on three issues: (1) whether a DSC existed at the location where the weir structures were built; (2) whether the Corps delayed returning the OSI's weir system submittals; and (3) whether OSI was responsible for concurrent delays even if the Corps delayed returning the weir system submittals. The operative facts relating to these issues centered upon the subsurface soil conditions at the location where the weir structures were built and the submittal review process. The operative facts of these issues were separate and distinct from any facts relating to whether piles made out of timber were suitable or appropriate for anchoring the weir structures and from any facts surrounding the timber piles' availability which was not specified.

23

We conclude that OSI's defective specification argument, presented for the first time as a part of its opening statement, involved different operative facts from those presented in its claim to the CO for decision. Consequently, we have no jurisdiction over OSI's defective specification claim.

## CONCLUSION

Because (1) OSI failed to prove that a DSC existed at the location where the weir structures were built, (2) OSI was responsible, in whole or in part, for the weir system submittal delays, and (3) the Board has no jurisdiction over OSI's belated defective specification argument, we deny the appeal.

Dated: 10 September 2013

PETER D. TING
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

JACK DELMAN
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

24

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 57575, Appeal of Optimum Services, Inc., rendered in conformance with the Board's Charter.

Dated:

 

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

52.236-2    DIFFERING SITE CONDITIONS (APR 1984)

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of

(1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or

(2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; provided, that the time prescribed in (a) above for giving written notice may be extended by the Contracting Officer.

(d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.

(End of clause)

| CECW-ED | Department of the Army | EM 1110-2-2906 |
| | U.S. Army Corps of Engineers | |
| Engineer Manual 1110-2-2906 | Washington, DC 20314-1000 | 15 January 1991 |
| | Engineering and Design<br><br>DESIGN OF PILE FOUNDATIONS | |
| | **Distribution Restriction Statement**<br>Approved for public release; distribution is unlimited. | |

CASE PARTICIPANTS ONLY Page: 99 Filed: 04/29/2014



EM 1110-2-2906
15 January 91

**US Army Corps
of Engineers**

**ENGINEERING AND DESIGN**

# Design of Pile Foundations

**ENGINEER MANUAL**

DEPARTMENT OF THE ARMY                    EM 1110-2-2906
US Army Corps of Engineers
CECW-ED                  Washington, DC  20314-1000

Engineer Manual
No. 1110-2-2906                                    15 January 1991

Engineering and Design
DESIGN OF PILE FOUNDATIONS

1.  Purpose.  This manual provides information, foundation exploration and
testing procedures, load test methods, analysis techniques, allowable crite-
ria, design procedures, and construction consideration for the selection,
design, and installation of pile foundations.  The guidance is based on the
present state of the technology for pile-soil-structure-foundation interaction
behavior.  This manual provides design guidance intended specifically for the
geotechnical and structural engineer but also provides essential information
for others interested in pile foundations such as the construction engineer in
understanding construction techniques related to pile behavior during instal-
lation.  Since the understanding of the physical causes of pile foundation
behavior is actively expanding by better definition through ongoing research,
prototype, model pile, and pile group testing and development of more refined
analytical models, this manual is intended to provide examples and procedures
of what has been proven successful.  This is not the last nor final word on
the state of the art for this technology.  We expect, as further practical
design and installation procedures are developed from the expansion of this
technology, that these updates will be issued as changes to this manual.

2.  Applicability.  This manual is applicable to all USACE commands having
civil works responsibilities, especially those geotechnical and structural
engineers charged with the responsibility for design and installation of safe
and economical pile foundations.

FOR THE COMMANDER:

ROBERT L. HERNDON
Colonel, Corps of Engineers
Chief of Staff

This manual supersedes EM 1110-2-2906, 1 July 1958.

```
              DEPARTMENT OF THE ARMY              EM 1110-2-2906
              US Army Corps of Engineers
CECW-ED       Washington, DC  20314-1000

Engineer Manual
No. 1110-2-2906                                   15 January 1991

              Engineering and Design
              DESIGN OF PILE FOUNDATIONS
```

Table of Contents

| Subject | Paragraph | Page |
|---|---|---|
| CHAPTER 1.  INTRODUCTION | | |
| Purpose | 1-1 | 1-1 |
| Applicability | 1-2 | 1-1 |
| References, Bibliographical and Related Material | 1-3 | 1-1 |
| Definitions | 1-4 | 1-2 |
| CHAPTER 2.  GENERAL CONSIDERATIONS | | |
| General | 2-1 | 2-1 |
| Structural and Geotechnical Coordination | 2-2 | 2-1 |
| Design Considerations | 2-3 | 2-1 |
| Nature of Loadings | 2-4 | 2-3 |
| Foundation Material | 2-5 | 2-4 |
| Identification and Evaluation of Pile Alternatives | 2-6 | 2-5 |
| Field Responsibilities for the Design Engineer | 2-7 | 2-7 |
| Subsurface Conditions | 2-8 | 2-8 |
| Pile Instrumentation | 2-9 | 2-8 |
| CHAPTER 3.  GEOTECHNICAL CONSIDERATIONS | | |
| Subsurface Investigations and Geology | 3-1 | 3-1 |
| Laboratory and Field Testing | 3-2 | 3-1 |
| Foundation Modification | 3-3 | 3-2 |
| Ground-Water Studies | 3-4 | 3-2 |
| Dynamic Considerations | 3-5 | 3-2 |
| Pile Load Test | 3-6 | 3-3 |
| Selection of Shear Strength Parameters | 3-7 | 3-4 |
| CHAPTER 4.  ANALYSIS AND DESIGN | | |
| General | 4-1 | 4-1 |
| Design Criteria | 4-2 | 4-1 |
| Pile Capacity | 4-3 | 4-10 |
| Settlement | 4-4 | 4-22 |
| Pile Group Analysis | 4-5 | 4-27 |

i

EM 1110-2-2906
15 Jan 91

| Subject | Paragraph | Page |
|---|---|---|
| Design Procedure | 4-6 | 4-38 |
| Special Considerations | 4-7 | 4-42 |
| CHAPTER 5. ENGINEERING CONSIDERATIONS PERTAINING TO CONSTRUCTION | | |
| General | 5-1 | 5-1 |
| Construction Practices and Equipment | 5-2 | 5-1 |
| Pile Driving Studies | 5-3 | 5-18 |
| Control of Pile Driving Operations | 5-4 | 5-22 |
| Results of Corps Experiences | 5-5 | 5-26 |
| As-Built Analysis | 5-6 | 5-27 |
| Field Evaluation | 5-7 | 5-29 |
| CHAPTER 6. FIELD PILE TESTS | | |
| General | 6-1 | 6-1 |
| Decision Process | 6-2 | 6-1 |
| Axial Load Test | 6-3 | 6-3 |
| Monotonic Lateral Load Test | 6-4 | 6-10 |
| APPENDIX A. REFERENCES | | A-1 |
| APPENDIX B. BIBLIOGRAPHICAL AND RELATED MATERIAL | | B-1 |
| APPENDIX C. CASE HISTORY - PILE DRIVING AT LOCK AND DAM NO. 1 RED RIVER WATERWAY | | C-1 |
| APPENDIX D. PILE CAPACITY COMPUTATIONS | | D-1 |

Add31

EM 1110-2-2906
15 Jan 91

CHAPTER 1

INTRODUCTION

1-1. <u>Purpose</u>. This manual provides information, foundation exploration and testing procedures, load test methods, analysis techniques, design criteria and procedures, and construction considerations for the selection, design, and installation of pile foundations. The guidance is based on the present state of technology for pile-soil-structure-foundation interaction behavior. This manual provides design guidance intended specifically for geotechnical and structural engineers and essential information for others interested in understanding construction techniques related to pile behavior during installation. The understanding of pile foundation behavior is actively expanding by ongoing research, prototype, model pile, and pile group testing and development of more refined analytical models. However, this manual is intended to provide examples and procedures of proven technology. This manual will be updated as changes in design and installation procedures are developed.

1-2. <u>Applicability</u>. This manual is applicable to all USACE commands having civil works responsibilities, especially those geotechnical and structural engineers charged with the responsibility for design and installation of safe and economical pile foundations.

1-3. <u>References, Bibliographical and Related Material</u>.

    a. US Army Corps of Engineers Directives are listed in Appendix A.

    b. Bibliographical and related material is listed in Appendix B, numbered, and cited in the text by the corresponding item number. These selections pertain to pile foundations for general knowledge and contain further expanded and related material.

    c. A series of computer programs are available to assist in analyzing and designing pile foundations in accordance with the engineering manual. This series of programs includes:

    (1) Pile Group Analysis (CPGA) which is a stiffness analysis of three-dimensional pile groups assuming linear elastic pile-soil interaction and a rigid pile cap.

    (2) Pile Group Graphics (CPGG) which displays geometry and the results of CPGA.

    (3) Pile Group Stiffness (CPGS) which determines the pile head stiffness coefficients for a single vertical pile, and computes the displacements, internal forces and moments, and axial and lateral soil pressures acting on a pile due to specified loads or displacements at the pile head.

    (4) Pile Group Dynamics (CPGD) which extends the capability of CPGA to account for dynamic loading.

    (5) Pile Group Concrete (CPGC) which develops the interaction diagrams and data required to investigate the structural capacity of prestressed concrete piles.

EM 1110-2-2906
15 Jan 91

(6) Pile Group Interference (CPGI) which investigates the pile layout for geometric interference due to the intersection of piles during driving.

(7) Pile Group Optimization (CPGO) which solves for the optimal arrangement of a pile group using data and analysis results from GPGA.

(8) Pile Group Base (CPGB) which analyzes a rigid base slab or pile cap for pile loads determined by CPGA.

(9) Pile Group Flexible (CPGF) which extends the capability of CPGA to account for the flexibility of the base slab or pile cap.

(10) Pile Group Probabilistic (CPGP) which extends the capability of CPGI to account for probabilistic variations in pile driving tolerances, tolerable manufacturing imperfections, pile flexibility, and subsurface obstructions.

The first five programs are available for use, and the remaining programs are under development. Other programs will be added to the series as needs are identified. Currently available programs are fully described in Items 5, 6, 15, and 16, respectively. The theoretical background for these computer programs and this Engineer Manual will be provided in "Theoretical Manual for the Design of Pile Foundations." The Theoretical Manual is currently in preparation and is intended to be a companion volume that provides a detailed discussion of the techniques used for the design/analysis of pile foundations as presented in this manual and used in the available computer programs listed on pp 1-1 and 1-2. It will present the theoretical development of these engineering procedures, how they were implemented in computer programs, and discussions on the limitations of each method.

d. A case history of pile driving at Lock and Dam No. 1, Red River Waterway, is presented in Appendix C.

e. Examples of pile capacity computations are presented in Appendix D.

1-4. Definitions.

a. Pile Foundation. In this manual, a pile foundation will be broadly described as one in which the following is true of the piles:

(1) Piles are driven, not drilled.

(2) Standard commercial, not special patent, piles are used.

(3) Usually steel or prestressed concrete piles are used for major hydraulic structures, but reinforced concrete or timber piles should also be considered.

b. Pile Industry Terms. Since many of the terms used in the piling (material, equipment, and driving) industry seem to be unique to this industry, it is suggested that reference be made to the Deep Foundations Institute (Item 32). These definitions are adhered to in this manual.

c. Units of Measurement. The English system of measurement units have been used exclusively throughout this manual.

1-2

d.  Notations and Symbols.  There is no unified set of symbols and no-
menclature for the analysis and design of pile groups.  Pile technology has
evolved over the last three decades and different symbols appear throughout
the engineering literature for describing the various geotechnical and struc-
tural aspects of single pile and pile group behavior.  This has presented a
major problem in writing this EM.  The following approach was adopted:

(1)  It was not practical to develop a unified system of symbols and
nomenclature.

(2)  Critical symbols which have attained recognition as defacto stan-
dards throughout the profession (such as p-y and t-z curves) and within the
Corps of Engineers (such as X, Y, and Z for the global coordinate axes and 1,
2, and 3 for the local pile coordinate axes) will be identified.  Some symbols
may therefore have dual meanings (such as x, y, and z for local coordinates or
as local pile displacements).

e.  Style of Presentation.  The EM was written in a manner to assist
readers struggling with the difficulties of the symbols and nomenclature and
the inherent technical complexity of pile behavior.  Footnotes are used when a
symbol which has a dual meaning is introduced.  This minimizes potential prob-
lems by explaining the meaning for that particular application and gives the
key references for a detailed explanation.

f.  Alternative Foundation Designs.  The first consideration in the de-
sign of a structural foundation should be the subsurface investigation.  The
data from such investigations should be evaluated to determine whether or not
the use of a pile foundation is necessary.  If such studies, together with
studies of the soil properties, reveal that detrimental settlement can be
avoided by more economical methods or that a pile foundation will not prevent
detrimental settlement, then piles should not be used.  A preliminary selec-
tion of the pile type may usually be made from a study of the foundation
investigations.  However, the nature of the structure, type of applied loads,
and technical and economic feasibility must be considered in the determination
of pile type, length, spacing, batters, etc.

(1)  If the boring data reveal that timber piles would not be damaged by
driving, such type may be considered.  Steel bearing piles may be desirable if
boulders or hard strata are present in the area of pile driving.  In deposits
of sands, silts, and clays that are relatively free of boulders, consideration
should be given to the use of concrete piles.  However, considerable diffi-
culty and problems often occur in driving displacement piles in granular soils
such as sands, silty-sands, and sandy silts.

(2)  The load-bearing stratum or strata can be selected from a study of
the soil profiles and characteristics of the soil.  By estimating the required
length of penetration into the load-bearing material, the lengths of piles may
be reasonably approximated.  In designing friction pile foundations, advantage
should be taken of increased capacity with greater depths by favoring fewer
piles with greater lengths.

(3)  In cases where piles are to be driven into or underlain by cohesive
soils, the foundation should be investigated to determine the type and length
of piles and the size and shape of the structural foundation which will result
in a minimum of ultimate settlement.  In wide foundations, long, heavily

CASE PARTICIPANTS ONLY Document: 23 Page: 106 Filed: 04/08/2014

EM 1110-2-2906
15 Jan 91

loaded, widely spaced piles will result in less settlement than short, lightly
loaded, closely spaced piles.

1-4

CHAPTER 2

GENERAL CONSIDERATIONS

2-1. <u>General</u>. Many factors must be considered when selecting an appropriate foundation for a hydraulic structure. This chapter presents criteria and methods for selecting the best type of foundation. Information is presented to identify the feasible foundation alternatives for more detailed study. The final selection should be based on an evaluation of engineering feasibility and comparative costs for the potential alternatives considering such factors as safety, reliability, constructability, and life cycle performance. This chapter also presents general criteria for feature design. Such criteria pertain to the type and function of the structure, the nature of the applied loads, and the type of foundation material. The requirements for a subsurface investigation program are also presented.

2-2. <u>Structural and Geotechnical Coordination</u>. A fully coordinated effort from geotechnical and structural engineers and geologists should ensure that the result of the pile foundation analysis is properly integrated into the overall foundation design. This coordination extends through plans and specifications, preconstruction meetings, and construction. Some of the critical aspects of the design process which require coordination are:

    a. Preliminary and final selection of pile type.

    b. Allowable deflections at the groundline and fixity of the pile head.

    c. Preliminary evaluation of geotechnical data and subsurface conditions.

    d. Selection of loading conditions, loading effects, potential failure mechanisms, and other related features of the analytical models.

    e. Minimum pile spacing and maximum batter.

    f. Lateral resistance of soil.

    g. Required pile length and axial capacity.

    (1) Maximum stresses during handling, driving, and service loading.

    (2) Load testing and monitoring programs.

    h. Driveability of the pile to the selected capacity.

2-3. <u>Design Considerations</u>. The pile foundation analysis is based upon several simplifying assumptions which affect the accuracy of the results. The computed results must always be reviewed with engineering judgement by the design engineer to assure that the values are reasonable. Also, the analysis results should be compared with load test results.

    a. Functional Significance of Structure. The type, purpose, and func- tion of the structure affect decisions regarding subsurface investigation pro- grams, analytical methods, construction procedures and inspection, and performance monitoring. Generally, the proposed structure should be evaluated

2-1

Case: 14-1228 Case: 14-1228 Document: 23 Page: 108 Filed: 04/28/2014 Filed: 04/23/2014

on the basis of the consequences of failure, that is, the potential for loss
of lives and property, economic losses both local and national, compromising
the national defense, and adverse public opinion. The designer must be aware
of these factors so that a rational approach may be taken throughout the anal-
ysis, design, and construction of the project. In order to reduce the
potential for failure, as well as to minimize the cost, the designer must
apply appropriate factors of safety to the design. These factors of safety
are based on the functional significance of the structure, the level of
confidence in the foundation parameters, the adequacy of the analysis tools,
and the level of construction controls.

   b. Definitions of Failure. Structure or foundation failures can be
categorized as an actual collapse or a functional failure. Functional failure
can be due to excessive deflection, unacceptable differential movements, ex-
cessive vibration, and premature deterioration due to environmental factors.
For critical structures, failure to meet functional requirements may be as
serious as the actual collapse of a lesser structure. Therefore, designers
should be cognizant not only of the degree of safety against collapse but also
of effects of settlement and vibration on the functional performance.

   c. Factors of Safety. Factors of safety represent reserve capacity
which a foundation or structure has against collapse for a given set of loads
and design conditions. Uncertain design parameters and loads, require a
higher factor of safety than required when the design parameters are well
known. For most hydraulic structures, designers should have a high level of
confidence in the soil and pile parameters and the analysis. Therefore,
uncertainty in the analysis and design parameters should be minimized rather
than requiring a high factor of safety. For less significant structures, it
is permissible to use larger factors of safety if it is not economical to
reduce the uncertainty in the analysis and design by performing additional
studies, testing, etc. Also, factors of safety must be selected to assure
satisfactory performance for service conditions. Failure of critical compo-
nents to perform as expected can be as detrimental as an actual collapse.
Therefore, it is imperative that in choosing a design approach, the designer
consider the functional significance of the project, the degree of uncertainty
in the design parameters and the analytical approach, and the probability of
failure due to both collapse and functional inadequacy.

   d. Soil-Structure Considerations for Analysis. The functional sig-
nificance and economic considerations of the structure will determine the type
and degree of the foundation exploration and testing program, the pile test
program, the settlement and seepage analyses, and the analytical models for
the pile and structure. For critical structures the foundation testing pro-
gram should clearly define the necessary parameters for the design of the pile
foundation, such as soil types and profiles, soil strengths, etc. (Para-
graphs 3-1 and 3-2 give further details.) Although pile load tests are usu-
ally expensive and time consuming, they are invaluable for confirming or
modifying a pile foundation design during the construction phase. A well-
planned and monitored pile load test program will usually save money by
allowing the designer to utilize a lower factor of safety or by modifying the
required number or length of piles required. A pile load test program should
be considered for all large structures for which a pile foundation is re-
quired. (Paragraph 3-6 gives further details.) Depending upon the type of
foundation material, the nature of the loading, the location of the ground
water, and the functional requirements of the structure, a detailed seepage

Add37

analysis and/or pile settlement analysis may also be required to define
adequately the pile-soil load transfer mechanism and the resulting parameters
necessary for an adequate pile design.  Where differential movement between
monoliths is a concern, an accurate estimate of pile settlement may be
crucial, particularly if the monoliths have significantly different load
levels.  (Paragraphs 3-4 and 4-4 give further discussions.)  Decisions
regarding the type and sophistication of the analytical models for the pile
and the structure should also be made with the functional significance of the
structure in mind.  For example, it may be satisfactory to analyze the pile
foundation for a small, lightly loaded structure based on conservative
assumptions for pile parameters and a crude structural model; however, a
larger, more important structure would probably require a detailed single pile
analysis to establish the proper pile parameters.  Perhaps it would even be
necessary to use a structural model capable of considering the actual struc-
tural stiffness to insure correct load distribution to the piles.  (See para-
graph 4-5 for further discussion.)

    e.  Construction and Service Considerations.  No matter how thorough and
well researched a design may be, it is only as good as its execution in the
field.  The proof of the entire design and construction process is in the
performance of the final product under service conditions.  Therefore, the
designer should consider the analysis and design of a structure and its
foundation as parts of an engineering process that culminates with the
successful long-term performance of the structure for its intended purposes.
The designer prepares the specifications and instructions for field personnel
to assure the proper execution of the design.  The designer must discuss crit-
ical aspects of the design with construction personnel to make sure that there
is a thorough understanding of important design features.  For critical
structures a representative of the design office should be present in the
field on a continuous basis.  One such example would be a major pile test
program where the execution of the pile test and the gathering of data is
critical for both a successful testing program and verification of design
assumptions.  Another critical activity that requires close cooperation
between the field and the designer is the installation of the foundation
piling.  The designer should be involved in this phase to the extent necessary
to be confident that the design is being properly executed in the field.  As a
general principle, designers should make frequent visits to the construction
site not only to ensure that the design intent is being fulfilled but also to
familiarize themselves with construction procedures and problems to improve on
future designs and complete as-built records.  Once the project is in oper-
ation, the designer should obtain feedback on how well the structure is
fulfilling its operational purposes.  This may require that instrumentation be
a part of the design or may take the form of feedback from operating personnel
and periodic inspections.

2-4.  Nature of Loadings.

    a.  Usual.  Usual loads refer to conditions which are related to the pri-
mary function of a structure and can be reasonably expected to occur during
the economic service life.  The loading effects may be of either a long term,
constant or an intermittent, repetitive nature.  Pile allowable loads and
stresses should include a conservative safety factor for such conditions.  The
pile foundation layout should be designed to be most efficient for these
loads.

EM 1110-2-2906
15 Jan 91

b. Unusual. Unusual loads refer to construction, operation or mainte-
nance conditions which are of relatively short duration or infrequent occur-
rence. Risks associated with injuries or property losses can be reliably
controlled by specifying the sequence or duration of activities, and/or by
monitoring performance. Only minor cosmetic damage to the structure may occur
during these conditions. Lower factors of safety may be used for such load-
ings, or overstress factors may be applied to the allowables for these loads.
A less efficient pile layout is acceptable for these conditions.

c. Extreme. Extreme loads refer to events which are highly improbable
and can be regarded as emergency conditions. Such events may be associated
with major accidents involving impacts or explosions and natural disasters due
to earthquakes or hurricanes which have a frequency of occurrence that greatly
exceeds the economic service life of the structure. Extreme loadings may also
result from a combination of unusual loading effects. The basic design con-
cept for normal loading conditions should be efficiently adapted to accommo-
date extreme loading effects without experiencing a catastrophic failure.
Extreme loadings may cause significant structural damage which partially
impairs the operational functions and requires major rehabilitation or re-
placement of the structure. The behavior of pile foundations during extreme
seismic events is a phenomenon which is not fully understood at present. The
existing general approach is to investigate the effects of earthquake loading
at sites in seismic Zones 1 or 2 by applying psuedostatic forces to the
structure and using appropriate subgrade parameters. In Zones 3 or 4 a
dynamic analysis of the pile group is appropriate. Selection of minimum
safety factors for extreme seismic events must be consistent with the seismol-
ogic technique used to estimate the earthquake magnitude. Designing for pile
ductility in high risk seismic regions is very important because it is very
difficult to assess pile damage after earthquakes and the potential repair
costs are very large. Effects related to liquefaction of subsurface strata
are discussed in paragraph 3-5.

2-5. Foundation Material.

a. Known Data. After a general site for a project is selected, the de-
signer should make a site visit to examine the topography at the site. Rock
outcrops or highway cuts on or near the site may provide valuable information
of the subsurface conditions. An examination of existing structures in the
vicinity may also provide information. A visit to the local building depart-
ment may provide foundation information and boring logs for nearby buildings.
The highway department may have soil and geological information in the area
for existing roads and bridges. Valuable soil and geological information can
be obtained from other governmental agencies, such as the United States
Geological Survey (USGS), Soil Conservation Service (SCS), Bureau of Records,
etc., for even remotely located areas. Colleagues may be able to provide
information on projects they have worked on in the area. Check the files for
previous jobs your office might have built or explored in the area.

b. Similar Sites. It is important to determine the geological history
of the site and geological origins of the material that exists at the site.
The geological history of the site will provide information on the properties
of the different geological zones and may allow the designer to find sites
with similar geological origins where data are available on the soil and rock
properties and on pile behavior.

Add39

EM 1110-2-2906
15 Jan 91

c.  Exploration Requirements.  The designer must lay out an exploration and testing program that will identify the various material zones and their properties.  This exploration and testing program shall identify the various soil and rock layers at the site; the groundwater table, water quality, and existing aquifers; and information relating to faults at the site.  The above information should be obtained to the degree that is necessary to design an adequate foundation for the proposed structure.

2-6.  Identification and Evaluation of Pile Alternatives.

a.  General.  Structures may be founded on rock, on strong or weak soils, cohesive or noncohesive soils, above ground level, below water level, etc. The type of foundation used to support a structure depends on local conditions.  After obtaining a general evaluation of the subsurface conditions the engineer should attempt to identify all potential useful foundation alternatives for a structure.  Three basic types of foundations are available: soil-founded, various types of piles, and piers or caissons.  Each of these foundation types has many subcategories.  The following paragraphs provide a short description and evaluation of the various pile types.

b.  Piles.  The purpose of a pile foundation is to transfer and distribute load through a material or stratum with inadequate bearing, sliding or up-lift capacity to a firmer stratum that is capable of supporting the load without detrimental displacement.  A wide range of pile types is available for applications with various soil types and structural requirements.  A short description of features of common types of piles follows:

(1)  Steel H-Piles.  Steel H-piles have significant advantages over other types of piles.  They can provide high axial working capacity, exceeding 400 kips.  They may be obtained in a wide variety of sizes and lengths and may be easily handled, spliced, and cut off.  H-piles displace little soil and are fairly easy to drive.  They can penetrate obstacles better than most piles, with less damage to the pile from the obstacle or from hard driving.  The major disadvantages of steel H-piles are the high material costs for steel and possible long delivery time for mill orders.  H-piles may also be subject to excessive corrosion in certain environments unless preventive measures are used.  Pile shoes are required when driving in dense sand strata, gravel strata, cobble-boulder zones, and when driving piles to refusal on a hard layer of bedrock.

(2)  Steel Pipe Piles.  Steel pipe piles may be driven open- or closed-end and may be filled with concrete or left unfilled.  Concrete filled pipe piles may provide very high load capacity, over 1,000 kips in some cases. Installation of pipe piles is more difficult than H-piles because closed-end piles displace more soil, and open-ended pipe piles tend to form a soil plug at the bottom and act like a closed-end pile.  Handling, splicing, and cutting are easy.  Pipe piles have disadvantages similar to H-piles (i.e., high steel costs, long delivery time, and potential corrosion problems).

(3)  Precast Concrete.  Precast concrete piles are usually prestressed to withstand driving and handling stresses.  Axial load capacity may reach 500 kips or more.  They have high load capacity as friction piles in sand or where tip bearing on soil is important.  Concrete piles are usually durable and corrosion resistant and are often used where the pile must extend above ground.  However, in some salt water applications durability is also a problem

2-5

Case: 14-1228 Case: 14-1228 Document: 23 Page: 112 Filed: 04/23/2014 Page: 112 Filed: 04/23/2014

with precast concrete piles. Handling of long piles and driving of precast
concrete piles are more difficult than for steel piles. For prestressed
piles, when the required length is not known precisely, cutting is much more
critical, and splicing is more difficult when needed to transfer tensile and
lateral forces from the pile head to the base slab.

(4) Cast-in-Place Concrete. Cast-in-place concrete piles are shafts of
concrete cast in thin shell pipes, top driven in the soil, and usually closed
end. Such piles can provide up to a 200-kip capacity. The chief advantage
over precast piles is the ease of changing lengths by cutting or splicing the
shell. The material cost of cast-in-place piles is relatively low. They are
not feasible when driving through hard soils or rock.

(5) Mandrel-Driven Piles. Mandrel-driven piles are thin steel shells
driven in the ground with a mandrel and then filled with concrete. Such piles
can provide up to a 200-kip capacity. The disadvantages are that such piles
usually require patented, franchised systems for installation and installation
is not as simple as for steel or precast concrete piles. They offer the
advantage of lesser steel costs since thinner material can be used than is the
case for top-driven piles. The heavy mandrel makes high capacities possible.
Mandrel-driven piles may be very difficult to increase in length since the
maximum pile length that can be driven is limited by the length of the mandrel
available at the site. Contractors may claim extra costs if required to bring
a longer mandrel to the site.

(6) Timber. Timber piles are relatively inexpensive, short, low-
capacity piles. Long Douglas Fir piles are available but they will be more
expensive. They may be desirable in some applications such as particular
types of corrosive groundwater. Loads are usually limited to 70 kips. The
piles are very convenient for handling. Untreated timber piles are highly
susceptible to decay, insects, and borers in certain environments. They are
easily damaged during hard driving and are inconvenient to splice.

c. Evaluation of Pile Types.

(1) Load Capacity and Pile Spacing. Of prime importance is the load-
carrying capacity of the piles. In determining the capacity of a pile founda-
tion, it is important to consider the pile spacing along with the capacity of
individual piles. The lateral load resistance of the piles may also be
important since lateral loads can induce high bending stresses in a pile.

(2) Constructability. The influence of anticipated subsurface and sur-
face effects on constructability must be considered. Piles susceptible to
damage during hard driving are less likely to penetrate hard strata or gravel
and boulder zones. Soil disturbance or transmission of driving vibrations
during construction may damage adjacent piles or structures. Pile spacing and
batters must be selected to prevent interference with other structural
components during driving. The ease of cutting or splicing a pile may also
affect constructability.

(3) Performance. The pile foundation must perform as designed for the
life of the structure. Performance can be described in terms of structural
displacements which may be just as harmful to a structure as an actual pile
failure. The load capacity should not degrade over time due to deterioration
of the pile material.

Add41

EM 1110-2-2906
15 Jan 91

(4)  Availability.  Piles must be available in the lengths required, or they must be spliced or cut off.  Project scheduling may make lead time an important consideration, since some piles may require up to 6 months between order and delivery.

(5)  Cost.  Once a pile type satisfies all other criteria, relative cost becomes a major consideration.  For comparisons between types of piles, it may be adequate to compare the pile cost per load capacity.  For example, an installed H-pile may cost $40 per linear foot and have a capacity of 200 kips for a 50-foot length.  The unit capacity cost would then be $10 per kip.  A comparison between unit capacity costs may lead to an obvious exclusion of certain pile types.  The cost evaluation should include all expenses related to and dependent on the pile foundation.  Such costs may include additional expense for storage or splicing.  They may include pressure-relief systems used to reduce uplift pressures and thus control pile loads.  In addition, any required modifications to the structure to accommodate the piles should be included in a comparative cost estimate.  For example, an increase in base slab thickness may be required to provide additional embedment for the tops of the piles.

d.  Preliminary Evaluations.  All identified foundation alternatives should first be evaluated for suitability for the intended application and cost.  For piles, this evaluation should be based on the capacity, availability, constructability, and expected performance of the various types of piles.  Initial evaluation of nonpile alternatives should be based on similar criteria.  This will limit further studies to those foundation alternatives which are reasonably feasible.  During this initial evaluation, it may also be possible to eliminate from consideration obvious high-cost alternatives.

e.  Final Evaluations.  The final evaluation and selection should be based mainly on relative costs of the remaining alternatives.  This evaluation should include the costs of structural or site modifications required to accommodate the foundation type.  Cost and other factors may be important in the selection.  Differences in delivery or installation schedules, levels of reliability of performance, and potential construction complications may be considered.  When comparing a pile foundation to another type of foundation, it will be necessary to develop a preliminary pile layout to determine a reasonable estimate of quantities.

2-7.  Field Responsibilities for the Design Engineer.

a.  Loading Test.  On all major structures with significant foundation costs, pile load tests are required.  On minor structures, pile load tests may not be required depending on economics, the complexity of the soil conditions, the loading conditions and the experience the designer has with pile foundations in that area.  Load tests of piles should be performed to finalize pile lengths and to provide information for improving design procedures.  Load tests are performed prior to construction of the pile foundation.  Consideration should be given to the use of indicator pile tests, that is the capacity may be inferred using the pile driving analyzer or other similar technique.  These are powerful tools that can augment but not replace static tests.

b.  Field Visits.  The quality design of a pile foundation design is only as good as the as-built conditions.  In order to ensure correct installation of the pile foundation, it is important for the design engineer to visit the

EM 1110-2-2906
15 Jan 91

construction site frequently. Field visits should be made to view critical construction phases and to discuss progress and potential changes in proce- dures with the construction representative. Critical items include monitoring and maintaining detailed records of driving operations, especially:

(1) Driving reports for individual piles - date and times, placement position and alinement; blow counts, difficulties and interruptions during driving; installation and location of any pile splices.

(2) General driving data - complete descriptions of driving equipment, adjustments and changes (leads, hammer, anvil, cap, cushions, etc.); pile storage and handling procedures; pile interference; pile heave.

(3) Driving restrictions - existing structures in vicinity; driving near new concrete; limiting water elevation.

    c. Instructions to the Field. Instructions to the field are necessary to convey to field personnel the intent of the design. Instructions to the field should be conveyed to the field by the designers through a report, "Engineering Considerations and Instructions for Field Personnel" as required by EM 1110-2-1910. This report should include the following information to the field:

(1) Present the design assumptions made regarding interpretation of subsurface investigation data and field conditions.

(2) The concepts, assumptions, and special details of the design.

(3) Assistance to field personnel in interpreting the plans and specifications.

(4) Information to make field personnel aware of critical areas in the design which require additional control and inspection.

(5) Provide results of wave equation analysis with explanation of appli- cation of results to monitor driving operations.

(6) Provide guidance for use of pile driving analyzer to monitor driving operations.

2-8. Subsurface Conditions. The ultimate axial load capacity of a single pile is generally accepted to be the total skin friction force between the soil and the pile plus the tip capacity of the pile, which are dependent on the subsurface conditions. The ultimate axial capacity of individual friction piles depends primarily upon the type of soil: soft clay, stiff clay, sand, or stratified soil layers. In soil deposits that contain layers of varying stiffness, the ultimate axial pile capacity cannot be equal to the sum of the peak strength of all the materials in contact with the pile because the peak strengths are not reached simultaneously. Failure is likely to be progres- sive. The existence of boulders or cobbles within foundation layers can present driving problems and hinder determination of ultimate axial capacity of a single pile.

2-9. Pile Instrumentation. Pile instrumentation can be delineated into three categories: instrumentation used during pile load tests to obtain design

Add43

EM 1110-2-2906
15 Jan 91

data, pile driving analyzer used to control quality of pile installation, and permanent instrumentation used to gather information during the service life of the project. Decisions on the type of instrumentation for pile load tests must be an integral part of the design. The designer should select instrumentation that has sufficient accuracy to measure the required data. Permanent instrumentation is used to gather data relating to the state of stress and behavior of the pile under service load conditions. Useful knowledge can be gained from permanent instrumentation, not only about the behavior of a particular pile foundation, but also about analysis and design assumptions in general. Verification (or modification) can be obtained for analytically derived information such as pile settlement, pile head fixity, location of maximum moment within the pile, and the distribution of loads to an individual pile within a group. However, a permanent instrumentation program can be very expensive and should be considered only on critical projects. Also, effective use of the instrumentation program depends on a continuing commitment to gather, reduce, and evaluate the data.

Add44

CHAPTER 3

GEOTECHNICAL CONSIDERATIONS

3-1. <u>Subsurface Investigations and Geology</u>.  The subsurface explorations are
the first consideration from site selection through design.  These investiga-
tions should be planned to gain full and accurate information beneath and
immediately adjacent to the structure.  The investigation program should cover
the area of the foundation and, as a very minimum, extend 20 feet below the
tip of the longest pile anticipated.  The borings should be of sufficient
depth below the pile tip to identify any soft, settlement-prone layers.  The
type of soil-boring will be determined by the type of soil profile that
exists.  In a clay layer or profile, sufficient undisturbed samples should be
obtained to determine the shear strength and consolidation characteristics of
the clay.  The sensitivity of the clay soils will have to be determined, as
strength loss from remolding during installation may reduce ultimate pile
capacity.  Shrink-swell characteristics should be investigated in expansive
soils, as they affect both capacity and movement of the foundation.  Since
most structures requiring a pile foundation require excavation that changes
the in situ soil confining pressure and possibly affects the blow count, the
standard penetration test commonly performed in granular soils will probably
be of limited use unless the appropriate corrections are made.  It should be
understood, however, that the standard penetration test is valid when applied
properly.  Where gravels or cobbles are expected, some large diameter soil
borings should be made in order to collect representative samples upon which
to determine their properties.  An accurate location of the soil borings
should be made in the field and a map provided in the design documents.  An
engineering geologist should be present during the drilling operation to
provide field interpretation.  The geologist must have the latitude to re-
locate the borings to define the subsurface profile in the best way possible.
Geologic interpretations should be provided in the design documents in the
form of geologic maps and/or profiles.  The profiles should extend from the
ground surface to well below the deepest foundation element.  The accompanying
text and/or maps should fully explain the stratigraphy of the subgrade as well
as its engineering geology characteristics.

3-2. <u>Laboratory and Field Testing</u>.  Laboratory determinations of the shear
strength and consolidation properties of the clay and clayey soils should be
performed routinely.  For details of performing the individual test, refer to
the laboratory test manual, EM-1110-2-1906.  For the construction case in clay
soils, the unconsolidated-undrained triaxial shear (Q) test should be per-
formed.  In silts, the consolidated-undrained triaxial shear (R) test, with
pore pressure recorded, should be performed and used to predict the shear
strength of the formation appropriate to the construction and long-term load-
ing cases.  In sands, the standard penetration test, or if samples can be
collected, the consolidated-drained triaxial shear test or direct shear test
(S) should be used to predict the shear strength appropriate to the two load-
ing cases.  The sensitivity of these soils should be estimated and the appro-
priate remolded triaxial shear test performed, as well as the shrink-swell
tests, if appropriate.  Consolidation tests should be performed throughout the
profile so that the downdrag and/or settlement of the structure may be
estimated.  The field testing should include in situ ground-water evaluation.
In situ testing for soil properties may also be used to augment the soil bor-
ings but should never be used as a replacement.  Some of the more common meth-
ods would be the electronic cone penetration test, vane shear, Swedish vane

3-1

Case: 14-1228 Case: 14-1228 Document: 23 Page: 117 Filed: 04/23/2014 Filed: 04/23/2014

borer, or pressuremeter. Geophysical techniques of logging the soil boring, electric logging, should be employed wherever possible if highly stratified soils are encountered or expected or if faults need to be located.

3-3. <u>Foundation Modification</u>. Installation of piles will densify loose, granular materials and may loosen dense, granular materials. This should be taken into consideration by the designer. For homogeneous stratifications, the best pile foundations would tend theoretically toward longer piles at a larger spacing; however, if the piles densify the granular soils, pile driving may become impossible at great depth. Pile installation affects soils from about 5 feet to 8 pile tip diameters laterally away from the pile and vertically below the tip; therefore, the designer should exercise judgement as to the effect that driving will have upon the foundation. In silty subgrades, the foundations may dilate and lose strength which will not be regained. Piles can be used to modify foundation soils by densification, but pile driving may be a costly alternative to subgrade vibration by other means. In soft clay soils piles could be used to achieve some slight gain in shear strength; however, there are more cost effective methods to produce the same or better results, such as surcharge and drainage. It may be necessary to treat piles or soil to provide isolation from consolidation, downdrag, or swell. This treatment may be in the form of prebored larger diameter cased holes or a material applied to the pile to reduce adhesion.

3-4. <u>Groundwater Studies</u>. The groundwater should be evaluated in each of the soil borings during the field investigation. Piezometers and/or monitoring wells should be installed and monitored during the various weather cycles. A determination should be made of all of the groundwater environments beneath the structure, i.e. perched water tables, artesian conditions and deep aquifers. The field tests mentioned in paragraph 3-2 will be useful in evaluating the movement of groundwater. Artesian conditions or cases of excess pore water pressure should also be considered as they tend to reduce the load-carrying capacity of the soil. An effective weight analysis is the best method of computing the capacity of piles. For the design of pile foundations the highest groundwater table elevation should prove to be the worst case for analysis of pile capacity. However, significant lowering of the water table during construction may cause installation and later service problems by inducing densification or consolidation.

3-5. <u>Dynamic Considerations</u>. Under dynamic loading, radical movements of the foundation and/or surrounding area may be experienced for soils that are subject to liquefaction. Liquefaction is most commonly induced by seismic loading and rarely by vibrations due to pile driving during construction or from vibrations occurring during operations. For dynamic loadings from construction or operations, the attenuation of the vibrations through the foundation and potential for liquefaction should be evaluated. In seismic Zones 2, 3, and 4, the potential liquefaction should be evaluated for the foundations. If soils in the foundation or surrounding area are subject to liquefaction, the removal or densifaction of the liquefiable material should be considered, along with alternative foundation designs. The first few natural frequencies of the structure-foundation system should be evaluated and compared to the operating frequencies to assure that resonance (not associated with liquefaction) is not induced.

EM 1110-2-2906
15 Jan 91

3-6. Pile Load Test.

a. General. The pile load test is intended to validate the computed capacity for a pile foundation and also to provide information for the improvement of design rational. Therefore, a test to pile failure or soil/pile failure should be conducted in lieu of testing to a specified load of termination. Data from a test should not be used to lengthen or shorten piles to an extent that their new capacities will vary more than 10 percent from the test load. Finally, if the pile tests are used to project pile capacity for tip elevations other than those tested, caution should be exercised. In a complex or layered foundation, selecting a tip elevation for the service piles different from the test piles may possibly change the pile capacity to values other than those projected by the test. As an example, shortening the service piles may place the tips above a firm bearing stratum into a soft clay layer. In addition to a loss in bearing capacity, this clay layer may consolidate over time and cause a transfer of the pile load to another stratum. Lengthening the service piles may cause similar problems and actually reduce the load capacity of the service piles if the tips are placed below a firm bearing stratum. Also, extending tips deeper into a firmer bearing may cause driving problems requiring the use of jetting, predrilling, etc. These techniques could significantly alter the load capacity of the service piles relative to the values revealed by the test pile program. A pile load testing program ideally begins with the driving of probe piles (piles driven at selected locations with a primary intention of gaining driving information) to gain knowledge regarding installation, concentrating their location in any suspect or highly variable areas of the foundation strata. Test piles are selected from among the probe piles based upon evaluation of the driving information. The probe and test piles should be driven and tested in advance of the construction contract to allow hammer selection testing and to allow final selection of the pile length. Upon completion of the testing program, the probe/test piles should be extracted and inspected. The test piles, selected from among the probe piles driven, should be those driven with the hammer selected for production pile driving if at all possible. In some cases different hammers will produce piles of different ultimate capacity. Additionally, use of the production hammer will allow a correlation between blow count and pile capacity which will be helpful during production pile driving. The pile driving analyzer should be used wherever possible in conjunction with the probe/test piles. This will allow the pile driving analyzer results to be correlated with the static tests, and greater reliance can be placed upon future results when using the analyzer for verifying the driving system efficiency, capacity, and pile integrity for production piles.

b. Safety Factor for Design. It is normal to apply safety factors to the ultimate load predicted, theoretically or from field load tests. These safety factors should be selected judiciously, depending upon a number of factors, including the consequences of failure and the amount of knowledge designers have gained relative to the subsurface conditions, loading conditions, life of the structure, etc. In general, safety factors for hydraulic structures are described in paragraph 4-2C.

c. Basis for Tests. A pile loading test is warranted if a sufficient number of production piles are to be driven and if a reduced factor of safety (increased allowable capacity) will result in a sufficient shortening of the piles so that a potential net cost savings will result. This is based upon the assumption that when a test pile is not used, a higher safety factor is

Case: 14-1228 Case: 14-1228 Document: 23 Document: 19 Page: 119 Page: 122 Filed: 04/29/2014 Filed: 04/23/2014

EM 1110-2-2906
15 Jan 91

required than when test piles are used. If very few piles are required,
longer piles as required by the higher factor of safety (3.0) may be less
expensive than performing a pile load test, reducing the factor of safety to
2.0, and using shorter piles. Pile load tests should also be performed if the
structure will be subjected to very high loads, cyclic loads of an unusual
nature, or where highly variable soil conditions exist. Special pile load
tests should be performed to determine soil parameters used in design when the
structure is subject to large dynamic loads, such as large reciprocating
machinery, earthquakes, etc.

d. Test Location. The pile load test should be conducted near the base
of the structure with the excavation as nearly complete as possible. If the
pile load test cannot be performed with the excavation completed, it will be
necessary to evaluate and compensate for the additional soil confining
pressure that existed during the load test. Note that casing off soils that
will later be excavated does not provide a solution to this problem. Test
piles should be located so that they can be incorporated into the final work
as service piles if practical.

e. Cautions. A poorly performed pile load test may be worse than having
no test at all. All phases of testing and data collection should be monitored
by an engineer familiar with the project and pile load test procedures and
interpretation. In highly stratified soils where some pile-tip capacity is
used in design computations, care should be taken to keep at least 5 feet or
8 pile tip diameters of embedment into the bearing stratum. Similarly, the
tip should be seated a minimum of 5 feet or 8 pile tip diameters above the
bottom of the bearing stratum. The driving records of any piles driven should
be used to evaluate driveability of the production piles, considering the
possibility of soil densification. In clay formations, where the piles may
tend to creep under load, add in holding periods for the load test and make
sure that the load on the pile is held constant during the holding period. A
reduction in allowable load may be necessary due to settlement under long-term
sustained load (creep). The jack and reference beam should be in the same
plane with the axis of the test pile since deviations will result in erroneous
pile load tests.

3-7. Selection of Shear Strength Parameters. Based upon the geologic inter-
pretation of the stratification, similar soil types may be grouped together
for purposes of analysis. From the triaxial shear test and any other indica-
tor type testing, a plot of both undrained shear strength and soil unit weight
should be plotted versus depth below ground surface. If the data appear
similar in this type of display, then an average trend of undrained shear
strength and soil unit weight may be selected to typify the subgrade clays and
clayey soils. The same procedures would be followed for silty soils with the
exception that the undrained shear strength would be determined from
consolidated-undrained triaxial shear tests (R) with pore pressure measure-
ments. This would be a construction case or short-term loading case, as the
Q case is called. For the long-term case, the shear testing would be repre-
sented by the consolidated-drained triaxial shear test or direct shear test
(S) in all soil types. The cases referenced above are shear strength cases of
the soil based upon the soil drainage conditions under which the structural
loadings will be applied. The construction case is the rapid loading without
pore pressure dissipation in the clay or clayey and silty soils represented by
the Q case. The long-term case allows drainage of the soils before or during
loading which is in general represented by the S test. This does not imply

3-4

Case: 14-1228 Case 14-1228 CASE-PARTICIPANTS ONLY Document 23 Document 22 Page: 120 Filed: 04/23/2014 Filed: 04/23/2014

that the construction case should not include all loads upon the completed
structure.  Using the shear strength data from the S test, a soil strength
profile may be developed using the following equation

$$s = (\Sigma h_i \gamma_i') \tan \phi + c \qquad (3\text{-}1)$$

where

   $s$ = shear strength of the soil

   $h_i$ = height of any stratum  i  overlying the point at which the
        strength is desired

   $\gamma_i'$ = effective unit weight in any stratum  i  above the point at which
        the strength is desired

   $\phi$ = angle of internal friction of the soil at the point at which the
        strength is desired

   $c$ = cohesion intercept of the soil at the point at which the strength
        is desired

The two allowable pile capacities obtained for undrained and drained soil
conditions should be compared and the lower of the two cases selected for use
for any tip penetration.  When the design is verified by pile load test, the
pile load test will take precedence in the selection of ultimate pile capacity
and pile tip over the predicted theoretical value in most cases.  However, the
test methodology should be compatible with the predicted failure mode; that is
if in the predictions the S case shear strength governs, then a Quick Test
should not be selected since it will best emulate the Q case.  In cases where
the S case governs, then the classic slow pile test should be selected.  The
designer should also consider using 24-hour load holding periods at 100, 200,
and 300 percent of design load especially when foundation soils are known to
exhibit a tendency to creep.  The load test should also include rebound and
reload increments as specified in the American Society for Testing and
Materials (ASTM) procedures.  The uses of these shear strength parameters are
explained in Chapter 4.

CHAPTER 4

ANALYSIS AND DESIGN

4-1.  <u>General</u>.  Design of a pile foundation involves solving the complex prob-
lem of transferring loads from the structure through the piles to the under-
lying soil.  It involves the analysis of a structure-pile system, the analysis
of a soil-pile system, and the interaction of the two systems, which is highly
nonlinear.  Close cooperation between the structural engineers and geotech-
nical engineers is essential to the development of an effective design.  This
chapter addresses the criteria, procedures, and parameters necessary for the
analysis and design of pile foundations.

4-2.  <u>Design Criteria</u>.

    a.  Applicability and Deviations.  The design criteria set forth in this
paragraph are applicable to the design and analysis of a broad range of piles,
soils and structures.  Conditions that are site-specific may necessitate vari-
ations  which must be substantiated by extensive studies and testing of both
the structural properties of the piling and the geotechnical properties of the
foundation.

    b.  Loading Conditions.

    (1)  Usual.  These conditions include normal operating and frequent flood
conditions.  Basic allowable stresses and safety factors should be used for
this type of loading condition.

    (2)  Unusual.  Higher allowable stresses and lower safety factors may be
used for unusual loading conditions such as maintenance, infrequent floods,
barge impact, construction, or hurricanes.  For these conditions allowable
stresses may be increased up to 33 percent.  Lower safety factors for pile
capacity may be used, as described in paragraph 4-2c.

    (3)  Extreme.  High allowable stresses and low safety factors are used
for extreme loading conditions such as accidental or natural disasters that
have a very remote probability of occurrence and that involve emergency
maintenance conditions after such disasters.  For these conditions allowable
stresses may be increased up to 75 percent.  Low safety factors for pile
capacity may be used as described in paragraph 4-2c.  An iterative (nonlinear)
analysis of the pile group should be performed to determine that a state of
ductile, stable equilibrium is attainable even if individual piles will be
loaded to their peak, or beyond to their residual capacities.  Special
provisions (such as field instrumentation, frequent or continuous field
monitoring of performance, engineering studies and analyses, constraints on
operational or rehabilitation activities, etc.) are required to ensure that
the structure will not catastrophically fail during or after extreme loading
conditions.  Deviations from these criteria for extreme loading conditions
should be formulated in consultation with and approved by CECW-ED.

    (4)  Foundation Properties.  Determination of foundation properties is
partially dependent on types of loadings.  Soil strength or stiffness, and
therefore pile capacity or stiffness, may depend on whether a load is vibra-
tory, repetitive, or static and whether it is of long or short duration.

4-1

EM 1110-2-2906
15 Jan 91

Soil-pile properties should, therefore, be determined for each type of loading to be considered.

    c. Factor of Safety for Pile Capacity. The ultimate axial capacity, based on geotechnical considerations, should be divided by the following factors of safety to determine the design pile capacity for axial loading:

| Method of Determining Capacity | Loading Condition | Minimum Factor of Safety Compression | Tension |
|---|---|---|---|
| Theoretical or empirical prediction to be verified by pile load test | Usual Unusual Extreme | 2.0 1.5 1.15 | 2.0 1.5 1.15 |
| Theoretical or empirical prediction to be verified by pile driving analyzer as described in Paragraph 5-4a | Usual Unusual Extreme | 2.5 1.9 1.4 | 3.0 2.25 1.7 |
| Theoretical or empirical prediction not verified by load test | Usual Unusual Extreme | 3.0 2.25 1.7 | 3.0 2.25 1.7 |

    The minimum safety factors in the table above are based on experience using the methods of site investigation, testing and analysis presented herein and are the basis for standard practice. Deviations from these minimum values may be justified by extensive foundation investigations and testing which reduce uncertainties related to the variability of the foundation material and soil strength parameters to a minimum. Such extensive studies should be conducted in consultation with and approved by CECW-ED. These minimum safety factors also include uncertainties related to factors which affect pile capacity during installation and the need to provide a design capacity which exhibits very little nonlinear load-deformation behavior at normal service load levels.

    d. Allowable Stresses in Structural Members. Allowable design stresses for service loads should be limited to the values described in the following paragraphs. For unusual loadings as described in paragraph 4-2b(2), the allowable stresses may be increased by one third.

    (1) Steel Piles. Allowable tension and compression stresses are given for both the lower and upper regions of the pile. Since the lower region of the pile is subject to damage during driving, the basic allowable stress should reflect a high factor of safety. The distribution of allowable axial tension or compression stress along the length of the pile is shown in Figure 4-1. This factor of safety may be decreased if more is known about the actual driving conditions. Pile shoes should be used when driving in dense sand strata, gravel strata, cobble-boulder zones, and when driving piles to refusal on a hard layer of bedrock. Bending effects are usually minimal in the lower region of the pile. The upper region of the pile may be subject to the effects of bending and buckling as well as axial load. Since damage in the upper region is usually apparent during driving, a higher allowable stress is permitted. The upper region of the pile is actually designed as a

Add51

beam-column, with due consideration to lateral support conditions. The allowable stresses for fully supported piles are as follows:

Tension or Compression in lower pile region

| | |
|---|---|
| Concentric axial tension or compression only 10 kips per square inch $(1/3 \times F_y \times 5/6)$ | 10 kips per square inch (ksi) for A-36 material |
| Concentric axial tension or compression only with driving shoes $(1/3 \times F_y)$ | 12 ksi for A-36 material |
| Concentric axial tension or compression only with driving shoes, at least one axial load test and use of a pile driving analyzer to verify the pile capacity and integrity $(1/2.5 \times F_y)$ | 14.5 ksi for A-36 material |

Combined bending and axial compression in upper pile region:

$$\left| \frac{f_a}{F_a} + \frac{f_{bx}}{F_b} + \frac{f_{by}}{F_b} \right| \leq 1.0$$

where

$f_a$ = computed axial unit stress

$F_a$ = allowable axial stress

$F_a = \frac{5}{6} \times \frac{3}{5} F_y = \frac{1}{2} F_y = 18$ ksi (for A-36 material)

$f_{bx}$ and $f_{by}$ = computed unit bending stress

$F_b$ = allowable bending stress

$F_b = \frac{5}{6} \times \frac{3}{5} F_y = \frac{1}{2} F_y = 18$ ksi (for A-36 noncompact sections)

or

$F_b = \frac{5}{6} \times \frac{2}{3} F_y = \frac{5}{9} F_y = 20$ ksi (for A-36 compact sections)

EM 1110-2-2906
15 Jan 91



Figure 4-1.  Allowable tension and compression
stress for steel piles

     For laterally unsupported piles the allowable stresses should be 5/6 of
the American Institute of Steel Construction (AISC) (Item 21) values for
beam-columns.

     (2)  Concrete Piles.  Design criteria for four types of concrete piles
(prestressed, reinforced, cast-in-place and mandrel driven) are presented in
the following paragraphs.

     (a)  Prestressed Concrete Piles.  Prestressed concrete piles are used
frequently and must be designed to satisfy both strength and serviceability
requirements.  Strength design should follow the basic criteria set forth by
the American Concrete Institute (ACI) 318 (Item 19) except the strength reduc-
tion factor (Ø) shall be 0.7 for all failure modes and the load factor shall
be 1.9 for both dead and live loads.  The specified load and strength reduc-
tion factors provide a safety factor equal to 2.7 for all combinations of dead
and live loads.  To account for accidental eccentricities, the axial strength
of the pile shall be limited to 80 percent of pure axial strength, or the pile
shall be designed for a minimum eccentricity equal to 10 percent of the pile
width.  Strength interaction diagrams for prestressed concrete piles may be
developed using the computer program CPGC (Item 16).  Control of cracking in
prestressed piles is achieved by limiting the concrete compressive and tensile
stresses under service conditions to the values indicated in Table 4-1.  The
allowable compressive stresses for hydraulic structures are limited to
approximately 85 percent of those recommended by ACI Committee 543 (Item 20)
for improved serviceability.  Permissible stresses in the prestressing steel
tendons should be in accordance with Item 19.  A typical interaction diagram,
depicting both strength and service load designs, is shown in Figure 4-2.  The
use of concrete with a compressive strength exceeding 7,000 psi requires

Table 4-1

Allowable Concrete Stresses, Prestressed Concrete Piles

(Considering Prestress)

---

Uniform Axial Tension                                                              0

Bending (extreme fiber)

  Compression                                                         $0.40 \, f'_c$

  Tension                                                                   0

For combined axial load and bending, the concrete stresses should be proportioned so that:

$$f_a + f_b + f_{pc} \leq 0.40 \, f'_c$$

$$f_a - f_b + f_{pc} \geq 0$$

Where:

    $f_a$ = computed axial stress (tension is negative)

    $f_b$ = computed bending stress (tension is negative)

    $f_{pc}$ = effective prestress

    $f'_c$ = concrete compressive strength

---

CECW-E approval. For common uses, a minimum effective prestress of 700 psi compression is required for handling and driving purposes. Excessively long or short piles may necessitate deviation from the minimum effective prestress requirement. The capacity of piles may be reduced by slenderness effects when a portion of the pile is free standing or when the soil is too weak to provide lateral support. Slenderness effects can be approximated using moment magnification procedures. The moment magnification methods of ACI 318, as modified by PCI, "Recommended Practice for the Design of Prestressed Concrete Columns and Walls" (Item 47), are recommended.

    (b) Reinforced Concrete Piles. Reinforced concrete piles shall be designed for strength in accordance with the general requirements of ACI 318 (Item 19) except as modified below. Load factors prescribed in ACI 318 should be directly applied to hydraulic structures with one alteration. The factored load combination "U" should be increased by a hydraulic load factor ($H_f$). This increase should lead to improved serviceability and will yield stiffer

Add54

EM 1110-2-2906
15 Jan 91



Figure 4-2. Typical interaction diagram, 16 × 16 in.
square prestressed concrete pile

members than those designed solely by ACI 318. The hydraulic load factor
shall be 1.3 for reinforcement calculations in flexure or compression, 1.65
for reinforcement in direct tension, and 1.3 for reinforcement in diagonal
tension (shear). The shear reinforcement calculation should deduct the shear
carried by the concrete prior to application of the hydraulic load factor. As
an alternate to the prescribed ACI load factors, a single load factor of 1.7
can be used. The 1.7 should then be multiplied by $H_f$. The axial compression
strength of the pile shall be limited to 80 percent of the ultimate axial
strength, or the pile shall be designed for a minimum eccentricity equal to
10 percent of the pile width. Strength interaction diagrams for reinforced
concrete piles may be developed using the Corps computer program CASTR
(Item 18). Slenderness effects can be approximated using the ACI moment
magnification procedures.

(c) Cast-in-Place and Mandrel-Driven Piles. For a cast-in-place pile,
the casing is top-driven without the aid of a mandrel, and the casing typi-
cally has a wall thickness ranging from 9 gage to 1/4 inch. The casing must
be of sufficient thickness to withstand stresses due to the driving operation
and maintain the cross section of the pile. The casing thickness for mandrel-
driven piles is normally 14 gage. Cast-in-place and mandrel-driven piles
should be designed for service conditions and stresses limited to those values
listed in Table 4-2. The allowable compressive stresses are reduced from
those recommended by ACI 543 (Item 20), as explained for prestressed concrete
piles. Cast-in-place and mandrel-driven piles shall be used only when full
embedment and full lateral support are assured and under conditions which
produce zero or small end moments, so that compression always controls. In
order for a pile to qualify as confined, the steel casing must be 14 gage
(US Standard) or thicker, be seamless or have spirally welded seams, have a
minimum yield strength of 30 ksi, be 17 inches or less in diameter, not be
exposed to a detrimental corrosive environment, and not be designed to carry a

4-6

EM 1110-2-2906
15 Jan 91

Table 4-2

Cast-in-Place and Mandrel-Driven Piles, Allowable Concrete Stresses

(Participation of steel casing or shell disallowed)

---

Uniform Axial Compression

    Confined                                                  $0.33\ f_c'$

    Unconfined                                          $0.27\ f_c'$

Uniform Axial Tension                                      0

Bending (extreme fiber)

    Compression                                      $0.40\ f_c'$

    Tension                                           0

For combined axial load and bending, the concrete stresses should be proportioned so that:

$$\left| \frac{f_a}{F_a} + \frac{f_b}{F_b} \right| \leq 1.0$$

Where:

      $f_a$ = computed axial stress

      $F_a$ = allowable axial stress

      $f_b$ = computed bending stress

      $F_b$ = allowable bending stress

4-7

Add56

EM 1110-2-2906
15 Jan 91

portion of the working load. Items not specifically addressed in this
paragraph shall be in accordance with ACI 543.

(3) Timber Piles. Representative allowable stresses for pressure-
treated round timber piles for normal load duration in hydraulic structures
are:

| Species | Compression Parallel to Grain (psi) $F_a$ | Bending (psi) $F_b$ | Horizontal Shear (psi) | Compression Perpendicular to Grain (psi) | Modulus of Elasticity (psi) |
|---|---|---|---|---|---|
| Pacific Coast (a)* Douglas Fir | 875 | 1,700 | 95 | 190 | 1,500,000 |
| Southern Pine (a)(b)* | 825 | 1,650 | 90 | 205 | 1,500,000 |

(a) The working stresses for compression parallel to grain in Douglas
Fir and Southern Pine may be increased by 0.2 percent for each foot of length
from the tip of the pile to the critical section. For compression perpendicu-
lar to grain, an increase of 2.5 psi per foot of length is recommended.

(b) Values for Southern Pine are weighted for longleaf, slash, loblolly
and shortleaf representatives of piles in use.

(c) The above working stresses have been adjusted to compensate for
strength reductions due to conditioning and treatment. For untreated piles or
piles that are air-dried or kiln-dried before pressure treatment, the above
working stresses should be increased by dividing the tabulated values by the
following factors:

        Pacific Coast Douglas Fir:                    0.90
        Southern Pine:                                0.85

(d) The allowable stresses for compression parallel to the grain and
bending, derived in accordance with ASTM D2899, are reduced by a safety factor
of 1.2 in order to comply with the general intent of Paragraph 13.1 of
ASTM D2899 (Item 22).

(e) For hydraulic structures, the above values, except for the modulus
of elasticity, have been reduced by dividing by a factor of 1.2. This addi-
tional reduction recognizes the difference in loading effects between the ASTM
normal load duration and the longer load duration typical of hydraulic struc-
tures, and the uncertainties regarding strength reduction due to conditioning
processes prior to treatment. For combined axial load and bending, stresses
should be so proportioned that:

$$\left| \frac{f_a}{F_a} + \frac{f_b}{F_b} \right| \le 1.0$$

Add57

where

      $f_a$ = computed axial stress

      $F_a$ = allowable axial stress

      $f_b$ = computed bending stress

      $F_b$ = allowable bending stress

    e. Deformations. Horizontal and vertical displacements resulting from applied loads should be limited to ensure proper operation and integrity of the structure. Experience has shown that a vertical deformation of 1/4 inch and a lateral deformation of 1/4 to 1/2 inch at the pile cap are representative of long-term movements of structures such as locks and dams. Operational requirements may dictate more rigid restrictions and deformations. For other structures such as piers, larger deformations may be allowed if the stresses in the structure and the piles are not excessive. Since the elastic spring constants used in the pile group analysis discussed later are based on a linear load versus deformation relationship at a specified deformation, it is important to keep the computed deformations at or below the specified value. Long-term lateral deformations may be larger than the computed values or the values obtained from load tests due to creep or plastic flow. Lateral deflection may also increase due to cyclic loading and close spacing. These conditions should be investigated when determining the maximum predicted displacement.

    f. Allowable Driving Stresses. Axial driving stresses calculated by wave equation analysis should be limited to the values shown in Figure 4-3.

    g. Geometric Constraints.

    (1) Pile Spacing. In determining the spacing of piles, consideration should be given to the characteristics of the soil and to the length, size, driving tolerance, batter, and shape of the piles. If piles are spaced too closely, the bearing value and lateral resistance of each pile will be reduced, and there is danger of heaving of the foundation, and uplifting or damaging other piles already driven. In general, it is recommended that end-bearing piles be spaced not less than three pile diameters on centers and that friction piles, depending on the characteristics of the piles and soil, be spaced a minimum of three to five pile diameters on center. Piles must be spaced to avoid tip interference due to specified driving tolerances. See paragraph 5-2a(3) for typical tolerances. Pile layouts should be checked for pile interference using CPGI, a program which is being currently developed and is discussed in paragraph 1-3c(b).

    (2) Pile Batter. Batter piles are used to support structures subjected to large lateral loads, or if the upper foundation stratum will not adequately resist lateral movement of vertical piles. Piles may be battered in opposite directions or used in combination with vertical piles. The axial load on a batter pile should not exceed the allowable design load for a vertical pile. It is very difficult to drive piles with a batter greater than 1 horizontal to 2 vertical. The driving efficiency of the hammer is decreased as the batter increases.

EM 1110-2-2906
15 Jan 91



Figure 4-3.   Prestressed concrete pile
driving stresses

4-3.  <u>Pile Capacity</u>.  Pile capacities should be computed by experienced designers thoroughly familiar with the various types of piles, how piles behave when loaded, and the soil conditions that exist at the site.

a.  Axial Pile Capacity.  The axial capacity of a pile may be represented by the following formula:

$$Q_{ult} = Q_s + Q_t$$

$$Q_s = f_s A_s$$

$$Q_t = q A_t$$

4-10

where

    $Q_{ult}$ = ultimate pile capacity

    $Q_s$ = shaft resistance of the pile due to skin friction

    $Q_t$ = tip resistance of the pile due to end bearing

    $f_s$ = average unit skin resistance

    $A_s$ = surface area of the shaft in contact with the soil

    $q$ = unit tip-bearing capacity

    $A_t$ = effective (gross) area of the tip of the pile in contact with the soil

    (1)  Piles in Cohesionless Soil.

    (a)  Skin Friction.  For design purposes the skin friction of piles in sand increase linearly to an assumed critical depth ($D_c$) and then remain constant below that depth.  The critical depth varies between 10 to 20 pile diameters or widths (B), depending on the relative density of the sand.  The critical depth is assumed as:

        $D_c$ = 10B  for loose sands

        $D_c$ = 15B  for medium dense sands

        $D_c$ = 20B  for dense sands

The unit skin friction acting on the pile shaft may be determined by the following equations:

$$f_s = K\sigma'_v \tan \delta$$

$$\sigma'_v = \gamma'D \quad \text{for} \quad D < D_c$$

$$\sigma'_v = \gamma'D_c \quad \text{for} \quad D \geq D_c$$

$$Q_s = f_s A_s$$

where

    $K$ = lateral earth pressure coefficient ($K_c$ for compression piles and $K_t$ for tension piles)

    $\sigma'_v$ = effective overburden pressure

    $\delta$ = angle of friction between the soil and the pile

Add60

Case: 14-1228 CASE PARTICIPANTS ONLY Document: 23 Page: 132 Filed: 04/23/2014

EM 1110-2-2906
15 Jan 91

    γ' = effective unit weight of soil

     D = depth along the pile at which the effective overburden pressure is
       calculated

Values of $\delta$ are given in Table 4-3.

Table 4-3

Values of $\delta$

| Pile Material | $\delta$ |
|---|---|
| Steel | 0.67 $\phi$ to 0.83 $\phi$ |
| Concrete | 0.90 $\phi$ to 1.0 $\phi$ |
| Timber | 0.80 $\phi$ to 1.0 $\phi$ |

Values of K for piles in compression ($K_c$) and piles in tension ($K_t$) are
given in Table 4-4. Table 4-3 and Table 4-4 present ranges of values of $\delta$
and K based upon experience in various soil deposits. These values should
be selected for design based upon experience and pile load test. It is not
intended that the designer would use the minimum reduction of the $\phi$ angle
while using the upper range K values.

Table 4-4

Values of K

| Soil Type | $K_c$ | $K_t$ |
|---|---|---|
| Sand | 1.00 to 2.00 | 0.50 to 0.70 |
| Silt | 1.00 | 0.50 to 0.70 |
| Clay | 1.00 | 0.70 to 1.00 |

Note: The above do not apply to piles that are
      prebored, jetted, or installed with a vibra-
      tory hammer. Picking K values at the
      upper end of the above ranges should be
      based on local experience. K , $\delta$ , and $N_q$
      values back calculated from load tests may
      be used.

For steel H-piles, $A_s$ should be taken as the block perimeter of the pile and
$\delta$ should be the average friction angles of steel against sand and sand
against sand ($\phi$). It should be noted that Table 4-4 is general guidance to be
used unless the long-term engineering practice in the area indicates other-
wise. Under prediction of soil strength parameters at load test sites has at
times produced back-calculated values of K that exceed the values in
Table 4-4. It has also been found both theoretically and at some test sites
that the use of displacement piles produces higher values of K than does the

4-12

Add61

use of nondisplacement piles.  Values of  K  that have been satisfac-
torily but with standard soil data in some locations are as follows in
Table 4-5:

Table 4-5

Common Values for Corrected K

| Soil Type | Displacement Piles | | Nondisplacement Piles | |
|-----------|-------------|---------|-------------|---------|
|           | Compression | Tension | Compression | Tension |
| Sand      | 2.00        | 0.67    | 1.50        | 0.50    |
| Silt      | 1.25        | 0.50    | 1.00        | 0.35    |
| Clay      | 1.25        | 0.90    | 1.00        | 0.70    |

Note:  Although these values may be commonly used in some areas
       they should not be used without experience and testing to
       validate them.

(b)  End Bearing.  For design purposes the pile-tip bearing capacity can
be assumed to increase linearly to a critical depth ($D_c$) and then remains
constant.  The same critical depth relationship used for skin friction can be
used for end bearing.  The unit tip bearing capacity can be determined as
follows:

$$q = \sigma_v' N_q$$

where:

$$\sigma_v' = \gamma' D \quad \text{for} \quad D < D_c$$

$$\sigma_v' = \gamma' D_c \quad \text{for} \quad D \geq D_c$$

For steel H-piles  $A_t$  should be taken as the area included within the block
perimeter.  A curve to obtain the Terzaghi-Peck (Item 59) bearing capacity
factor  $N_q$  (among values from other theories) is shown in Figure 4-4.  To use
the curve one must obtain measured values of the angle of internal friction
($\phi$) which represents the soil mass.

(c)  Tension Capacity.  The tension capacity of piles in sand can be cal-
culated as follows using the  K  values for tension from Table 4-4:

$$Q_{ult} = Q_{s_{tension}}$$

(2)  Piles in Cohesive Soil.

(a)  Skin Friction.  Although called skin friction, the resistance is due
to the cohesion or adhesion of the clay to the pile shaft.

$$f_s = c_a$$

$$c_a = \alpha c$$

$$Q_s = f_s A_s$$

4-13

EM 1110-2-2906
15 Jan 91

where

    $c_a$ = adhesion between the clay and the pile

    $\alpha$ = adhesion factor

    c = undrained shear strength of the clay from a Q test

The values of $\alpha$ as a function of the undrained shear are given in
Figure 4-5a.



Figure 4-4. Bearing capacity factor

An alternate procedure developed by Semple and Rigden (Item 56) to obtain
values of $\alpha$ which is especially applicable for very long piles is given in
Figure 4-5b where:

$$\alpha = \alpha_1 \alpha_2$$

and

$$f_s = \alpha c$$

4-14

Add63

EM 1110-2-2906
15 Jan 91



Figure 4-5a. Values of $\alpha$ versus undrained shear strength



Figure 4-5b. Values of $\alpha_1$ $\alpha_2$ applicable for very long piles

(b) End Bearing. The pile unit-tip bearing capacity for piles in clay can be determined from the following equation:

$$q = 9c$$

$$Q_t = A_t q$$

However, the movement necessary to develop the tip resistance of piles in clay soils may be several times larger than that required to develop the skin friction resistance.

(c) Compression Capacity. By combining the skin friction capacity and the tip bearing capacity, the ultimate compression capacity may be found as follows:

Add64

$$Q_{ult} = Q_s + Q_t$$

(d) Tension Capacity. The tension capacity of piles in clay may be cal-
culated as:

$$Q_{ult} = Q_s$$

(e) The pile capacity in normally consolidated clays (cohesive soils)
should also be computed in the long-term S shear strength case. That is,
develop a S case shear strength trend as discussed previously and proceed as
if the soil is drained. The computational method is identical to that
presented for piles in granular soils, and to present the computational
methodology would be redundant. It should be noted however that the shear
strengths in clays in the S case are assumed to be $\phi > 0$ and $C = 0$.
Some commonly used S case shear strengths in alluvial soils are as follows
in Table 4-6:

Table 4-6

S Case Shear Strength

| Soil Type | Consistency | Angle of Internal Friction $\phi$ |
|---|---|---|
| Fat clay (CH) | Very soft | 13° to 17° |
| Fat clay (CH) | Soft | 17° to 20° |
| Fat clay (CH) | Medium | 20° to 21° |
| Fat clay (CH) | Stiff | 21° to 23° |
| Silt (ML) | | 25° to 28° |

Note: The designer should perform testing and select shear
strengths. These general data ranges are from test on
specific soils in site specific environments and may not
represent the soil in question.

(3) Piles in Silt.

(a) Skin Friction. The skin friction on a pile in silt is a two compon-
ent resistance to pile movement contributed by the angle of internal friction
($\phi$) and the cohesion (c) acting along the pile shaft. That portion of the re-
sistance contributed by the angle of internal friction ($\phi$) is as with the sand
limited to a critical depth of ($D_c$), below which the frictional portion
remains constant, the limit depths are stated below. That portion of the
resistance contributed by the cohesion may require limit if it is sufficiently
large, see Figures 4-5a and b. The shaft resistance may be computed as
follows:

$$K\gamma'D \tan \delta + \alpha c$$

$$\text{where } (D \leq D_c)$$

$$Q_s = A_s f_s$$

4-16

Add65

where

$Q_s$ = capacity due to skin resistance

$f_s$ = average unit skin resistance

$A_s$ = surface area of the pile shaft in contact with soil

$K$ = see Table 4-4

$\alpha$ = see Figures 4-5a and b

$D$ = depth below ground up to limit depth $D_c$

$\delta$ = limit value for shaft friction angle from Table 4-3

(b) End Bearing. The pile tip bearing capacity increases linearly to a critical depth ($D_c$) and remains constant below that depth. The critical depths are given as follows:

$$D_c = 10 \ B \ \text{for loose silts}$$

$$D_c = 15 \ B \ \text{for medium silts}$$

$$D_c = 20 \ B \ \text{for dense silts}$$

The unit and bearing capacity may be computed as follows:

$$q = \sigma'_v N_q$$

$$\sigma'_v = \gamma' D \quad \text{for} \quad D < D_c$$

$$\sigma'_v = \gamma' D_c \quad \text{for} \quad D \geq D_c$$

$$Q_t = A_t q$$

where

$N_q$ = Terzaghi bearing capacity factor, Figure 4-4

$\sigma'_v$ = vertical earth pressure at the tip with limits

$A_t$ = area of the pile tip, as determined for sands

EM 1110-2-2906
15 Jan 91

(c)  Compression Capacity.  By combining the two incremental contributors, skin friction and end bearing the ultimate capacity of the soil/pile may be computed as follows:

$$Q_{ult} = Q_s + Q_t$$

(d)  Tension Capacity.  The tension capacity is computed by applying the appropriate value of  $K_t$  from Table 4-4 to the unit skin friction equation above.

$$Q_{ult} = Q_{s_{tension}}$$

(e)  It is recommended that when designing pile foundations in silty soils, considerations be given to selecting a very conservative shear strength from classical R shear tests.  It is further recommended that test piles be considered as a virtual necessity, and the possibility that pile length may have to be increased in the field should be considered.

(4)  Piles in Layered Soils.  Piles are most frequently driven into a layered soil stratigraphy.  For this condition, the preceding methods of computation may be used on a layer by layer basis.  The end bearing capacity of the pile should be determined from the properties of the layer of soil where the tip is founded.  However, when weak or dissimilar layers of soil exist within approximately 5 feet or 8 pile tip diameters, whichever is the larger, of the tip founding elevation the end bearing capacity will be affected.  It is necessary to compute this affect and account for it when assigning end bearing capacity.  In computing the skin resistance, the contribution of each layer is computed separately, considering the layers above as a surcharge and applying the appropriate reduction factors for the soil type within that increment of pile shaft.

(a)  Skin Friction.  The skin friction contributed by different soil types may be computed incrementally and summed to find the ultimate capacity. Consideration should be given to compatibility of strain between layers when computing the unit skin resistance.

$$Q_s = \sum_{i=1}^{N} f_{s_i} A_{s_i}$$

where

   $f_{s_i}$ = unit skin resistance in layer i

   $A_{s_i}$ = surface area of pile in contact with layer i

    N = total number of layers

4-18

Add67

(b)  End Bearing.  The pile tip bearing should be computed based upon the soil type within which the tip is founded, with limits near layer boundaries mentioned above.  Using the overlying soil layers as surcharge the following equations may be used.

$$\text{Sand or Silt:} \quad q = \sigma'_v N_q$$

$$\sigma'_v = \gamma'D \quad \text{for} \quad D < D_c$$

$$\sigma'_v = \gamma'D_c \quad \text{for} \quad D > D_c$$

$$Q_t = A_t q$$

$$\text{Clay:} \quad q = 9c$$

$$Q_t = A_t q$$

(c)  Compression Capacity.  By combining the skin resistance and end bearing, the ultimate capacity of the soil/pile may be computed as follows:

$$Q_{ult} = Q_s + Q_t$$

(d)  Tension Capacity.  The tension capacity may be computed by applying the appropriate values of $K_t$ from Table 4-4 as appropriate for granular soils to the incremental computation for each layer and then combining to yield:

$$Q_{ult} = Q_{s_{tension}}$$

(5)  Point Bearing Piles.  In some cases the pile will be driven to refusal upon firm good quality rock.  In such cases the capacity of the pile is governed by the structural capacity of the pile or the rock capacity.

(6)  Negative Skin Friction.

(a)  Negative skin friction is a downward shear drag acting on piles due to downward movement of surrounding soil strata relative to the piles.  For such movement of the soils to occur, a segment of the pile must penetrate a compressible soil stratum that consolidates.  The downward drag may be caused by the placement of fill on compressible soils, lowering of the groundwater table, or underconsolidated natural or compacted soils.  The effect of these occurrences is to cause the compressible soils surrounding the piles to consolidate.  If the pile tip is in a relatively stiff soil, the upper compressible stratum will move down relative to the pile, inducing a drag load.  This load can be quite large and must be added to the structural load for purposes of assessing stresses in the pile.  Vesic (Item 60) stated that a relative downward movement of as little as 0.6 inch of the soil with respect to the pile may be sufficient to mobilize full negative skin friction.  The geotechnical capacity of the pile is unaffected by downdrag, however downdrag does serve to increase settlement and increase the stresses in the pile and pile cap.

4-19

Add68

EM 1110-2-2906
15 Jan 91

(b)  For a pile group, it can be assumed that there is no relative
movement between the piles and the soil between the piles.  Therefore, the
total force acting down is equal to the weight of the block of soil held
between the piles, plus the shear along the pile group perimeter due to
negative skin friction.  The average downward load transferred to a pile in a
pile group  $Q_{nf}$  can be estimated by

$$Q_{nf} = \frac{1}{N} [A\gamma L + sLP] \tag{1}$$

where

    A = horizontal area bounded by the pile group (cross-sectional area of
        piles and enclosed soil)

    N = number of piles in pile group

    $\gamma$ = unit weight of fill or compressible soil layers

    L = length of embedment above the bottom of the compressible soil layers

    s = shear resistance of the soil

    P = perimeter of the area A

(c)  For a single pile, the downward load transferred to the pile is
equal to the shearing resistance along the pile as shown in Equation 2.

$$Q_{nf} = sLP' \tag{2}$$

where  $P'$  = perimeter of pile.  The total applied load ($Q_T$) on a pile group or
single pile is the live load, dead load, and the drag load due to negative
skin friction.

$$Q_T = Q + A\gamma L + sLP \quad \text{(pile group)} \tag{3a}$$

$$Q_T = Q + sLP' \quad \text{(single pile)} \tag{3b}$$

where  Q = live load plus dead load.

(d)  Commentary.  Equation 1 for pile groups was used by Teng (Item 58)
and Terzaghi and Peck (Item 59).  However, in Peck, Hanson, and Thornburn
(Item 46), the shear resistance on the perimeter was eliminated.  Both Teng
and Terzaghi and Peck state that the component due to shear resistance is the
larger value.  Teng recommends using the lesser of the summation of shear
resistance for individual piles of a pile group and Equation 1.  Bowles
(Item 27) and the Department of the Navy, Naval Facilities Engineering Command
(NAVFAC) (Item 33) both use a coefficient relating the overburden pressures to

the shearing resistance around the pile. NAVFAC gives different values for clay, silt, and sands and references Garlanger (Item 35), <u>Prediction of Downdrag Load at the Cutler Circle Bridge</u>. Bowles uses the block perimeter resistance for a pile group similar to Equation 1. Bowles recommends using the higher value of Equation 1 and, between the summation of shear resistance on a single pile, using the coefficient relating overburden pressure to shear resistance and Equation 1. NAVFAC does not use the block perimeter resistance for a pile group. For single piles, NAVFAC uses the coefficient times the effective vertical stress.

b. Pile Group Capacity. The pile group capacity for piles in cohesionless and cohesive soils is given below.

(1) Piles in Cohesionless Soil. The pile group efficiency $\eta$ is defined as:

$$\eta = \frac{Q_{group}}{NQ_{ult}}$$

where

$Q_{group}$ = ultimate capacity of a pile group

$N$ = number of piles in a group

$Q_{ult}$ = ultimate capacity of a single pile

The ultimate group capacity of driven piles in sand is equal to or greater than the sum of the ultimate capacity of the single piles. Therefore in practice, the ultimate group capacity of driven piles in sand not underlain by a weak layer, should be taken as the sum of the single pile capacities ($\eta = 1$). For piles jetted into sand, $\eta$ is less than one. For piles underlain by a weak layer, the ultimate group capacity is the smaller of (a) the sum of the single pile ultimate capacities or (b) the capacity of an equivalent pier with the geometry defined by enclosing the pile group (Item 59). The base strength should be that of the weak layer.

(2) Piles in Cohesive Soil. The ultimate group capacity of piles in clay is the smaller of (a) the sum of the single pile ultimate capacities or (b) the capacity of an equivalent pier (Item 59). The ultimate group capacity of piles in clay is given by the smaller of the following two equations:

$$Q_{group} = NQ_{ult}$$

$$\mathbf{Q_{group}} = 2(\mathbf{B_g} + \mathbf{L_g})D\overline{c} + \left[ 5\left(1 + \frac{D}{5\mathbf{B_g}}\right)\left(1 + \frac{\mathbf{B_g}}{5L_\mathbf{g}}\right) \right] c_b L_G \mathbf{B}_G$$

EM 1110-2-2906
15 Jan 91

where

$$N_c = 5 \left(1 + \frac{D}{5B_g}\right) \left(1 + \frac{B_g}{5L_g}\right) \leq 9$$

and:

    $B_g$ = width of the pile group

    $L_g$ = length of the pile group

    $D$ = depth of the pile group

    $\overline{c}$ = weighted average of undrained shear strength over the depth of pile embedment. $\overline{c}$ should be reduced by $\alpha$ from Figure 4-5.

    $c_b$ = undrained shear strength at the base of the pile group

This equation applies to a rectangular section only. It should be modified for other shapes.

4-4. Settlement. The load transfer settlement relationship for single piles and pile groups is very complex. Most settlement analysis methods are based on empirical methods and give only a rough approximation of the actual settlement. However, settlements of single piles and pile groups should be calculated to give the designer a perception of how the structure will perform and to check that these calculated settlements are within acceptable limits (paragraph 4-2e). Calculated foundation settlements should be compatible with the force-movement relationships used in designing the structure.

    a. Single Piles.

    (1) Semi-Empirical Method. The semi-empirical method for calculating the settlement of single piles is the method proposed by Vesic (Item 60). The settlement of a single pile is given by the equation

$$w = w_s + w_{pp} + w_{ps}$$

where

    $w$ = vertical settlement of the top of a single pile

    $w_s$ = amount of settlement due to the axial deformation of the pile shaft

    $w_{pp}$ = amount of settlement of the pile tip due to the load transferred at the tip

    $w_{ps}$ = amount of settlement of the pile tip caused by load transmitted along the pile shaft

The axial deformation of the pile shaft is given by:

$$w_s = (Q_p + \alpha_s Q_s) \frac{L}{AE}$$

4-22

Add71

where

$Q_p$ = tip resistance of the pile for the design load for which the settlement is being calculated

$\alpha_s$ = number that depends on the skin friction distribution along the pile (Figure 4-6)

$Q_s$ = shaft resistance of the pile for the design load for which the settlement is being calculated

L = length of the pile

A = cross-sectional area of the pile

E = modulus of elasticity of the pile

Lesser values of $\alpha_s$ have been observed in long driven piles subject to hard driving. A typical value for piles driven into dense sand may be around 0.1. Lesser values of $\alpha_s$ are also observed for long, flexible friction piles where under working loads, only a fraction of the shaft length transmits load. The settlement at the tip of the pile can be calculated by the following equations:

$$w_{pp} = \frac{C_p Q_p}{Bq}$$

$$w_{ps} = \frac{C_s Q_s}{Dq}$$

where

$C_p$ = empirical coefficient given in Table 4-7

B = pile diameter or width

q = unit ultimate tip bearing capacity

$C_s$ = coefficient given by the following equation
$$C_s = (0.93 + 0.16 \ \sqrt{D/B} \ ) \ C_p$$

D = embedded pile length

The values of $C_p$ given in Table 4-7 are for long-term settlement of the pile where the bearing stratum beneath the pile tip extends a minimum of 10B beneath the pile tip and where such soil is of equal or higher stiffness than that of the soil at the tip elevation. The value of $C_p$ will be lower if rock exists nearer the pile tip than 10B. If rock exists at 5B beneath the pile tip, use 88 percent of $w_{pp}$ in the settlement calculations. If rock

EM 1110-2-2906
15 Jan 91



Figure 4-6.  Values of  $\alpha_s$   for different skin
friction distributions (Item 60)

Add73

exists at 1B beneath the pile tip, use 51 percent of $w_{pp}$ in the settlement calculations. Unless a highly compressible layer exists beneath the pile tip, consolidation settlement should not be significant and normally does not exceed 15 percent of the total settlement. If a highly compressible layer does exist beneath the pile tip, a consolidation-settlement analysis should be performed to determine the additional long-term settlement that will occur.

Table 4-7

Value of $C_p$

| Soil Type | Driven Piles | Bored Piles |
|---|---|---|
| Sand (dense to loose) | 0.02 to 0.04 | 0.09 to 0.18 |
| Clay (stiff to soft) | 0.02 to 0.03 | 0.03 to 0.06 |
| Silt (dense to loose) | 0.03 to 0.05 | 0.09 to 0.12 |

(2) Elastic Method. For the elastic method of calculating single pile settlement, the designer is referred to Item 48.

(3) t-z Curve Methods. The t-z curve methods of calculating settlement of a single pile requires the use of a computer program and t-z curves (load transfer relationships for the pile-soil system). A number of computer programs are available from WES (Items 4, 13) for performing t-z curve analyses. Various load-transfer relationships (t-z curves) exist in supplemental literature (Items 9, 28, 29, 38, and 61).

b. Pile Groups. A number of methods exist for calculating settlement of groups of piles. The designer of a pile foundation should be aware that less is known about settlement of pile groups than any item discussed in this section.

(1) Group Settlement Factors. The simplest method for calculating settlement of a group of piles implements a group settlement factor.

$$S = \zeta_g w$$

where

   $S$ = settlement of a group of piles

   $\zeta_g$ = group settlement factor

   $w$ = settlement of a single pile

The simplest expression for the group settlement factor is:

$$\zeta_g = \left( \frac{\bar{B}}{B} \right)^{0.5}$$

EM 1110-2-2906
15 Jan 91

where

$\overline{B}$ = width of the pile group

B = diameter or width of a single pile

Three things must be kept in mind when using the above method:

(a)  It is an approximate method.

(b)  The group settlement factor was determined empirically from pile groups in sand.

(c)  The settlement of a pile group is larger than that of a single pile with the same load per pile.  This method takes that fact into account.

The following expression for the group settlement factor has been used for pile groups in clay:

$$\zeta_g = 1 + \sum_{i=1}^{n} \frac{B_i}{\pi s_i}$$

where

N = number of piles in group

$s_i$ = distance from pile i to the location in the group where the group settlement is to be calculated

(2)  Empirical Method.  The empirical method for calculating the settlement of a group of piles is the method presented in Item 40.  It is based on the concept that the pile group can be treated as an equivalent pier.  For a group of friction piles, the equivalent footing is assumed to be founded at an effective depth of two-thirds of the pile embedment in the bearing stratum. For a group of end bearing piles, the equivalent footing is assumed to be founded at the pile tips.

(a)  Groups in Sand.  For calculating the settlement of pile groups in a homogeneous sand deposit not underlain by a more compressible soil at greater depth, the following expressions can be used:

$$S = \frac{2p \, \overline{B}}{\overline{N}} I$$

$$I = 1 - \frac{D'}{8\overline{B}} \geq 0.5$$

4-26

Add75

where

       S = settlement of the pile group in inches

       p = net foundation pressure, is defined as the applied load divided by
          the horizontal area of the group in tons per square foot

       $\bar{B}$ = width of the pile group in feet

       I = influence factor of effective group embedment

       $\bar{N}$ = average corrected standard penetration resistance in blows per foot
          within the zone of settlement (extending to a depth equal to the
          pile group width beneath the pile tip in homogeneous soil)

       D' = embedment depth of the equivalent pier

In using the above equation, the measured blow counts should be corrected to an effective overburden pressure of 1 ton per square foot as suggested in Item 46. The calculated value of settlement should be doubled for silty sand.

    (b) Groups in Clay. The settlement of pile groups in clay or above a clay layer can be estimated from the initial deformation and consolidation properties of the clay. The pile group is treated as an equivalent pier and allowance is made for the effective foundation embedment and compressible stratum thickness as outlined above. (PHT reference)

    (3) Elastic Methods. For the elastic methods of calculating settlements of a pile group, the designer is referred to Item 48. These methods require the estimation of a secant modulus.

    (4) Stiffness Method. The stiffness method of analysis of pile groups as outlined in paragraph 4-5 can be used to calculate settlements of pile groups. As mentioned for other methods for calculating settlement of pile groups in clay, this method does not take into account any consolidation of the clay and must be corrected for settlement due to consolidation if such consolidation occurs.

4-5. <u>Pile Group Analysis</u>.

    a. General. Several approximate methods for analysis of pile groups have been used. These graphical or numerical methods distribute applied loads to each pile within the group based on pile location, batter, and cross-sectional area. These approaches did not consider lateral soil resistance, pile stiffness, pile-head fixity, structure flexibility, or any effects of pile-soil interaction. Such factors significantly affect the distribution of forces among the piles and, if ignored, can result in an unconservative and erroneous pile design. Therefore, these methods should not be used except for very simple, two-dimensional (2-D) structures where the lateral loads are small (less than 20 percent of the vertical loads).

    b. Stiffness Methods.

    (1) General. The behavior of the structure-pile-soil system is non-linear. However, it is not practical to apply nonlinear theory to the

EM 1110-2-2906
15 Jan 91

analysis and design of large pile groups in a production mode.  Therefore, it
is necessary to develop elastic constants which satisfactorily represent the
nonlinear, nonelastic behavior.  An approach for pile group analysis using
force-displacement relationships has been developed.  This method, referred to
as the stiffness method, accounts for all of the variables mentioned above.
The stiffness method is based on work published by A. Hrennikoff (Item 37).
This method involves representation of individual pile-soil behavior by axial,
lateral, rotational, and torsional stiffness constants.  Individual pile
forces are equal to the corresponding pile displacements times the pile-soil
stiffness.  Hrennikoff's analysis was restricted to two dimensions and piles
with identical properties.  Aschenbrenner (Item 26) extended the solution to
three dimensions, and Saul (Item 54) used matrix methods to incorporate
position and batter of piles, and piles of different sizes, and materials.
The Saul approach is the basis for the pile analysis presented in the follow-
ing paragraphs.  These stiffness methods should be used for the analysis and
design of all but the simplest pile groups.  This method is implemented in the
computer program CPGA (Item 5).

    (2)  Pile-Soil Model.  In the stiffness method of pile analysis, the
structure is supported by sets of six single degree-of-freedom springs which
are attached to the base of the structure.  These springs represent the action
of the pile-soil foundation when the structure is displaced due to applied
forces (Figure 4-7).  The pile-load springs are linearly elastic and are used



Figure 4-7.  Spring model of pile-soil interaction

4-28

EM 1110-2-2906
15 Jan 91

to account for all the variables and nonlinearities of the foundation.  The behavior of each pile is represented by spring (or stiffness) constants in matrix form:

$$\{q\}_i = [B]_i \{u\}_i$$

where

$$(q)_i = \begin{Bmatrix} F_1 \\ F_2 \\ F_3 \\ M_1 \\ M_2 \\ M_3 \end{Bmatrix} = \text{pile forces and moments in } i^{th} \text{ pile}$$

$[B]_i$ = matrix of stiffness constants for $i^{th}$ pile

$$(\mu)_i = \begin{Bmatrix} U \\ V \\ W \\ \Theta_1 \\ \theta_2 \\ \Theta_3 \end{Bmatrix} = \text{displacements and rotations of } i^{th} \text{ pile}$$

The total foundation stiffness is the summation of all the individual pile stiffnesses assembled into a global foundation stiffness matrix:

$$[K] = \sum_{i=1}^{n} [K]_i$$

where

   $[K]$ = total pile group stiffness

   $n$ = number of piles in the foundation

   $[K]_i$ = stiffness of $i^{th}$ pile transformed to global coordinates

The elastic response of each pile to applied forces is based on a subgrade reaction assumption.  This assumption is that the lateral resistance of the

Add78

EM 1110-2-2906
15 Jan 91

soil to pile displacements can be modeled as a series of linear springs con-
nected to an individual pile. Therefore, the behavior of each set of springs
is affected only by the properties of the pile and the surrounding soil and
not by the behavior of adjacent piles. This approximation is necessary for
computational simplicity and to allow for easy adaptability of the model to
complications such as changes in soil type. Analytical results have been com-
pared to actual field results from pile load tests for numerous cases and have
demonstrated that this pile-soil model is satisfactory for the analysis of
pile groups at working load. However, the designer should always be aware of
the model limitations. A more realistic approach is being developed for de-
sign. Methods for determining the stiffness constants are presented in
paragraph 4-5c.

   (3) Rigid Base Versus Flexible Base. Distribution of the loads applied
by the structure to each pile is affected by many factors. One important
assumption is related to the flexibility of the pile cap. The pile cap
(structure) can be modeled as a rigid or a flexible body. If the structure is
assumed to behave as a rigid body, then the stiffness of the pile cap is in-
finite relative to the stiffness of the pile-soil system. For a rigid pile
cap deformations within the structure are negligible, and the applied loads
are distributed to each pile on the basis of rigid body behavior (Figure 4-8)
as is the case in CPGA (Item 5). If the pile cap is assumed to be a flexible
body, then the internal deformations of the structure are also modeled and
play an important role in the distribution of the applied loads to each pile
(Figure 4-9). When performing a pile group analysis, one of the first design
decisions that must be made is how to model the flexibility of the structure.
Parametric studies should be performed to determine the effects of the struc-
ture stiffness on the pile forces. For example, a pile-founded dam pier could
be idealized using a 2-D beam element for the structure and springs for the
piles. Available computer programs (such as SAP, STRUDL, CFRAME, etc.) can be
used to vary the stiffness of the beams (structure), and the axial and lateral
stiffness of the springs (piles), and thereby determine which pile cap assump-
tion is appropriate. For either type of the pile cap, the piles are modeled
as linear elastic springs.



Figure 4-8. Rigid pile cap on a spring
            (pile) foundation

4-30



Figure 4-9.  Flexible pile cap on
spring (pile)
foundation

(4) Nonlinear Effects.  A pile group analysis is normally a linear elas-
tic model.  Actual load-deflection relationships for the pile-soil system can
be nonlinear.  Programs such as PILGP2R have been developed for nonlinear
analysis of pile groups.  The major disadvantage with using nonlinear pile
group analysis programs is that they can only be used to analyze small pile
groups, 30 piles or less.  Many pile groups for hydraulic structures consist
of 200 piles or more.  Linear elastic pile group programs can approximate
satisfactorily the nonlinear group analysis programs at working loads.  A
comparison was conducted for two typical pile groups using PILGP2R to perform
a nonlinear analysis and using CPGA to perform a linear analysis which
approximates nonlinear behavior (Item 45).  The results for these two pile
groups were in good agreement.  The following methods for choosing stiffness
coefficients are used to perform the linear CPGA analyses which approximately
model nonlinear behavior.

c.  Soil and Pile Properties.  The soil-pile stiffness is a function of
the pile structural properties, soil properties, degree of pile restraint
against rotation, and pile-head movement.  The pile properties needed to de-
termine the spring stiffnesses are the modulus of elasticity, moment of
inertia, cross-sectional area, width, and length.  The soil properties needed
to determine the spring stiffnesses are the undrained shear strength or angle
of internal friction, and the unit weight.  An estimate of pile-head movement
is needed to determine the linear spring stiffnesses.  This is accomplished by
using a secant modulus corresponding to an estimated pile-head movement.  If
the calculated pile head movements reasonably agree with the estimated values,
then the solution is acceptable; if not, then a new estimate of pile head
movements must be used.  (See paragraph 4-2e for additional discussion.)

d.  Axial Stiffness.  The axial pile stiffness is expressed as:

$$b_{33} = C_{33} \frac{AE}{L}$$

4-31

Add80

EM 1110-2-2906
15 Jan 91

where

$b_{33}$ = axial pile stiffness

$C_{33}$ = constant which accounts for the interaction between the soil and the pile

A = cross-sectional area of the pile

E = modulus of elasticity of the pile

L = length of the pile

The term AE/L is the elastic stiffness of the pile acting as a short column with no soil present. The coefficient ($C_{33}$) accounts for the stiffness of the soil-pile system. The relationship between axial load capacity, movements of the pile head and tip, and load transfer along the shaft of friction piles is presented in the companion volume "Theoretical Manual for the Design of Pile Foundations," which is currently in preparation and is discussed in paragraph 1-3c(10).

(1) For design purposes, $C_{33}$ for a compression pile ranges between 1.0 and 2.0 although values as low as 0.1 and as high as 3.0 have been noted in the literature. There appears to be a relationship between $C_{33}$ and pile length. Longer piles tend to have higher values of $C_{33}$ than shorter piles. $C_{33}$ for tension piles in sand can be taken as one half of the value used for compression piles. For tension piles in clay use 75 to 80 percent of the value of $C_{33}$ for compression piles.

(2) Long-term loading, cyclic loading, pile group effects, and pile batter can affect $C_{33}$. In sand, long-term loading has little effect on the value of $C_{33}$; however consolidation in clay due to long-term loading can reduce $C_{33}$. At present, the effect of cyclic loading on $C_{33}$ is neglected. For design purposes, if piles are driven to refusal in sand or to a hard layer, there is no change in the value of $C_{33}$ for pile groups; however, $C_{33}$ may be reduced for groups of friction piles.

(3) The value of $C_{33}$ for single piles can be calculated using the following equation:

$$C_{33} = \frac{\Delta}{\delta}$$

where

$\Delta = \frac{PL}{AE}$

$\delta$ = axial movement of the pile head due to axial load P

P = allowable axial design load for the pile

4-32

Add81

EM 1110-2-2906
15 Jan 91

For axial stiffness, the load-deflection curve is essentially linear to one-half of the ultimate pile capacity (the design load), so nonlinearity of the axial pile stiffness can be neglected. Methods for calculating $C_{33}$ from the above equations include empirical methods (Item 60), Winkler foundation analysis (Item 55), t-z curve analyses (Items 9, 28, 29, 38, and 61), finite element methods, and elastic method (Item 48). Values of $C_{33}$ can be determined most accurately from pile load tests, where $C_{33}$ can be determined to approximate the linear portion of the pile load-deflection curve.

    e. Lateral Stiffness. Expressions for lateral pile stiffness are given in Item 17. The lateral pile stiffness expressions contain the following terms:

        $E$ = modulus of elasticity of the pile material

        $I$ = moment of inertia of the pile section

        $C_1$ = pile head-cap fixity constant (rotational restraint between pile head and pile cap)

        $E_s$ = modulus of horizontal subgrade reaction (expressed as soil reaction per unit length of pile per unit of lateral deflection)

        $n_h$ = constant of horizontal subgrade reaction (linear variation of $E_s$ with depth i.e., $E_s = n_h \times$)

Lateral pile stiffness expressions containing $E_s$ (modulus of horizontal subgrade reaction not a function of depth) are assumed constant for overconsolidated clays. Lateral pile stiffness expressions containing $n_h$ (modulus of horizontal subgrade reaction increasing linearly with depth) are used for sands and normally consolidated clays. Since the upper portion (10 pile diameters or less) of the soil profile usually controls the behavior of laterally loaded piles, most onshore clay deposits can be represented with a constant modulus of horizontal subgrade reaction. $E_s$ and $n_h$ are not constants. They both vary with deflection of the pile head. This is due to the fact that linear lateral stiffnesses are used to represent a nonlinear problem. To determine appropriate values of $E_s$ or $n_h$, an estimate of lateral deflection must be made. If the calculated values of lateral deflection match the estimated values, then the correct value of $E_s$ or $n_h$ was used in the analysis. If not, a new value of $E_s$ or $n_h$ must be used based on the calculated deflection. For design, ranges of $E_s$ or $n_h$ are used to take into account variation of pile properties in different directions, variation of lateral pile deflection caused by different loading conditions, and variation of soil properties. After the analyses are completed, the calculated lateral deflection should be checked to make sure they correspond to the range of values of $E_s$ or $n_h$ assumed. If they do not, then the assumed range should be modified.

    (1) Calculation of $E_s$ or $n_h$. The first step in determining the range of $E_s$ or $n_h$ values to use in pile design is to determine curves of the variation of $E_s$ or $n_h$ with lateral pile head deflection. These curves can be estimated from plots of pile-head deflection versus applied lateral load (load-deflection curves). The pile-head, load-deflection curves can be obtained from lateral pile load tests or from p-y curve analyses (Items 13,

EM 1110-2-2906
15 Jan 91

39, 50, 51, 52, and 53). From the load-deflection curves, the variation of $E_s$ or $n_h$ with deflection can be obtained using these equations for the case of applied groundline shear and zero applied moment.

$$n_h = \frac{C_n \left(\dfrac{P_t}{Y_t}\right)^{1.67}}{(EI)^{0.67}}$$

or

$$E_s = \frac{C_E \left(\dfrac{P_t}{Y_t}\right)^{1.33}}{(EI)^{0.33}}$$

where

$C_n$ = 0.89 for a fixed-head pile or 4.41 for a free-head pile

$P_t$ = lateral load applied at the top of the pile at the ground surface

$Y_t$ = lateral deflection of the top of the pile at the ground surface

$C_E$ = 0.63 for a fixed-head pile or 1.59 for a free-head pile

Use consistent units $C_n$ and $C_E$ are nondimensional constants.

(2) Stiffness Reduction Factors. Values of $n_h$ or $E_s$ calculated as outlined in the preceding paragraphs are for a single pile subject to static loading. Groups of piles, cyclic loading, and earthquake loading cause a reduction in $E_s$ and $n_h$. Reducing $E_s$ and $n_h$ increases the pile deflections and moments at the same load level. The value of $E_s$ or $n_h$ for a single pile is divided by a reduction factor (R) to get the value of $E_s$ or $n_h$ for groups of piles, cyclic loading, or earthquake loading.

(a) Group Effects. Laterally loaded groups of piles deflect more than a single pile loaded with the same lateral load per pile as the group. This increased deflection is due to overlapping zones of stress of the individual piles in the group. The overlapping of stressed zones results in an apparent reduction in soil stiffness. For design, these group effects are taken into account by reducing the values of $E_s$ or $n_h$ by a group reduction factor ($R_g$). The group reduction factor is a function of the pile width (B), pile spacing, and number of piles in the group. Pile groups with center-line-to-center-line pile spacing of 2.5B perpendicular to the direction of loading and 8.0B in the direction of loading have no reduction in $E_s$ or $n_h$. The group reduction factors for pile groups spaced closer than mentioned above are:

4-34

Add83

EM 1110-2-2906
15 Jan 91

| Center-Line-to-Center-Line Pile Spacing in Direction of Loading | Group Reduction Factor $R_g$ |
|---|---|
| 3B | 3.0 |
| 4B | 2.6 |
| 5B | 2.2 |
| 6B | 1.8 |
| 7B | 1.4 |
| 8B | 1.0 |

More recent data from pile group tests (Item 1, 8, and 12) suggest that these values are conservative for service loads, but at the present time no new procedure has been formalized.

(b) Cyclic Loading Effects. Cyclic loading of pile foundations may be due to tide, waves, or fluctuations in pool. Cyclic loading causes the deflection and moments of a single pile or a group of piles to increase rapidly with the number of cycles of load applied up to approximately 100 cycles, after which the deflection and moments increase much more slowly with increasing numbers of cycles. In design, cyclic loading is taken into account by reducing the values of $E_s$ or $n_h$ by the cyclic loading reduction factor ($R_c$). A cyclic loading reduction factor of 3.0 is appropriate for preliminary design.

(c) Combined Effect, Group and Cyclic Loading. When designing for cyclic loading of a group of piles, $E_s$ or $n_h$ for a single, statically loaded pile is divided by the product of $R_g$ and $R_c$.

(d) Earthquake Loading Effects. The loading on the foundation induced by a potential earthquake must be considered in seismic active areas. The designer should first consider probability of an earthquake occurring during the life of the structure. If there is a likelihood of an earthquake occurring during the life of the structure, in seismic Zones 0 and 1 (EM 1110-2-1902), no reduction of $E_s$ or $n_h$ is made for cyclic loading due to short-term nature of the loading. In seismic Zones 2, 3, and 4, the potential liquefaction should be evaluated. If soils in the foundation or surrounding area are subject to liquefaction, the removal or densification of the liquefiable material will be necessary. Once the designer is assured that the foundation material will not liquefy, the analysis should be performed by Saul's approach (Item 54) extended for seismic analysis as implemented in the computer program CPGD (Item 15).

(3) Stiffness Reduction Factor Equations.

(a) $E_s$-type Soil. For soils with a constant modulus of horizontal subgrade reaction, the following equations apply:

$$E_{s_{group}} = \frac{E_s}{R_g}$$

EM 1110-2-2906
15 Jan 91

$$E_{s_{cyclic}} = \frac{E_s}{R_c}$$

$$E_{s_{group\ and\ cyclic}} = \frac{E_s}{(R_g R_c)}$$

$$Y_{t_{group}} = Y_t\ R_g^{0.75}$$

$$Y_{t_{cyclic}} = Y_t\ R_c^{0.75}$$

$$Y_{t_{group\ and\ cyclic}} = Y_t\ R_g^{0.75}\ R_c^{0.75}$$

(b)  $n_h$-type Soil.  For soils with a linearly increasing modulus of horizontal subgrade reaction, the following equations apply:

$$n_{h_{group}} = \frac{n_h}{R_g}$$

$$n_{h_{cyclic}} = \frac{n_h}{R_c}$$

$$n_{h_{group\ and\ cyclic}} = \frac{n_h}{(R_g R_c)}$$

$$Y_{t_{group}} = Y_t\ R_g^{0.6}$$

$$Y_{t_{cyclic}} = Y_t\ R_c^{0.6}$$

$$Y_{t_{group\ and\ cyclic}} = Y_t\ R_g^{0.6}\ R_c^{0.6}$$

(c)  Definitions.  The terms used in the above equations are:

$E_{s_{group}}$ = modulus of horizontal subgrade reaction for a pile in a pile group with static loading

$E_s$ = modulus of horizontal subgrade reaction for a single pile with static loading

$R_g$ = group reduction factor

4-36

Add85

$E_{s_{cyclic}}$ = modulus of horizontal subgrade reaction for a single pile with cyclic loading

$R_c$ = cyclic loading reduction factor

$E_{s_{group \ and \ cyclic}}$ = modulus of horizontal subgrade reaction for a pile in a pile group with cyclic loading

$Y_{t_{group}}$ = pile head horizontal deflection at the ground surface for a pile in a pile group with static loading

$Y_t$ = pile head horizontal deflection at the ground surface for a single pile with static loading

$Y_{t_{cyclic}}$ = pile head horizontal deflection at the ground surface for a single pile with cyclic loading

$Y_{t_{group \ and \ cyclic}}$ = pile head horizontal deflection at the ground surface for a pile in a pile group with cyclic loading

$n_{h_{group}}$ = constant of horizontal subgrade reaction for a pile in a pile group with static loading

$n_h$ = constant of horizontal subgrade reaction for a single pile with static loading

$n_{h_{cyclic}}$ = constant of horizontal subgrade reaction for a single pile with cyclic loading

$n_{h_{group \ and \ cyclic}}$ = constant of horizontal subgrade reaction for a pile in a pile group with cyclic loading

(4) Pile Length. All of the lateral pile stiffness terms are based on the assumption that the piles are long and flexible as opposed to short and rigid. Piles are considered long if the applied lateral load at the head has no significant effect on the tip (the tip does not rotate or translate). Short piles behave rigidly and exhibit relatively no curvature (the tip rotates and translates). The computer programs referenced in this manual for group pile design are not intended for design of foundations containing short piles. Most piles used in the design of civil works structures are classified as long piles. The determination of the behavior of a pile as long or short is:

(a) Constant Modulus of Horizontal Subgrade Reaction.

$$R = \sqrt[4]{\frac{EI}{E_s}}$$

EM 1110-2-2906
15 Jan 91

$$L/R \leq 2.0 \quad ; \quad \text{Short pile}$$

$$2.0 < L/R < 4.0 \quad \text{Intermediate}$$

$$L/R \geq 4.0 \quad \text{Long pile}$$

(b)  Linearly Increasing Modulus of Horizontal Subgrade Reaction.

$$T = \sqrt[5]{\frac{EI}{n_h}}$$

$$L/R \leq 2.0 \quad \text{Short pile}$$

$$2.0 < L/R < 4.0 \quad \text{Intermediate}$$

$$L/R \geq 4.0 \quad \text{Long pile}$$

f.  Torsional Stiffness.  The torsional pile stiffness is expressed as:

$$b_{66} = C_{66} \frac{JG}{L}$$

where

$b_{66}$ = torsional pile stiffness

$C_{66}$ = constant which accounts for the interaction between the soil and the pile

$J$ = polar moment of inertia of the pile

$G$ = shear modulus of the pile.

$L$ = length of the pile

The torsional stiffness of individual piles contributes little to the stiffness of a pile group for rigid pile caps and has been neglected in the past. More recent research has shown that a reasonable torsional stiffness is to use $C_{66}$ equal to two.  The coefficient $C_{66}$ is equal to zero if the pile head is not fixed into the pile cap.  See Items 44, 55, and 57 for details.

4-6.  Design Procedure.

a.  General.  The following paragraphs outline a step-by-step procedure to design an economical pile foundation.  The steps range from selection of applicable loads and design criteria through use of rigid and flexible base analyses.  Identification and evaluation of foundation alternatives, including selection of the type of pile, are presented in Chapter 2.

4-38

Add87

b.   Selection of Pile-Soil Model.  A computer model (CPGS) is currently
being developed and its capabilities are discussed in paragraph 1-3c(3), for
analyzing the nonlinear interaction of the pile and surrounding soil.  This
model represents the lateral and axial behavior of a single pile under loading
and accounts for layered soil, water table, skin friction, end bearing, and
group effects.  This computer model will be presented in detail in Mode CPGS.
For large pile groups, the pile response is approximated by linear elastic
springs.  These springs represent the six degrees of freedom at the pile head,
and their stiffnesses should be determined in close coordination between
structural and geotechnical engineers.  The designer should select a linear,
elastic pile stiffness value for the group analysis by assuming a limiting
deflection at the pile head.  Then a secant pile stiffness should be deter-
mined for the assumed deflection using the nonlinear model or data from load
tests conducted at the site.  Deformations computed in the pile group analysis
should be limited to this assumed deflection.  The forces computed in the pile
group analysis, using the secant pile stiffnesses, should be less than the
actual forces from a nonlinear analysis (Figure 4-10).  If more than 10 per-
cent of the piles exceed the limiting deflection, a new secant pile stiffness
should be developed for a larger limiting deflection.  This method should be
used in conjunction with interpretations of full-scale pile tests done at
other sites that closely relate to the site under analysis.  If site condi-
tions are such that the foundation properties are not well defined, then a
parametric approach should be used.  A parametric analysis is performed by
using stiff and weak values for the elastic springs based on predicted limits
of pile group deflections.  This parametric analysis should be applied to the
lateral and the axial stiffnesses.  See paragraph 4-5e for further discussion.



Figure 4-10.  Pile forces for linear and nonlinear analysis

c.   Selection of Pile Structure Model.  The selection of the pile-
structure model for analysis and design of a pile-founded structure must con-
sider the following three critical items:

EM 1110-2-2906
15 Jan 91

Type of structure (concrete or steel)

Type of analysis (rigid or flexible base)

Pile-head fixity (fixed, pinned, or partially fixed)

A reinforced concrete structure will require a rigid or flexible base analysis
with the pile heads fixed or pinned. The decision regarding which type of
base analysis to use is determined from the parametric analysis discussed in
the preceding paragraph. A rigid base analysis should use the program CPGA
(Item 5). A flexible base analysis should use one of the general purpose
finite element computer programs, such as STRUDL or SAP, which have a pile
element similar to the one used in CPGA. The flexible base analysis should be
capable of handling all degrees of freedom for the two- or three-dimensional
models. For example, to analyze a pile group with loading in the x, y, and z
directions, the base should be modeled using plate elements or three-
dimensional elements. For structures with loads in two directions only, a
typical base strip should be modeled using frame elements as shown in Fig-
ure 4-11. Pile forces and moments and structure forces and moments are
obtained from these analyses. An analysis of a steel frame on a pile founda-
tion is accomplished in a similar manner. The degree of fixity of the pile to
the steel frame must be included in developing the pile stiffnesses. The
steel frame should be modeled as a space frame or plane frame supported by
linear elastic springs which account for the degree of pile-head fixity. Pile
forces and moments and frame forces and moments are obtained from this
analysis. Earthquake loading in seismic areas must be considered. The
program CPGD (Item 15) extends the three-dimensional rigid pile cap analysis
of CPGA (Item 5) to provide a simplified, yet realistic, approach for seismic
analysis of pile foundations. The CPGD program includes viscous damping of
the pile-soil system and response spectrum loading. The CPGD program should
be used during the seismic design process. Pile forces and moments are
obtained from this seismic analysis.



Figure 4-11. Typical 2-dimensional base strip
modeled using frame elements

d. Selection of Load Cases. General loading conditions should be iden-
tified, and each condition should be assigned an appropriate safety factor and

Add89

allowable stress.  Study of the list of loading cases will reveal that some
load cases will not control the design and should be eliminated.  The remain-
ing load cases should be studied in more detail.  Loading details should be
established to produce critical combinations.  Consider the effect each load
will have on pile forces and on internal forces in the pile cap.  Some load-
ings may control the internal design of the pile cap even though they may not
produce the critical pile forces.  Generally, it is important to analyze the
load cases with the largest lateral loads in each direction and the cases with
the maximum and minimum vertical loads.  Final selection of the load cases
should be based on engineering judgement.

    e.  Selection of Design Criteria.  Paragraph 4-2 provides specific guid-
ance about safety factors, pile stresses, and pile cap movements.  Criteria
for ultimate pile capacity are presented in paragraph 4-3, and development of
pile stiffness values is described in paragraph 4-5.  These criteria may be
applied to most pile foundation designs.  However, uncertainty about pile-soil
behavior may require modification of some criteria to ensure a conservative
design.  The magnitude of the lateral or axial pile stiffness may signifi-
cantly affect the results of any pile analysis.  Combining limiting values of
lateral and axial pile stiffnesses may result in significantly different per-
centages of the applied loads being resisted by pile bending or axial force.
This is particularly important for flexible base analyses because the applied
loads are distributed to the piles based on the relative stiffness of the
structure and the piles.  Therefore realistic variations in pile stiffnesses
should usually be evaluated, and the pile group should be designed for the
critical condition.  The variation of stiffnesses should correspond to the
predicted deflection of the pile group.

    f.  Deformations.  The pile stiffnesses in the lateral and axial direc-
tions is determined by a nonlinear analysis assuming a limiting deformation.
Since the pile stiffness is a secant model of the pile response, the calcu-
lated deflections of the pile head under working loads should be limited to
that assumed value.  If the analysis yields deformations greater than those
assumed in determining the pile stiffnesses, then the geotechnical engineer
should be consulted and the stiffnesses should be reevaluated.  Calculated
pile cap deformations should be checked against functional and geometric
constraints on the structure.  These values are usually 1/4-inch axially and
1/2-inch laterally.  For unusual or extreme loads these values should be
increased.

    g.  Initial Layout.  The simplest pile layout is one without batter
piles.  Such a layout should be used if the magnitude of lateral forces is
small.  Since all piles do not carry an equal portion of the load, axial pile
capacity can be reduced to 70 percent of the computed value to provide a good
starting point to determine an initial layout.  In this case, the designer
begins by dividing the largest vertical load on the structure by the reduced
pile capacity to obtain the approximate number of piles.  If there are large
applied lateral forces, then batter piles are usually required.  Piles with
flat batters, 2.5 (V) to 1 (H), provide greater resistance to lateral loads
and the less resistance to vertical loads.  Piles with steep batters, 5 (V)
to 1 (H), provide greater vertical resistance and less lateral resistance.
The number of batter piles required to resist a given lateral load can also be
estimated by assuming that the axial and lateral resistances are approximately
70 percent of computed capacity.  This should be done for the steepest and
flattest batters that are practical for the project, which will provide a

4-41

EM 1110-2-2906
15 Jan 91

range estimate of the number of batter piles required.  For a single load case
this method is not difficult.  However, when the pile group is subjected to
several loading conditions, some with lateral loads applied in different
directions, this approach becomes more difficult.  For such cases, two or
three critical loading conditions should be selected to develop a preliminary
layout from which the number, batters, and directions of piles are estimated.
A uniform pile grid should be developed based on the estimated number of
piles, the minimum pile spacing and the area of the pile cap.  If piles with
flat batters are located in areas of high vertical loads, then vertical piles
should be placed adjacent to these battered piles.  An ideal layout for flexi-
ble structures will match the pile distribution to the distribution of applied
loads.  This match will result in equal loads on all piles and will minimize
the internal forces in the structure because the applied loads will be re-
sisted by piles at the point of loading.  For example, a U-frame lock monolith
has heavy walls and a relatively thin base slab.  Therefore, piles should be
more closely spaced beneath the walls and located at larger spacings in the
base slab.

h.  Final Layout.  After the preliminary layout has been developed the
remaining load cases should be investigated and the pile layout revised to
provide an efficient layout.  The goal should be to produce a pile layout in
which most piles are loaded as near to capacity as practical for the critical
loading cases with tips located at the same elevation for the various pile
groups within a given monolith.  Adjustments to the initial layout by the
addition, deletion, or relocation of piles within the layout grid system may
be required.  Generally, revisions to the pile batters will not be required
because they were optimized during the initial pile layout.  The designer is
cautioned that the founding of piles at various elevations or in different
strata may result in monolith instability and differential settlement.

i.  Design of Pile Cap.  If the pile group is analyzed with a flexible
base, then the forces required to design the base are obtained directly from
the structure model.  If the pile group is analyzed with a rigid base, then a
separate analysis is needed to determine the stresses in the pile cap.  An ap-
propriate finite element model (frame, plate and plane stress or plane strain)
should be used and should include all external loads (water, concrete soil,
etc.) and pile reactions.  All loads should be applied as unfactored service
loads.  The load factors for reinforced concrete design should be applied to
the resulting internal shears, moments, and thrusts acting at each cross sec-
tion.  The applied loads and the pile reactions should be in equilibrium.
Appropriate fictitious supports may be required to provide numerical stability
of some computer models.  The reactions at these fictitious supports should be
negligible.

4-7.  Special Considerations.

a.  Soil-Structure Interaction.  Pile-supported structures should be
analyzed based on the axial and lateral resistance of the piles alone.
Additional axial or lateral resistance from contact between the base slab and
the foundation material should be neglected for the following reasons.  Scour
of the riverbed frequently removes material from around the slab.  Vibration
of the structure typically causes densification of the foundation material and
creates voids between the base slab and foundation material.  Also, consolida-
tion or piping of the foundation material can create voids beneath the
structure.

   b.  Deep Seated Lateral Movement and Settlement.  The soil mass surround-
ing a pile group must be stable without relying on the resistance of the pile
foundation.  In actual slides, 48-inch diameter piles have failed.  Deep
seated stability of the soil mass should be analyzed by neglecting the piles.
Potential problems of inducing a deep seated failure due to excess pore water
pressures generated during pile driving or liquefaction due to an earthquake
should be recognized and accounted for in the design.  The probable failure
mechanism for piles penetrating a deep seated weak zone is due to formation of
plastic hinges in the piles after experiencing large lateral displacements.
Movement in the weak zone will induce bending in the piles as shown in
Figure 4-12.  A second mechanism is a shear failure of the piles which can
only occur if the piles penetrate a very thin, weak zone which is confined by
relatively rigid strata.  The shear force on the piles can be estimated along
the prescribed sliding surface shown in Figure 4-13.  Research is being
sponsored at the University of Texas which will develop a practical approach
to solve these problems.  The results of this research will be included in
this manual and the capabilities of CPGA (Item 5) and CPGS, paragraph 1-3c(3),
for analyzing such situations will be extended.  Downdrag due to settlement of
the adjacent soil mass may induce additional loads in the piles.



Figure 4-12.  Piles are sheared off by the massive soil movement

   c.  Differential Loadings on Sheet-Pile Cutoffs.  The length of a sheet
pile cutoff should be determined from a flow net or other type of seepage
analysis.  The net pressure acting on the cutoff is the algebraic sum of the
unbalanced earth and water pressures.  The resulting shear and moment from the
net pressure diagram should be applied to the structure.  For flexible steel
sheet piles the unbalanced load transferred to the structure may be negligi
ble.  For a continuous rigid cutoff, such as a concrete cutoff, the unbalanced
load should be accounted for.  An example is shown in Figure 4-14.

4-43

EM 1110-2-2906
15 Jan 91



Figure 4-13.  Piles are overstressed by bending moment



Figure 4-14.  Pressure distribution on sheet
pile cut off wall

Add93

EM 1110-2-2906
15 Jan 91

    d.  Effects of Changes in the Pile Stiffness.

    (1)  General.  Accurate predictions of the soil-pile stiffnesses for a
specific site and set of construction circumstances are extremely difficult.
The interaction of the structure-pile-soil system is complex and is usually
nonlinear.  The load deformation behavior of this system is affected to vary-
ing degrees by the type of loading, pile spacing, pile head fixity, subgrade
modulus, pile-driving procedures, water table variations, and other variables.
The designer should account for these uncertainties and variations by judi-
ciously selecting a realistic range of pile stiffnesses, and by evaluating the
sensitivity of the pile forces, moments and displacements to reasonable varia-
tions in the pile stiffnesses.  This procedure should be used to develop a
high degree of confidence in the design.

    (2)  Rigid Base.  For a pile group that contains only vertical piles, the
rigid cap assumption requires that the plane of the pile heads remains plane
when loads are applied.  Therefore, since the axial and lateral components of
the pile reactions are independent, changes in the axial or lateral pile
stiffnesses will have predictable results.  If the pile layout contains a
combination of vertical and batter piles, then the interaction of lateral and
axial components of the pile reactions can have significant and often unfore-
seen effects on the distribution of pile forces.  Therefore, changes in the
lateral stiffnesses could have a profound effect on the axial pile forces, and
the sensitivity of the pile forces to changes in the pile stiffnesses would
not be predictable without using a computer analysis.  See Item 3 for example.

    (3)  Flexible Base.  When the stiffness of the structure is not infinite
compared to the stiffness of the pile-soil system, the pile cap is assumed
flexible.  The sensitivity of the pile loads to changes in the pile stiffness
then becomes even more difficult to predict.  The axial and lateral response
of the piles are interrelated, and the internal stiffness of the structure
significantly influences the distribution of the individual pile loads.
Changes in the pile stiffnesses can also affect the deformation character-
istics of the structure, thereby changing the internal moments and member
forces.  Figure 4-15 illustrates the effects of changing the stiffness of pile
cap.  In Figure 4-16 the base of the infinitely rigid pile cap deflects
uniformly, causing uniform loads in the piles and large bending moments in the
base slab.  If the slab stiffness is modeled more realistically, as shown in
Figure 4-15, the pile loads will vary with the applied load distribution.  The
pile loads will be lower under the base slab causing the base slab moments to
be reduced.  The correct stiffness relationship between the structure and the
foundation is extremely important for accurately designing a pile group.

    (4)  Confidence Limits.  An essential element of all pile foundation de-
signs is the effort required to define the stiffness of the structure-pile-
soil system confidently.  Initial pile stiffnesses should be selected and used
to perform a preliminary analysis of critical load cases.  If the preliminary
analysis indicate that the selected pile stiffnesses are not sufficiently
reliable, and that the variation of the pile stiffnesses will significantly
affect the analytical results, then more intensive investigation is required.
Normally a limit analysis is performed to bracket the solution.  With this
limit approach, all the factors which tend to minimize the pile-soil resis-
tance are collectively used to represent a weak set of pile stiffnesses.  This
condition is a lower bound.  Similarly, all the factors which tend to maximize

4-45

EM 1110-2-2906
15 Jan 91



Figure 4-15. Deflected shape of flexible pile caps



Figure 4-16. Deflected shape of a rigid pile cap

pile-soil resistance are collectively used to represent a strong set of pile
stiffnesses (upper bound). Using this procedure, the designer can establish
confidence limits by performing two analyses which bracket the actual set of
parameters. For further discussion of this procedure, refer to Paragraph 4-6.

   e.  Effects of Adjacent Structures.

   (1)  General.  Most hydraulic structures are designed to function as in-
dependent monoliths.  Sometimes it is necessary to design hydraulic structures
which interact with adjacent monoliths or existing structures.  Certain proce-
dures and details should be used to assure that the actual structural perfor-
mance is consistent with the design assumptions.

Add95

EM 1110-2-2906
15 Jan 91

(2)  Independent Monoliths.  Generally, hydraulic structures should be designed to function as independent monoliths.  Each monolith should be isolated by vertical joints and should not interact with adjacent monoliths. This approach greatly simplifies the analysis and is a reliable basis for predicting performance.  Validity of the design assumptions should be assured by including the following procedures and details.  Independent monoliths should not be physically connected to adjacent monoliths.  Expansion joints should be provided between monoliths to accommodate the predicted displacements.  Rigid cap displacements should be extrapolated to the top of the monolith and the displaced structure should not make contact with adjacent monoliths.  Batter piles should not interfere (based on common construction tolerances) with piles under adjacent structures.  It is good design practice, but not always practical, to keep the tips of all piles within the perimeter of the pile cap. Possible interferences with piles under adjacent monoliths should be checked using CPGI, a program currently being developed and discussed in paragraph 1-3c(6), and the pile layout should be modified as needed.

(3)  Interacting Monoliths.  Sometimes it is necessary to design the pile groups of adjacent monoliths to interact and resist large unbalanced lateral loads.  There are three types of circumstances:

(a)  Analysis of new structures that are geometrically constrained from permitting sufficient batter and numbers of vertical piles to resist the lateral forces.

(b)  Analysis of new structures that are subjected to a highly improbable loading condition.  Such extreme lateral loads make it economically unfeasible to design a pile layout for independent adjacent monoliths.

(c)  Evaluation of existing structures.

For designing new structures, provisions should be included to assure positive load transfer between monoliths (preferably at the pile cap) and without causing detrimental cracking and spalling.  Provisions should be included for keying and grouting the monolith joint between the pile caps of interacting structures.  Special attention should be given to the monolith joints in the thin wall stems of U-frame locks.  The wall joints should be detailed to accommodate monolith movements without significant load transfer and thereby control localized cracking and spalling.  For evaluating existing structures, the analyst should model actual field conditions as closely as practical. Field measurements should be made to determine pile-cap displacements and changes in monolith joint dimensions.  Investigations should determine if load transfer is occurring between monoliths (joint closure, spalling concrete at joints, etc.).  Foundation investigations should be adequate to estimate the lateral and axial pile stiffnesses.

(4)  New Structures Adjacent to Existing Structures.  Special provisions are appropriate for designing and installing piles adjacent to an existing structure.  Existing structures include those under construction or already in service.  During construction, pile driving should not be allowed within 100 feet of concrete which has not attained its design strength.  Pile driving within 100 feet of concrete that has achieved the required design strength should be monitored for detrimental effects on the existing concrete.  If piles are installed near an existing structure, it is prudent to monitor and document effects of pile driving on the existing structure and foundation.

4-47

EM 1110-2-2906
15 Jan 91

Such provisions should be fully considered during design. Potential damage to existing structures may be influenced by a variety of factors:

(a) Densification of existing fill may induce settlement and a significant increase in lateral earth pressures.

(b) Driving displacement piles in noncompressible materials may cause heave of the ground surface.

(c) Driving piles in submerged, uniformly fine-grained, cohesionless soils may rearrange the soil grains and increase groundwater pressure with corresponding large settlements.

(d) Lateral load resistance of adjacent pile foundations may be significantly reduced.

These factors and others should be thoroughly investigated during design.

(5) Special Techniques. Special types of pile installation should be used to minimize possible damage. These may include:

(a) Using nondisplacement piles.

(b) Specifying a pile hammer that minimizes vibrations.

(c) Jacking piles.

(d) Using predrilled pilot holes or jetting.

The condition of existing structures and the surrounding area should be carefully documented before, during, and after pile driving. Field surveys, measurements, photographs, observations, sketches, etc. should be filed for future reference.

f. Overstressed Piles. The design criteria in preceding paragraphs are generally applicable for each load case. However, on large foundations, a few piles may exceed the allowable capacity or stresses by a relatively small amount without endangering the integrity of the structure. The design of a pile group should not be dictated by localized overload of a few corner piles for one load case. Because of the highly nonlinear load-deflection relationship of piles and the large plastic ranges that some piles exhibit, high localized pile loads are usually redistributed without danger of distress to adjacent piles until a stable state of equilibrium is attained. The stiffness method of analysis is an approximate linear model of the nonlinear load deflection behavior of each pile. Since the stiffness analysis is not exact a few piles may be loaded above the allowable capacity. Iterative pile group analyses are required.

g. Pile Buckling. Buckling of individual piles is related to the load level, the flexibility of the pile cap, the geometry of the pile group, and the properties of the soil and piles. Pile-soil stiffness and the degree of lateral support provided by the soil primarily depend on the following factors:

(1) Embedment.  If the piles are fully embedded, then the lateral support provided by the soil is usually sufficient to prevent pile buckling. Even extremely weak soils may provide sufficient support to prevent buckling when fully embedded.  Buckling may be critical if the piles project above the surface of soils that provide strong lateral support.

(2) Rigidity.  The pile shape (radius of gyration), modulus of elasticity of the pile, the lateral and axial support provided by the soil, the degree of fixity of the pile head, and the flexibility of the pile cap all affect the relative pile rigidity.  Buckling analysis is very complex because the axial and transverse loads and the pile stiffnesses affect the deformation of the pile, and this behavior is related through interaction with the soil.

(3) Tip Resistance.

h.  Pile Splicing.

(1) General.  The probability and reliability of splicing piles should be considered early in design.  The structural integrity of the piles and complexity of the installation procedures must be comprehensively evaluated before selecting the location and types of splices allowed.  Most splicing is performed in the field and significantly increases construction time, cost, and the field inspection required to assure reliability.  Therefore, field splicing is normally limited to situations where only occasional splices are required.  Splicing may be necessary in construction areas with limited overhead clearances or if the pile does not attain its required design capacity at the specified tip elevation.  Contract plans and specifications should address the use (or exclusion) of splices and any specific requirements or limitations that are necessary.  Splicing should not be allowed in the field without prior consent and approval of the designer.

(2) Structural Integrity.  Splices should be capable of resisting all forces, stresses, and deformations associated with handling, driving, service loads, or other probable sources.  Splices in the upper portion of the pile should be designed to account for the possible effects of accidental eccentric loadings.  Regions of low bending and shear stresses under service loads are preferable for splice locations.  Allowable stresses should be limited to those listed in paragraph 4-2d, and deformations should be compatible with the interaction between the pile and structure.  The design should also account for the effects of corrosion and cyclic or reverse loading if present.  Many commercial splices are not capable of developing the full strength of the pile in tension, shear, and bending.

(3) Soil Integrity.  Splice surfaces which extend beyond the perimeter of the pile may disturb the interface between the pile and soil during driving and decrease adhesion.  If appropriate, reductions in axial and lateral pile capacities should be made.  This condition is most likely to occur in stiff clays, shales, and permafrost.

(4) Installation.  Most splicing is performed in the field, sometimes in the driving leads.  Engineering experience and judgement are essential in assessing the critical factors influencing reliability and cost (i.e. field access to the splice location, workmanship and quality assurance).  The time required to perform the splice is also critical if the pile tends to set and become more difficult to restart when driving resumes.  Piles driven into

EM 1110-2-2906
15 Jan 91

materials with high adhesion or granular materials exhibit rapid set to a
greater degree than soft clays or sensitive soils.

    i.  As-Built Analyses.  As explained in paragraph 5-6a, conditions en-
countered in the field may result in variations between the pile foundation
design and the actual pile foundation.  All such variations should be ob-
served, recorded and evaluated by the designer in an as-built analysis.  The
number of overloaded piles, the severity of the overload, and the consequences
of the failing of one or more overloaded piles should be evaluated in the
as-built analysis.  Structural deformations and interaction between adjacent
monoliths also could be significant factors.

    (1)  Geometric Factors.  Field conditions may cause variations in the
geometric layout of individual piles; i.e., pile head may move horizontally or
rotate, batter may change, and final tip elevation may vary due to a change in
batter or soil properties.  Such geometric variations may substantially affect
the individual pile loads even though the pile capacity remains unchanged.

    (2)  Soil Properties.  Variations in soil properties may affect pile-tip
elevations, pile capacities and the axial and lateral pile stiffnesses.

    (3)  Obstructions.  Unexpected subsurface obstructions may prevent driv-
ing some piles to the design tip elevation, thereby causing variations in the
pile stiffnesses or necessitating field changes.

Add99

Case: 14-1228 Case: 14-1228 Document: 23 Document: 23 Page: 171 Page: 171 Filed: 04/23/2014 Filed: 04/23/2014

CHAPTER 5

ENGINEERING CONSIDERATIONS PERTAINING TO CONSTRUCTION

5-1. <u>General</u>.  This chapter addresses engineering considerations pertaining to the construction of pile foundations.  It is important for the designer to become familiar with the various equipment (Items 31 and 32) and methods used during construction since either may adversely affect soil-structure interaction, economics, and the overall effectiveness of the design.  Early in the design process consideration should be given to available pile materials and lengths, appropriate construction methods and equipment, load tests, acceptable and achievable construction tolerances, and maintaining quality control and records during construction.  Design coordination with construction should begin in the early design stages.  These considerations, combined with past experience, should result in the formulation of an appropriate foundation design and the preparation of suitable construction plans and specifications.  Upon completion, a review of construction variations should be made to determine if an as-built analysis is warranted.  Material presented in this chapter is intended to give design and construction engineers an overview of installation and its effect on the design.  Detailed discussions can be found in the literature and the cited references.

5-2. <u>Construction Practices and Equipment</u>.  A variety of methods and special equipment have been used for the installation of piles.  Many factors are involved in the selection process, but the end result should always be structurally sound piling supported by soil or rock that is capable of developing the design loads.  To achieve this result, it is imperative that the specifications provide for use of appropriate installation methods, suitable equipment, and acceptable field procedures.  Contract specifications should be as flexible as possible so that economy is achieved, yet rigid enough to result in the desired final product.

    a.  Installation Practices.  Installation practices include consideration and utilization of appropriate field methods for storing, handling, and accurately driving each pile to the desired final position within established tolerances.  Specifications typically outline requirements for the contractor to submit his proposed plan for installing the pile.  Required submittal items normally include detailed descriptions for pile storage and handling, the driving rig and all auxiliary equipment (with manufacturer's specifications and ratings), installation sequence, methods for controlling placement and alignment of piles, and, if permitted, the pile splice types, locations and plan, and quality control plan.  In addition, the specifications normally require submittal of data for a Government-performed wave equation analysis.  Government review should focus on the contractor's compliance with the specifications and the ability of his proposed equipment and methods to produce structurally sound piling, driven within the established tolerances and capable of developing the required design capacity.  Installation methods or equipment suspected of compromising the foundation design should be clearly excluded by the specifications.  The contractor may question those exclusions and may substantiate his claim at his expense by performing wave equation analysis, field verification of driving and static load tests, dynamic monitoring, or other methods designated by the designer.

    (1)  Storage and Handling.  Piles are subject to structural damage during the storage and handling processes.  Improper storage or handling may result

Add100

Case: 14-1228 Case: 14-1228 Document: 23 Document: 23 Page: 172 Page: 172 Filed: 04/23/2014 Filed: 04/23/2014

in excessive sweep (camber) or cracking in concrete and may be cause for re-
jection of a pile. Excessive sweep, or camber, has been known to result in a
pile drifting out of tolerance during installation. Sweep and camber limita-
tions should be included in the specifications. Stresses developed during the
storage and handling phases should be investigated and compared to those al-
lowed in paragraph 4-2d. Additionally, both the required number and locations
of permissible pick-up points on the pile should be clearly indicated in the
plans and specifications. Any deviations in the field must be approved by the
design engineer. Special care must be exercised when handling piles with pro-
tective coatings, and damaged areas must be repaired prior to installation.
All pilings should be visually examined at the driving site by a qualified in-
spector to prevent the use of any pile damaged by faulty storage or handling
procedures.

(2) Placement and Tolerances. When determining suitable placement tol-
erances, consideration should be given to the site conditions, i.e., topogra-
phy; subsurface materials; type of loading; pile type, spacing and batter;
size and type of pile cap and structure; available driving equipment; and pos-
sible interference between piles. A lateral deviation from the specified
location at the head of not more than 3 to 6 inches measured horizontally and
a final variation in alignment of not more than 0.25 inch per foot measured
along the longitudinal axis should normally be permitted. In the vertical
direction a deviation of plus or minus 1 inch from the specified cutoff
elevation can be considered reasonable. The above recommendations are general
guidance for large pile groups and should be verified as applicable for each
specific project. It should be noted that sloping surfaces may require field
adjustment of the pile location if the actual excavation line differs from the
reference plane used in the plans to depict pile locations. Each pile should
be checked in the field prior to driving. The pile head should be seated in
the hammer and the pile checked for correct batter, vertical plumbness, and
rotation of the pile by a method approved by the design engineer. Many jobs
require the use of a transit to set the pile and the leads accurately when
driving battered piles. Once driving has commenced, attempts to move the pile
by rotating the leads, pulling on the pile, or wedging may result in damage
(structural or soil alteration) or increased misalignment of the pile tip.

(3) Driving. Contract specifications disallow field driving of piles
until the contractor's methods and equipment are approved by the design engi-
neer. Designer approval is necessary to ensure the pile can be driven without
damage to the pile or soil, and methods for determining such are discussed in
paragraph 5-3. The designer should be aware that certain equipment and meth-
ods for pile installation have been known to reduce axial and lateral resis-
tance or damage the pile in certain situations. Field variations from the
approved methods and equipment require re-submittal to the design office, as
changes can and usually do effect the pile capacity attained for a given
length pile. It is incumbent upon the designer to supply field personnel with
the necessary information to ensure each pile installed is capable of support-
ing its design load. Such information most often consists of limiting
penetration resistances (paragraph 5-3) or the specification of a pile driving
analyzer (paragraph 5-4a) to prevent structural damage from overdriving and to
ensure that adequate capacity is developed. Field personnel must ascertain
the equipment and installation methods are properly employed, the equipment is
performing up to its capabilities, records are properly kept (paragraph 5-4b),
and any driving abnormalities are promptly reported back to the design office.
Pile driving should not result in crushing or spalling of concrete, permanent

Add101

Case: 14-1228 Case: 14-1228 Document: 23 Page: 173 Filed: 04/23/2014

deformation of steel, or splitting or brooming of wood. Damage sustained
during driving can frequently be attributed to misalignment of the pile and
hammer, a material failure within the drive cap, equipment malfunction, or
other improper construction practices. Field installation requires diligent
monitoring of penetration resistance. Any piling suspected of either sustain-
ing structural damage or failing to develop the required capacity, for
whatever reason, must be promptly evaluated by the designer to determine its
effect on the overall foundation design. Repetitive problems may require
modification of the installation equipment or procedure. Pile heave can be a
problem in some cases and is more inclined to occur for displacement piles.
In this case, an installation sequence should be required to minimize the
likelihood of pile heave. Piles that experience heave should be restruck to
seat the pile properly. The installation of a concrete pile requires special
consideration due to its inherent low tensile strength. The pile must be
firmly seated prior to the application of full driving energy to prevent pile
cracking or breakage. Pile driving can sometimes be supplemented by special
driving assistance such as the addition of driving shoes, jetting, preboring,
spudding, or followers. The use of special assistance should be considered
when one of two conditions exist. If a pile reaches refusal with a suitable
hammer but does not achieve the necessary capacity, a modification to the
installation procedures may be necessary. Simply increasing the size of the
hammer may not be appropriate because the pile would be damaged due to
excessive driving stresses. The second condition is an economic one, where
the installation time and effort can be substantially reduced by the modifying
installation procedures. In either case, the potential effect on the axial
and lateral pile capacity must be closely evaluated. Contract specifications
should define as clearly as possible what type of special driving assistance,
if any, would be allowed and under what conditions they would be allowed.
Since methods of providing special driving assistance usually result in
reduced pile capacity, specifications normally preclude their use without
written approval from the designer. Methods and rationale for the selection
of equipment, field inspection, establishment of penetration limitations,
record keeping requirements and methods for controlling the driving operation
are contained elsewhere in this chapter.

(a) Pile shoes. Pile shoes are frequently used to improve driveability
and also provide protection at the pile tip. When driving piles in dense
sands, in hard layers containing cobbles or boulders, or through other
obstructions, increased cutting ability and tip protection are provided by the
shoe. Piles seated in rock normally require shoes for tip protection and
improved bearing characteristics. Steel pile shoes are usually fabricated of
cast steel, particularly for steel H-piles, where plates welded to the flange
and web have proven unreliable. The design engineer should evaluate the
necessity and cost of using pile shoes on a case-by-case basis.

(b) Jetting. Jetting is normally used when displacement-type piles are
required to penetrate strata of dense, cohesionless soils. Exceptions are
very coarse or loose gravel where experience shows jetting to be ineffective.
Piles, in some cases, have been successfully jetted in cohesive soils but clay
particles tend to plug the jets. Jetting aids in preventing structural damage
to the pile from overdriving. Water is pumped under high pressure through
pipes internally or externally attached to the pile, although air may be used
in combination with the water to increase the effectiveness in certain cases.
The last 5 to 10 feet of pile penetration should be accomplished with no
jetting allowed. Piles that cannot be driven the last 5 to 10 feet without

Add102

EM 1110-2-2906
15 Jan 91

the aid of jetting should be immediately brought to the attention of the
design engineer, since a reduction in axial capacity will probably result.
When jetting concrete piles, driving should be restricted to a static weight
while the water is being injected to prevent damage due to excessive tensile
stresses that may be induced by impact.  Jetting adjacent to existing struc-
tures or piles should be avoided if possible.  Although driving vibrations are
reduced, extreme caution must be exercised, since jetting causes disturbance
of soil material.  The design engineer must exercise caution when determining
the design capacity for a jetted pile.  Adequate provisions must be made for
the control, treatment (if necessary), and disposal of run-off water.  If
jetting is anticipated, test piles should be installed using jetting, with the
test pile being installed after the reaction piles are installed to assess the
effects of jetting on capacity.

    (c)  Preboring.  A pilot or prebore hole may be required to penetrate
hard nonbearing strata; to maintain accurate location and alignment when pass-
ing through materials which tend to deflect the pile; to avoid possible damage
to adjacent structures by reducing vibrations; to prevent heave of adjacent
buildings; or to remove a specified amount of soil when installing
displacement-type piles, thereby reducing foundation heave.  Preboring
normally takes place in cohesive soils and is usually required when concrete
piles must penetrate man-made fills and embankments containing rock particles
or other obstructions.  It should be noted that on past Corps projects,
concrete piles have been successfully driven through man-made fills such as
levee embankments without preboring.  Preboring through cohesionless soils is
not recommended, since the prebored hole may not stay open and could require a
casing.  The most widely used method of preboring is by utilizing an auger
attached to the side of the crane leads.  When preboring is permitted, the
hole diameter should not be greater than two-thirds the diameter or width of
the pile and not extend more than three-fourths the length of the pile.
Oversizing the hole will result in a loss of skin friction and a reduction in
the axial capacity and lateral support, thereby necessitating reevaluation of
the pile foundation.  When extensive preboring is needed, consideration should
be given to using a drilled-shaft system rather than a driven-pile system.

    (d)  Spudding.  Spudding is similar to preboring and may be appropriate
when layers or obstructions are present near the surface that would damage the
pile or present unusual driving difficulty.  Spudding is accomplished by driv-
ing a spud, such as mandrel, heavy steel pipe or H-pile section, to provide a
pilot hole.  The spud is withdrawn and the pile inserted into the hole and
driven to the required depth.  Problems may result if the spud is driven too
deep, since extraction becomes more difficult as penetration is increased.
Spudding may sometimes entail alternately lifting a partially driven pile a
short distance and redriving it when very difficult driving is encountered
(e.g. for heavy piles).  Because this procedure adversely affects the soil's
lateral and axial capacity, it should be avoided for friction piles and should
never be permitted without the specific authorization of the design engineer.

    (e)  Followers.  A follower is a member placed between the pile hammer
and pile that allows the pile to be driven below the reach of the leads.  The
most common uses are to drive a pile below the top of an existing structure or
for driving piles over water.  Although the follower can make driving less
difficult, there are several problems associated with their use.  Experience
shows it to be quite difficult to maintain alignment between the pile and fol-
lower, especially for battered piles.  Additionally, erratic energy losses due

Add103

EM 1110-2-2906
15 Jan 91

to poor connection between the pile and follower, frequent misalignment, and follower flexibility make it nearly impossible to equate blow count with pile capacity. For these reasons most specifications exclude the use of followers. If a follower must be used, it should be selected so that it's impedance is between 50 and 200 percent of the pile impedance. The impedance is defined as $EA/c$ where $E$ is the modulus of elasticity of the material, $A$ is the cross sectional area, and $c$ is the velocity of wave propagation for the material. If concrete piles are being driven, then some cushion must be used between the follower and the pile.

(4) Extraction. Extraction, or pulling of specific piles for inspection, may be required when unusually difficult driving conditions have been encountered and pile damage is suspected. Extraction and redriving may also be necessary when a pile drifts excessively during driving and fails to maintain the specified placement tolerances discussed in paragraph 5-2a(2). When excessive drift occurs, the circumstances should be carefully investigated to determine the cause and appropriate remedial measures specified. Pile extraction is usually difficult, expensive, requires special equipment and experienced personnel. A large pulling force concentric with the longitudinal axis of the pile must be exerted continuously in addition to application of hammer energy in the same direction. Extraction can be assisted by jetting, especially when removing low tensile strength piles such as concrete. See paragraph 5-2b(2) for a discussion of equipment required for extraction.

(5) Underwater Driving. Occasionally piles must be driven below the water surface at a location where site dewatering is not economically feasible, e.g., navigation fenders, dolphins, guide walls, piers, etc. Commonly, pile driving equipment is placed on barges and positioned at the work site with tug boats. A special templet is normally utilized to maintain the designated position and alignment of the piles during driving. Placement tolerances are usually less stringent for these structures. When the pile head must be driven below the water surface, a follower with a special connection to the pile head may be used. In some cases a hydraulically driven, submersible pile hammer (clamped to the pile head) may be used, especially if the pile head must be driven a substantial distance below the water surface. For example, a submersible hammer would be appropriate to drive steel piles to the mudline for anchoring mooring buoys that have substantial design loads and the accuracy of placement position is not critical.

b. Equipment. Piles are normally driven by impact or vibratory-type hammers. Typical driving equipment consists of a crawler-mounted crane with a boom, leads, hammer, and various accessories, each connected to act as a unit. The equipment serves to guide and drive each pile accurately into its final position and must be strong enough to withstand safely all loads imposed during the process. The crane and boom must have adequate size, capacity and connections to handle the pile and the special driving equipment, such as the hammer or extractor, leads, and accessories, safely. Considerable engineering experience and judgement are necessary when evaluating or specifying the suitability of driving equipment. Supplemental information is normally available in the form of technical literature provided by the equipment manufacturer. Only equipment anticipated to be detrimental to the pile, soil, or soil-pile interaction should be excluded by the construction specifications. A discussion of hammer selection is presented in paragraph 5-3b. Safe equipment operation must also be considered in the design and construction phases of a project. Common situations that typically require special safety precautions

5-5

EM 1110-2-2906
15 Jan 91

are obstructions (such as overhead or buried electrical lines), driving on
slopes or near the edges of excavations, and possible crane overturning.
Specific safety requirements are contained in EM 385-1-1.

(1) Hammers. Hammers can generally be divided into two groups, impact
and vibratory. Impact hammers may be lifted manually or automatically by
steam, air or diesel, and may also be single or double-acting. These hammers
are sized by the maximum "rated energy" (foot-pounds) theoretically contained
as kinetic energy in the ram just before impact. This rated energy is not
necessarily absorbed by the pile. Vibratory hammers are electrically or
hydraulically powered, usually have a variable operating frequency range
(vibrations per minute), and are generally rated by "eccentric moment" (inch-
pounds) and "driving force" (tons) for a specified frequency. Literature
providing specific properties for currently available hammers may be obtained
on request from the hammer manufacturer or distributor. The hammer approved
for use should be examined in the field to assure that the hammer is in good
condition and operating as close as possible to its rated capacity in accor-
dance with procedures provided by the manufacturer. Hammer efficiency may be
influenced by items such as the operating pressure, wear of moving parts,
lubrications, drive cap cushions, driving resistance, batter angle, and the
relative weights of the hammer and pile. Operating pressure at the hammer
(for steam and air hammers), stroke distance and operation rate (blows per
minute) must be checked regularly while driving piles with any type of impact
hammer. Variations in these values usually signify changes in hammer energy
and efficiency, or pile damage. Steam- or air-powered automatic-type hammers
also require special supplemental equipment, including adequately sized hoses,
power source and fuel, and self-powered air compressor or boiler with a water
supply for steam. A brief description of the various hammers and general
recommendations follow. Item 31 contains an excellent discussion of hammer
operation and suggested inspection techniques.

(a) Drop Hammers. The drop hammer is the simplest and oldest type of
impact hammer. It consists of a guided weight (ram) that is lifted to a spec-
ified height (stroke) by a hoist line and released. Drop hammers are operated
by raising the ram with the crane and then, at the desired height as judged by
the crane operator, dropping the ram by allowing the winch to spool. Some of
the available energy is used as kinetic energy in the winch and is not
actually available to drive the pile. Drop hammers can damage the pile head
if driving stresses are not controlled by limiting the stroke distance and
supplying a cushion material (hammer cushion) between the anvil, which sits on
the pile head, and ram. Theoretical or rated hammer energy is the product of
the stroke times the ram weight. To arrive at actual energy delivered to the
pile, proper allowances must be made for the effects of friction and interac-
tion of the drive cap. The drop hammer is a comparatively simple device that
is easily maintained, portable, relatively light, and does not require a
boiler or air compressor. The drop hammer is most suitable for very small
projects that require relatively small, lightweight timber, steel, or aluminum
piles. Due to its slow operating rate, usually 5 to 10 blows per minute, this
type of hammer is used only when the cost of bringing in a more sophisticated
hammer would not be economical.

(b) Single-Acting Steam or Air Hammers. The single-acting hammer as
shown in Figure 5-1 has been in use for many years, has been extremely well
developed and can be used for most any pile-soil combination. This hammer
type utilizes pressure from steam or compressed air to raise the ram, then

Add105

EM 1110-2-2906
15 Jan 91



Figure 5-1. Single-acting steam/air hammer (Permission to
reprint granted by Deep Foundation Institute (Item 31))

automatically releases the pressure allowing the ram to fall freely and strike
the drive cap. Hammer operation is automatic and generally in the range of 40
to 60 blows per minute. In comparison to the drop hammer, single-acting
hammers operate at much faster speeds, have shorter stroke distances and
possess considerably larger ram weights. A hammer cushion may or may not be
utilized within the drive cap, and its use is largely dependent on the
recommendations of the hammer manufacturer. Hammer efficiency can be checked
by observation of the ram stroke and hammer operation rate. If the hammer
maintains the specified stroke and operating speed, it can be reasonably
assumed the hammer is functioning properly. A single-acting hammer may lose
considerable driving energy when used to drive battered piles. This energy
loss can be attributed to a reduction in the height of the ram's vertical fall
and increased friction between the piston and cylinder wall and between the
ram and the columns.

   (c) Double-Acting Steam or Air Hammers. Double-acting and differential-
acting hammers, as shown in Figures 5-2 and 5-3, utilize pressure from steam
or compressed air to raise the ram in a manner similar to a single-acting

Add106

EM 1110-2-2906
15 Jan 91

FIG. 2 A                                    FIG. 2 B



Figure 5-2.  Double-acting steam/air hammer (Permission to
reprint granted by Deep Foundations Institute (Item 31))

hammer.  The steam or compressed air is also utilized to supply additional
energy to the ram on the downward part of the stroke.  The combination of
pressure on the downstroke and a short stroke distance results in an operating
rate generally ranging from 90 to 150 blows per minute.  These hammers can
deliver impact energies comparable to the single-acting hammers at approxi-
mately 1.5 to 2.0 times the operating rate.  Although the high operation speed
is beneficial to production, it generates relatively high impact velocities
and stresses, which may result in pile-head damage to piles of low compressive
strength.  A hammer cushion material is not used between the ram and pile
helmet for the double-acting hammer but is required for the differential-
acting hammer.  The types of impact hammers are normally closed at the top,
and the stroke cannot be monitored during driving.  Actual field operation
should be at the full hammer speed as listed by the manufacturer, since the
rated hammer energy quickly reduces at lesser speeds.  Rated energy and
efficiency values provided by the manufacturers can be misleading, and the
engineer must be cautious and use appropriate judgement when calculating the
energy actually transferred to the pile during driving.  These hammer types
may be used without leads (when not required for piles) and may be inverted
and rigged for use as pile extractors.  Best performance is usually obtained

EM 1110-2-2906
15 Jan 91



Figure 5-3.  Differential-acting steam/air hammer (Permission to
reprint granted by Deep Foundations Institute (Item 31))

when driving wood or nondisplacement steel piles into sands, but the hammers
may be used in any type soil.

     (d)  Open-End Diesel Hammers.  The open-end diesel hammer (Figure 5-4),
also known as the single-acting diesel hammer, is self-contained, economical,
light in weight, and easy to service.  The fuel is injected into the cylinder
while the ram drops.  When the ram strikes the anvil the fuel is atomized and
ignited, explodes and forces the anvil down against the pile and the ram up.
This supplies energy to the pile in addition to that induced by impact of the
ram.  The sequence repeats itself automatically provided that sufficient pile
resistance is present.  Hammer efficiency is a function of pile resistance and
therefore the harder the driving the greater the efficiency.  Diesel hammers
can be equipped to permit the amount of fuel injected into the cylinder to be

Add108

EM 1110-2-2906
15 Jan 91



Figure 5-4.  Open-end (single-acting) diesel hammer (Permission to reprint granted by Deep Foundations Institute (Item 31))

Add109

varied.  This feature can be an asset when initially seating concrete pile.
The energy transmitted to the pile can be controlled by limiting the amount of
fuel supplied to the hammer, thereby yielding some control on the critical
tensile stresses induced by driving.  Diesel hammers combine medium ram
weights and high impact velocities.  The open-end diesel hammer requires a
cushion material (hammer cushion) between the anvil and the helmet.  Operating
speeds are somewhat slower than the single-acting air-stem hammer ranging from
40 to 50 blows per minute.  As the driving resistance increases, the stroke
increases and the operating speed decreases.  Proper maintenance and operation
of the diesel hammer is a necessity.  Open-end diesel hammers are best suited
for medium to hard driving conditions.  They do not tend to operate well in
soft soils because of the driving resistance required for compression and
ignition.

   (e)  Closed-End Diesel Hammers.  The closed-end diesel hammer,
Figure 5-5, also known as the double-acting diesel hammer, is similar to the
open-end hammer, except that a closed top and bounce chamber (air tank) are
provided at the upper end of the cylinder.  The stroke is shortened from that
of the open-end hammer by creating a cushion of compressed air in the bounce
chamber and between the ram and the closed upper end of the cylinder.  This
results in operating speeds of about 80 blows per minute.  Some closed-end
hammers are convertible to the single-acting mode, thereby giving the contrac-
tor further flexibility.  Requirements for cushion materials, leads, mainte-
nance, and operation are similar to those of the open-end diesel hammer.

   (f)  Vibratory Hammers.  Vibratory hammers are available in high, medium,
and low frequency ranges.  High-frequency hammers are commonly known as "sonic
hammers."  The sonic hammer has had limited success and is seldom used.  Vi-
bratory hammers operate by utilizing electric or hydraulic motors to rotate
eccentric weights and produce vertical vibrations as shown in Figure 5-6.  The
vibrations reduce frictional grip of the soil and also permit the soil at the
tip to be displaced.  Additional biased static loads can often be provided by
dead weight to enhance drivability.  Leads are not required for use of a
vibratory hammer but are normally required for desired driving accuracy.  It
is important that a rigid connection be maintained between the hammer and the
pile, usually by means of a mechanical clamp, and a back-up system may be
required to prevent release of the clamp in the event of a power failure.
Vibratory hammers are most efficient for installing non-displacement type
piles in sand.  Clay soils tend to dampen the vibration of the hammer, thereby
retarding penetration.  When used in clay materials, the low frequency hammer
has been more successful since it has more of a chopping effect than the
medium-frequency hammer which is normally used for sands.  These hammers are
not very effective in penetrating obstacles, large cobbles or stiff clays.
Vibratory hammers are generally not suitable for the installation of most
concrete piles and are seldom used on timber piles.  When used for the right
combination of pile and soil, vibratory hammers can install production piles
at a rate much faster than any type of impact hammer.  For example, it would
not be uncommon to drive a 60-foot steel H-pile in sand in less than
5 minutes.  An added advantage of the vibratory hammer is that it can extract
piles as easily as it can drive them, requiring no new equipment set-up.
Vibratory hammers and their limitations are discussed in paragraph 5-3b.

   (2)  Extractors.  The extraction of piles can be difficult and usually
requires special equipment and experienced personnel.  Extractors can be clas-
sified as either impact or vibratory type.  The impact type operates similar

EM 1110-2-2906
15 Jan 91



Figure 5-5.   Closed-end (double-acting) diesel hammer (Permission to reprint
granted by Deep Foundations Institute (Item 31))



Figure 5-6.  Vibratory driver/extractor system (Permission to
reprint granted by Deep Foundations Institute (Item 31))

to the double-acting hammer in an inverted position and is powered by com-
pressed air or steam.  The vibratory type is a vibratory hammer which is used
for extraction, is operated in the same manner as for driving except a steady
pulling force is provided and can be as effective as driving.  When pulling a
pile with either type of extractor, a steady pull must be exerted through the
crane line on the pile in the direction of its longitudinal axis to supplement
the extractor energy.  The lifting line of the crane is attached to the
extractor, and the extractor is connected to the pile head with rigid side

EM 1110-2-2906
15 Jan 91

straps or clamps.  This connection must be strong enough to transfer to the
pile safely the large forces that are developed by the combined action of the
lifting line and the extractor during the pulling operation.  If the pile is
vertical, or nearly vertical, leads are normally not required for extraction.
However, a steeply battered pile would normally require leads to maintain the
alignment of the pulling forces along the longitudinal axis of the pile.
Effectiveness of the extraction process is directly related to the steady pull
exerted by the crane line in the direction of the pile axis plus the effi-
ciency of the extractor.  Large hydraulic jacks have occasionally been used to
jack piles out of the ground slowly under unusual circumstances, but this
method of extraction is not recommended due to the excessive time required and
large reaction forces generated.

   (3)  Leads.  Pile driving leads, sometimes called leaders, are usually
fabricated of steel and function to align the pile head and hammer concentri-
cally, maintain proper pile position and alignment continuously during the
driving operation, and also to provide lateral support for the pile when re-
quired.  Typical lead systems are shown in Figures 5-7 and 5-8.  Proper hammer
alignment is extremely important to prevent eccentric loadings on the pile.
Otherwise driving energy transferred to the pile may be reduced considerably
and structural pile damage due to excessive stresses near the top of the pile
may result from eccentric loading.  Leads can generally be classified as being
either of the fixed or swinging type with several variations of each.  Another
less widely used type consists of a pipe or beam section that allows the ham-
mer to ride up and down by means of guides attached to the hammer.  When driv-
ing long slender piles, the use of intermediate pile supports in the leads may
be necessary as long unbraced lengths may result in structural damage to the
pile and may also contribute to violation of placement and driving tolerances.
Leads are not absolutely necessary for every pile-driving operation, but they
are normally used to maintain concentric alignment of the pile and hammer, and
to obtain required accuracy of pile position and alignment while driving the
pile, especially for battered piles.  If leads are not required, a suitable
template should be provided to maintain the pile in its proper location
throughout the driving process.  A brief description of fixed leads and swing-
ing leads follows.

   (a)  Fixed Leads.  Fixed leads, also called extended leads, are connected
near the top with a horizontal hinge at the tip of the boom and extend some-
what above that point.  Near the crane base, a spotter or horizontal brace is
normally used and may be hydraulically operated to allow rapid achievement of
pile batter.  This combination provides maximum control, accuracy and speed
when positioning the leads.  A much more flexible version is the cardonic
fully articulated lead, often called the swivel or three-way lead.  Swivels
are combined with moon beams or braces to allow movement not only in or out,
but also side to side, and rotation of the leads.  On large complex jobs which
require the installation of a large number of battered piles, it is most
advantageous to have leads capable of movement in all directions without
having to reposition the entire driving rig.  A special version of the fixed
lead is the semi-fixed lead, in which the lead is free to move in the up and
down direction independently of the crane boom.  This type of lead is most
beneficial when driving piles into a hole, ditch or over the edge of an
excavation.  An alternative to the semi-fixed lead is a fixed lead system
accompanied by a pony or telescope lead, which secures the hammer in the fixed
lead and allows driving below the bottom point of the fixed lead.

EM 1110-2-2906
15 Jan 91



Figure 5-7. Typical fixed or extended leads



Figure 5-8. Typical swinging lead system

Add114

EM 1110-2-2906
15 Jan 91

    (b) Swinging Leads.  The swinging lead, also known as the hanging lead,
is hung from the crane boom by a single crane line and permits movement in all
directions.  A slightly different version is the underhung lead, which hangs
from the boom itself by straps or pendant cables.  Stabbing points are usually
provided at the bottom end of the swinging lead for assistance when fixing
position or batter.  Swinging leads are lighter, simpler and less expensive
than fixed leads, although precise positioning is slow and difficult.  If
swinging leads are to be used to drive piles that require a high degree of
positioning accuracy, a suitable template should be provided to maintain the
leads in a steady or fixed position.  Leads that are not properly restrained
may produce structural damage to piles, particularly concrete piles which are
subject to spalling, cracking or even breakage.  Swinging leads are especially
useful to drive piles in a hole, ditch or over the edge of the excavation.


    (4)  Driving Caps.  The drive cap will be defined here as a complete unit
consisting of a helmet, anvil and cushion materials which function to properly
transfer the driving energy from the hammer of the pile without damage to the
pile.  Various sites and types of helmets exist, two of which are shown in
Figures 5-9 and 5-10.  As impact hammers produce tremendous amounts of impact



            Figure 5-9.  Box lead mounting, air/steam and
                         diesel hammers

energy, the hammer blow must be transmitted uniformly over the top of the
pile.  Driving helmets made of cast steel are used for this purpose and are
typically produced by the pile hammer manufacturer to suit its particular
equipment.  Experience indicates the helmet yields best results when guided by

Add115



Figure 5-10.  Truss lead mounting, generally with
diesel hammers

the driving leads, although swinging helmets have proven satisfactory when
used with steel-H or heavy walled pipe piles.  An appropriate helmet should
fit loosely around the pile top to prevent pile restraint by the helmet in
cases where the pile tends to rotate during driving.  However, the fit should
not be so loose that it does not provide alignment of the hammer and pile.
While the helmet tends to protect the pile by distributing the blow, the
hammer may also require protection from the shock wave reflected back to the
hammer.  For this purpose, a shock absorbing material known as the hammer
cushion is placed between the hammer ram and the helmet.  Hammer cushions are
required for diesel hammers, while those powered by air or steam may or may
not require hammer cushions, depending on the particular hammer type and
manufacturer.  The hammer cushion also serves to protect the helmet and the
pile.  Commonly used hammer cushion materials are hardwoods, plywoods, woven
steel wire, laminated micarta and aluminum discs, and plastic laminated discs.
Thick blocks of hardwood are commonly used but have a tendency to crush, burn
and have variable elastic properties during driving.  The laminated materials
are normally proprietary, provide superior energy transmission charactics-
tics, maintain their elastic properties more uniformly during driving and have
a relatively long useful life.  The use of materials such as small wood
blocks, wood chips, ropes and other materials which allow excessive loss of
energy or provide highly erratic properties should be discouraged (or pro-
hibited).  Sheet asbestos has been commonly used in the past but is no longer
acceptable due to health hazards.  A second cushion known as the pile cushion

5-17

EM 1110-2-2906
15 Jan 91

is required when driving concrete piles. This cushion is placed between the
helmet and the pile. The pile cushion protects the pile from compressive
damage at the head of the pile and can also help control tensile stresses re-
sulting from the tension shock waves produced by driving. Wood materials such
as plywood and oak board are most commonly used. A pile cushion is rarely
used when driving steel or timber piles. The type and thickness of the hammer
and pile cushion materials have a major effect on the energy delivered to the
pile. If the contractor chooses too soft a material, excessive energy absorp-
tion will result and driving may stall. On the other hand, choosing too hard
a material will result in hammer or pile damage. Engineering experience
combined with a wave equation analysis is the best method of selecting cushion
materials and thicknesses. The complete drive cap design and properties of
all components should be submitted by the contractor and reviewed for
suitability. Cushion materials require periodic replacement during driving,
since their effectiveness is reduced by excessive compression or deteri-
oration. Indications of a need for replacement may be early throttling or
bouncing of the hammer, or a ringing sound of the ram. The cushion design is
based upon experience to a large extent, and the hammer manufacturer should be
consulted in case of questions or distinct problems. Item 34 contains infor-
mation regarding cushion properties and selection.

(5) Jetting Equipment. Typical equipment consists of jet pipes, a noz-
zle, pump, engine and hoses. The ensemble of equipment must be capable of
providing the desired volume of water at the required pressure. Water volume
and pressure must be sufficient to allow discharged water to surface along the
sides of the pile. Typical pipe sizes range from 1.5 to 4.0 inches in diame-
ter with nozzles approximately one-half the pipe diameter. Water pressures of
100 to 300 psi are most common but may run as high as 700 psi in isolated
cases. Jetting pipes may be encased or cast into the pile, attached to the
exterior of the pile or attached to the driving leads and thereby become mov-
able. Moveable jets are preferable, if circumstances do not exclude their
use, due to the relative high costs of permanently attached jets. The use of
two jets, one on each side the pile, provides the most rapid penetration and
best alignment control. When using multiple jets, each should be equipped
with its own water source and both should be similarly operated at the same
depths and pressures. A single jet placed on one side of the pile may result
in excessive pile drift. Experienced personnel should be relied upon when se-
lecting and sizing jetting equipment.

5-3. Pile Driving Studies. Pile driving studies are required for effective
design of constructible pile foundations. When evaluating alternative pile
types during the design phase, the designer must consider the effects of the
pile installation method on the pile and soil capacities and on any existing
structures in the proximity of the new foundation. The relative difficulty of
driving the piles, and the procedure to determine when each pile has attained
adequate capacity to end driving, must also be assessed. Past practices have
addressed these considerations by use of empirical dynamic formulas, engineer-
ing experience and judgement, review of historical driving data, and various
rules of thumb. More recently, the wave equation analysis and the dynamic
pile driving analyzer methods have been generally accepted and should be
employed. The pile-driving industry is presently moving toward exclusive use
of wave equation analysis as the means for a designer to evaluate pile
driveability, hammer selection, and limits of penetration. While the wave
equation method provides superior analytical techniques, engineering exper-
ience and sound judgement are still very much a necessity. A review of pile

installations for similar sites and structures can be extremely valuable in that regard. Rules of thumb can still be used for preliminary design and simple projects and should continue to be used during a design office's transition to the wave equation method. The designer must transform the results of these analyses into contract specifications that provide framework for the contractor to select appropriate equipment and installation proce- dures. Specifications should clearly define the basis of hammer approval, state criteria which will be used to establish the limits of penetration, and exclude installation methods or equipment deemed unsuitable. Analytical predictions are verified in the field by driving and static load tests, or the dynamic analyzer. Three principal topics are discussed in the following paragraphs; wave equation analysis, hammer selection, and penetration limita- tions. Wave equation results and penetration limitations can and should be used by field personnel to monitor and control the driving operation. In general, these topics are all interrelated.

a. Wave Equation. A wave equation analysis can provide the engineer with two very important items: first, a guide in the selection of properly sized driving equipment and piling to ensure the pile can be driven to final grade without exceeding allowable driving stresses; and secondly, a penetra- tion rate expressed as a minimum number of blows per inch of penetration for impact hammers to determine when the pile has been driven sufficiently to develop the required capacity. This can be presented graphically by depicting the relationships between blows/inch (driving resistance) and ultimate static soil resistance (pile capacity) and blows/inch versus structural stresses in the pile. The graphs can then be used by field personnel and the contractor to monitor driving. When using the analysis results during installation, the design engineer must make certain that assumed design parameter values closely correspond to the actual values encountered in the field. This correlation can be accomplished by utilizing the load capacity and load transfer distribu- tion obtained from static load tests and the dynamic analyzer. Analysis is based on a specific type and length of pile, and a driving system operating at an assumed efficiency in a modeled soil stratification. The results are applicable only to the assumed system and should only be used for the length of pile investigated. Incremental analysis is typically performed where the length of pile embedded into the ground is varied. Design application requires sound engineering judgement and experience where parameter (hammer, drive cap, pile and soil resistance) sensitivity is concerned. Research has shown that published hammer efficiencies (by the manufacturer) tend to significantly overestimate the energy actually absorbed by the pile in the field. Efficiency is also affected by placing the hammer on a batter and this can be a major source of error. Diesel hammers may have a variable stroke and a bracket analysis is strongly recommended. Hammer efficiency can be field- verified by good inspection techniques and more accurately by use of a dynamic pile analyzer. Data obtained from the wave equation analysis should be used with judgement for friction piles since pile set-up may occur. Data generated using the dynamic analyzer during original driving will not reflect pile set- up and may under-predict a pile's capacity. To produce data that reflect the true capacity of the pile, the pile should be restruck after set-up has occurred, usually a minimum of 14 days after initial driving. A wave equation analysis is recommended for all but the simplest of projects for which the de- signers have experience and should be performed for predicting behavior during design and confirming pile performance during construction of a project. The wave equation computer program "WEAP" (Wave Equation Analysis of Pile Driving) is available to Corps of Engineers offices. Item 34 contains an excellent

Add118

EM 1110-2-2906
15 Jan 91

discussion of wave propagation theory and its application to pile foundations.

b. Hammer Selection.

(1) General. Hammer selection may be the most important aspect of pile installation. In some installations only one hammer type may be applicable for the pile-soil combination, while for others several types may suitable. Evaluation must consider the need to use pile penetration rate as the means to end driving, the ability to drive the pile without structural damage or reducing soil capacity, the ability to obtain penetration rates within the desired band, and the realization that some hammer types may cause reduced capacities for identical pile lengths. In general, wave equation analysis supplemented by engineering experience and judgement should be the basis for hammer approval and criteria such as allowable driving stresses, desired penetration rates, and any other data used as a basis for approval that are clearly defined in the specifications. Wave equation analysis should normally be performed by the Government, and data that the contractor are required to submit must be clearly defined. Contractor disagreements with the Government's analysis can be contested by the contractor and resolved at his expense through resubmittals performed and sealed by a registered engineer, by field verification of driving and load tests, and by other methods approved by the design engineer.

(2) Size selection for a particular hammer must consider the pile's anticipated driving resistance, ultimate capacity, pile stresses expected during driving, and pile set-up. The hammer type and size used for production should always match that used in the test program because a different hammer would most likely result in a different capacity. The designer or contractor may designate a number of hammers for the test program when warranted. Any changes in hammer type or size will usually require additional testing.

(3) Prior to the wave equation method and development of the desk top computer, hammers were typically chosen based on dynamic formulas, rules of thumb, minimum energy rating based on pile type or load capacity, and methods which equated the pile weight to the weight of the moving hammer parts. These methods were primarily derived from experience and still have a place in hammer selection. However, these methods are only recommended as secondary procedures. Dynamic formulas are not recommended due to the lack of reliability and are considered to be inferior to the wave equation method. Table 5-1 is presented for information purposes only and to illustrate one of the many empirical methods still in use today. Tables such as this are generally being phased out and replaced by the wave equation method and sometimes supplemented by dynamic analysis in the field. These methods can and should still be utilized in an office in transition to the wave equation method.

(4) Vibratory hammers require special attention as they have been shown to yield reduced capacity at work loads in some cases (Item 10, Item 15). Another reason for special attention is that there is no reliable way to evaluate driving resistance and driving induced stresses in piles as can be done for impact driven piles via pile driving analyzer and wave equation analysis. However, the potential economic advantage of a vibratory hammer cannot be discounted without adequate consideration, especially for large projects. Specifications can be written to require dual driving and load test programs if needed to address additional pile length and penetration

TABLE 5-1

SUGGESTED MINIMUM HAMMER ENERGY - IMPACT HAMMERS
(Taken from ARMY TM 5-849-1, May 1982)

---

### Class I - Timber Piles

| | |
|---|---|
| Capacity to 20 Tons | - 7,500 ft-lb |
| Capacity over 20 Tons to 25 Tons | - 9,000 ft-lb (Single-acting hammers)<br>- 14,000 ft-lb (Double-acting hammers) |
| Capacity over 25 Tons | - 12,000 ft-lb (Single-acting hammers)<br>- 14,000 ft-lb (Double-acting hammers) |

### Class II - Concrete and Steel Piles

| | |
|---|---|
| Capacities to 60 Tons | - 15,000 ft-lb |
| Capacities over 60 Tons | - 19,000 ft-lb |

---

limitations. Other engineering and construction agencies have permitted the use of a vibratory hammer but require a percentage of production piles be driven or struck with an impact hammer to determine relative capacity. In cases where tests indicate that additional pile length can be attributed to the hammer type, increased cost should be the responsibility of the contractor. The contractor may determine if the additional cost for testing and monitoring would be offset by increased production rate.

c. Penetration Limitations. For impact hammers the rate of penetration is customarily defined as the blow count per unit length of pile penetration. Blow counts are typically recorded in the field on a per-foot basis until the pile approaches a designated tip elevation or the end of driving. At that point the blow count is usually recorded for each inch of penetration. Limiting penetration rates are designated to prevent overdriving, which may cause structural damage to the pile, and to provide guidance for determining the relative capacity attained during driving. Pile tip damage due to very difficult driving (commonly referred to as refusal) is not readily detectable when the pile encounters an obstruction or a hard bearing stratum prior to reaching the indicated tip elevation. Therefore, the limiting penetration rates, or the criteria necessary to determine limiting rates, should be specified. Rules of thumb, used to avoid structural damage, derived through experience and generally accepted by most engineers are listed in Table 5-2.

Add120

EM 1110-2-2906
15 Jan 91

Table 5-2

Limiting Penetration Rates

| Pile Type | Maximum Blow Count (blows per inch) |
|-----------|-------------------------------------|
| Timber | 3-4 |
| Concrete | 10 |
| Steel Pipe | 10-20 |
| Steel -H | 10-20 |

The limiting penetration rates generally should be established by the Government and based upon results of wave equation analysis that have been correlated with results obtained from use of a pile driving analyzer during driving the test piles and the results of static load tests. Piles that derive their primary support from friction are driven to a predetermined tip elevation. For friction piles, the required length of penetration or tip elevation is determined from geotechnical data and capacity from test piles. The results of static load tests are then used to adjust the specified tip elevation or penetration length. Applicable penetration rate limits are compared with the rates encountered when driving the piles for the static load tests and adjusted if necessary. Piles that derive their primary support from end bearing in a hard soil layer or rock typically require a verification of load capacity, which may be indicated by the penetration rate. In this case the pile is normally driven to a specified blow count rather than a predetermined length. Once again, this blow count can best be obtained from wave equation analyses that have been correlated with driving and static load test data. Refinements in the wave equation analyses should be made by use of the pile dynamic analyzer when pile load test are not economically feasible. In either event the pile driving analyzer can be used to monitor the installation of piling. The designer should be wary that penetration rates observed in the field can easily be distorted by erratic or malfunctioning equipment and improper contractor operations. Distorted rates can be frequently attributed to an erratic or poorly maintained hammer, poor alignment of the hammer and pile, erratically behaving cushion materials, changing of a cushion near the end of driving, and noncontinuous driving that may allow the pile to set up and gain strength. A driven pile that has failed to acquire a specified tip elevation or penetration rate must be reanalyzed by the designer. If the safety factor for the pile or group is jeopardized, remedial measures are necessary, including extension of the driven pile by a splice, replacement of the pile with a longer one, or the addition of a sister pile. An end-bearing pile that stops short of its bearing stratum may be a candidate for special driving assistance, as discussed in paragraph 5-2a(3).

5-4. Control of Pile Driving Operations. Field installation requires continuous monitoring to ensure that an adequate foundation is achieved. All facets of installation require examination, from storage and handling to end of driving. If it is assumed that equipment is properly utilized and working at an efficient level, there remain two areas of concern: (1) monitoring installation to prevent structural damage, and (2) acquiring data to ensure that adequate capacity is obtained. Paragraph 5-3c previously discussed the use of wave equation analysis and selection of penetration limits in that regard. Field monitoring can be supplemented by dynamic analysis which can refine several assumptions made in the wave equation analysis (e.g. energy

5-22

Case: 14-1228 CASE PARTICIPANTS ONLY Document: 23 Page: 193 Filed: 04/23/2014

transfer to the pile), evaluate equipment performance, determine pile stresses estimated, and detect pile breakage. Piles suspected of sustaining structural damage or lacking in capacity can be further investigated by extraction or load testing.

a. Pile Driving Analyzers. These devices give a general indication of capacity, measure hammer and cushion performance and pile stresses from measurements of applied force and acceleration at the head of the pile. Capacity can often be inferred from the measurements using a simple damping constant for the soil. The soil damping constants can be calibrated from static load tests or by using special wave equation programs designed to infer capacity from pile-head measurements. The equipment is highly portable, performs most calculations on the job site, and requires trained and experienced personnel to operate. Analyzers are helpful to establish driving criteria and provide construction quality control when used in combination with static pile load test. The pile driving analyzer can be used in conjunction with theoretical predictions where static pile tests are not economically justified. Experience and sound engineering judgement are required when determining whether or not to use dynamic analyzers on a job, since this is a site-dependent decision. As previously stated, the analyzer only yields results of estimated capacity for the specific blow recorded, i.e., if data are taken during initial driving, the results can be distorted due to locked-in residual stresses, and any gain in capacity with time (set-up) is not accounted for. To account for the time-dependent gain in capacity, the pile should be restruck after a specified time (e.g. 7 to 14 days) has elapsed. If correlated with static pile tests and good driving records, the pile driving analyzer may be used successfully to predict capacity of production piles. It may also be used to indicate hammer efficiency, driving energy delivered to the pile or indicate pile breakage during driving. Specifications must address contractor and Government responsibilities when using a dynamic analyzer.

b. Records. Examples of the minimum records to be kept during driving are contained in Figures 5-11 and 5-12. The blow count per foot of pile penetration and the amount of free run drop under the hammer weight are two very obvious pieces of data to collect. When driving data are being analyzed, common questions are: the hammer type, manufacturer and any identifying numbers, has the hammer been modified in any way, was the hammer working at its rated capacity, cushion material and thickness, pile length and size, date of casting if precast concrete, depth of penetration, was driving continuous, were any special efforts of installation such as jetting or preboring applied, type of connection to the pile, magnitude of bias load, and the method and location of any splices. For vibratory hammers, the operating frequency, horsepower applied, and rate of penetration should also be recorded. Any occurrence of heave or subsidence for both the ground surface and adjacent piles should be noted. The method of hauling, storing, and handling the pile should also be recorded. Another item which should be recorded is whether or not the pile was properly handled as it was raised into the leads of the pile driver. Such records of data are invaluable when problems arise, performing as-built analysis and resolving contract disputes involving claims or litigation.

c. Proof Tests. Proof tests may become necessary if damage to a pile is suspected during handling or driving. Proof testing may also be prudent when large numbers of piles are driven into soils with highly variable stratification, and the driving records contain erratic data which can not be explained

Add122

EM 1110-2-2906
15 Jan 91

PILE DRIVING REPORT

PROJECT _Golden Meadon Flood Gate_        PILE NO. _4_        F3

CONTRACTOR _Bosick Construction_          LOCATION _East Floodside_

HAMMER:                                   TYPE: _Prestress Concrete_

MAKE & MODEL _Conmaco 115_                DIMENSIONS _14 x 14 x 83.4_

WT. RAM _11500_  STROKE _3'_              LENGTH IN LEADS _100_

ENERGY DELIVERED _37375_                  BATTER 1 ON (5)

DESCRIPTION AND DIMENSIONS OF             ELEVATION OF GROUND _-14.0_
   DRIVING CAP _14" x 14"_  (K) _1770 lb_
                                          ELEVATION OF CUT-OFF _-4.98_
SPEED:  RATED _____ MEASURED _49_
                                          ELEVATION OF PILE TIP _-71.4_
STEAM OR AIR PRESSURE:
   AT HAMMER _____ AT BOILER _128 psi_    ELEVATION OF SPLICES _None_

JETTING PRESSURE AND ELEVATIONS:
  _Predrilling: Size & Depth_             INSPECTOR _Fisher_  DATE _11/7/83_

TIME:  START DRIVING _14:49_  FINISH DRIVING _14:53_  DRIVING TIME _4 min_

   INTERRUPTIONS (TIME, TIP ELEV. & REASON) _14:52_          _unhook piling_

DRIVING RESISTANCE

| FT | NO. OF BLOWS | FT | NO. OF BLOWS | FT | NO. OF BLOWS | FT | NO. OF BLOWS | FT | NO. OF BLOWS | FT | NO. OF BLOWS | FT | NO. OF BLOWS | FT | NO. OF BLOWS |
|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
| 0 |  | 15 |  | 30 | 2 | 45 | 5 | 60 | 2 | 75 |  | 90 |  | | |
| 1 |  | 16 |  | 31 | 3 | 46 | 5 | 61 | 2 | 76 |  | 91 |  | | |
| 2 |  | 17 |  | 32 | 3 | 47 | 5 | 62 | 2 | 77 |  | 92 |  | | |
| 3 |  | 18 |  | 33 | 3 | 48 | 5 | 63 | 2 | 78 |  | 93 |  | | |
| 4 |  | 19 |  | 34 | 3 | 49 | 4 | 64 | 2 | 79 |  | 94 |  | | |
| 5 |  | 20 |  | 35 | 4 | 50 | 3 | 65 | 3 | 80 |  | 95 |  | | |
| 6 |  | 21 |  | 36 | 5 | 51 | 4 | 66 | 2 | 81 |  | 96 |  | | |
| 7 |  | 22 |  | 37 | 7 | 52 | 3 | 67 | 3 | 82 |  | 97 |  | | |
| 8 |  | 23 | 1 | 38 | 6 | 53 | 3 | 68 | 3 | 83 |  | 98 |  | | |
| 9 |  | 24 | 1 | 39 | 10 | 54 | 3 | 69 | 3 | 84 |  | 99 |  | | |
| 10 |  | 25 | 1 | 40 | 10 | 55 | 3 | 70 | 3 | 85 |  | 100 |  | | |
| 11 |  | 26 | 1 | 41 | 11 | 56 | 2 | 71 | 3 | 86 |  | 101 |  | | |
| 12 |  | 27 | 2 | 42 | 12 | 57 | 2 | 72 | 3 | 87 |  | 102 |  | | |
| 13 |  | 28 | 2 | 43 | 10 | 58 | 2 | 73 | 4 | 88 |  | 103 |  | | |
| 14 |  | 29 | 2 | 44 | 5 | 59 | 2 | 74 | 100 | 89 |  | 104 |  | | |

BLOWS/INCH FOR LAST FOOT OF DRIVING

| FT | NO. OF BLOWS |
|----|----|
| 1 | 4 |
| 2 | 6 |
| 3 | 6 |
| 4 | 8 |
| 5 | 8 |
| 6 | 8 |
| 7 | 10 |
| 8 | 10 |
| 9 | 10 |
| 10 | 10 |
| 11 | 10 |
| 12 | 10 |

Figure 5-11.  Example of a completed Pile Driving Record

Add123

Project: _____
_____

Structure Name _____

Pile Driving Contractor or Subcontractor: _____

(Piles driven by)

**Hammer Components**

**Ram**

**Anvil**

**Hammer**

Manufacturer: _____ Model: _____
Type: _____ Serial No.: _____
Rated Energy: _____ at _____ Length of Stroke

Modifications: _____
_____
_____
_____
_____

**Capblock (Hammer Cushion)**

Material: _____
Thickness _____ Area: _____
Modulus of Elasticity — E _____ (P.S.I.)
Coefficient of Restitution-e _____

**Pile Cap**

Helmet
Bonnet
Anvil Block
Drivehead

— Weight: _____

**Pile Cushion**

Cushion Material: _____
Thickness: _____ Area: _____
Modulus of Elasticity — E _____ (P.S.I.)
Coefficient of Restitution _____

**Pile**

Pile Type: _____
Length (in Leads) — _____
Weight/ft. _____
Wall Thickness: _____ Taper: _____
Cross Sectional Area _____ in²
Design Pile Capacity: _____ (Tons)
Description of Splice: _____
_____

Tip Treatment Description: _____
_____

Note: If mandrel is used to drive the pile, attach separate manufacturer's
detail sheet(s) including weight and dimensions.

Figure 5-12.   Example of a typical Pile Driving Equipment
Report (Permission to reprint granted by Deep Foundations
Institute (Item 31))

Case: 14-1228 Case: 14-1228 Document: 23 Page: 196 Filed: 04/23/2014 Filed: 04/23/2014

by the contractor's operations.  An equally important indicator may be failure
of a pile to reach the prescribed tip elevation or rate of penetration.
Different types of proof testing can be employed depending upon the problem
suspected.  Testing with the pile driving analyzer may be performed by
restriking previously driven piles, or data may be generated during driving
and used in a wave equation analysis.  A static quick load test, ASTM D1143-81
(Item 25), may also be used to determine the ultimate load carrying capacity
of piles.  On projects where it is anticipated that proof testing will be
required, it is recommended that a line item be included in the bid schedule
for performing such.

    d.  Extraction for Inspection.  Piles are subject to structural damage
during the driving process.  Suspected damage below the ground surface would
be cause for extracting a pile.  Typical indicators are a pile suddenly drift-
ing off location, erratic driving unexplained by the soil stratification, a
sudden decrease in the driving resistance indicating breakage of the pile, or
possible pile interference indicated by sound or vibration of nearby piles.
Damage at the pile head may or may not indicate damage near the pile tip.  If
pile damage is suspected, the pile should be extracted and visually inspected.
However, both the designer and field engineer should be cognizant of the fact
that high costs and additional problems may be incurred as a result of extrac-
tion.  For instance, a perfectly good pile may be damaged during the extrac-
tion procedure, particularly when extracting concrete piles, and soil stress
states can be adversely modified around nearby piles where the subject pile is
in a group.  Costs associated with additional driving rig moves, obtaining and
setting up extraction equipment, redriving time delays, and engineering and
administrative costs are normally claimed by the contractor.

5-5.  Results of Corps Experience.

    a.  Generalized Principles.  The Corps of Engineers has been responsible
for the design of construction of numerous foundations during the past 40 to
50 years.  Through the efforts of Corps engineers, design and construction
consultants, researchers, construction and individual contractors, the Corps
has acquired vast experience in the foundation field.  Advantage should be
taken of this experience by researching available technical literature such as
WES reports, engineering manuals, technical letters, project completion
reports, contract specifications, design documents and verbal communications
with other offices.  Both the foundation design and constructability can
benefit from this experience and historical data.  Case histories of similar
projects and similar sites are extremely valuable in this regard.

    b.  Case History.  A typical case history for a recent project is
presented in Appendix C.

    c.  Augmenting the Q/C and Q/A Processes.  Providing for suitable con-
trols during the construction process is an essential part of foundation
design and contract preparation.  Engineering judgement and past experience
are required to determine the appropriate construction control procedures and
methods for a particular type of pile foundation and soil system.  The details
of the construction controls should be developed during the foundation design
process, tested during driving of test piles, and finalized upon evaluation of
pile load test results.  Proposed methods should be included in the design
memoranda with proposed instrumentation and should reflect the functional
importance and economic parameters of the project.  An attempt should be made

to anticipate and address all possible situations that may be encountered
during pile driving and that could have a detrimental effect on the service-
ability of the foundation.  Adverse conditions are explained in paragraph 2-7
(and throughout this manual) and include pile material and geometry, sub-
surface conditions, driving equipment, and miscellaneous items.

(1)  Pile material and geometry include defective pile material,
strength, dimensions, straightness, spacing, alinement, location, etc.

(2)  Subsurface conditions refer to strata variation, voids, liquefac-
tion, obstruction, heave, densification, downdrag, water table, etc.

(3)  Driving equipment pertains to defects in hammer, loads, accessories,
etc.

(4) Miscellaneous items are vibration, adjacent structures or utilities,
erratic values from PDA compared with wave equation results, etc.

5-6.  <u>As-Built Analysis</u>.

a.  Structural.  Several variables may cause the actual pile foundation
to differ from the initial design both in geometry (affecting pile loads) and
pile capacities.  The effects of these variations should be evaluated as
discussed in paragraph 4-7i.

(1)  Pile Geometry.  As reflected by the relatively lenient driving tol-
erances normally allowed for pile position, orientation, and batter, physical
control of the individual piles during driving is very difficult due to the
nature of the large equipment required.  Initial positioning and orientation
of the pile in preparation for driving is not precise, and individual piles
may have various amounts of initial camber and warp.  During driving, varia-
tions in soil resistance combined with necessary clearances between the pile
and the guides in the leads, and between the pile and hammer components
(driving head or helmet, cushioning material, and hammer ram), permit varia-
tions in pile position and orientation.  Small variations may be substantially
amplified by long piles that are relatively flexible, by large pile batters,
and by unexpected obstructions encountered in the soil during driving.  Any
combination of the aforementioned variables may result in differences between
the design and the actual geometry of the resulting pile foundation.  Varia-
tions in initial pile positioning and drifting of the pile during driving will
each affect the final position and orientation of the head, the longitudinal
axis, and the tip of the driven pile.  The final position, orientation and
batter of the pile head can be accurately measured after driving.  However,
the variation in orientation of the pile axis (curvature, twist, batter angle,
and direction) and the pile tip elevation cannot be accurately determined
after driving.  If a pile is extracted for inspection and is undamaged, the
axis orientation and tip elevation may be closely approximated for that pile
as previously driven by extrapolation from measurements at the pile head.

(2)  Pile Capacity.  The pile capacity (axial, lateral, and buckling) is
an interactive function of the properties of the soil and the pile, both gov-
erned by pile length.  Also, the design length is determined by the batter
angle and tip elevation.  The batter angle may be affected by the unknown
drift, which also affects the tip elevation.  Variations in driving resis-
tance may cause a substantial variation from design tip elevation.  Based on

Case: 14-1228 Case: 14-1228 Document: 23 Page: 198 Filed: 04/23/2014

EM 1110-2-2906
15 Jan 91

static pile load test results, a tip elevation is specified to provide the estimated design capacity and safety factor for the service piles. In addition, a minimum driving resistance (minimum blow count rate) required to develop the pile capacity and a maximum driving resistance that may be tolerated without structural damage to the piles are usually specified for guidance during driving. When the pile has been driven to the required tip elevation and the minimum driving resistance has not been developed, the pile may be extended by splicing and driven until the indicated driving resistance is developed, if deemed necessary. If the maximum driving resistance is developed prior to the pile's being driven to the design tip elevation, the situation must be investigated to determine the cause of the resistance (subsurface obstruction, gravel or cobbles, improper driving, etc.) When the cause has been determined, a decision must be made either to extract the pile and redrive it in another location, to leave the pile intact and cut off the upper portion, or to continue driving with a modified procedure or an increased maximum resistance parameter.

b. Geotechnical. As adjacent piles are generally driven into progressively denser materials, some piles driven previously may heave. Heave, which can be measured with quality surveying techniques, is detrimental to the performance of the pile foundation. Heave can be minimized by using the largest possible spacing between piles. Soil movements can be detected 5 feet to 8 pile diameters away from a pile, and a pile spacing of 3 diameters or less is not recommended. This problem can best be avoided by greater center-to-center spacing and driving radially outward from the center of the foundation. If significant heave occurs, the pile hammer should be replaced on the pile and the pile redriven. Since the pile can easily be damaged during this operation, the design engineer specifies driving energy or blow count that should not be exceeded. When the necessity for redriving develops during driving operations, the design engineer should evaluate and modify the driving sequence in an attempt to minimize the heave effect. When installation problems, especially heave, might conceivably occur while driving the piles, no pile head should be cut off until a sufficient number of piles have been driven or the driving operation has progressed for a sufficient distance to ascertain that problems will not be encountered or that the driving operation will no longer affect the driven piles. For any pile driven short of the specified tip elevation, the capacity should be recomputed and a safety factor estimated for the design load. If a significant number of piles, or a group of piles clustered together, are found to have less than the required safety factor, the structure should be reanalyzed using the recomputed capacity.

c. Wave Equation and Pile Driving Analyzer. Both of these are tools available to the pile foundation designer to evaluate his theoretical design from a constructability standpoint or to evaluate the as-built pile foundation. The pile driving analyzer is extremely useful in evaluating the field installation procedures. If used in conjunction with static load tests for correlation, it may be useful in evaluating the further installation of production piles. The pile driving analyzer, may be used to evaluate the pile hammer efficiency and to evaluate or detect potentially damaged piles. In using the pile driving analyzer, it should be noted that the analyzer uses dynamic theory to infer static pile capacity. In some soils the pile develops a significant portion of its ability to carry load after it has been set-up for a period of time, therefore in such a case the pile should be restruck after this set-up has been allowed to occur. In general, a set-up period of 14 days is considered sufficient. The wave equation allows the dynamic analysis of

5-28

EM 1110-2-2906
15 Jan 91

the pile, soil, and driving equipment to be evaluated as a system, thereby
allowing the designer to evaluate variables such as the pile cushion, the
hammer, or even the pile material.  The wave equation is a valuable tool that
can be used to evaluate proposed methods for pile installation during design
or construction, i.e., if the contractor proposes a hammer system to install a
pile, this program can evaluate the data and aid in detecting potential
problems or deficiencies.

5-7.  Field Evaluation.

     a.  Driving Operations.  The design engineers (structural and geotechni-
cal) should visit the construction site while service piles are being driven
to observe the driving operation and to investigate any difficulty that is en-
countered.  The driving equipment should be inspected, and field conditions
should be checked.  Proposed methods for storage and handling of piles, posi-
tioning and aligning piles, supporting piles in leads, and transferring hammer
energy to piles should be checked prior to driving the first pile.  Driving of
the first few piles should be observed to assure compliance with approved
methods, proper operation of equipment (per manufacturer's rating) and proper
driving procedures.  In addition, the observer should watch for abnormal driv-
ing resistances and the occurrence of pile heave or voids adjacent to driven
piles.  When unusual difficulties develop, driving should again be observed
and compared with the initial set of observations.  The blow count for the
piles should be plotted during the installation process to detect broken or
damaged piles.  Drastic drops in blow counts of similar piles in similar soils
would be an indication of broken piles.  It is also recommended that the blows
per minute of hammer operation be recorded to indicate the efficiency of a
hammer, since reduced rates often indicate reduced efficiency.

     b.  Pile Positioning.  When pile driving has been satisfactorily com-
pleted, the actual position, orientation, and batter of each pile should be
measured (extrapolating from head measurements) and compared with the design
geometry.  If substantial variations are found, an as-built analysis may be
required, as discussed in paragraph 4-7i.  If there is substantial variation
from the design tip elevation or from the anticipated driving resistance, the
pile capacities should be re-evaluated.  The piles may be inspected for
drifting, which would be evidenced by voids adjacent to the pile.  Drifting
could be caused by striking a hard underground object or another pile.  (A
change in the impact sound of the pile during driving can be used to detect
piles striking an obstruction.)  It is also recommended that the blows per
minute of hammer operation be recorded to indicate the efficiency of a hammer.
The blow count records should be studied while driving is ongoing.

     c.  Static Loading.  Prior to static load test, the jack and load cell
should be checked, and the load settlement data should be plotted and checked
in the field during the test.

Case: 14-1228 Case: 14-1228 Document: 23 Page: 202 Filed: 04/23/2014

CHAPTER 6

FIELD PILE TESTS

6-1.  <u>General</u>.

    a.  A field pile test program will generally consist of two types of pro-
cedures:  load tests to determine the load capacity of service piles; and
driving selected types of piles with selected types of hammers and recording
data on driveability.  These tests may be conducted separately or, as is more
common, concurrently.  The latter can be accomplished by simply recording the
necessary data during the driving of the piles that will be load tested.
Field pile tests are performed to verify or predict driving conditions and/or
load capacity of service piles at the construction site.  Verification is the
process of test driving and loading the designated piles to predetermined
static loads to confirm prior design capacity calculations that were based on
static or dynamic type equations, previous experience, or empirical methods.
This process is used primarily only to confirm the load capacity and drive-
ability of the selected pile as service piles.  Prediction is the process of
test driving various piles or of loading test piles in increments to failure
to determine the length, type, and ultimate capacity of the service piles at
the construction site.  Prediction tests differ from the verification process
in that these tests will be utilized for design purposes.  Therefore, the
final pile size, type, and lengths generally have not yet been determined when
these tests are conducted.  Prediction type tests are more common to large or
major structures where changes in pile lengths, size, type, or method of
installation could result in significant economic savings due to the large
number of piles involved.

    b.  A field load test on test piles may consist of two types, axial
and/or lateral.  These tests may be performed on single piles or pile groups.


6-2.  <u>Decision Process</u>.  Pile tests are not practical or economically feasible
under certain circumstances, but they are always technically desirable.  In
the initial design stages, as soon as the requirement for a pile foundation is
confirmed, several factors should be considered and evaluated to govern the
decision process.

    a.  Factors for Consideration.  Appropriate evaluations of the following
factors should be included in the reconnaissance study and updated in each
successive report stage for the project.

    (1)  Engineering.  The size, type, and importance of the proposed struc-
ture, type of subsurface conditions, and economics are engineering factors.
Size and economics are directly related; since pile tests are relatively ex-
pensive, a structure requiring a small number of piles could not normally
justify the expense of a pile test.  The type and functional importance of a
structure could offset the added cost of a pile test program for a complex
foundation when the consequences of a potential failure would be catastrophic,
especially if the information obtained from subsurface investigations indi-
cated unusual conditions that would be difficult to interpret.  The costs of
pile tests should be compared with the potential project savings from basing
the foundation design on the test results with reduced safety factors.  Also,
when a requirement for a field pile test program has been established, the

Add129

EM 1110-2-2906
15 Jan 91

technical aspects, scheduling, estimated costs and any intangible benefits of
the two following alternatives should be evaluated:

(a)  Perform pile tests by separate contract and complete the foundation
design prior to award of the construction contract.

(b)  Award a construction contract with a selected type or types of piles
and estimate pile lengths with a pile test program included to determine the
actual pile lengths required.

(2)  Budget and Schedules.  During the reconnaissance study phase of a
new project, a preliminary foundation evaluation for each potential project
site is required to determine the need for pile foundations.  For each poten-
tial site that needs a pile foundation, initial cost estimates and schedules
must identify and include resources for necessary site investigations to pro-
vide adequate data for proper site selection and estimated costs for the
feasibility study phase.  The feasibility report should include a recommended
site, preliminary alternate foundation designs, and the scope of required pile
tests, etc.  Required resources, schedules and cost estimates must be revised
for each successive report phase to reflect the current design status of each
project component.  If a separate contract for pile tests is recommended prior
to award of the construction contract, appropriate adjustments must be made to
the schedules and budgeted funds.

(3)  Available Test Site.  Consideration has to be given to the timing of
the test pile program in relation to the construction schedule.  The test pile
program may be a separate contract awarded and completed before construction
begins.  The advantages of this approach are many:  the pile size, type,
lengths, and preferred installation method can be determined before construc-
tion of the project; any problems with the pile test and potential problems
with design revealed by the pile tests may be resolved prior to construction
when they are more likely to be less costly.  The disadvantages of this
approach are:  the design schedule is extended to allow time for the separate
operations; the test conditions may not closely simulate design assumptions
since excavation, water conditions, fill, etc. may not necessarily match
construction conditions; and additional problems may develop if different
contractors and/or equipment are used during the testing program and driving
the service piles.  These advantages and disadvantages must be evaluated in
relation to the site availability.

(4)  Site access.  If the decision is made to conduct the testing program
during the construction process, the scheduling of the test program becomes
important.  The tests must be conducted early in the construction process,
since the contractor generally must await the outcome of the tests before
ordering the service piles.  However, the testing cannot be scheduled too
early, since the test site needs to be prepared and accessible.

b.  Proof Test.  In the overall design process, field tests are normally
scheduled after some estimate of pile capacity and driveability has been made.
The driveability of piles is generally evaluated early in the design process,
usually in the General Design Memorandum stage when basic design decisions are
being made relative to the foundation.  Also at this point, an estimate of
pile capacity is made.  During the Feature Design Memorandum phase of design,
a more accurate prediction of pile capacity and/or required pile lengths is
made, and a test pile program is established to verify the design assumptions

6-2

and pile driveability.  The final stage of the design process is the actual
testing program.  As discussed earlier, the results of this testing program
may be used solely to verify the predicted pile capacities, and/or required
pile lengths, or may be used as an extension of the design process by changing
the pile size, type, lengths, or installation method of the service piles as
required.  Refer to preceding paragraphs relative to the timing of field tests
with respect to construction, site availability, site access, and potential
problems.

6-3.  Axial Load Test.

    a.  Compression.

    (1)  General.  The load test should basically conform to the procedures
contained in ASTM D1143 (Item 25).  This standard is recommended as a guide
and should be modified as required to satisfy individual project requirements.
Important aspects of the test are discussed in the following paragraphs.
Information on conducting dynamic load tests may be obtained from the Geotech-
nical Laboratory of the US Army Engineer Waterways Experiment Station in
Vicksburg, MS.

    (2)  Applying Load.  In the past, test loads were generally applied by
placing dead weight as a vertical load directly on top of the piles to be
tested.  In current practice, loads are applied by jacking (with a hydraulic
ram) against a stable, loaded platform, or against a test frame anchored to
reaction piles.  Typical loading arrangements are illustrated in the refer-
enced ASTM D1143 Standard.  If reaction piles are used, various studies have
indicated that the distance between these piles and the test piles should be a
minimum of at least 5 pile diameters for nondisplacement piles to up to
10 diameters for displacement piles.

    (3)  Jacks and Load Cells.  Most load tests are conducted with hydraulic
jacks to apply the load, and load cells to measure the load.  The hydraulic
jack ram or the load cell should have a spherical head to minimize eccentric-
ity between the jack and the loading frame.  Both the jack (with pressure
gage) and the load cell should be calibrated by a qualified lab to include
calibration curves.  During the load test both the load cell and the jack
pressure gage should be read and compared.  In the event it is later dis-
covered or determined that the load cell has malfunctioned, the pressure gage
readings will then be available.  It is also important during the test to con-
tinually monitor the load cell to ensure that the load increment is being
maintained at a constant value.  The load has a tendency to decrease due to
pile penetration into the ground, deflection of the test beams, and loss of
hydraulic fluid from leaking valves, etc.

    (4)  Measuring Devices.  Settlement measurement devices are usually dial
gages, with some other independent system as a backup.  It is important to
protect these devices from the weather, since direct sunlight can signifi-
cantly affect the readings.  The ASTM D1143 Standard illustrates a typical
installation.  Consideration should also be given to measuring the lateral
movement of the pile during the test procedure to detect eccentric loading
conditions.  All dial gages should be calibrated by a qualified lab.

    (5)  Instrumentation.  If the distribution of the pile load along its em-
bedded length is required, and not merely the total or ultimate load, the pile

Case: 14-1228 Case 14-1228 Document 23 Page: 203 Filed: 04/23/2014 Page: 203 Filed: 04/23/2014

EM 1110-2-2906
15 Jan 91

should be instrumented with telltales or strain gages. All instrumentation
should be tested after the pile is driven to verify that it is still function-
ing properly. Refer to the ASTM D1143 Standard for possible telltale ar-
rangements. A strain-gage system may also be used. These systems, although
generally more expensive, but can yield excellent results if properly in-
stalled and read.

(6) Net Settlement. Provisions should be made during the pile tests to
determine the net settlement of the pile (i.e. the total settlement less the
elastic compression of the pile and soil). This is required to develop a net
settlement (i.e. the pile tip movement) versus load curve to determine pile
capacity. Net settlement may be determined by loading and unloading the pile
in cycles (see the ASTM D1143-81 Standard (Item 25)) by employing a telltale
located at the pile tip.

(7) Technical Specifications. Plans and specifications for the pile
test should be developed generally in accordance with the referenced ASTM
D1143 Standard and should be specifically modified as needed to satisfy the
particular project requirements and subsurface conditions. Technical specifi-
cations should include the following as a minimum:

(a) Type, size, length, and location of pile(s) to be tested

(b) Size and capacity of pile driving equipment

(c) Driving criteria and any special installation methods required

(d) Types of tests to be conducted and maximum testing capacity neces-
sary

(e) Required testing equipment and instrumentation, including calibra-
tion, to be furnished

(f) Testing procedures to be followed

(g) Data to be recorded and reported

(h) Report format to be followed

(i) Provisions for additional tests

(j) Payment schedule and schedule of bid items

b. Tension.

(1) General. The load test should basically conform to the procedures
contained in ASTM D3689-78 (Item 23). This standard is recommended as a
guide, and should be modified as required to satisfy individual project re-
quirements. Important aspects of the test are discussed in the following
paragraphs.

(2) Testing. Tension tests are often conducted on piles which have
previously been tested in axial compression. Some advantages to this are: a
direct comparison of tension and compression on the same subsurface profile,
cost savings in not having to drive an additional pile, and information on

Add132

EM 1110-2-2906
15 Jan 91

piles that must function in both tension and compression under operating
conditions.  Some disadvantages are:  residual stresses may significantly
affect the results, remolding of the soil may take place during the first
test, and a waiting period is generally required between the compression and
tension test.  Appropriate references should be consulted relative to residual
stresses and the necessary waiting period (paragraph 6-3d(5)).

   (3)  Other Considerations.  The same aspects of compression tests need to
be considered for conducting tension tests:  applying the load, use of jacks,
load cells, measuring devices and instrumentation, net settlement, and techni-
cal specifications.  Paragraph 6-3a and the referenced ASTM Standards must be
referred to for compression and tension tests.  Interpretation of test results
is described in paragraph 6-3e.

   c.  Quick Load Tests.

   (1)  General.  The load test outlined in the referenced ASTM
D1143 Standard (Item 25) can be described as a slow, maintained-load test.
The duration of this procedure can exceed 70 hours or longer, especially when
cyclic loading is included.  There are alternatives to this "slow" test when
time is of the essence, or when a quick method is needed to verify service
pile capacities that were projected from test piles using the slow,
maintained-load method.  These alternatives are the constant-rate-of-
penetration test (CRP), and the quick, maintained-load test.  Both of these
methods are permissible options described in the referenced ASTM Standard
(Item 25).  The CRP test appears to be seldom used in this country.  The
quick, maintained-load test is often used, although its format has many
variations.

   (2)  CRP Test.  In a CRP test, the load is applied to cause the pile head
to settle at a predetermined constant rate, usually in the vicinity of
0.01 inch per minute to 0.1 inch per minute, depending on whether the sub-
surface conditions are cohesive or granular, respectively.  The duration of
the test is usually 1 to 4 hours, depending on the variation used.  The par-
ticular advantage of the CRP test is that it can be conducted in less than one
working day.  A disadvantage is that ordinary pumps with pressure holding de-
vices like those used for "slow" tests are difficult to use for the CRP test.
A more suitable pump is one that can provide a constant, nonpulsing flow of
oil.  Appropriate references should be consulted relative to the CRP test, if
it is utilized.

   (3)  Quick Maintained-Load Test.  In this test, the load is applied in
increments of about 10 percent of the proposed design load and maintained for
a constant time interval, usually about 2 to 15 minutes.  The duration of this
test will generally be about 45 minutes to 2 hours, again depending on the
variation selected.  The advantage of this test, like the CRP test, is that it
can be completed in less than 1 working day.  Also, unlike the CRP test, no
special equipment is required.  Appropriate references should be studied if
this test is utilized.

   (4)  Other Considerations.  The same aspects of axial load testing dis-
cussed in paragraphs 6-3a and 6-3b, and the referenced ASTM Standards
(Items 23 and 25), need to be considered for "quick" tests.  These include
applying the load, use of jacks, load cells, measuring devices and

EM 1110-2-2906
15 Jan 91

instrumentation, net settlement, and technical specifications, when applicable. Refer to paragraph 6-3e for interpretation of test results.

    d.  General Considerations.

    (1)  Reaction Pile Effects.  If a pile is loaded by jacking against reaction piles, the effects of the reaction piles on the test pile (increase or decrease in intergranular pressures) should be taken into consideration.

    (2)  Load to Failure.  Test piles should be loaded to failure when possible, as this test yields valuable information to the designer.  Ideally, care must be taken as failure is approached to collect data more frequently than at sub-failure loads and to maintain the same rate of loading employed before reaching failure.

    (3)  Pile Driving Analyzer or Quick Tests.  On a large or significant structure, consideration should be given to using a pile driving analyzer and/or performing quick tests in conjunction with the regular test pile program.  The additional information provided (hammer efficiency, etc.) could aid the designer in evaluating the adequacy of the service piles, should unexpected problems develop, without having to conduct additional and costly conventional pile testing.  In conjunction with the pile driving analyzer, a wave equation analysis should be performed prior to the pile test to calibrate the wave equation analysis with the results of the pile driving analyzer. Refer to Chapter 5, paragraph 5-3a for a discussion of the wave equation analysis.  The pile driving analyzer is discussed in paragraph 5-4a.  On a smaller or less significant project, the use of a pile driving analyzer may not be economically justified.  However, a wave equation analysis is very simple to run and should be performed.

    (4)  Location of Test Site.  Test piles should be located as near as possible to a boring.  In many instances, circumstances warrant that a boring be taken specifically for the pile test.  Piezometric data should also be available.  Conditions measured by the piezometers should be correlated with design/operating conditions.

    (5)  Waiting Period.  The waiting period between the driving of the test piles and the pile load test should allow sufficient time for dissipation of excess pore water pressures resulting from the pile driving operation.  If sufficient time is not allowed, the test results may mislead the engineer to select pile capacities that are lower than the actual values.  This waiting period is a function of many interrelated complex factors and can significantly affect the results of the pile test.  Generally, piles driven into cohesive foundations require more time than those placed in granular materials.  For the cohesive case, 14 days is recommended.  An absolute minimum of 7 days is required.  The referenced ASTM Standards (Items 23 and 25) have some guidance in this area.  Other references should be studied before writing the technical specifications, if applicable. For cast-in-place concrete piles, the waiting period should consider the curing time and resulting strength of the concrete, and the possible effects of concrete hydration on the soil surrounding the pile.

    (6)  Reporting Test Results.  Data from the load tests should be recorded and reported in an orderly fashion.  Items to be included are listed in the referenced ASTM Standards (choose only those that are applicable to the

Add134

project requirements). Results will often be used to estimate axial capacity and/or driving characteristics for other projects with similar subsurface conditions, or expansion/modification of the existing project. Thus, it is important to maintain records in a manner that will be useful and easy to interpret at some future date.

e. Interpretation of Results. The interpretation of the tests results generally involves two phases, analyzing the actual test data, and application of the final test results to the overall design of the service piles and the structure.

(1) Axial Capacity Determination Method. There are many empirical and arbitrary methods available to determine the axial capacity of a pile from load test data. Some of these methods are contained in bibliographical material found in Appendix A. It should be noted that the methods described in Table 6-1 are for informational purposes only, are not necessarily current practice, nor necessarily recommended by the respective listed sources. The methods are listed merely to indicate historical practice and the diversity of philosophy.

(a) Corps of Engineers Method. The following method has often been used by the Corps of Engineers and has merit: determine the load that causes a movement of 0.25 inch on the net settlement curve; determine the load that corresponds to the point at which the settlement curve has a significant change in slope (commonly called the tangent method); and determine the load that corresponds to the point on the curves that has a slope of 0.01 inch per ton. The average of the three loads determined in this manner would be considered the ultimate axial capacity of the pile. If one of these three procedures yields a value that differs significantly from the other two, judgment should be used before including or excluding this value from the average. A suitable factor of safety should be applied to the resulting axial pile capacity. See Figure 6-1 for an example of this method.

(b) Davisson Method. A commonly used method to evaluate pile tests is one suggested by Davisson (Item 30). The failure load is defined as the point at which the movement of the pile butt exceeds the elastic compression of the pile by 0.15 inch plus a factor (B/120) that is a function of pile diameter (B). The advantage of this method is the inclusion of physical pile size (length and diameter) in the definition of failure load. This failure load should exceed two times the allowable load.

(2) Foundation Considerations. Once the axial capacity of the pile is established, the next step is to interpret this information relative to the known foundation conditions, the nature of the loads on the structure, the size and significance of the structure, and any other pertinent information.

(a) Group Effects. It should be noted that the results of a single pile test may not indicate the capacity of a group of similar piles. The effects of group loading are experienced much deeper in the foundation than those of the single pile. Group loading may result in the consolidation of a soft clay layer that would otherwise be unaffected by a single pile loaded to the same unit load.

(b) Settlement. A pile test on a single pile will generally yield sufficient data to determine the failure load or bearing capacity. However, the

EM 1110-2-2906
15 Jan 91

Table 6-1

Methods of Pile Load Test Interpretation

---

1.  Limiting Total Butt Settlement

    a.  1.0 in. (Holland)
    b.  10% of tip diameter (United Kingdom)
    c.  Elastic settlement + D/30 (Canada)

2.  Limiting Plastic Settlement

    a.  0.25 in. (AASHO, N.Y. State, Louisiana)
    b.  0.5 in. (Boston) [complete relaxation of pile assumed]

3.  Limiting Ratio:  Plastic/Elastic Settlement

    1.5 (Christiani and Nielson of Denmark)

4.  Limiting Ratio:  Settlement/Unit Load

    a.  Total        0.01 in./ton (California, Chicago)
    b.  Incremental 0.03 in./ton (Ohio)
                    0.05 in./ton (Raymond International)

5.  Limiting Ratio:  Plastic Settlement/Unit Load

    a.  Total        0.01 in./ton (N.Y. City)
    b.  Incremental 0.003 in./ton (Raymond International)

6.  Load-Settlement Curve Interpretation

    a.  Maximum curvature – plot log total settlement vs log load; choose
                            point of maximum curvature
    b.  Tangents – plot tangents to general slopes of upper and lower portion
                    of curves; observe point of intersection
    c.  Break point – observe point at which plastic settlement curve breaks
                        sharply; observe point at which gross settlement curve
                        breaks sharply (Los Angeles)

7.  Plunge

    Find loading at which the pile "plunges," (i.e., the load increment could
    not be maintained after pile penetration was greater than 0.2 B).

8.  Texas Quick Load

    Construct tangent to initial slope of the load vs gross settlement curve;
    construct tangent to lower portion of the load vs gross settlement curve
    at 0.05 in./ton slope; the intersection of the two tangent lines is the
    "ultimate bearing capacity."

---

Add136

EM 1110-2-2906
15 Jan 91



Figure 6-1.  Corps of Engineers method for
determining axial capacity

pile test does not provide data relative to the settlement of the pile under
operating conditions in a cohesive foundation.  The load test is generally
conducted in too short a time frame to enable clays to consolidate.  There-
fore, a significant amount of settlement may occur during the life of the
structure--settlement that would not be predicted by the pile test.  For gran-
ular foundations however, the pile test does generally yield adequate data on
bearing capacity and settlement.

    (c)  Operating Conditions.  Consideration should be given to the possi-
bility that the test pile conditions may differ significantly from the operat-
ing conditions for the structure.  Examples are:  potential uplift in pervious
strata that are dewatered during the pile test; backfill or excavation after
the pile test; the nature of the loading on the piles (static, dynamic, long
term, short term, etc.); battered service piles in lieu of vertical test
piles; lateral loading effects; and negative skin friction.

6-9

Add137

EM 1110-2-2906
15 Jan 91

(d) Driving Effects. The effects of driving many service piles may change the conditions existing during the test. Piles driven into a granular material may densify the foundation and increase pile capacity, while piles driven into a sensitive cohesive foundation may decrease pile capacity.

(e) Layered Foundations. Layered foundations may cause service piles to perform differently than indicated by test piles. During a test pile loading, a cohesive layer may be supporting the piles. During the life of the service pile, this same cohesive layer may consolidate under the load, and transfer the load to another soil layer not stressed during the pile test. The service pile may also shift from being a friction pile to being more of an end bearing pile under similar conditions.

(f) Residual Stresses. Residual stresses that may be present during the pile test may be significant and must be considered. These stresses may be detected by instrumenting the piles and taking readings prior to and just after driving. If residual stresses are present, it may be necessary to consider these stresses when evaluating the distribution of the tip and skin resistance.

(g) Tip Elevations. Finally, if the pile tests are used to project pile capacity for tip elevations other than those tested, caution should be exercised. In a complex or layered foundation, selecting a tip elevation for the service piles different from the test piles may possibly change the pile capacity to values other than those projected by the test. As an example, shortening the service piles may place the tips above a firm bearing stratum into a soft clay layer. In addition to a loss in bearing capacity, this clay layer may consolidate over time and cause a transfer of the pile load to another stratum. Lengthening the service piles may cause similar problems and actually reduce the load capacity of the service piles if the tips are placed below a firm bearing stratum. Also, extending tips deeper into a firmer bearing stratum may cause driving problems requiring the use of jetting, predrilling, etc. These techniques could significantly alter the load capacity of the service piles relative to the values revealed by the test pile program and should be considered in setting tip elevations for service piles.

6-4. Monotonic Lateral Load Test.

a. General. The main purpose of a lateral load test is to verify the values of $n_h$ or $E_s$ used in design. The value of the cyclic reduction factor used in design can also be verified if the test pile is cyclically loaded for approximately 100 cycles. The basis for conducting a lateral load test should be ASTM D3966-81 (Item 24) modified to satisfy the specific project requirements.

b. Applying Load. A lateral load test is most easily conducted by jacking one pile against another. In this manner, two lateral load tests can be conducted simultaneously. When applying the lateral load to the pile, it is important to apply the load at the ground surface with no restraint at the pile head. This gives a free-head pile boundary condition and makes the data easy to reduce to curves of $n_h$ or $E_s$ versus pile top deflection. The loads are applied with a hydraulic jack. A spherical bearing head should be used to minimize eccentric loading.

Add138

Case: 14-1228 Case 14-1228 Document 23 Document 23 Page 210 Page 210 Filed: 04/23/2014 Filed: 04/23/2014

c.  Instrumentation.  The minimum amount of instrumentation needed would be dial gages to measure lateral pile head deflection and a load cell to measure applied load.  A load cell should be used to measure load instead of the pressure gage on the jack because pressure gage measurements are known to be inaccurate.  Additional instrumentation could consist of another level of dial gages so the slope at the top of the pile can be calculated, and an inclinometer for the full length of the pile so that lateral pile deflection at any depth along the pile can be calculated.  If p-y curves are necessary for the pile foundation design, then strain gages along the pile to measure bending moment are needed.  However, since the purpose of lateral load tests described in this section is to verify or determine pile-soil properties to be used in the normal design of a civil works project, the use of strain gages along the length of the pile is not recommended.  Accurate strain-gage data are difficult to obtain and only of value in research work where p-y curves are being developed.  Strain gages should not be installed by construction contractors because they do not have the necessary expertise to install them.  If strain gages are used, consultants experienced in their use should be hired to install them, and record and reduce the data.

d.  General Considerations.

(1)  Groundwater.  The location of the ground-water table has an effect on how laterally loaded piles behave.  For this reason it is important to have the groundwater table during testing as near as possible to the level that will exist during operation of the structure.

(2)  Load to Failure.  It is important to carry the load test to failure.  Failure is defined as when the incremental loading can not be maintained.

(3)  Location of Test Site.  Piles should be located as near to the site of the structure as possible and in similar materials.

(4)  Reporting Test Results.  Accurate records should be made of the pile installation, of load testing, and of the load test data to document the test.

6-5.  Cyclic Lateral Load Test.

a.  General.  The main purpose of a cyclic lateral load test is to verify the value of the cyclic loading reduction factor ($R_c$) used in design.  Approximately 100 cycles of load should be used in a cyclic load test.  The load test should be conducted according to ASTM D3966-81 (Item 24) modified as necessary for cyclic loading and specific project requirements.  The instrumentation, equipment, and test layout necessary for conducting the cyclic load test is similar to that required for the monotonic lateral load test.

b.  Procedure.  Generally the cyclic lateral load test would be done in combination with the monotonic lateral load test on the same piles.  Since repeated testing of the same pile can cause permanent nonrecoverable deformations in the soil, the sequence of testing is important.  One sequence for doing the monotonic and cyclic lateral load test is outlined as follows:  The designer must first select the load level of the cyclic test.  This may be done from a known load level applied to the pile founded monoliths or a deflection criterion.  A deflection criterion would consist of loading the load test piles to a predetermined deflection and then using that load level for the cyclic load test.  Using the cyclic load level, the test piles would

Add139

EM 1110-2-2906
15 Jan 91

be cyclically loaded from zero loading to the load level of the cyclic load
test.  This cyclic loading procedure would be repeated for the number of
cycles required.  Dial gage readings of lateral deflection of the pile head
should be made at a minimum at each zero load level and at each maximum cyclic
load level.  Additional dial gage readings can be made as necessary.  After
the last cycle of cyclic loading has been released the test piles should then
be loaded laterally to failure.  That portion of the final cycle of load to
failure above the cyclic test load can be superimposed on the initial cycle of
loading to get the lateral load-deflection curve of the piles to failure.

EM 1110-2-2906
15 Jan 91

APPENDIX A

REFERENCES

EM 1110-2-2906
15 Jan 91

A-1.  <u>References are US Army Corps of Engineers Directives.</u>

(1)  TM 5-849-1, "Pile Driving Equipment."

(2)  EM 385-1-1, "Safety and Health Requirements Manuals."

(3)  EM 1110-2-1902, "Stability of Earth and Rock Fill Dams CH 1."

(4)  EM 1110-2-1906, "Laboratory Soils Testing CH 1-2."

(5)  EM 1110-2-1910, "Inspection of Earthwork Construction."

APPENDIX B


BIBLIOGRAPHICAL AND RELATED MATERIAL

B-1.  <u>Corps of Engineers Publications.</u>  All related publications are available on interlibrary loan from the Research Library, US Army Engineer Waterways Experiment Station, Attn:  CEWES-IM-MI-R, 3909 Halls Ferry Road, Vicksburg, MS 39180-6199.

1.   Brown, D. A., and Reese, L. C.  1988 (Feb).  "Behavior of a Large-Scale Pile Group Subjected to Cycle Lateral Loading," Miscellaneous Paper GL-88-2, US Army Engineer Waterways Experiment Station, Vicksburg, MS.

2.   CASE Task Group on Pile Foundations.  1980 (Dec).  "Basic Pile Group Behavior," Technical Report K-80-5, US Army Engineer Waterways Experiment Station, Vicksburg, MS.

3.   CASE Task Group on Pile Foundations.  1983 (Sep).  "Basic Pile Group Behavior," Technical Report K-83-1, US Army Engineer Waterways Experiment Station, Vicksburg, MS.

4.   Dawkins, William P.  1984.  "User's Guide:  Computer Program for Soil-Structure Interaction Analysis of Axially Loaded Piles (CAXPILE)," Instruction Report K-84-4, US Army Engineer Waterways Experiment Station, Vicksburg, MS.

5.   Hartman, Joseph P., Jaeger, John J., Jobst, John J., and Martin, Deborah K.  1989 (Jul).  "User's Guide:  Pile Group Analysis (CPGA) Computer Program," Technical Report ITL-89-3, US Army Engineer Waterways Experiment Station, Vicksburg, MS.

6.   Jaeger, John J., Jobst, John J., and Martin, Deborah K.  1988 (Apr).  "User's Guide:  Pile Group Graphics (CPGG) Computer Program," Technical Report ITL-88-2, US Army Engineer Waterways Experiment Station, Vicksburg, MS.

7.   Martin, D. K., Jones, H. W., and Radhakrishnan, N.  1980 (Jun).  "Documentation for LMVDPILE Program," Technical Report K-80-3, US Army Engineer Waterways Experiment Station, Vicksburg, MS.

8.   Morrison, C. S., and Reese, L. C.  1988 (Feb).  "A Lateral-Load Test of Full-Scale Pile Group in Sand," Miscellaneous Paper GL-88-1, US Army Engineer Waterways Experiment Station, Vicksburg, MS.

9.   Mosher, R. L.  1984 (Jan).  "Load-Transfer Criteria for Numerical Analysis of Axially Loaded Piles in Sand, Part 1:  Load-Transfer Criteria," Technical Report K-84-1, US Army Engineer Waterways Experiment Station, Vicksburg, MS.

10.  Mosher, R. L.  1987.  "Comparison of Axial Capacity of Vibratory-Driven Piles to Impact-Driven Piles," Technical Report ITL-87-7, US Army Engineer Waterways Experiment Station, Vicksburg, MS.

11.  Mudd, T. J.  1971.  "Analysis of Pile Foundation," Paper presented at Structures Conference, Lower Mississippi Valley Division, 23-24 Sep 1969, Vicksburg, MS.

Add144

EM 1110-2-2906
15 Jan 91

12. Ochoa, M., and O'Neill, M. W. 1988 (Jun). "Lateral Pile-Group Interaction Factors for Free-Headed Pile Groups in from Full-Scale Experiments," Miscellaneous Paper GL-88-12, US Army Engineer Waterways Experiment Station, Vicksburg, MS.

13. Radhakrishnan, N., and Parker, F. 1975 (May). "Background Theory and Documentation of Five University of Texas Soil-Structure Interaction Computer Programs," Miscellaneous Paper K-75-2, US Army Engineer Waterways Experiment Station, Vicksburg, MS.

14. Reese, L. C., Cooley, L. A., and Radhakrishnan, N. 1984 (Apr). "Laterally Loaded Piles and Computer Program COM624G," Technical Report K-84-2, US Army Engineer Waterways Experiment Station, Vicksburg, MS.

15. Smith, William G., and Mlakar, Paul F. 1987 (Jun). "Lumped Parameter Seismic Analysis of Pile Foundations," Report No. J650-87-008/2495, Vicksburg, MS.

16. Strom, Ralph, Abraham, Kevin, and Jones, H. Wayne. 1990 (Apr). "User's Guide: Pile Group - Concrete Pile Analysis Program (CPGC) Computer Program," Instruction Report ITL-90-2, US Army Engineer Waterways Experiment Station, Vicksburg, MS.

17. Tucker, L. M., and Briaud, J. 1988. "Axial Response of Three Vibratory and Three Impact Driven H-Pile in Sand," Miscellaneous Paper GL-88-28, US Army Engineer Waterways Experiment Station, Vicksburg, MS.

18. US Army Engineer Waterways Experiment Station. 1987 (May). "User's Guide: Concrete Strength Investigation and Design (CASTR) in Accordance with ACI 318-83," Instruction Report ITL-87-2, Vicksburg, MS.

B-2. <u>Other Publications.</u> All related publications are available on interlibrary loan from the Research Library, US Army Engineer Waterways Experiment Station, Attn: CEWES-IM-MI-R, 3909 Halls Ferry Road, Vicksburg, MS 39180-6199.

19. American Concrete Institute. 1983. "Building Code Requirements for Reinforced Concrete," ACI 318-83, Detroit, MI.

20. American Concrete Institute. 1986. "Recommendations for Design, Manufacture and Installation of Concrete Piles," ACI 543R-74, Detroit, MI.

21. American Institute of Steel Construction. 1989. <u>Manual of Steel Construction,</u> 9th ed., New York.

22. American Society for Testing and Materials. 1974. "Method for Establishing Design Stresses for Round Timber Piles," D2899-74, Vol 04.09, Philadelphia, PA.

23. American Society for Testing and Materials. 1978. "Method of Testing Individual Piles Under Static Axial Tensile Load," D3689-78, Vol 04.08, Philadelphia, PA.

24. American Society for Testing and Materials. 1981. "Method of Testing Piles Under Lateral Loads," D3966-81, Vol 04.08, Philadelphia, PA.

25. American Society for Testing and Materials. 1983. "Method of Testing Piles under Static Axial Compressive Load," D1143-81, <u>1986 Annual Book of ASTM Standards</u>, Vol 04.08, Philadelphia, PA.

26. Aschenbrenner, T. B., and Olson, R. E. 1984 (Oct). "Prediction of Settlement of Single Piles in Clay," <u>Analysis and Design of Pile Foundations,</u> American Society of Civil Engineers, J. R. Meyer, Ed.

27. Bowles Foundation Analysis and Design. 1977. 2nd ed., McGraw-Hill, New York.

28. Coyle, H. M., and Reese, L. C. 1966 (Mar). "Load-Transfer for Axially Loaded Piles in Clay," <u>Journal, Soil Mechanics and Foundations Division,</u> American Society of Civil Engineers, Vol 92, No. SM2, pp 1-26.

29. Coyle, H. M., and Sulaiman, I. H. 1967 (Nov). "Skin Friction for Steel Piles in Sand," <u>Journal, Soil Mechanics and Foundations Division,</u> American Society of Civil Engineers, Vol 93, No. SM-6, pp 261-278.

30. Davisson, M. T. 1970. "Lateral Load Capacity of Piles," <u>Highway Research Record No. 333</u>, Highway Research Board, National Academy of Sciences--National Research Council, Washington, DC.

31. Deep Foundations Institute. 1979. "A Pile Inspectors Guide to Hammers," Equipment Applications Committee, Springfield, NJ.

32. Deep Foundations Institute. 1981. "Glossary of Foundation Terms," Equipment Applications Committee, Springfield, NJ.

33. Department of the Navy. 1982 (May). "Foundations and Earth Structures." NAVFAC DM-7.2, Naval Facilities Engineering Command, 200 Stovall St., Alexandria, VA.

34. Federal Highway Administration. 1985. "Manual on Design and Construction of Driven Pile Foundations," Demonstration Projects Division and Construction and Maintenance Division, Washington, DC.

35. Garlanger, J. H. 1973. "Prediction of the Downdrag Load at Culter Circle Bridge," <u>Symposium on Downdrag of Piles,</u> Massachusetts Institute of Technology.

36. Hetenyi, M. 1946. <u>Beams on Elastic Foundation,</u> The University of Michigan Press, Ann Arbor, MI.

37. Hrennikoff, A. 1950. "Analysis of Pile Foundation with Batter Piles," <u>Transactions,</u> American Society of Civil Engineers, Vol 115, No. 2401, pp 351-383.

38. Kraft, L. M., Focht, J. A., and Amerasinghe, S. F. 1981 (Nov). "Friction Capacity of Piles Driven Into Clay," <u>Journal, Geotechnical Engineering Division,</u> American Society of Civil Engineers, Vol 107, No. GT11, pp 1521-1541.

EM 1110-2-2906
15 Jan 91

39. Matlock, H. 1970. "Correlations for Design of Laterally Loaded Piles in Soft Clay," Paper No. OTC 1204, <u>Proceedings,</u> Second Annual Offshore Technology Conference, Houston, TX, Vol 1, pp 577-594.

40. Meyerhof, G. G. 1976 (Mar). "Bearing Capacity and Settlement of Pile Foundations," <u>Journal, Geotechnical Engineering Division,</u> American Society of Civil Engineers, Vol 102, No. GT3, pp 197-228.

41. Nathan, Noel D. 1983 (Mar/Apr). "Slenderness of Prestressed Concrete Columns," <u>PCI Journal,</u> Vol. 28, No.2, pp 50-77.

42. Novak, M. 1984 (Nov). "Dynamic Stiffness and Damping of Piles," <u>Canadian Geotechnical Journal</u>, Vol 11, No. 4, pp 574-598.

43. Novak, M., and Grigg, R. F. 1976 (Nov). "Dynamic Experiments With Small Pile Foundations," <u>Canadian Geotechnical Journal</u>, Vol 13, No. 4, pp 372-385.

44. O'Neill, M. W. 1964. "Determination of the Pile-Head, Torque-Twist Relationship for a Circular Pile Embedded in a Clay Soil," M.S. thesis, University of Texas, Austin, TX.

45. O'Neill, M. W., and Tsai, C. N. 1984 (Nov). "An Investigation of Soil Nonlinearity and Pile-Soil-Pile Interaction in Pile Group Analysis," Research Report No. UHUC 84-9, Department of Civil Engineering, University of Houston, prepared for US Army Engineer Waterways Experiment Station, Vicksburg, MS.

46. Peck, R. B., Hanson, W. E., and Thornburn, T. H. 1974. <u>Foundation Engineering,</u> Wiley, New York.

47. PCI Committee on Prestressed Concrete Columns. 1988 (Jul-Aug). "Recommended Practice for the Design of Prestressed Concrete Columns and Walls," Vol 33, No. 4, pp 56-95.

48. Poulas, H. G., and Davis, E. H. 1980. <u>Pile Foundation Analysis and Design,</u> Wiley, New York.

49. Prakash, S. 1981. <u>Soil Dynamics,</u> McGraw-Hill, New York.

50. Reese, L. C. 1975 (Mar). "Laterally Loaded Piles," Design, Construction, and Performance of Deep Foundations Lecture Series, University of California, Berkeley.

51. Reese, L. C., Cox, W. R., and Koop, F. D. 1974. "Analysis of Laterally Loaded Piles in Sand," Paper No. OTC 2090, <u>Proceedings,</u> Sixth Offshore Technology Conference, Houston, TX, Vol 2, pp 473-483.

52. Reese, L. C., Cox, W. R., and Koop, F. D. 1975. "Field Testing and Analysis of Laterally Loaded Piles in Stiff Clay," Paper No. OTC 2312, <u>Proceedings,</u> Seventh Offshore Technology Conference, Houston, TX, pp 671-690.

Add147

EM 1110-2-2906
15 Jan 91

53. Reese, L. C., and Welsh, R. C. 1975 (Jul). "Lateral Loading of Deep Foundations in Stiff Clay," Journal, Geotechnical Engineering Division, American Society of Civil Engineers, Vol 101, No. GT7, pp 633-649.

54. Saul, William E. 1968 (May). "Static and Dynamic Analysis of Pile Foundations," Journal, Structural Division, American Society of Civil Engineers, Vol 94, No. ST5.

55. Scott, F. S. 1981. Foundation Analysis, Prentice-Hall, Englewood Cliffs, NJ.

56. Semple, R. M., and Rigden, W. J. 1984 (Oct). "Shaft Capacity of Driven Pile in Clay," Analysis and Design of Pile Foundations, American Society of Civil Engineers, J. R. Meyer, Ed., pp 59-79.

57. Stoll, U. W. 1972 (Apr). "Torque Shear Test of Cylindrical Friction Piles," Civil Engineering, American Society of Civil Engineers, Vol 42, pp 63-65.

58. Teng, W. C. 1962. Foundation Design, Prentice-Hall, Englewood Cliffs, NJ.

59. Terzaghi, Z., and Peck, R. B. 1967. Soil Mechanics in Engineering Practice, Wiley, New York.

60. Vesic, A. S. 1977. "Design of Pile Foundations," National Cooperative Highway Research Program, Synthesis of Highway Practice No. 42, Transportation Research Board, Washington, DC.

61. Vijayrergiya, V. N. 1977 (Mar). "Load - Movement Characteristics of Piles," Ports '77, Proceedings, 4th Annual Symposium of the Waterways, Port, Coastal and Ocean Division of American Society of Civil Engineers, Vol 2, pp 269-284.

Add148

EM 1110-2-2906
15 Jan 91

APPENDIX C

CASE HISTORY

PILE DRIVING AT LOCK AND DAM NO. 1
RED RIVER WATERWAY

CASE HISTORY

PILE DRIVING AT LOCK AND DAM NO. 1
RED RIVER WATERWAY

I.  Introduction.

       This case history report has been prepared to present an overview of
problems associated with the driving of steel H-piles at the Red River Lock
and Dam No. 1 in the New Orleans District of the Lower Mississippi Valley
Division.

       The discussion of problems encountered such as pile interference, piles
hitting early refusal, driving with a vibratory hammer, etc., and the solu-
tions and recommended preventive measures for these problems are presented for
others who may encounter similar situations and benefit from this experience.

II.  Description of Project.

       Lock and Dam No. 1 is a feature of the Red River Waterway Project (Mis-
sissippi River to Shreveport), located in Catahoula Parish, Louisiana,
approximately 5 miles north of the town of Brouillette.  (See Figure C-1.)
Navigation from the Mississippi River to the Red River is now provided through
Old River via Old River Lock.  The purpose of this project is to provide for
navigation on the Red River from its junction at Old River up to Shreveport,
Louisiana.

       The Lock is a soil-supported reinforced concrete U-frame structure with a
useable length of 685 ft and a width of 84 feet.  The dam is a reinforced
concrete structure with eleven 50-foot wide steel tainter gates.  (See
Figure C-2.)  Both the dam structure and its stilling basin are supported on
steel H-piles.

III.  Phases of Construction.

       To expedite the construction schedule for Lock and Dam No. 1 phased con-
struction was necessary.  A contract for the initial excavation and construc-
tion of the earthen cofferdam was awarded in June 1977 (Phase I).  A second
contract, which included installation of the dewatering system, structural
excavation and construction, driving and testing piles, and driving of the dam
service piles, was awarded in July 1978 (Phase II).

       Although the specifications properly stated that the actual pile lengths
would be determined from the test pile driving and loading, because of time
constraints, production piles were ordered and purchased to the lengths as
determined from soil parameters obtained from the soil borings.  Numerous
delays encountered by the Contractor in starting the pile driving led to the
deletion of the driving of the service piles from this contract.

       The third contract was awarded in December 1979.  It consisted of all the
remaining work and included the driving of the service piles which had to be
incorporated into the final plans and specifications for this phase of con-
struction (Phase III) due to its earlier deletion from Phase II.

EM 1110-2-2906
15 Jan 91

C-4



Figure C-1.  Location map

EM 1110-2-2906
15 Jan 91



Figure C-2. Elevation and section of dam structure

Add152

EM 1110-2-2906
15 Jan 91

IV.  Soil Conditions.

    A layer of medium to stiff holocene backswamp clays is located along the
dam axis extending from the base of the dam (approximately -11 N.G.V.D.) to
the top of the sand stratum (approximately elevation -48 N.G.V.D.).  The bot-
tom of this sand stratum extends to below elevation -140 N.G.V.D.

V.  Driving Hammers.

    The Phase II pile specifications allowed for the use of a vibratory
hammer which the Contractor elected to use.  Pile tests were to be performed
on HP 14x89 and HP 12x53 steel H-piles.  The Contractor drove the test piles
using a Foster Vibratory Hammer Model 4000, having an eccentric moment of
4,000 inch-pounds and a weight of 18,800 pounds.  Using this hammer, the 60 to
80 foot HP 12x53 test piling were driven in less than 2 minutes, while the
87 to 106 foot long HP 14x89 piling were driven in 10-16 minutes driving time.
The various test piles were instrumented with "telltales" to determine the
pile capacity in the various strata.  Only load carrying capacity in the sand
substratum was used in the design since it was determined that the long-term
support capabilities of the overburden clays and silts would be negligible.
The total pile support in the soil was to be developed by the skin friction in
the sand and the pile tip bearing.

    All compression pile tests were conducted 7 to 8 days after driving with
tension pile tests conducted 11 to 15 days after driving.  Two compression
tests were conducted at site PT-1S on HP 14x89 piles 1-C and 2-C.  The results
of these tests indicated pile capacities of 63 and 83% of the computed theo-
retical capacity, respectively.  At site PT-A, for 4 HP 12x53 piles (1-C, 2-C,
3-C, and 2C-X) tested in compression, the results were 37, 25, 40 and 57% of
the computed theoretical capacities, respectively.  In tension, the HP 12x53
pile 2C-X developed 30% of the computed capacity.

    Retesting of some of the piles was directed to determine what effects
elapsed time would have on the capacities of the piling.  A compression re-
test, 25 days after driving, was made on HP 14x89 pile 1-C which originally
tested at 63% of the computed capacity.  The capacity of the pile increased
from 63% to 78% of the computed capacity indicating a strength growth with
elapsed time.  The compression retests of two of the HP 12x53 piles resulted
in increases from 37% to 70% of the computed capacity for pile 1-C, retested
70 days after driving; and from 40% to 78% for pile 3-C, retested 56 days
after driving.  Two tension pile retests were made, one test after 22 days had
elapsed from the time of driving and the other test performed after 54 days
had elapsed.  An increase from 41% to 86% in HP 14x89 pile 2-C and an increase
from 30% to 67% in HP 12x53 pile 2C-X of the computed capacity resulted for
these two tension pile retests.

    Consequently, the retests for both compression and tension test piles
resulted in increased pile capacities with the passage of time for piling
driven with a vibratory hammer.  Figure C-3 is a table showing the capacities
and dates driven for the tests and retests in compression and tension.

    As a result of the pile tests and retests the service piling had to be
approximately 12 feet longer than the computed theoretical lengths.  As stated
previously, the steel H-piling had been ordered and delivered prior to the
pile tests, therefore splicing to obtain the additional length piling was

C-6

| SITE | PILE NO. | PILE TYPE | PILE DATA | | | DATE DRIVEN | COMPUTED COMP. LOAD(TON)* | COMPRESSION TEST | | | COMPRESSION RE-TEST | | | COMPUTED TENSION LOAD(TON) | TENSION TEST | | | TENSION RE-TEST | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | BUTT ELEV | TIP ELEV | L | | | DATE | LOAD* | %** | DATE | LOAD* | %** | | DATE | LOAD* | %** | DATE | LOAD* | %** |
| PT-IS | I-C | 14x89 | -18.6' | -105.2 | 86.6' | 7/9/79 | 176$^T$ | 7/17/79 | 110$^T$ | 63 | 8/3/79 | 137$^T$ | 78 | | | | | | | |
| PT-IS | 2-C | 14x89 | -18.7 | -124.2 | 105.5' | 7/9/79 | 228$^T$ | 7/16/79 | 190$^T$ | 83 | | | | 126$^T$ | 7/20/79 | 51$^T$ | 41 | 7/31/79 | 108$^T$ | 86 |
| PT-A | I-C | 12x53 | -20.1 | -80.3 | 60.2' | 7/11/79 | 87$^T$ | 7/19/79 | 32$^T$ | 37 | 9/19/79 | 60$^T$ | 70 | | | | | | | |
| PT-A | 2-C' | 12x53 | -20.8 | -89.3 | 68.5' | 7/11/79 | 110$^T$ | 7/18/79 | 26$^T$ | 25 | | | | | | | | | | |
| PT-A | 3-C | 12x53 | -20.8 | -89.0 | 68.2' | 8/1/79 | 110$^T$ | 8/9/79 | 44$^T$ | 40 | 9/27/79 | 86$^T$ | 78 | | | | | | | |
| PT-A | 2C-X | 12x53 | -20.7 | -99.2 | 78.5' | 8/1/79 | 134$^T$ | 8/8/79 | 76$^T$ | 57 | | | | 69$^T$ | 8/16/79 | 21$^T$ | 30 | 9/25/79 | 46$^T$ | 67 |

*LOAD IN SAND.

**PERCENTAGE OF COMPUTED LOAD

Figure C-3.  Red River Lock 8 Dam No. 1 pile test summary

C-7

EM 1110-2-2906
15 Jan 91

EM 1110-2-2906
15 Jan 91

necessary. The required splicing was performed in the storage area during the
Phase III contract, increasing the maximum pile length from 96 feet to
108 feet.

The pile splice detail required a full penetration butt weld with
3/8-inch thick fish plates over the outside of the flanges (Figure C-4).

VI. <u>Pile Layout</u>.

The pile layout for the dam foundation consisted of alternating rows of
batter piles, with a downstream batter of 2.5 vertical to 1 horizontal and an
upstream batter of 4 vertical to 1 horizontal. (See Figure C-5 for typical
layout.) Typical pile spacing between rows was 5 feet center to center.
There were 904 HP 14x89 piles and 1,472 HP 14x73 piles in the dam foundation.
The stilling basin, which consisted of predominantly 60-foot vertical piling,
had 388 HP 14x73 piles and 633 HP 12x53 piles. (See Figure C-6 for typical
layout.)

VII. <u>Pile Driving Specifications</u>.

The pile specifications allowed for a driving tolerance of 1/4 inch per
linear foot along the longitudinal axis of the pile. A 3-inch tolerance in
both X and Y directions in the position of the butt of the pile was allowed.
The specifications also required that the pile be sufficiently supported in
the leads.

Since the test piling were driven with a vibratory hammer, the specifica-
tion for the Phase III contract mandated the use of a vibratory hammer with
the same effective driving energy and efficiency. The Contractor elected to
use an ICE (International Construction Equipment, Inc.) model 812 Vibratory
Hammer. This hammer has an eccentric moment of 4,000 inch-pounds and weighs
15,600 pounds.

The Contractor's driving equipment included two 4100 Manitowac Cranes
fitted with International Construction Equipment (ICE) fixed leads and hydrau-
lic spotters. An intermediate support was not provided in the leads, conse-
quently the pile was supported only at the hammer and the ground, and was free
to move between these two points.

VIII. <u>Pile Driving</u>.

Within the first few days of driving, several piles were reported to have
reached refusal above final grade. The specifications defined refusal as a
penetration rate of less than a tenth of a foot per minute. The piles reached
refusal at depths ranging from 37 feet to 85 feet as measured along the length
of the piling. Some of the piling that refused above the specified grade were
ordered pulled. Upon examination of these piles it was apparent from the
bottom damage that there had been pile interference during driving and colli-
sion with other piles.

A review of the Contractor's driving procedures revealed the following:

a. The batter was set by using a 5-foot carpenter's level with a
template. The template, which was a triangle set to the prescribed batter,

EM 1110-2-2906
15 Jan 91



NOTE: SPLICE LAYOUT IS TYPICAL
FOR HP 14 x 73, HP 14 x 89
AND HP 12 x 53

Figure C-4.  H-pile splice layout

Add156

EM 1110-2-2906
15 Jan 91



Figure C-5.  Typical dam monoliths-pile layout

Add158

C-11



Figure C-6.  Typical stilling basin monoliths-pile layout

EM 1110-2-2906
15 Jan 91

EM 1110-2-2906
15 Jan 91

was placed against the leads, with a level used to plumb the vertical leg of
the triangle.

      b.  Alignment of the pile along a line perpendicular to the axis of
the dam was being accomplished by "eye-balling" the leads.  Since a slight
error in alignment would lead to pile interference, this method of alignment
was not acceptable.

      c.  The Contractor was observed to be picking piles up at their ends
in lieu of the specified one- and two-point pick up locations shown on the
drawings.  This method of pick up was causing excessive sweep in the piles.

      d.  Piling were being dragged one pile at a time with a front end
loader from the storage area to the driving area.  The lifted end of the pile
was approximately 4 feet above the ground.  This method of transport, along
with improper storing, was causing damage to the piles.  Permanent sweep of
magnitudes 1-1/2 to 2 feet was observed on some of the piles.

      e.  During driving, the pilings were supported at the hammer and at
the ground with no intermediate support point in the leads.  Therefore, the
piles which were 90-108 feet long had a tendency to buckle during driving.
This buckling had the effect of increasing alignment problems.

    It was concluded that the driving difficulties were caused by pile inter-
ference.  Pile interference resulted from piles being driven off-line and/or
driving of piles having substantial sweep caused by improper handling.  The
Contractor was directed to take the following remedial measures:

      a.  Use a transit to set the alignment of the piling perpendicular
to the axis of the dam.  Set up a transit on the pile-driving line, and by
shooting the top and bottom of the leads, bring the pile into alignment.

      b.  Prior to driving, straighten all piles having more than 6" of
sweep.

      c.  Revise all pile handling operations utilizing the one- and two-
point pick ups shown on the plans.

      d.  Handle the piles such that deflections and/or bending stresses
are resisted by the strong axis of the pile.

      e.  Add an additional pile support in the leads to support the piles
at their midpoints.

IX.  <u>Piles Hitting Refusal</u>.

    Within the next several weeks after the above remedial measures were put
into effect, additional piles hit refusal during driving.  The pattern of re-
fusal was very erratic.  Piles adjacent to refused piles could possibly be
driven to grade with no problem.  On some occasions, refused piles could be
pulled and redriven to grade within 1.5 feet of the original location.
Average time of driving was approximately 7 minutes.

    About this time several theories were developed as to the reasons for
pile refusals; 1) the piles were refusing due to obstructions in the

foundation; 2) the vibratory hammer was delivering insufficient energy to the
pile tip; 3) or a combination of the above. Because of all these uncertain-
ties, William A. Loftus, an expert in the field of pile driving was brought in
by the New Orleans District for advice on the problem of pile refusals. After
visiting the site and observing the Contractor's pile driving operations,
Mr. Loftus made the following observations and recommendations:

      a. The corrective measures that were placed upon the Contractor had
resulted in adequate control of pile alignment and placement. The possibility
that sand densifications and obstructions in the sand stratum, such as gravel
layers were more likely than had been expected from the pile tests and borings
could be the cause of early pile refusal.

      b. A load test of an in-place pile that reached early refusal
should be made to determine the capacity.

      c. Large diameter borings should be taken to determine the extent
and size of gravel which was suspected as a cause of pile refusal.

    The above recommendations were adopted, and six large-diameter borings
were taken using a 3-inch spiltspoon and a 6-inch core barrel. Gravel zones
were found to exist below elevation -85. The average size of gravel was
3/4 to 1-1/2 inches. Gravels larger than 2-1/2 to 3 inches were uncommon;
however, cobbles as large as 4 inches were encountered. The original design
borings were small diameter borings and could not detect these cobbles.

    About 15 percent of the 2,376 piles in the dam foundation (excluding the
shorter stilling basin piles which were not a problem) reached refusal above
grade. Slightly less than 10 percent of the piles were cut off. Typically,
about 20 feet of piling was cut off with the maximum being 40 feet. Shoes
were used on about 10 percent of the piles. Compression and tension pile load
tests were performed on a service pile that was cut off 12 feet above grade
and a service pile that was driven to grade, and an evaluation of the as-built
pile foundation with actual pile lengths was accomplished. This evaluation
concluded that the pile foundation was safe and provided an adequate degree of
stability for the dam monoliths.

X. <u>Conclusions</u>.

    In reviewing the history of the pile tests, the driving procedure, the
design, and the specifications for the Phase II and Phase III contracts for
Lock and Dam No. 1, there are several factors that led to the many problems
encountered during the pile driving operations. A sample pile specification
which attempts to remedy these problems, is included as an attachment. This
attachment was developed solely for this particular case history. Future
projects should utilize the guide specification with appropriate modifications
as necessary.

    A. Factors Leading to Problems:

    The vibratory hammer was very efficient in driving the piles to grade,
but apparently reduced the capacity of the test piles. The phenomenon which
causes this apparent loss of capacity is unknown, but there was sufficient
evidence in the retests that showed a growth of pile strength with time.

Add160

EM 1110-2-2906
15 Jan 91

Secondly, the Contractor started driving piling with very poor alignment and quality control procedures.  This undoubtedly led to pile interference problems.

Thirdly, there existed cobbles in the foundation which were undetected by the original small diameter bore holes.  These cobbles were the cause of early pile refusals after the Contractor's pile driving procedures were improved.

B. Vibratory Hammer:

The vibratory hammer is a very efficient device for driving piles and therefore it's use reduces pile driving costs.  In addition to the driving economics of the vibratory hammer in a sand foundation, the hammer has other good attributes.  These attributes include reduced noise, alignment control since the hammer grips the pile at its butt, and easier pile extraction since the hammer can be used without rerigging.  Consequently, we should not indiscrimently prohibit its use.  However, until further data are obtained for the vibratory hammer relative to reduced pile capacity, it is recommended that specifications allow the Contractor the option to use a vibratory hammer or a combination of the vibratory hammer with an impact hammer used for seating the piles with the following qualifications:

1.  The Contractor perform duplicate pile tests for the vibratory hammer at his expense.

2.  If increased pile lengths are required because of the vibratory hammer, the Contractor should bear the cost of the added lengths (specifications for the Old River Auxiliary Structures contained these stipulations).

C.  Handling and Driving Piles:

It is extremely important that proper care should be taken in setting batters and aligning the piles.  This is particularly important in congested pile foundations where a slight misalignment may cause pile interference.  The specifications should require piles to be driven within a tolerance of 1/4 inch per linear foot of piling.

1.  Piles with excessive sweep should be straightened before driving.

2.  Intermediate supports in the leads should be provided to restrain piles from buckling during driving.

3.  Care should be taken during driving, storing, handling, and transporting piles to avoid damage to the piling.

D.  Sufficient Soils Data:

It seems that in the design of any foundation, there can never be too much information on the stratigraphy.  A pile foundation is no exception. Where there is evidence of gravel layers or cobbles, it is recommended that large-diameter borings be taken to determine the extent and size of the gravel or cobbles.

Add161

E.  Pile Refusal:

Refusal of piling in most instances is an indication of extreme point
bearing capacity.  Therefore, unless pile interference or a malfunctioning
hammer system is suspected and the piling is not an uplift (tension) pile, it
may be acceptable to cutoff the pile.  For the refusal of tension piles,
consideration has to be given to the number of piles that refuse, the required
capacity and what reduction in safety factors can be accepted.  If a large
percentage of piles reach refusal, then an in situ pile test or changes in
pile driving, e.g., hammer type of size, or use of pile shoes may be neces-
sary.  However, since construction delays are inherent in testing and the
associated costs to the Contractor and to the Government are very high, this
procedure should be used only when absolutely necessary.

F.  Layout of Pile Foundation:

In the structural design and layout of the pile foundation, piles should
be adequately spaced to allow for some pile drift.  Although good pile
alignment and batter can be achieved in the leads, it is virtually impossible
to control or detect pile drift in the ground.  It is recommended that the
specified tolerance of 1/4 inch per linear foot of pile be used to determine
the minimum pile spacing.  Thus, if piling were 100 feet long, a minimum clear
spacing of 50 inches would be provided to allow for the tolerance in each of
the piles (2 x 100' x 1/4").

ATTACHMENT

SECTION 2I - STEEL H-PILES

PART 1 - GENERAL

1.  SCOPE.  The work covered by this section consists of furnishing all
plant, equipment, labor, and materials and performing all operations in con-
nection with the installation of steel H-piles in accordance with these
specifications and applicable drawings.  Tension anchors are covered under
SECTION 5J.  The pile load and driving test program is covered in SECTION 2K.

2.  QUALITY CONTROL.

2.1  General.  The Contractor shall establish and maintain quality control
for all operations to assure compliance with contract requirements and main-
tain records of his quality control for all construction operations, including
but not limited to the following:

      (1)  Material
      (2)  Storing and handling
      (3)  Placing (location, alignment, etc.)
      (4)  Driving and splicing
      (5)  Cutting

2.2  Reporting.  The original and two copies of these records and tests,
as well as corrective action taken, shall be furnished to the Government
daily.  Format of the report shall be as prescribed in SP-16.

3.  APPLICABLE PUBLICATIONS.  The following publications of the issues
listed below, but referred to thereafter by basic designation only, form a
part of this specification to the extent indicated by the references thereto:

3.1  American Society for Testing and Materials (ASTM) Standards.

     A 36-77a                    Structural Steel

3.2  American Institute of Steel Construction (AISC).

     Manual of Steel Construction, 9th Edition

4.  SUBMITTALS.

4.1  Equipment Descriptions.  The Contractor shall submit complete de-
scriptions of pile driving equipment, including hammers, extractors, and other
appurtenances to the Contracting Officer for approval 45 days prior to com-
mencement of work.

4.2  Handling and Storage Plans.  Proposed methods of handling and stock-
piling the piles shall comply with requirements of 2I-6.4 and 2I-6.5 and shall
be submitted in detail to the Contracting Officer for review and approval at
least 45 days prior to delivery of the production piles to the job site.

4.3  Control of Placement.  Proposed methods of controlling the location
and alinement of the production piles shall comply with requirements of 2I-6.6

and shall be submitted in detail to the Contracting Officer for review and approval at least 45 days prior to driving the first production pile.  Description of the alinement controls shall include the proposed methods of controlling the pile batter, the vertical plumbness, and rotation of the pile about the longitudinal centerline of the web.

4.4  <u>Driving Record</u>.  The Contractor shall furnish daily to the Contracting Officer a copy of all driving data required in 2I-6.7.1.  Unusual driving conditions, interruptions or delays during driving, and any other information associated with the pile driving operations shall be noted.  The records shall be submitted in triplicate (original and two copies).

PART 2 - PRODUCTS

5.  MATERIALS.

5.1  <u>Steel</u>.  Steel for H-piles and splice plates shall conform to the requirements of ASTM A 36.

5.2  <u>Steel H-Piles</u>.  Steel H-piles shall be of the shape and sections shown on the drawings.  Piles shall have standard square ends, unless otherwise specified or directed.  Lengths of piles shall be determined as specified below in 2I-6.3.1.

5.3  <u>Pile Points</u>.  Pile points shall be Pruyn H-Pile Points, Type BP-75750, or approved equal.

5.4  <u>Steel H-Pile Splices</u>.  Pile splice plates shall conform to details shown on the drawings.  All welding shall be performed by certified welders as specified in SECTION 5E.  The Government will test select splices by nondestructive methods.

5.5  <u>Pile Tension Anchors</u>.  Pile tension anchors shall conform to details shown on the drawings.  The Government will test the capacity of select tension anchors.

PART 3 - EXECUTION

6.  INSTALLATION.

6.1  <u>Pile Driving Equipment</u>.  <u>Pile driving hammers shall be steam, air or diesel operated impact, single-acting, double-acting or differential acting type</u>.  Vibratory hammers will be allowed provided applicable requirements of SECTION 2K are satisfied.  The production piles shall be driven with the same size and type hammer, operating with the same effective energy and efficiency as used in driving the steel test piles (which are covered in SECTION 2K). All pile driving equipment and appurtenant items shall be equal to that used in the test pile driving operations.  The size or capacity of hammers shall be as recommended by the manufacturer for the pile weights and soil formation to be penetrated.  Impact hammers shall have a minimum energy of 24,000 ft-lb for 14-inch H-piles and 19,500 ft-lb for 12-inch H-piles.  The hammers shall be operated at all times at the speed and conditions recommended by the manufacturer.  Boiler, compressor, or engine capacity shall be sufficient to operate the hammer continuously at full rated speed and inlet pressures.  Once the actual driving has begun, all conditions (such as alinement, batter,

EM 1110-2-2906
15 Jan 91

cushions, etc.) shall be kept as constant as possible. Hammers shall have
firmly supported leads extending to the lowest point the hammer must reach.
In order to reduce the unbraced length of the pile during driving, the
Contractor shall provide <u>intermediate support for the pile in the leads at no
additional cost to the Government</u>. The Contractor shall submit details on
intermediate supports to the Contracting Officer for approval.

6.2 <u>Test Piles</u>. All work associated with the required pile tests is
covered in SECTION 2K.

6.3 <u>Permanent Production Piles</u>.

6.3.1 <u>Lengths</u>. The estimated quantities of piles listed in the unit
price schedule are given for bidding purposes only. The Contractor shall not
order piling until he receives a quantities list from the Contracting Officer
as specified below. <u>The Contracting Officer will determine the actual lengths</u>
of production piles required to be driven below cut-off elevation for the
various locations in the work and will furnish the Contractor a quantities
list which indicates lengths and locations of all piles to be placed. This
determination will be made from the results of the pile driving and load tests
performed as specified in SECTION 2K of this specification and will be pro-
vided to the Contractor as specified in SECTION 2K. Piling shall be furnished
full length. <u>Splicing of piling to make up the required lengths will not be
permitted</u>. The Contractor's schedule shall be established to assure timely
accomplishment of the pile tests, an essential item along the critical path.

6.4 <u>Storing</u>. Steel H-piles stored at the job site shall be stored on a
level surface in an area that will not pond water and the piles shall be
stacked in such a manner that all piles have uniform support along their
length without sagging or bending. If it is not feasible to store the piles
on a hard level surface, hardwood blocking shall be laid in such a manner so
that piles are brought to level. Blocking shall be spaced at distances suf-
ficiently short to prevent sagging or bending. In no case shall blocking be
more than 10 feet apart nor more than 2 feet from the ends of the pile. The
method of stacking shall not result in damage to the pile or excessive sweep
or camber. Plan for storing H-piles shall be submitted as specified in
2I-4.2.

6.5 <u>Handling</u>. Pick-up points for steel H-piles shall be as shown on the
drawings and shall be plainly marked on all piles. All lifting shall be done
at these points. All lifting, except for lifting the pile into the driving
leads, shall be accomplished using a two point pick-up. A one point pick-up
may be used for lifting the pile into the driving leads. Pick-up devices
shall be of the type that clamp to both pile flanges at each pick-up point.
Use of alternate types of pick-up devices shall be subject to approval by the
Contracting Officer. Burning holes in flanges or webs for handling shall not
be permitted. During on-site transporting of piles, the piles shall be main-
tained in a straight position and shall be supported, as a minimum, at the
quarter points. Dragging of piles across the ground shall not be permitted.
Before the piles are transported from the stockpile area to the driving area,
all piles shall be inspected for damage and excessive sweep and camber in
accordance with these specifications and the drawings. The web and flanges of
the piles shall be checked by rotating the pile with the pile resting on a
firm level surface. A pile which has camber and/or sweep greater than
2 inches shall be rejected and shall not be transported to the driving areas.

Case: 14-1228 Case: 14-1228 Document: 23 Page: 237 Filed: 04/23/2014 Page: 237 Filed: 04/23/2014

A pile which is damaged and which in the opinion of the Contracting Officer is unusable, will be rejected, and shall not be transported to the driving areas. After the piles are delivered to the driving area, they shall be checked again, visually, to insure that damage has not occurred during handling and transporting from the stockpile area to the driving area. Any pile which is damaged and which damage, in the opinion of the Contracting Officer, renders the pile unusable and/or which contains excessive sweep or camber, as defined above, shall be replaced by a new pile at no additional cost to the Government. Proposed methods of handling shall be submitted as specified in 2I-4.2.

6.6  <u>Placement</u>.  Piles shall be accurately placed in the correct location and alinements, both laterally and longitudinally and to the vertical or batter lines as shown on the contract drawings.  To insure correct placement of piles, the Contractor shall establish a rectangular grid system by use of a surveying instrument having at least the accuracy of a one-second Theodolite. The Contractor shall check each pile, prior to driving and with the pile head seated in the hammer, for correct batter, vertical plumbness, and rotation of the pile about the centerline of the web.  The vertical plumbness of the pile shall be checked with a surveying instrument having at least the accuracy of a one-second Theodolite to insure that the pile is being driven parallel to the grid line in the direction of the pile batter.  A lateral deviation from <u>the correct location at</u> the cut-off elevation of not more <u>than 3 inches will be</u> permitted.  A vertical deviation from the correct cut-off elevations shown on the drawings of not more <u>than +2 inches will</u> be permitted.  A variation in alinement of not more <u>than 1/4-inch per foot of longitudinal axis will be permitted</u>.  Moving the pile by rotating the leads, pulling on the pile, and wedging the pile will not be allowed.  If, during driving, the pile shifts or otherwise moves beyond the specified tolerances, the Contractor may be required to pull and redrive the pile as directed by the Contracting Officer. Piles which are misplaced shall be pulled and redriven at no additional cost to the Government.  Any voids that remain after pulling misplaced piles shall be filled with sand, and all costs related thereto shall be borne by the Contractor.

6.7  <u>Pile Driving</u>.

6.7.1  <u>Driving</u>.  No piling shall be driven <u>within 100 feet of any concrete structure, unless authorized</u> by the Contracting Officer.  A complete and accurate record of the driving of piles as specified in 2I-4.4 shall be compiled by the Contractor for submission to the Contracting Officer.  This record shall include pile dimensions and locations, the description of hammer used, rate of hammer operation, for impact hammers the number of blows required for each foot of penetration throughout the entire length of each pile, for vibratory hammers the cumulative time of penetration at five foot intervals shall be recorded throughout the entire length of each pile, butt elevation upon completion of driving and any other pertinent information requested by the Contracting Officer.  When driving long piles of high slenderness-ratio, special precautions shall be taken to insure against overstressing and leading away from a plumb or true position.  During driving, pile driving hammers shall be operated at all times at the speed, inlet pressure, and conditions recommended by the hammer manufacturer.  Each pile shall be driven continuously and without interruption to the minimum required depth of penetration.  Deviation from this procedure will be permitted only for cases where interruptions due to splicing as described below or the driving is stopped by causes which reasonably could not have been anticipated.  If the pile is

Add166

EM 1110-2-2906
15 Jan 91

driven with an impact hammer to the minimum depth of penetration but the
minimum penetration per blow has not been attained, the pile shall be driven
deeper as necessary to attain the minimum penetration per blow.  The minimum
penetration per blow will be determined by the Contracting Officer upon
completion of the pile tests.  A pile which has not reached the minimum
penetration rate per blow when the top has been driven to the cut-off eleva-
tion shall be spliced as shown on the drawings and driven to a depth suffi-
cient to develop the minimum penetration rate per blow.  All pile splices
shall be fabricated by qualified welders.  For impact hammers, when the maxi-
mum permissible blows of <u>17 blows per inch for 3 consecutive inches (single-
acting)</u> or <u>20 blows per inch for 3 consecutive inches (double-acting)</u> is
reached above the minimum tip elevation, the pile shall be pulled and redriven
or shall be cut off and either used or abandoned, as directed by the Contract-
ing Officer.  For vibratory hammers, when the tip does not move more than
0.1 foot per minute, the Contractor shall immediately attempt driving of the
pile with an impact type hammer conforming to 2I-6.1.  If redriving is neces-
sary, piles shall be redriven at a site specified by the Contracting Officer.
Piles which have been uplifted after driving shall be redriven to grade after
conclusion of other driving activity in that general area.  if backdriving is
required an equitable adjustment in contract time and price will be made in
accordance with the General Provision Clause "Changes".  Jetting shall not be
used to assist driving the piles.  Pile points shall be installed only when
directed by the Contracting Officer.  Method of installation shall be as
recommended by pile point manufacturer.

6.7.1.1.  The Contracting Officer may require that any pile be pulled for
inspection.  Any pile which is damaged because of internal defects or by im-
proper handling or driving or is otherwise damaged so as to impair it for its
intended use, shall be removed and replaced.  Piles pulled at the direction of
the Contracting Officer and found to be in suitable condition shall be re-
driven to the required depth at a site specified by the Contracting Officer.
Any pile that cannot be driven to the required depth because of an obstruction
shall be pulled and redriven at a site specified by the Contracting Officer.
Payment for pulled piles will be made in accordance with 2I-8.3.

7.  MEASUREMENT.

7.1  <u>Steel H-Piles</u>.  Measurement for furnishing and delivering steel
H-piles will be made by the linear foot for steel H-piles acceptably delivered
at the site.  Steel H-piles driven with an impact hammer will be measured for
payment on the basis of lengths along the axis of the pile in place below the
cut-off elevation.  Steel H-piles driven with a vibratory hammer will be
measured for payment on the basis of pile lengths determined from the testing
program for piles driven with an impact hammer, see SECTION 2K.  Pile lengths
will be measured to the nearest tenth of a foot.

8.  PAYMENT.

8.1  <u>Furnishing and Delivering Piles</u>.  Payment for furnishing and deliver-
ing steel H-piles, at the site, will be made at the applicable contract unit
prices for:

"Furnish and Deliver Steel H-Piles (HP 14 x 89)",
"Furnish and Deliver Steel H-Piles (HP 14 x 73)", and
"Furnish and Deliver Steel H-Piles (HP 12 x 53)".

C-20

Add167

Payment for furnishing and delivering will be made after proper storage of the piling.

8.1.1 <u>Driving Piles</u>. Payment for the measured length of each pile acceptably driven will be made at the applicable contract price per linear foot for "Drive Steel H-Piles (HP 14 x 89)", "Drive Steel H-Piles (HP 14 x 73)", and "Drive Steel H-Piles (HP 12 x 53)". These prices shall include all items incidental to driving the piles and cutting off all piles at the cut-off elevation. Payment for furnishing and installing tension anchors will be made according to SECTION 5J. No additional payment will be made for the use of an impact hammer on piles which have refused with a vibratory hammer. Payment for furnishing and driving test piles will be made according to SECTION 2K.

8.2 <u>Reserved</u>.

8.3 <u>Pulled Piles</u>.

8.3.1 <u>Undamaged Pile</u>. Piles which are pulled at the direction of the Contracting Officer and found to be in good condition will be paid for at the applicable contract unit price for "Furnish and Deliver Steel H-Piles" and "Drive Steel H-Piles" in its original driven position. The cost of pulling and backfilling with sand, if applicable, will be paid for at the applicable contract unit price for "Drive Steel H-Piles". Such pulled piles when re-driven will be paid for at the applicable contract unit price for "Drive Steel H-Piles".

8.3.2 <u>Damaged Pile</u>. Where a pile is pulled and found to be defective and or damaged due to Contractor negligence or internal defects, no payment will be made for either originally furnishing and driving such pile or for the operation of pulling and backfilling with sand, if applicable, and it shall be replaced by a new pile which will be paid for at the applicable contract unit prices. Piles which are pulled and found to be damaged through no fault of the Contractor will be paid for the applicable contract unit price for "Furnish and Deliver Steel H-Piles" and "Drive Steel H-Piles" in its originally driven position. The cost of pulling and backfilling with sand, if applicable, will be paid for at the applicable contract unit price for "Drive Steel H-Pile". A new pile shall be driven in place of the defective and/or damaged pile and will be paid for at the applicable contract unit prices.

8.4 <u>Steel H-Pile Splices</u>. For each pile splice directed by the Contracting Officer, payment will be made at the rate of $200 per splice. This price shall include the cost of furnishing all plant, labor and material required to make the directed splices.

8.5 <u>Pile Points</u>. If pile points are required, as directed by the Contracting Officer, payment will be made at the rate of $150 per pile point. This price shall include all costs incidental to furnishing and properly installing the pile points on the pile.

EM 1110-2-2906
15 Jan 91

APPENDIX D

PILE CAPACITY COMPUTATIONS

EM 1110-2-2906
15 Jan 91

D-1. <u>General</u>. After the shear strength and stratification has been selected, the capacity of piles may be computed. The geotechnical engineer computes the capacity of a single pile placed in the subgrade at various levels, then furnishes to the structural engineer a curve relating the pile tip elevation to the axial capacity. These computations may be for any number of pile types, i.e., timber, concrete, steel H-pile, etc., and the computations should be both in the construction shear strength case Q and the long-term shear strength case S. Therefore, two curves for each compression and tension loading will be produced and the designer should use the lowest composite in selecting an allowable load.

D-2. <u>Example Computations</u>. Included are examples for soil profiles consisting of soft clay, sand, silt, and alternating layers. To reduce the number of computations, a timber pile at a single tip elevation is shown. These computations must be made at each change in soil property and at a close enough interval to describe the curve mentioned in Paragraph D-1. In the examples, each of the various tip elevations used a timber pile having a 12-inch butt diameter and a 7-inch tip diameter, with the butt driven flush to the ground surface.

   a. Uniform Clay Profile. This example was developed for a bottom of slab elevation of +10.0 feet.* Using the shear strengths from the laboratory testing, two shear strength trends are developed. The example trend is shown below:

<u>Average Laboratory Test Results</u>

| Elevation ft | $\phi°$ | Q Case $\gamma$ (pcf) | Q Case c (psf) | $\phi°$ | S Case $\gamma$ (pcf) | S Case c (psf) |
|---|---|---|---|---|---|---|
| 10.0 to 0.0 | 0 | 110 | 400 | 23 | 110 | 0 |
| 0.0 to −15.0 | 0 | 48* | 600 | 23 | 48* | 0 |
| −15.0 to −20.0 | 0 | 42* | 650 | 23 | 42* | 0 |
| −20.0 to −30.0 | 0 | 40* | 800 | 23 | 40* | 0 |
| −30.0 to −60.0 | 0 | 38* | 900 | 23 | 38* | 0 |

   *The unit weight below the water table at elevation 0.0 (NGVD) is the submerged weight.

   (1) Example computation for soft clay in the "Q" case for a single tip elevation of −30.0 using a timber pile having butt diameter of 12 inches and tip diameter of 7 inches. This will be the computation for a single point on a pile capacity vs. tip elevation curve. It is based upon the data above which therefore means that the pile length is 40 ft.

   (a) Compute pile skin friction "Q" case. Computations will be by layer due to property variation computed as follows:

---

*All elevations (el) cited herein are in feet referred to National Geodetic Vertical Datum (NGVD) of 1929.

Case: 14-1228 Case: 14-PARTICIPANTS ONLY Document: 22 Filed 04/23/2014 Page: 242 Filed: 04/23/2014

$$Q_s = \sum_{i=1 \text{ to } N} f_{s_i} A_{s_i}$$

To compute the average diameter of the tapered timber pile the following
equation is used.

$$d_{i_A} = d_t + \frac{L(d_B - d_t)}{B}$$

where:

$d_{i_A}$ = diameter at the midpoint of the layer being computed

$d_t$ = diameter of pile tip

$d_B$ = diameter of pile butt

$L$ = length from pile tip to midpoint of layer

$L_t$ = total length of pile

Layer from elevation +10.0 to elevation 0.0

Average pile diameter = $7 + \dfrac{35(5)}{40}$ = 11.375 inches

$\Delta Q_s$ = $\pi$ · Avg. Diameter · Length · Cohesion · Adhesion reduction factor

obtained from Figure 4-3

Increment of skin friction

$\Delta Q_s = \pi \dfrac{11.375}{12} (10)(400)(1)$ = 11,911 pounds

Layer from elevation 0.0 to elevation -15.0

Average pile diameter

$d = 7 + \dfrac{22.5(5)}{40}$ = 9.813 inches

D-4

Add171

$\alpha$  from Figure 4-3 is 0.95

Increment of skin friction

$$\Delta Q_s = \pi \ \frac{9.813}{12} \ (15') (600) (0.95) = 21,965 \text{ pounds}$$

Layer from elevation −15.0 to elevation −20.0

Average pile diameter

$$d = 7 + \frac{12.5(5)}{40} = 8.563 \text{ inches}$$

Increment of skin friction

$$\Delta Q_s = \pi \ \frac{8.563}{12} \ (5)(650)(1.9) = 6,556 \text{ pounds}$$

Layer from elevation −20.0 to elevation −30.0

Average pile diameter

$$d = 7 + \frac{5(5)}{40} = 7.625 \text{ inches}$$

Increment of skin friction

$$\Delta Q_s = \pi \ \frac{7.625}{12} \ (10)(800)(.8) = 12,712 \text{ pounds}$$

$$Q_s = \sum_{1-4} \Delta Q_s = 54,295 \text{ lb} = 27.15 \text{ tons}$$

EM 1110-2-2906
15 Jan 91

$$Q_{S_{Allow}} = \frac{Q_s}{FS} = \frac{27.15 \text{ tons}}{2.0} = 13.57 \text{ tons}$$

    (b)  Compute end bearing "Q" case with pile tip at elevation -30.0 using the equations:

$$q = 9C$$

$$Q_T = A_T q$$

where:

      C = shear strength

      $A_T$ = tip area

$$Q_T = 9.0(800) \frac{\pi(7/12)^2}{4} = 1,924.23 \text{ lb} = 0.962 \text{ tons}$$

$$Q_{T_{Allow}} = \frac{Q_T}{FS} = \frac{0.962}{2.0} = 0.48 \text{ tons}$$

The allowable "Q" case Compression soil/pile load with the pile tip at elevation -30.0 using a safety factor of 2.0 in the "Q" case is computed as follows:

$$Q_{A_{-30}} = Q_{S_A} + Q_{T_A} = 14 \text{ tons}$$

The allowable "Q" case tension soil/pile load with the pile tip at elevation -30.0 using a safety factor of 2.0 in the "Q" case is computed as follows:

$$Q_{A_{-30}} = Q_{S_A} \times k_T = 13.57 \text{ tons} \times 1.0 = 14 \text{ tons}$$

    (2)  Example computation for the "S" case capacity with all factors as in (1).  This will compute a single point upon the "S" case portion of the curve pile capacity vs. tip elevation.  The effective overburden pressure at any point has to be computed at any point in the soil profile, this is presented herein on page D-21, using the soil properties presented in the table above.

    (a)  Compute Skin Friction "S" case.  Computations will be by the layer due to property variations as follows:

Add173

EM 1110-2-2906
15 Jan 91

$$Q_s = \sum_{i=1 \text{ to } N} f_{s_i} A_{s_i}$$

where:

$f_s = ks_u$

$s_u = \gamma'D \tan \phi + C$

Layer from elevation +10.0 to elevation 0.0

Average pile diameter  d = 11.375 inches (see previous computation)

Average strength (Note a reduction factor to the angle-of-internal friction  $\phi$ is normally considered necessary to obtain  $\delta$). See Table 4-2 for values of  $\delta$  to use.  A reduction factor value of 1.0 is used herein.  The engineer has to use judgement and load test results to find the range of  $\delta$  for the area in which the work is being performed.

$$s_u = \frac{1,100 \tan 23°}{2} + 0 = 233.46 \text{ psf}$$

$s_u = 233.46$ ,  $f_s = k\sigma'v = 233.46$ psf

Increment of skin friction

$$\Delta Q_s = \pi \frac{11.375}{12} (10)(233.46) = 6,952.4 \text{ pounds}$$

Layer from elevation 0.0 to elevation -15.0

Average pile diameter  d = 9.813 inches

Average strength

$$s_u = \frac{1,100 + 1,820}{2} \tan 23° = 619.73$$

$f_s = k\sigma'v = 619.73$

Add174

EM 1110-2-2906
15 Jan 91

Increment of skin friction

$$\Delta Q_s = \pi \, \frac{9.813}{12} \, (15)(619.73) = 23,880.43 \text{ pounds}$$

Layer from elevation -15.0 to elevation -20.0

Average pile diameter  $d = 8.563$ inches

Average strength

$$s_u = \frac{1,820 + 2,030}{2} \, \tan 23° = 817.11 \text{ psf}$$

$f_s = 817.11$ psf

Increment of skin friction

$$\Delta Q_s = \pi \, \frac{8.563}{12} \, (5)(817.11) = 9,158.94 \text{ pounds}$$

Layer from elevation -20.0 to elevation -30.0

Average pile diameter  $d = 7.625$ inches

Average strength

$$s_u = \frac{2,030 + 2,430}{2} \, \tan 23° = 946.58 \text{ psf}$$

$f_s = 946.58$ psf

Increment of skin friction

$$\Delta Q_s = \pi \, \frac{7.625}{12} \, (10)(946.58) = 18,895.82 \text{ pounds}$$

Add175

$$Q_s = \sum_{i=1 \text{ to } N} \Delta Q_s = 58,887.6 \text{ lb} = 29.44 \text{ tons}$$

$$Q_{s_{\text{Allowable}}} = \frac{Q_s}{FS} = 14.72 \text{ tons}$$

(b)  Compute end bearing in the "S" case with the pile tip at elevation -30.0 using the equations:

$$q = \sigma'_v N_q$$

$$Q_T = A_T q$$

where:

$N_q$ = Terzaghi's bearing factor for  $\phi$ = 23°

$N_q$ = 10 (from "Terzaghi and Peck," Figure 4-2)

Area of tip = $A_T = \pi \dfrac{7/12^2}{4} = 0.267$ sq ft

$Q_T = (0.267)(2430)(10) = 6,488.1 \text{ lb} = 3.24 \text{ tons}$

$$Q_{s_{\text{Allowable}}} = \frac{Q_s}{FS} = 1.62 \text{ tons}$$

The allowable "S" case compression soil/pile load with the pile tip at elevation -30.0 using a safety factor of 2.0 in the "S" case is computed as follows:

$$Q_{A_{-30}} = Q_{S_A} + Q_{T_A} = 16.34 \text{ tons}$$

The allowable "S" case tension soil/pile load at elevation -30.0 tip, using a safety factor of 2.0 in the "S" case is as follows:

$$Q_{A_{-30}} = Q_{S_A} \times k_T = 14.72 \times 0.7 = 10.3 \text{ tons}$$

(3)  Negative skin friction is directly addressed in other areas of this text and should be accounted for in any actual computation.  Negative skin friction may occur, especially in the long-term, drained shear strength case. The soils engineer will estimate this load and furnish it to the structural engineer to be included into the applied loads.

D-9

EM 1110-2-2906
15 Jan 91

    e.  Uniform Medium Density Sand Profile.  This example was also developed
for a bottom slab/ground line elevation of +10.0 feet, using the shear
strengths from laboratory testing on a sand classified SP-F the shear strength
trends shown below were developed.

<p align="center">Average Laboratory Test Results</p>

| Elevation (ft) | $\phi$ (degrees) | $\gamma'$ (pcf) | c (psf) |
|---|---|---|---|
| 10.0 to 0.0 | 30 | 122 | 0 |
| 0.0 to -60.0 | 30 | 60* | 0 |

    *The unit weight below the water table at el 0.0 is submerged
     weight.

    (1)  Example computation for sand using a single-pile tip elevation of -
30.0 and a timber pile having butt diameter of 12 inches and tip diameter of
7 inches.  This is a single point computation in a series to form a curve of
pile tip elevation vs. pile capacity.  This computation requires a 40 ft pile
from elevation +10.0 to elevation -30.0.

    (a)  Compute the overburden pressure at the pile  $\sigma'_v = \gamma D$  as shown in
the computer example on Page D-24.  Applying the critical depth limiting value
criterion of  D/B = 15 , the critical depth is 15 feet, taking  B  to be the
butt diameter.  Therefore,  $\sigma'_v$  is zero at the surface, 1,220 psf at eleva-
tion 0.0, and 1,520 psf at limit depth.

The angle of internal friction  $\phi$  is reduced in some cases by  $\delta$  shown in
Table 4-3.  In this example  $\delta$  is taken as 1.0, which is based upon engineer-
ing judgement, the pile material and pile load tests in this area.

    (b)  Compute pile skin friction.  Computations will be by layer due to
property variations, as follows:

$$Q_s = \sum_{i=1 \text{ to } N} f_{s_i} A_{s_i}$$

where:

$$f_{s_i} = k s_u$$

$$s_u = \gamma' D \tan \phi + c$$

Layer from elevation +10.0 to elevation 0.0

$$\text{Average pile diameter} \quad d = 7 + \frac{35(5)}{40} = 11.375 \text{ inches}$$

Average strength of sand  $s_u$

$$s_u = \frac{0 + 1,220}{2} \tan 30° + 0 = 352.18 \text{ psf}$$

$$f_s = ks_u = 352.18 \text{ psf}$$

Increment of skin friction

$$\Delta Q_s = \pi \frac{11.375}{12} 10(352.18) = 10,487.83 \text{ pounds}$$

Layer from elevation 0.0 to elevation -5.0

Average pile diameter  $d = 7 + \frac{27.5(5)}{40} = 10.438 \text{ inches}$

Average strength of sand  $s_u$

$$s_u = \frac{1,220 + 1,520}{2} \tan 30° = 790.97 \text{ psf}$$

$$f_s = ks_u = 790.97 \text{ psf}$$

Increment of skin friction

$$\Delta Q_s = \pi \frac{10.438}{12} 5(790.97) = 10,806.78 \text{ pounds}$$

Layer from elevation -5.0 to elevation -30.0

Average pile diameter  $d = 7 + \frac{12.5(5)}{40} = 8.563 \text{ inches}$

Average strength of sand  $s_u$

$$s_u = 1,520 \tan 30° = 877.57$$

Add178

EM 1110-2-2906
15 Jan 91

$$f_s = ks_u = 877.57$$

$$\Delta Q_s = \pi \frac{8.563}{12} (25)(877.57) = 49,108.04 \text{ pounds}$$

$$Q_s = \sum_{i=1 \text{ to } N} \Delta Q_{s_i} = 70,475.0 \text{ pounds}$$

$$Q_s = \begin{array}{c} \\ \sum \\ i=1 \text{ to } N \end{array} \Delta Q_{s_i} = 70,475.0 \text{ pounds}$$

(c) Compute end bearing with the tip at elevation -30.0 using the following equations:

$$q = \sigma'_v N_q$$

$$Q_T = A_T q$$

where:

$N_q$ = Terzaghi's bearing factor for $\phi = 30°$

$N_q = 18$

Compute:

$\sigma'_v = 1,520$ (limit value at D/B =15)

$$A_T = \pi \frac{7/12^2}{4} = 0.2672 \text{ sq ft}$$

$Q_T = 7,311.24$ pounds

The allowable compression soil/pile load with the pile tip at elevation -30.0 using a safety factor of 2.0 will be:

$$Q_{A_{-30}} = \frac{Q_s + Q_T}{FS} = \frac{70,475.00 + 7,311.24}{2(2,000 \text{ lb/ton})} = 19.45 \text{ tons}$$

The allowable tension soil/pile load with the pile tip at elevation -30.0 using a safety factor of 2.0 will be:

D-12

Add179

$$Q_{A_{-30}} = \frac{Q_s \times k_T}{FS} = \frac{70,475(0.7)}{2(2,000 \text{ lb/ton})} = 12.33 \text{ tons}$$

c.  Uniform Silt Subgrade.  This example is developed for a bottom of slab/ground line_elevation of +10.0 feet, using the shear strengths developed from laboratory R testing on a silt (ML).  The "Q" values are from the envelope to the total stress circles, where the "S" values are from the effective stress circles.  The silt used in this example was "dirty" with some clay included.  The shear strength trends are as shown:

<u>Average Laboratory Test Results</u>

| Elevation, ft | "Q" Case | | | "S" Case | | |
|---|---|---|---|---|---|---|
| | $\phi$ (deg) | $\gamma$ (pcf) | c (psf) | $\phi$ (deg) | $\gamma$ (pcf) | c (psf) |
| 10.0 to 0.0 | 15 | 117 | 200 | 28 | 117 | 0 |
| 0.0 to -60.0 | 15 | 55* | 200 | 28 | 55* | 0 |

*The unit weight (?) below the watertable at elevation 0.0 ft is the
 submerged unit weight.

(1)  Example computation for silt in the "Q" case using a pile tip at elevation -30.0 and a timber pile having a butt diameter of 12 inches and a tip diameter of 7 inches.  This is a single point computation in a series to form a curve of pile tip elevation vs. pile capacity.  This computation will use a 40 foot pile to extend from elevation +10.0 to elevation -30.0.

(a)  Compute the overburden pressure at the pile as  $\sigma_v' = \gamma D$  as shown in the computer example on page D-27/28.  Applying the critical depth limiting value criterion of  D/B = 15  we find the critical depth to be 15 feet. Therefore,  $\sigma_v'$  at the surface in zero, at elevation 0.0, it is 1,170 psf, and at the limit depth elevation of -5.0, it is 1,445 psf.

(b)  The angle of internal friction  $\phi$  is reduced by a factor given in Table 4-3 to obtain  $\delta$ .  In this example  $\delta$  is taken as 1.0 for the "Q" case and 0.9 for the "S" case.  The use of reduction factor to obtain  $\delta$  depends upon engineering judgement, the pile material, and the results of pile load tests in the area.

(c)  Compute skin friction "Q" case.  Computations will be by layer due to property variations as follows:

$$Q_s = \sum_{i=1 \text{ to } N} f_{s_i} A_{s_i}$$

where:

$$f_{s_i} = k s_u$$

EM 1110-2-2906
15 Jan 91

$$s_u = \gamma'D \tan \phi + c$$

Layer from elevation +10.0 to elevation 0.0

Average pile diameter  $d = 7 + \dfrac{35(5)}{40} = 11.375$ inches

Average strength of silt  $s_u$

$$s_u = \frac{0 + 1,170}{2} \tan 15° + 200 = 356.72 \text{ psf}$$

$$f_s = ks_u = 356.72 \text{ psf}$$

Increment of skin friction

$$\Delta Q_s = \pi \frac{11.375}{12} (10)(356.72) = 63,738.19 \text{ pounds}$$

Layer from elevation 0.0 to elevation −5.0

Average pile diameter  $d = 7 + \dfrac{27.5(5)}{40} = 10.438$ inches

Average strength of silt  $s_u$

$$s_u = \frac{1,170 + 1,445}{2} \tan 15° + 200 = 550.34 \text{ psf}$$

$$f_s = ks_u = 550.34 \text{ psf}$$

Increment of skin friction

$$\Delta Q_s = \pi \frac{10.483}{12} (5)(550.34) = 7,519.48 \text{ pounds}$$

Layer from elevation −5.0 to elevation −30.0

D-14

Add181

Average pile diameter $\quad d = 7 + \dfrac{12.5(5)}{40} = 8.563$ inches

Average strength of silt $\quad s_u$

$s_u = 1{,}445 \tan 15° + 200 = 587.19$ psf

$f_s = ks_u = 587.19$ psf

Increment of skin friction

$\Delta Q_s = \pi \dfrac{8.563}{12} (25)(587.19) = 32{,}908.97$ pounds

$Q_s = \displaystyle\sum_{i=1 \text{ to } N} \Delta Q_{s_i} = 104{,}166.64$ pounds

   (d)  Compute end bearing in the "Q" case with the pile tip at elevation -30.0 using the following equations:

$q = \sigma'_v N_q$

$Q_T = A_T q$

where:

$N_q$ = Terzaghi's bearing factor at $\phi = 15°$

$N_q = 4$

compute:

$\sigma'_v = 1{,}445$ psf (limit value at $D/B = 15$)

$A_T = \pi \dfrac{7/12^2}{4} = 0.2672$ sq ft

$Q_T = 0.2672(1{,}445)(4) = 1{,}544.42$ pounds

Add182

EM 1110-2-2906
15 Jan 91

The allowable "Q" case compression soil/pile load with the pile tip at elevation -30.0 using a safety factor of 2.0 will be:

$$Q_{A_{-30}} = \frac{Q_S + Q_T}{FS} = 26.43 \text{ tons}$$

The allowable "Q" case tension soil/pile load with the pile tip at elevation -30.0 using a safety factor of 2.0 will be:

$$Q_{A_{-30}} = \frac{Q_S \times K_T}{FS} = 18.33 \text{ tons}$$

(2) Example computation for silt in the "S" case using a single pile tip at elevation -30.0 and a timber pile having a butt diameter of 12 inches and a tip diameter of 7 inches. This is a single point computation in a series to form a curve of pile tip elevation vs. pile capacity. This computation will use a 40-foot pile to extend from elevation +10.0 to elevation -30.0.

(a) The overburden pressure and limit values from the "Q" case example are valid; i.e., elevation +10.0, $\sigma'_v = 0.0$ ; elevation 0.0, $\sigma'_v = 1,170$ psf; elevation -5.0, $\sigma'_v = 1,445$ psf and $D/B_{critical} = 15$ feet.

(b) Compute skin friction "S" case. Computations will be by layer due to property variations as follows:

$$Q_S = \sum_{i=1 \text{ to } N} f_{s_i} A_{s_i}$$

where:

$$f_{s_i} = k s_u$$

$$s_u = \gamma' D \tan \phi + c$$

Layer from elevation +10.0 to elevation 0.0

$$\text{Average pile diameter} \quad d = 7 + \frac{35(5)}{40} = 11.375 \text{ inches}$$

D-16

Add183

Average strength of silt  $s_u$

$$s_u = \frac{0 + 1170}{2} \tan (28° \times .9) + 0 = 275.28 \text{ psf}$$

$f_s = ks_u = 275.28$ psf

Increment of skin friction

$$\Delta Q_s = \pi \frac{11.375}{12} (10)(275.28) = 8{,}197.75 \text{ pounds}$$

Layer from elevation 0.0 to elevation -5.0

Average pile diameter  $d = 7 + \frac{27.5(5)}{40} = 10.438$ inches

Average strength of silt  $s_u$

$$s_u = \frac{1{,}170 + 1{,}445}{2} \tan (28° \times 0.9) = 615.26 \text{ psf}$$

$f_s = ks_u = 615.26$ psf

Increment of skin friction

$$\Delta Q_s = \pi \frac{10.438}{12} (5)(615.26) = 8{,}406.49 \text{ pounds}$$

Layer from elevation -5.0 to elevation -30.0

Average pile diameter  $d = 7 + \frac{12.5(5)}{40} = 8.563$ inches

Average strength of silt  $s_u$

$$s_u = (1{,}445) \tan (28 \times 0.9) = 679.97 \text{ psf}$$

D-17

EM 1110-2-2906
15 Jan 91

$$f_s = ks_u = 679.97 \text{ psf}$$

Increment of skin friction

$$\Delta Q_s = \pi \frac{8.563}{12} (25)(679.97) = 38,108.71 \text{ pounds}$$

$$Q_s = \sum_{i=1 \text{ to } N} \Delta Q_s = 54,712.95 \text{ pounds}$$

(c)  Compute end bearing in the "S" case with the tip of at elevation -30.0 using the following equations:

$$q = \sigma_v' N_q$$

$$Q_T = A_T q$$

where:

$N_q$ = Terzaghi's bearing factor at  $\phi = 28°$

$N_q = 15$

Compute:

$\sigma_v' = 1,445 \text{ psf (limit value of D/B = 15)}$

$$A_T = \pi \frac{7/12^2}{4} = 0.2672 \text{ sq ft}$$

$$Q_T = 0.2672(1,445)(15) = 5,791.56 \text{ pounds}$$

The allowable "S" case compression soil/pile load with the pile tip at elevation -30.0, using a safety factor of 2.0, will be:

$$Q_{A_{-30}} = \frac{Q_s + Q_T}{FS} = 15.13 \text{ tons}$$

D-18

Add185

EM 1110-2-2906
15 Jan 91

The allowable "S" case tension soil/pile load with the pile tip at
elevation -30.0, using a safety factor of 2.0, will be:

$$Q_{A_{-30}} = \frac{Q_s \times K_T}{FS} = \frac{54,712.95(.7)}{2,(2,000 \text{ lb/ton})} = 9.57 \text{ tons}$$

f. Layered Clay, Silt and Sand Subgrade. This example is developed for
a bottom of slab/ground line elevation of +10.0 feet, using the strengths
developed from laboratory testing on the various soil types as follows:

### Average Laboratory Test Results

| Elevation (ft) | "Q" case | | | "S" case | | | Soil Type |
|---|---|---|---|---|---|---|---|
| | $\phi$ (deg) | $\gamma$ (pcf) | c (psf) | $\phi$ (deg) | $\gamma$ (pcf) | c (psf) | |
| +10.0 to 0.0 | 0 | 110 | 400 | 23 | 110 | 0 | CH |
| 0.0 to -12.0 | 15 | 55* | 200 | 28 | 55* | 0 | ML |
| -12.0 to -20.0 | 0 | 38* | 600 | 23 | 38* | 0 | CH |
| -20.0 to -60.0 | 30 | 60* | 0 | 30 | 60* | 0 | SP |

*The unit weight ($\gamma$) below the water table at elevation 0.0 feet is the
submerged weight.

(1) Example computation for a multiplayered soil in the "Q" case using a
single pile tip at elevation -30.0 and a timber pile having a butt diameter of
12 inches and a tip diameter of 7 inches. This is a single-point computation
in a series to form a curve of pile tip elevation vs. pile capacity. This
computation will use a 40-foot pile to extend from elevation +10.0 to eleva-
tion -30.0.

(a) Compute the overburden pressure at the pile as $\sigma'_v = \gamma D$ as shown on
the computer example on Page D-31. It should be noted that the critical depth
limit was applied from the upper surface of the granular layer and not from
the ground surface.

(b) The angle of internal friction $\phi$ is reduced by a factor given in
Table 4-3 to obtain $\delta$. In this example, $\delta$ is taken as 1.0 for both the
"Q" and "S" case. The use of reduction factor to obtain $\delta$ depends upon
engineering judgement, the pile material and results of pile load test in the
area.

(c) Compute Skin Friction "Q" Case. Computations will be by layer due
to material variations as follows:

$$Q_s = \sum_{i=1 \text{ to } N} f_{s_i} A_{s_i}$$

D-19

Add186

EM 1110-2-2906
15 Jan 91

where:

$$f_{s_i} = k s_u$$

$$s_u = \gamma'D \tan \phi + c$$

Layer from elevation +10.0 to 0.0 (clay)

Average pile diameter $\quad d = 7 + \dfrac{35(5)}{40} = 11.375$

Average shear strength $\quad c = 400 \text{ psf} = f_s$

Increment of skin friction

$$\Delta Q_s = \pi \, \frac{11.375}{12} \, (10)(400) = 11{,}911.9 \text{ pounds}$$

Layer from elevation 0.0 to elevation -12.0 (silt)

Average pile diameter $\quad d = 7 + \dfrac{24(5)}{40} = 10.0 \text{ inches}$

$\sigma'_v$ top of stratum $= 10' \times 110 \text{ pcf} = 1{,}100 \text{ psf}$

$\sigma'_v$ bottom of stratum $= 10' \times 110 \text{ pcf} + 12' \times 55 \text{ pcf} = 1{,}760 \text{ psf}$

Average strength in silt $\quad s_u$

$$s_u = \frac{1{,}100 + 1{,}760}{2} \tan 15° + 200 = 583.17 \text{ psf}$$

$$f_s = k s_u = 583.17 \text{ psf}$$

Increment of skin friction

$$\Delta Q_s = \pi \, \frac{10.0}{12} \, (12)(583.17) = 18{,}320.87 \text{ pounds}$$

Add187

EM 1110-2-2906
15 Jan 91

Layer from elevation −12.0 to elevation −20.0 (clay)

Average pile diameter   $d = 7 + \dfrac{23(5)}{40} = 9.875$ inches

Average shear strength   $C = 600$ psf $= f_s$

Increment of skin friction

$\Delta Q_s = \pi \dfrac{9.875}{12} (8)(600)(0.95) = 11{,}788.85$ pounds

Layer from elevation −20.0 to elevation −30.0 (sand)

Average pile diameter   $d = 7 + \dfrac{5(5)}{40} = 7.625$ inches

$\sigma'_v$ top of stratum $= 10' \times 110$ pcf $+ 12' \times 55$ pcf $+ 8' \times 38$ pcf

$= 2{,}064$ psf

$\sigma'_v$ bottom of stratum $= 10' \times 110$ pcf $+ 12' \times 55$ pcf $+ 8 \times 38$ pcf $+ 10'$

$\times 60$ pcf $= 2{,}664$ psf

Average strength of sand   $s_u$

$s_u = \dfrac{2{,}064 + 2{,}664}{2} \tan 30° = 1{,}364.86$ psf

$f_s = k s_u = 1{,}364.86$ psf

Increment of skin friction

$\Delta Q_s = \pi \dfrac{7.625}{12} (10)(1{,}364.86) = 27{,}245.68$ pounds

Add188

EM 1110-2-2906
15 Jan 91

$$Q_s = \sum_{i=1 \text{ to } N} \Delta Q_s = 69{,}887.77 \text{ pounds}$$

    (d) Compute end bearing in the "Q" case with the pile tip at elevation -30.0 using the following equations:

$$q = \sigma_v' N_q$$

$$Q_T = A_T q$$

where:

    $N_q$ = Terzaghi's bearing capacity factor $N_q = 18$ at $\phi = 30$

    $\sigma_v'$ = 2,664 psf (limit value is greater than 10 feet)
    (Refer to paragraph C-2.f(1)(2))

    $A_T = \pi \dfrac{7/12^2}{4} = 0.2672$ sq ft

    $Q_T = 0.2672(2664)(18) = 12{,}812.77$ pounds

The allowable "Q" case compression soil/pile load with the pile tip at elevation -30.0 and a safety factor of 2.0 will be:

$$Q_{A_{-30}} = \frac{Q_s + Q_T}{FS} = 20.53 \text{ tons}$$

The allowable "Q" case tension soil/pile load with the pile tip at elevation -30.0 and a safety factor will be:

$$Q_{A_{-30}} = \frac{Q_s \times K_T}{FS} = 20.13 \text{ tons}$$

    (2) Example computation for a multilayered system in the "S" case using a single pile tip elevation -30.0 and a timber pile having a butt diameter of 12 inches and a tip diameter of 7 inches. This is a single point computation in a series to form a curve of pile tip elevation vs. pile capacity. This computation will use a 40 foot pile to extend from elevation +10.0 to -30.0.

    (a) Compute the overburden pressure as in Paragraph 1.a. The angle-of-internal friction ($\phi$) reduction factor is reduced by a factor given in Table 4-3 to obtain $\delta$ is taken as 1.0 as discussed in Paragraph 1.b.

EM 1110-2-2906
15 Jan 91

(b)  Compute Skin Friction "S" case.  Computations will be by layer due to material variations as follows:

$$Q_s = \sum_{i=1 \text{ to } N} f_{s_i} A_{s_i}$$

where:

$f_{s_i} = k s_u$

$s_u = \gamma' D \tan \phi + c$

Layer from elevation +10.0 to elevation 0.0 (clay)

Average pile diameter  $d = 7 + \dfrac{35(5)}{40} = 11.375$ inches

$\sigma'_v$ top of stratum = 0

$\sigma'_v$ bottom of stratum = 10' × 110 pcf = 1,100 psf

Average strength in clay  $s_u$

$s_u = \dfrac{0 + 1,100}{2} \tan 23° + 0 = 233.46$ psf

$f_s = k s_u = 233.46$ psf

Increment of skin friction

$\Delta Q_s = \pi \dfrac{11.375}{12} (10)(233.46) = 6,952.38$ pounds

Layer from elevation 0.0 to elevation −12.0 (silt)

Average pile diameter  $d = 7 + \dfrac{24(5)}{40} = 10.0$ inches

$\sigma'_v$ top of stratum = 10' × 110 pcf = 1,100 psf

D-23

Add190

EM 1110-2-2906
15 Jan 91

$\sigma_v'$ bottom of stratum = 10' × 110 pcf + 12' × 55 pcf = 1,760 psf

Average strength in silt   $s_u$

$$s_u = \frac{1100 + 1,760}{2} \tan 28° = 760.34 \text{ psf}$$

$f_s = ks_u = 760.34$ psf

Increment of skin friction

$$\Delta Q_s = \pi \frac{10.0}{12} (12)(760.34) = 23,886.84 \text{ pounds}$$

Layer from elevation -12.0 to elevation -20.0 (clay)

Average pile diameter   $d = 7 + \frac{23(5)}{40} = 9.875$ inches

$\sigma_v'$ top of stratum = 10' × 110 pcf + 12' × 55 pcf = 1,760 psf

$\sigma_v'$ bottom of stratum = 10' × 110 pcf + 12' × 55 pcf + 8' × 38 pcf

= 2,064 psf

Average strength in clay   $s_u$

$$s_u = \frac{1,760 + 2,064}{2} \tan 23° = 811.6 \text{ psf}$$

$f_s = ks_u = 811.6$ psf

Increment of skin friction

$$\Delta Q_s = \pi \frac{9.875}{12} (8)(811.6) = 16,785.67 \text{ pounds}$$

Layer from elevation -20.0 to elevation -30.0 (sand)

D-24

Add191

Average pile diameter  $d = 7 + \dfrac{5(5)}{40} = 7.625$  inches

$\sigma'_v$ top of stratum $= 10' \times 110$ pcf $+ 12' \times 55$ pcf $+ 8' \times 38$ pcf

$\qquad\qquad\qquad = 2,064$ psf

$\sigma'_v$ bottom of stratum $= 10' \times 110$ pcf $+ 12' \times 55$ pcf $+ 8' \times 38$ pcf $+ 10'$
$\qquad\qquad\qquad \times 60$ pcf $= 2,664$ psf

Average strength in sand  $s_u$

$$s_u = \dfrac{2,064 + 2,664}{2} \tan 30° = 1,364.86 \text{ psf}$$

$f_s = k s_u = 1,364.86$ psf

Increment of skin friction

$$\Delta Q_s = \pi \dfrac{7.625}{12} (10)(1,364.86) = 27,245.68 \text{ pounds}$$

$$Q_s = \sum_{i=1 \text{ to } N} \Delta Q_s = 74,870.57 \text{ pounds}$$

(c)  Compute end bearing in "S" case with the pile tip at elevation -30.0 using the following equations:

$$q = \sigma'_v N_q$$

$$Q_T = A_T q$$

where:

$N_q$ = Terzaghi's Bearing Capacity Chart at  $\phi = 30°$

$N_q = 18$

$\sigma'_v = 2,664$ psf (limit value greater than 10 feet)

EM 1110-2-2906
15 Jan 91

$$A_T = \pi \, \frac{7/12^2}{4} = 0.2672 \text{ sq ft}$$

$$Q_T = 0.2672(2,664)(18) = 12,812.77 \text{ pounds}$$

The allowable "S" case compression soil/pile load with the pile tip at elevation -30.0 and a safety factor of 2.0 will be:

$$Q_{A_{-30}} = \frac{Q_s + Q_T}{FS} = 21.92 \text{ tons}$$

The allowable "S" case tension soil/pile load with the pile tip at elevation -30.0 and a safety factor of 2.0 will be:

$$Q_{A_{-30}} = \frac{Q_s \times K_T}{FS} = 13.10 \text{ tons}$$

e. Computer programs are currently available to compute pile capacity, examples similar to those computed above are shown in Tables C1 through C4.

Add193

Table D-1

Computer Output for Allowable Design Loads
for Uniform Soft Clay Subgrade

---

* PILE CAPACITY COMPUTATIONS *


CASE I
TIMBER PILE
CLAY SUBGRADE


*************************
CLASS B  TIMBER PILE
*************************


PILE BUTT DIA. IS AT THE GROUND SURFACE FOR ALL TIP PENETRATIONS
PILE LENGTH USED IS FROM GROUND SURFACE TO TIP
TIMBER PILE DIM.: 12.0 IN.BUTT DIA.,  7.0 IN.TIP DIA.
TOP SURFACE ELEV.:,  10.0 FT.


**** Q-CASE ****
--------

| * STRATUM NUMBER | SOIL/SOIL FRIC.ANG DEG. | WEIGHT DENSITY LB/CU FT | TOP STRA COHESION LB/SQ FT | BOT STRA COHESION LB/SQ FT | COEF LAT EAR.PRES (KC) |
|---|---|---|---|---|---|
| 1 | 0.00 | 110.00 | 400.00 | 400.00 | 1.00 |
| 2 | 0.00 | 48.00 | 400.00 | 400.00 | 1.00 |
| 3 | 0.00 | 48.00 | 600.00 | 600.00 | 1.00 |
| 4 | 0.00 | 42.00 | 650.00 | 650.00 | 1.00 |
| 5 | 0.00 | 40.00 | 800.00 | 800.00 | 1.00 |
| 6 | 0.00 | 38.00 | 900.00 | 900.00 | 1.00 |


| * STRATUM NUMBER | COEF LAT EAR.PRES (KT) | TERZAGHI BEAR.CAP. (NC) | TERZAGHI BEAR.CAP. (NQ) | BOTTOM ELEVATION FEET | SOIL/PILE FRIC.ANG. DEG. | SOIL TYPE |
|---|---|---|---|---|---|---|
| 1 | 0.70 | 9.00 | 1.00 | 0.00 | | CH |
| 2 | 0.70 | 9.00 | 1.00 | -5.00 | | CH |
| 3 | 0.70 | 9.00 | 1.00 | -15.00 | | CH |
| 4 | 0.70 | 9.00 | 1.00 | -20.00 | | CH |
| 5 | 0.70 | 9.00 | 1.00 | -30.00 | | CH |
| 6 | 0.70 | 9.00 | 1.00 | -60.00 | | CH |


(Continued)

EM 1110-2-2906
15 Jan 91

Table D-1 (Continued)

| STRAT *NUM * | EL.TIP (FT) | COH/ADH. RESISTAN TONS | FRICTION COMPRESS TONS | RESISTAN TENSION TONS | END BEARING TONS | PILE CAPAC IN COMPRS. TONS | PILE CAPAC IN TENSION TONS |
|---|---|---|---|---|---|---|---|
| 1 | 5.000 | 2.487 | 0.000 | 0.000 | 0.555 | 3.042 | 2.487 |
| 1 | 0.000 | 4.974 | 0.000 | 0.000 | 0.628 | 5.602 | 4.974 |
| 2 | 0.000 | | | | 0.628 | 5.602 | 4.974 |
| 2 | -2.500 | 6.218 | 0.000 | 0.000 | 0.644 | 6.862 | 6.218 |
| 2 | -5.000 | 7.461 | 0.000 | 0.000 | 0.660 | 8.121 | 7.461 |
| 3 | -5.000 | | | | 0.901 | 8.362 | 7.461 |
| 3 | -10.000 | 10.946 | 0.000 | 0.000 | 0.901 | 11.847 | 10.946 |
| 3 | -15.000 | 14.530 | 0.000 | 0.000 | 0.901 | 15.431 | 14.530 |
| 4 | -15.000 | | | | 0.961 | 15.491 | 14.530 |
| 4 | -17.500 | 16.460 | 0.000 | 0.000 | 0.961 | 17.421 | 16.460 |
| 4 | -20.000 | 18.405 | 0.000 | 0.000 | 0.961 | 19.366 | 18.405 |
| 5 | -20.000 | | | | 1.141 | 19.546 | 18.405 |
| 5 | -25.000 | 23.050 | 0.000 | 0.000 | 1.141 | 24.191 | 23.050 |
| 5 | -30.000 | 27.777 | 0.000 | 0.000 | 1.141 | 28.918 | 27.777 |
| 6 | -30.000 | | | | 1.261 | 29.039 | 27.777 |
| 6 | -45.000 | 43.737 | 0.000 | 0.000 | 1.261 | 44.998 | 43.737 |
| 6 | -60.000 | 60.051 | 0.000 | 0.000 | 1.261 | 61.313 | 60.051 |

#### **** MODIFIED S-CASE ****
------------------

| * * * STRATUM NUMBER | SOIL/SOIL FRIC.ANG DEG. | WEIGHT DENSITY LB/CU FT | TOP STRA COHESION LB/SQ FT | BOT STRA COHESION LB/SQ FT | COEF LAT EAR.PRES (KC) |
|---|---|---|---|---|---|
| 1 | 23.00 | 110.00 | 0.00 | 0.00 | 1.00 |
| 2 | 23.00 | 48.00 | 0.00 | 0.00 | 1.00 |
| 3 | 23.00 | 48.00 | 0.00 | 0.00 | 1.00 |
| 4 | 23.00 | 42.00 | 0.00 | 0.00 | 1.00 |
| 5 | 23.00 | 40.00 | 0.00 | 0.00 | 1.00 |
| 6 | 23.00 | 38.00 | 0.00 | 0.00 | 1.00 |

| * * * STRATUM NUMBER | COEF LAT EAR.PRES (KT) | TERZAGHI BEAR.CAP. (NC) | TERZAGHI BEAR.CAP. (NQ) | BOTTOM ELEVATION FEET | SOIL/PILE FRIC.ANG. DEG. | SOIL TYPE |
|---|---|---|---|---|---|---|
| 1 | 0.70 | 0.00 | 10.00 | 0.00 | | CH |
| 2 | 0.70 | 0.00 | 10.00 | -5.00 | | CH |
| 3 | 0.70 | 0.00 | 10.00 | -15.00 | | CH |
| 4 | 0.70 | 0.00 | 10.00 | -20.00 | | CH |
| 5 | 0.70 | 0.00 | 10.00 | -30.00 | | CH |
| 6 | 0.70 | 0.00 | 10.00 | -60.00 | | CH |

(Continued)

Add195

EM 1110-2-2906
15 Jan 91

Table D-1 (Concluded)

| STRAT *NUM * | EL.TIP (FT) | COH/ADH. RESISTAN TONS | FRICTION COMPRESS TONS | RESISTAN TENSION TONS | END BEARING TONS | PILE CAPAC IN COMPRS. TONS | PILE CAPAC IN TENSION TONS |
|---|---|---|---|---|---|---|---|
| 1 | 5.000 | 0.000 | 0.726 | 0.508 | 0.735 | 1.461 | 0.508 |
| 1 | 0.000 | 0.000 | 2.903 | 2.032 | 1.470 | 4.373 | 2.032 |
| 2 | 0.000 | | | | 1.470 | 4.373 | 2.032 |
| 2 | -2.500 | 0.000 | 4.265 | 2.985 | 1.630 | 5.895 | 2.985 |
| 2 | -5.000 | 0.000 | 5.813 | 4.069 | 1.791 | 7.603 | 4.069 |
| 3 | -5.000 | | | | 1.791 | 7.603 | 4.069 |
| 3 | -10.000 | 0.000 | 9.132 | 6.392 | 1.791 | 10.922 | 6.392 |
| 3 | -15.000 | 0.000 | 12.538 | 8.777 | 1.791 | 14.329 | 8.777 |
| 4 | -15.000 | | | | 1.791 | 14.329 | 8.777 |
| 4 | -17.500 | 0.000 | 14.259 | 9.981 | 1.791 | 16.049 | 9.981 |
| 4 | -20.000 | 0.000 | 15.988 | 11.191 | 1.791 | 17.778 | 11.191 |
| 5 | -20.000 | | | | 1.791 | 17.778 | 11.191 |
| 5 | -25.000 | 0.000 | 19.462 | 13.623 | 1.791 | 21.253 | 13.623 |
| 5 | -30.000 | 0.000 | 22.952 | 16.066 | 1.791 | 24.743 | 16.066 |
| 6 | -30.000 | | | | 1.791 | 24.743 | 16.066 |
| 6 | -45.000 | 0.000 | 33.473 | 23.431 | 1.791 | 35.263 | 23.431 |
| 6 | -60.000 | 0.000 | 44.032 | 30.822 | 1.791 | 45.822 | 30.822 |

* RUN COMPLETED *  1 TON = 2000 LBS.

Add196

S-CASE
CH,CL- Φ=23°
ML- Φ=28°
SM,SP- Φ=30°

TYPICAL SOIL PROFILE

SOIL STRATIFICATION IS BASED ON GEOLOGIC PROFILE

SHEAR STRENGTH AND WET DENSITIES SEE PLATE

SECOND ORDER STATIONS

NOTES:
$K_H$ = $\alpha K_1/B$=(0.2222 au/B)(C)(D) COHESIVE
$\alpha$ = 0.4 = Factor of material properties of soil and pile
k1 = Modulus of subgrade reaction for test plate (pci)
B1 = Width or diameter of test plate (in.)
K1 = k1B1 = 80 au (psf) = 0.5556 au(psi)
au = 2 · c = Unconfined compressive strength (psf)
C = Reduction for cyclic loading—not applicable
D = Group effect reduction factor
B = Width of pile measured at right angles to the direction of displacement (in.)
$K_H$ = (nh)(Z/B)(C)(D) COHESIONLESS
nh = Coefficient of horizontal subgrade reaction (pci)
Z = Depth below equivalent ground surface (in.)

Figure D-1. Soil pressure and allowable design loads for uniform soft clay subgrade (Continued)

EM 1110-2-2906
15 Jan 91



THE FACTOR SHOWN, (MODULUS OF HORIZONTAL
SUBGRADE $K_h$, TIMES THE PILE WIDTH IN
INCHES (B), MEASURED AT RIGHT ANGLES TO
THE DIRECTION OF DISPLACEMENT) MUST
BE MODIFIED BY A REDUCTION FACTOR FOR
THE EFFECT OF GROUP ACTION (G) AND A
REDUCTION FACTOR FOR CYCLIC LOADING
(C) EX: $K_h = \frac{0.2222 \cdot_u (C)(D)}{(B)}$

Figure D-1. (Concluded)

Add198

Table D-2

Computer Output for Allowable Design Loads for
Uniform Medium Density Sand Subgrade, Run 1

---

* PILE CAPACITY COMPUTATIONS *

CASE II
TIMBER PILE
SAND SUBGRADE

************************
CLASS B   TIMBER PILE
************************

PILE BUTT DIA. IS AT THE GROUND SURFACE FOR ALL TIP PENETRATIONS
PILE LENGTH USED IS FROM GROUND SURFACE TO TIP
TIMBER PILE DIM.: 12.0 IN.BUTT DIA.,   7.0 IN.TIP DIA.
TOP SURFACE ELEV.:,   10.0 FT.

**** Q-CASE ****
--------

| * STRATUM * NUMBER * | SOIL/SOIL FRIC.ANG. DEG. | WEIGHT DENSITY LB/CU FT | TOP STRA COHESION LB/SQ FT | BOT STRA COHESION LB/SQ FT | COEF LAT EAR.PRES (KC) |
|---|---|---|---|---|---|
| 1 | 30.00 | 122.00 | 0.00 | 0.00 | 1.00 |
| 2 | 30.00 | 60.00 | 0.00 | 0.00 | 1.00 |
| 3 | 30.00 | 60.00 | 0.00 | 0.00 | 1.00 |
| 4 | 30.00 | 60.00 | 0.00 | 0.00 | 1.00 |

| * STRATUM * NUMBER * | COEF LAT EAR.PRES (KT) | TERZAGHI BEAR.CAP. (NC) | TERZAGHI BEAR.CAP. (NQ) | BOTTOM ELEVATION FEET | SOIL/PILE FRIC.ANG. DEG. | SOIL TYPE |
|---|---|---|---|---|---|---|
| 1 | 0.70 | 9.00 | 18.00 | 0.00 | | SP |
| 2 | 0.70 | 9.00 | 18.00 | -5.00 | | SP |
| 3 | 0.70 | 9.00 | 18.00 | -30.00 | | SP |
| 4 | 0.70 | 9.00 | 18.00 | -60.00 | | SP |

(Continued)

D-32

Add199

Table D-2 (Continued)

| STRAT CAPAC *NUM TENSION * TONS | EL.TIP (FT) | COH/ADH. RESISTAN | FRICTION COMPRESS TONS | RESISTAN TENSION TONS | END BEARING TONS | PILE CAPAC IN COMPRS. TONS | PILE IN TONS |
|---|---|---|---|---|---|---|---|
| 1 | 5.000 | 0.000 | 1.095 | 0.766 | 1.467 | 2.562 | 0.766 |
| 1 | 0.000 | 0.000 | 4.380 | 3.066 | 2.934 | 7.314 | 3.066 |
| 2 | 0.000 | | | | 2.934 | 7.314 | 3.066 |
| 2 | -2.500 | 0.000 | 6.445 | 4.512 | 3.295 | 9.740 | 4.512 |
| 2 | -5.000 | 0.000 | 8.819 | 6.173 | 3.656 | 12.475 | 6.173 |
| 3 | -5.000 | | | | 3.656 | 12.475 | 6.173 |
| 3 | -17.500 | 0.000 | 21.832 | 15.282 | 3.656 | 25.488 | 15.282 |
| 3 | -30.000 | 0.000 | 35.238 | 24.666 | 3.656 | 38.894 | 24.666 |
| 4 | -30.000 | | | | 3.656 | 38.894 | 24.666 |
| 4 | -45.000 | 0.000 | 51.466 | 36.026 | 3.656 | 55.122 | 36.026 |
| 4 | -60.000 | 0.000 | 67.754 | 47.428 | 3.656 | 71.410 | 47.428 |

**** MODIFIED S-CASE ****
-----------------

| * STRATUM * NUMBER * | SOIL/SOIL FRIC.ANG DEG. | WEIGHT DENSITY LB/CU FT | TOP STRA COHESION LB/SQ FT | BOT STRA COHESION LB/SQ FT | COEF LAT EAR.PRES (KC) |
|---|---|---|---|---|---|
| 1 | 30.00 | 122.00 | 0.00 | 0.00 | 1.00 |
| 2 | 30.00 | 60.00 | 0.00 | 0.00 | 1.00 |
| 3 | 30.00 | 60.00 | 0.00 | 0.00 | 1.00 |
| 4 | 30.00 | 60.00 | 0.00 | 0.00 | 1.00 |

| * STRATUM * NUMBER * | COEF LAT EAR.PRES (KT) | TERZAGHI BEAR.CAP. (NC) | TERZAGHI BEAR.CAP. (NQ) | BOTTOM ELEVATION FEET | SOIL/PILE FRIC.ANG. DEG. | SOIL TYPE |
|---|---|---|---|---|---|---|
| 1 | 0.70 | 0.00 | 10.00 | 0.00 | | SP |
| 2 | 0.70 | 0.00 | 10.00 | -5.00 | | SP |
| 3 | 0.70 | 0.00 | 10.00 | -30.00 | | SP |
| 4 | 0.70 | 0.00 | 10.00 | -60.00 | | SP |

(Continued)

D-33

Add200

EM 1110-2-2906
15 Jan 91

Table D-2 (Concluded)

| STRAT CAPAC *NUM TENSION TONS | EL.TIP (FT) * | COH/ADH. RESISTAN | FRICTION COMPRESS TONS | RESISTAN TENSION TONS | END BEARING TONS | PILE CAPAC IN COMPRS. TONS | PILE IN TONS |
|---|---|---|---|---|---|---|---|
| 1 | 5.000 | 0.000 | 1.095 | 0.766 | 0.815 | 1.910 | 0.766 |
| 1 | 0.000 | 0.000 | 4.380 | 3.066 | 1.630 | 6.010 | 3.066 |
| 2 | 0.000 | | | | 1.630 | 6.010 | 3.066 |
| 2 | -2.500 | 0.000 | 6.445 | 4.512 | 1.831 | 8.276 | 4.512 |
| 2 | -5.000 | 0.000 | 8.819 | 6.173 | 2.031 | 10.850 | 6.173 |
| 3 | -5.000 | | | | 2.031 | 10.850 | 6.173 |
| 3 | -17.500 | 0.000 | 21.832 | 15.282 | 2.031 | 23.863 | 15.282 |
| 3 | -30.000 | 0.000 | 35.238 | 24.666 | 2.031 | 37.269 | 24.666 |
| 4 | -30.000 | | | | 2.031 | 37.269 | 24.666 |
| 4 | -45.000 | 0.000 | 51.466 | 36.026 | 2.031 | 53.497 | 36.026 |
| 4 | -60.000 | 0.000 | 67.754 | 47.428 | 2.031 | 69.786 | 47.428 |

* RUN COMPLETED *   1 TON = 2000 LBS.

Add201

S-CASE
CH.CL- Φ=23°
ML- Φ=28°
SM.SP- Φ=30°

TYPICAL SOIL PROFILE

SOIL STRATIFICATION IS BASED ON GEOLOGIC PROFILE

SHEAR STRENGTH AND WET DENSITIES SEE PLATE

SECOND ORDER STATIONS

NOTES:

KH = αK1/B=(0.2222 au/B)(C)(D) COHESIVE
α = 0.4 = Factor of material properties of soil and pile
k1 = Modulus of subgrade reaction for test plate (pci)
B1 = Width or diameter of test plate (in.)
K1 = k1B1 = 80 au (psf) = 0.5556 au(psi)
au = 2 · c = Unconfined compressive strength (psf)
C = Reduction for cyclic loading—not applicable
D = Group effect reduction factor
B = Width of pile measured at right angles to the direction of displacement (in.)
KH = (nh)(Z/B)(C)(D) COHESIONLESS
nh = Coefficient of horizontal subgrade reaction (pci)
Z = Depth below equivalent ground surface (in.)

Figure D-2. Soil pressure and allowable design loads for uniform medium density sand subgrade (Continued)

EM 1110-2-2906
15 Jan 91



Figure D-2. (Concluded)

Add203

EM 1110-2-2906
15 Jan 91

Table D-3

Computer Output for Allowable Design Loads
for Uniform Silt Subgrade, Run 2

---

* PILE CAPACITY COMPUTATIONS *

CASE III
TIMBER PILE

************************
CLASS B   TIMBER PILE
************************

PILE BUTT DIA. IS AT THE GROUND SURFACE FOR ALL TIP PENETRATIONS
PILE LENGTH USED IS FROM GROUND SURFACE TO TIP
TIMBER PILE DIM.: 12.0 IN.BUTT DIA.,  7.0 IN.TIP DIA.
TOP SURFACE ELEV.:,  10.0 FT.

**** Q-CASE ****
---------

| * STRATUM NUMBER | SOIL/SOIL FRIC.ANG DEG. | WEIGHT DENSITY LB/CU FT | TOP STRA COHESION LB/SQ FT | BOT STRA COHESION LB/SQ FT | COEF LAT EAR.PRES (KC) |
|---|---|---|---|---|---|
| 1 | 15.00 | 117.00 | 200.00 | 200.00 | 1.00 |
| 2 | 15.00 | 55.00 | 200.00 | 200.00 | 1.00 |
| 3 | 15.00 | 55.00 | 200.00 | 200.00 | 1.00 |
| 4 | 15.00 | 55.00 | 200.00 | 200.00 | 1.00 |

| * STRATUM NUMBER | COEF LAT EAR.PRES (KT) | TERZAGHI BEAR.CAP. (NC) | TERZAGHI BEAR.CAP. (NQ) | BOTTOM ELEVATION FEET | SOIL/PILE FRIC.ANG. DEG. | SOIL TYPE |
|---|---|---|---|---|---|---|
| 1 | 0.70 | 9.00 | 4.00 | 0.00 | | ML |
| 2 | 0.70 | 9.00 | 4.00 | -5.00 | | ML |
| 3 | 0.70 | 9.00 | 4.00 | -30.00 | | ML |
| 4 | 0.70 | 9.00 | 4.00 | -60.00 | | ML |

| STRAT *NUM | EL.TIP (FT) | COH./ADH. RESISTAN TONS | FRICTION COMPRESS TONS | RESISTAN TENSION TONS | END BEARING TONS | PILE CAPAC IN COMPRS. TONS | PILE CAPAC IN TENSION TONS |
|---|---|---|---|---|---|---|---|
| 1 | 5.000 | 1.244 | 0.487 | 0.341 | 0.553 | 2.284 | 1.585 |
| 1 | 0.000 | 2.487 | 1.949 | 1.364 | 0.866 | 5.302 | 3.852 |
| 2 | 0.000 | | | | 0.866 | 5.302 | 3.852 |
| 2 | -2.500 | 3.109 | 2.867 | 2.007 | 0.939 | 6.915 | 5.115 |
| 2 | -5.000 | 3.731 | 3.916 | 2.742 | 1.013 | 8.660 | 6.472 |
| 3 | -5.000 | | | | 1.013 | 8.660 | 6.472 |
| 3 | -17.500 | 6.840 | 9.661 | 6.763 | 1.013 | 17.513 | 13.602 |
| 3 | -30.000 | 9.948 | 15.577 | 10.904 | 1.013 | 26.538 | 20.852 |
| 4 | -30.000 | | | | 1.013 | 26.538 | 20.852 |
| 4 | -45.000 | 13.679 | 22.737 | 15.916 | 1.013 | 37.429 | 29.595 |
| 4 | -60.000 | 17.410 | 29.924 | 20.947 | 1.013 | 48.347 | 38.357 |

(Continued)

Add204

EM 1110-2-2906
15 Jan 91

Table D-3 (Concluded)

---

**** MODIFIED S-CASE ****
------------------

| * STRATUM | SOIL/SOIL | WEIGHT | TOP STRA | BOT STRA | COEF LAT |
| * NUMBER | FRIC.ANG | DENSITY | COHESION | COHESION | EAR.PRES |
| * | DEG. | LB/CU FT | LB/SQ FT | LB/SQ FT | (KC) |
| 1 | 28.00 | 117.00 | 0.00 | 0.00 | 1.00 |
| 2 | 28.00 | 55.00 | 0.00 | 0.00 | 1.00 |
| 3 | 28.00 | 55.00 | 0.00 | 0.00 | 1.00 |
| 4 | 28.00 | 55.00 | 0.00 | 0.00 | 1.00 |

| * STRATUM | COEF LAT | TERZAGHI | TERZAGHI | BOTTOM | SOIL/PILE | SOIL |
| * NUMBER | EAR.PRES | BEAR.CAP. | BEAR.CAP. | ELEVATION | FRIC.ANG. | TYPE |
| * | (KT) | (NC) | (NQ) | FEET | DEG. | |
| 1 | 0.70 | 0.00 | 10.00 | 0.00 | | ML |
| 2 | 0.70 | 0.00 | 10.00 | -5.00 | | ML |
| 3 | 0.70 | 0.00 | 10.00 | -30.00 | | ML |
| 4 | 0.70 | 0.00 | 10.00 | -60.00 | | ML |

| STRAT *NUM | EL.TIP (FT) | COH/ADH. RESISTAN TONS | FRICTION COMPRESS TONS | RESISTAN TENSION TONS | END BEARING TONS | PILE CAPAC IN COMPRS. TONS | PILE CAPAC IN TENSION TONS |
|---|---|---|---|---|---|---|---|
| 1 | 5.000 | 0.000 | 0.967 | 0.677 | 0.782 | 1.749 | 0.677 |
| 1 | 0.000 | 0.000 | 3.868 | 2.708 | 1.563 | 5.431 | 2.708 |
| 2 | 0.000 | | | | 1.563 | 5.431 | 2.708 |
| 2 | -2.500 | 0.000 | 5.688 | 3.982 | 1.747 | 7.435 | 3.982 |
| 2 | -5.000 | 0.000 | 7.772 | 5.440 | 1.931 | 9.703 | 5.440 |
| 3 | -5.000 | | | | 1.931 | 9.703 | 5.440 |
| 3 | -17.500 | 0.000 | 19.171 | 13.419 | 1.931 | 21.101 | 13.419 |
| 3 | -30.000 | 0.000 | 30.910 | 21.637 | 1.931 | 32.840 | 21.637 |
| 4 | -30.000 | | | | 1.931 | 32.840 | 21.637 |
| 4 | -45.000 | 0.000 | 45.119 | 31.583 | 1.931 | 47.050 | 31.583 |
| 4 | -60.000 | 0.000 | 59.380 | 41.566 | 1.931 | 61.311 | 41.566 |

* RUN COMPLETED *  1 TON = 2000 LBS.

Add205



Figure D-3.  Soil pressure and allowable design loads for uniform silt subgrade (Continued)

EM 1110-2-2906
15 Jan 91

Add206

EM 1110-2-2906
15 Jan 91



Figure D-3.   (Concluded)

Add207

EM 1110-2-2906
15 Jan 91

Table D-4

Computer Output for Allowable Design Loads for
Layered Clay, Silt, and Sand Subgrade, Run 3

---

### * PILE CAPACITY COMPUTATIONS *

CASE IV
TIMBER PILE
INTERBEDDED SOILS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
CLASS B   TIMBER PILE
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PILE BUTT DIA. IS AT THE GROUND SURFACE FOR ALL TIP PENETRATIONS
PILE LENGTH USED IS FROM GROUND SURFACE TO TIP
TIMBER PILE DIM.: 12.0 IN.BUTT DIA., 7.0 IN.TIP DIA.
TOP SURFACE ELEV.:, 10.0 FT.

\*\*\*\*  Q-CASE  \*\*\*\*
--------

| * STRATUM | SOIL/SOIL | WEIGHT | TOP STRA | BOT STRA | COEF LAT |
| * NUMBER | FRIC.ANG | DENSITY | COHESION | COHESION | EAR.PRES |
| * | DEG. | LB/CU FT | LB/SQ FT | LB/SQ FT | (KC) |
| 1 | 0.00 | 110.00 | 400.00 | 400.00 | 1.00 |
| 2 | 15.00 | 55.00 | 200.00 | 200.00 | 1.00 |
| 3 | 15.00 | 55.00 | 200.00 | 200.00 | 1.00 |
| 4 | 0.00 | 38.00 | 600.00 | 600.00 | 1.00 |
| 5 | 30.00 | 60.00 | 0.00 | 0.00 | 1.00 |

| * STRATUM | COEF LAT | TERZAGHI | TERZAGHI | BOTTOM | SOIL/PILE | SOIL |
| * NUMBER | EAR.PRES | BEAR.CAP. | BEAR.CAP. | ELEVATION | FRIC.ANG. | TYPE |
| * | (KT) | (NC) | (NQ) | FEET | DEG. | |
| 1 | 0.70 | 9.00 | 1.00 | 0.00 | | CH |
| 2 | 0.70 | 9.00 | 4.00 | -5.00 | | ML |
| 3 | 0.70 | 9.00 | 4.00 | -12.00 | | ML |
| 4 | 0.70 | 9.00 | 1.00 | -20.00 | | CH |
| 5 | 0.70 | 9.00 | 18.00 | -60.00 | | SP |

(Continued)

Add208

EM 1110-2-2906
15 Jan 91

Table D-4 (Continued)

| STRAT *NUM TENSION * TONS | EL.TIP (FT) | COH/ADH. RESISTAN | FRICTION COMPRESS TONS | RESISTAN TENSION TONS | END BEARING TONS | PILE CAPAC IN COMPRS. TONS | PILE CAPAC IN TONS |
|---|---|---|---|---|---|---|---|
| 1 | 5.000 | 2.487 | 0.000 | 0.000 | 0.555 | 3.042 | 2.487 |
| 1 | 0.000 | 4.974 | 0.000 | 0.000 | 0.628 | 5.602 | 4.974 |
| 2 | 0.000 | | | | 0.828 | 5.803 | 4.974 |
| 2 | -2.500 | 5.727 | 0.769 | 0.538 | 0.902 | 7.397 | 6.265 |
| 2 | -5.000 | 6.436 | 1.700 | 1.190 | 0.975 | 9.111 | 7.626 |
| 3 | -5.000 | | | | 0.975 | 9.111 | 7.626 |
| 3 | -8.500 | 7.389 | 3.132 | 2.193 | 0.975 | 11.497 | 9.582 |
| 3 | -12.000 | 8.316 | 4.619 | 3.234 | 0.975 | 13.911 | 11.549 |
| 4 | -12.000 | | | | 0.905 | 13.840 | 11.549 |
| 4 | -16.000 | 10.903 | 4.933 | 3.453 | 0.905 | 16.741 | 14.356 |
| 4 | -20.000 | 13.596 | 5.162 | 3.614 | 0.905 | 19.664 | 17.210 |
| 5 | -20.000 | | | | 3.307 | 22.066 | 17.210 |
| 5 | -40.000 | 15.195 | 22.386 | 15.670 | 3.307 | 40.888 | 30.865 |
| 5 | -60.000 | 15.880 | 41.050 | 28.735 | 3.307 | 60.237 | 44.615 |

**** MODIFIED S-CASE ****
------------------

| * * * STRATUM NUMBER | SOIL/SOIL FRIC.ANG DEG. | WEIGHT DENSITY LB/CU FT | TOP STRA COHESION LB/SQ FT | BOT STRA COHESION LB/SQ FT | COEF LAT EAR.PRES (KC) |
|---|---|---|---|---|---|
| 1 | 23.00 | 110.00 | 0.00 | 0.00 | 1.00 |
| 2 | 28.00 | 55.00 | 0.00 | 0.00 | 1.00 |
| 3 | 28.00 | 55.00 | 0.00 | 0.00 | 1.00 |
| 4 | 23.00 | 38.00 | 0.00 | 0.00 | 1.00 |
| 5 | 30.00 | 60.00 | 0.00 | 0.00 | 1.00 |

| * * * STRATUM NUMBER | COEF LAT EAR.PRES (KT) | TERZAGHI BEAR.CAP. (NC) | TERZAGHI BEAR.CAP. (NQ) | BOTTOM ELEVATION FEET | SOIL/PILE FRIC.ANG. DEG. | SOIL TYPE |
|---|---|---|---|---|---|---|
| 1 | 0.70 | 0.00 | 10.00 | 0.00 | | CH |
| 2 | 0.70 | 0.00 | 10.00 | -5.00 | | ML |
| 3 | 0.70 | 0.00 | 10.00 | -12.00 | | ML |
| 4 | 0.70 | 0.00 | 10.00 | -20.00 | | CH |
| 5 | 0.70 | 0.00 | 10.00 | -60.00 | | SP |

(Continued)

EM 1110-2-2906
15 Jan 91

Table D-4 (Concluded)

| STRAT *NUM TENSION TONS | EL.TIP (FT) | COH/ADH. RESISTAN | FRICTION COMPRESS TONS | RESISTAN TENSION TONS | END BEARING TONS | PILE CAPAC IN COMPRS. TONS | PILE IN TONS |
|---|---|---|---|---|---|---|---|
| 1 | 5.000 | 0.000 | 0.726 | 0.508 | 0.735 | 1.461 | 0.508 |
| 1 | 0.000 | 0.000 | 2.903 | 2.032 | 1.470 | 4.373 | 2.032 |
| 2 | 0.000 | | | | 1.470 | 4.373 | 2.032 |
| 2 | -2.500 | 0.000 | 4.581 | 3.207 | 1.654 | 6.235 | 3.207 |
| 2 | -5.000 | 0.000 | 6.531 | 4.572 | 1.837 | 8.369 | 4.572 |
| 3 | -5.000 | | | | 1.837 | 8.369 | 4.572 |
| 3 | -8.500 | 0.000 | 9.470 | 6.629 | 1.837 | 11.308 | 6.629 |
| 3 | -12.000 | 0.000 | 12.487 | 8.741 | 1.837 | 14.324 | 8.741 |
| 4 | -12.000 | | | | 1.837 | 14.324 | 8.741 |
| 4 | -16.000 | 0.000 | 15.418 | 10.793 | 1.837 | 17.256 | 10.793 |
| 4 | -20.000 | 0.000 | 18.342 | 12.840 | 1.837 | 20.180 | 12.840 |
| 5 | -20.000 | | | | 1.837 | 20.180 | 12.840 |
| 5 | -40.000 | 0.000 | 37.315 | 26.121 | 1.837 | 39.153 | 26.121 |
| 5 | -60.000 | 0.000 | 56.729 | 39.710 | 1.837 | 58.566 | 39.710 |

* RUN COMPLETED *  1 TON = 2000 LBS.

EM 1110-2-2906
15 Jan 91



Figure D-4. Soil pressure and allowable design loads for
layered clay, silt, and sand subgrade (Continued)

D-44

EM 1110-2-2906
15 Jan 91



Figure D-4. (Concluded)

Add212

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 23rd day of April 2014, I served via the Court's

electronic filing system, the foregoing **Appellant-Petitioner's Corrected Initial**

**Brief** on the following individuals:

> Devin A. Wolak
> U.S. Department of Justice
> Commercial Litigation Branch
> Civil Division
> Attn:  Classification Unit
> P.O. Box 480
> Ben Franklin Station
> Washington, D.C.  20044
> (202) 616-0170
> (202) 305-7643 – fax
> email: Devin.Wolak@usdoj.gov

> Counsel for Appellee-Respondent

<div align="right">

s/*Karl F. Dix, Jr.*
Karl F. Dix, Jr.

</div>

## CERTIFICATE OF COMPLIANCE

PURSUANT TO FED. R. APP. 32(a)(7)(C)
for Case No. 2014-1228

I certify that pursuant to Fed. R. App. P. 32(a)(7) (C), the attached principal brief of Appellant-Petitioner is proportionately spaced, has a typeface of 14 points or more and contains 13,985 words.

By: *Karl F. Dix, Jr.*

Karl F. Dix, Jr.
SMITH, CURRIE & HANCOCK LLP
2700 Marquis One Tower
245 Peachtree Center Avenue NE
Atlanta, GA 30303-1227
(404) 582-8038
(404) 668-0671 –fax
email: kfdix@smithcurrie.com

Counsel for Appellant-Petitioner

Dated:   April 18, 2014